UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X
                                         :

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, :
et al.,                                          :

                               Plaintiffs,    :

                                           :

               -v-                           :

KARTRI SALES COMPANY, INC., et al.,       :

                                         :

                               Defendants.   :

                                         :
-------------------------------------------------------------------------X

15 Civ. 10154 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

       Plaintiffs Focus Products Group International, LLC, Zahner Design Group, Ltd.,

Hookless Systems of North America, Inc., SF Home Décor, LLC, Sure Fit Home Décor

Holdings Corp., and Sure Fit Home Products, LLC (collectively, "Focus") bring this action

against defendants Kartri Sales Company, Inc. ("Kartri") and Marquis Mills, International, Inc.

("Marquis") alleging, *inter alia*, infringement of three utility patents and a design patent.

       In connection with these claims, the parties have asked this Court to construe several

disputed terms of the patents-in-suit. The Court held a *Markman* hearing in this action on July

26, 2018. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Court's

constructions of the disputed terms are set forth below.

**I.      Background**

      **A.     Factual Background**

1

There are four patents at issue in this case. Each concerns shower curtains. The three utility patents are U.S. Patent Nos. 6,494,248 B1 (the "'248 Patent"),[1] 7,296,609 B2 (the "'609 Patent"), and 8,235,088 B2 (the "'088 Patent"). Because these patents are "related," in the sense that they derive from a common patent application, they share common specifications and figures. The design patent is U.S. Design Patent No. D746,078 (the "Design Patent").

The parties nominally dispute 18 of the claim terms appearing in these patents. *See* Dkt. 162-1. As explained below, however, the scope of the parties' disagreement has narrowed, such that only 14 terms remain in dispute.

### B. Procedural History

On December 30, 2015, Focus filed its initial complaint against Kartri. Dkt. 1. On March 1, 2016, following Kartri's motion to dismiss, Dkt. 15, Focus amended its complaint to add Marquis as a defendant, Dkt. 20. After each defendant moved to dismiss, Dkts. 27, 35, Focus filed another amended complaint to amend its allegations against Marquis, Dkt. 47. After Marquis moved to dismiss that complaint, Dkt. 55, on July 14, 2016, the Court issued a bench decision denying the motions to dismiss, *see* Dkt. 63. Following discovery, on September 29, 2017, Focus filed the Fourth Amended Complaint, which is now operative. Dkt. 148.[2]

On November 22, 2017, the parties filed an amended joint claim terms chart. Dkt. 162.[3] On December 22, 2017, Focus filed its opening *Markman* brief. Dkt. 169 ("Focus Br."). On

---

[1] On August 29, 2017, the Patent and Trademark Office ("PTO") issued an *ex parte* reexamination certificate amending the '248 Patent. *See* U.S. Patent No. 6,494,248 C1 (the "Amended '248 Patent").

[2] Kartri later filed a motion to dismiss or transfer on the basis of improper venue. Dkt. 149. The Court denied the motion on the record of a December 21, 2017 conference. *See* Dkt. 170.

[3] The parties had filed their original joint claim terms chart on July 7, 2017. Dkt. 124.

January 22, 2018, Kartri and Marquis each filed responsive *Markman* briefs. Dkts. 173 ("Kartri Br."), 174 ("Marquis Br."). On February 5, 2018, Focus filed two reply briefs. Dkts. 177, 179. On February 9, 2018, Marquis filed a letter motion seeking leave to file an attached sur-reply. Dkt. 181. On February 14, 2018, Focus filed a letter consenting to Marquis' application on the condition that the Court also consider Focus's responsive letter brief. Dkt. 182. Although the Court had not commissioned these supplemental submissions, it has found them useful and considered them accordingly.

On July 26, 2018, the Court held a *Markman* hearing. *See* Dkt. 193 ("Tr.").

## II.     Applicable Law

Claim construction is an issue of law properly decided by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). In construing a patent, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

To determine the meaning of the claims, courts look "first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1313–14; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). Where an analysis of the intrinsic evidence fails to resolve some ambiguity in a disputed claim, the Court may then turn to extrinsic evidence, *Vitronics*, 90 F.3d at 1583, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," *Markman*, 52 F.3d at 980.

Subject to certain exceptions discussed below, there is a "heavy presumption" that each claim term should be construed according to its ordinary and customary meaning, as understood by a person of ordinary skill in the art in question at the time of the invention (a "POSITA"). *Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016) (quotation marks omitted); *see also Phillips*, 415 F.3d at 1312–13. In certain cases, "the ordinary meaning of claim language as understood by a [POSITA is] readily apparent even to lay judges, and claim construction [therefore] involves little more than the application of the widely accepted meaning of commonly understood words." *See Phillips*, 415 F.3d at 1314. The parties, who have not adduced any expert testimony, agree that this is such a case. *See* Tr. 3–4. Accordingly, the Court has construed the disputed terms from the familiar perspective of a lay judge.

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). "Absent implied or explicit lexicography or disavowal," the plain meaning of the claim terms governs. *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 n.2 (Fed. Cir. 2016).

The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309. As to lexicography, it is well settled that "patentees may choose their own descriptive terms as long as those terms adequately divulge a reasonably clear meaning to one of

skill in the art." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1375 (Fed. Cir. 1999). But to act as his or her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *GE Lighting Sols.*, 750 F.3d at 1309 (quoting *Thorner*, 669 F.3d at 1365). Likewise, "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature. Ambiguous language cannot support disavowal." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citations omitted), *cert. denied*, 137 S. Ct. 2267 (2017). Disavowal need not be explicit, however; a patentee may disavow claims by "distinguish[ing] or disparag[ing] prior art" in relation to the present invention. *Id.*

## III.     Disputed Claims in the Utility Patents

The Court proceeds now to construe the disputed terms of the utility patents, in the order provided in the parties' amended joint claim terms chart. *See* Dkt. 162-1. At the beginning of each subsection below, the Court has provided the parties' proposed constructions, as set forth in the amended joint claim terms chart, and, if applicable, the revised constructions defendants offered in their *Markman* briefs.

### A.     "Item"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|-------------------------------|-------------------------------|
| Item | Claim 1 in '248 Patent | Plain meaning | *Joint Chart:*<br>Plain meaning | *Joint Chart:*<br>Any item for hanging on a rod including grommet curtains, windscreens, accessory tapes, other hanging items, etc. restricted to Figures 18, 19 and 20. |

| | Brief:<br>This term can be taken to mean "curtain" and in particular a "shower curtain."<br>[Kartri Br. 10] | Brief:<br>"Item" means "curtain."<br>[Marquis Br. 7] |
|---|---|---|

The parties do not dispute this term. *See* Tr. 5. Nor could they: Claim 1 of the '248 Patent, as amended, reads, "[a] product comprising an item for hanging, wherein said item is a curtain." Amended '248 Patent at 2:1–2. The Court construes the term "item" as "curtain."

### B. "Ring"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Ring | Used in each patent in multiple claims | A piece of material (of any shape) that generally encloses an opening. | *Joint Chart*:<br>Annulus of generally round shape (Figs. 18, 19, 20, 31B). | *Joint Chart*:<br>"[A] ring attached to said opening" is a grommet.<br><br>*Brief*:<br>A fastener that reinforces the opening.<br>[Marquis Br. 7] |

The parties dispute the proper construction of the term "ring" along two axes: First, whether the ring must be of a "generally round shape," and second, as between Focus and Marquis, whether the ring must "reinforce" the opening it encloses.

As to the first, Focus now agrees that the ring may not take "any shape." *See* Tr. 6. It is true that the claim terms do not expressly restrict "ring" to any particular shape, and the specification notes that "the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral." *E.g.*, '248 Patent at 5:6–9. But as Focus conceded at argument, the fact that the claims refer to rings comprising "circumferences" strongly implies curvature. *See* Tr. 6. Likely for that reason, all embodiments in the specification include at least some curvature. *See, e.g.*, '248 Patent at Fig. 4A (a vertically elongated circle); *id.* at Fig. 4B (a horizontally elongated circle); *id.* at Fig. 21 (a shape resembling the letter D). Accordingly, the

Court's construction of "ring" will include the phrase "a piece of material that is curved at least in part."[4]

As to the second dispute, Focus agreed at argument that the ring must reinforce the opening it encloses. *See* Tr. 7. Properly so. Two of the patents' claims themselves define the ring as reinforcing the opening. *See* '248 Patent at 10:23–24 ("[A] ring attached to said opening such that said opening is reinforced by said ring . . . ."); '088 Patent at 11:14–15 ("[A] ring, wherein said ring reinforces said opening."). The '609 Patent's claim terms do not include the same language. Nevertheless, the specification of that patent explains that the invention "involves a series of reinforced openings." '609 Patent at 2:6–7. Although the Court typically will not import functional limitations not recited in the claims themselves, *see Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001), the Court perceives no basis for distinguishing the '609 Patent from the '248 and '088 Patents with respect to this feature, and therefore adopts Marquis' proposed requirement that the ring reinforce the opening. *See* Marquis Br. 7–8.

In view of the foregoing, the Court construes the term "ring" as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening."[5]

---

[4] This dispute also implicates whether the inner and outer circumference of the ring, at least in the '248 and '609 Patents, must be circular, as defendants contend, or just curved at least in part, as plaintiffs contend. The Court takes up that issue in the next section.

[5] In construing claims, the Court need not adopt the parties' proposed definitions. *See Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1376 (Fed. Cir. 2017).

## C.    "Inner circumference"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| **Inner circumference** | Claim 1, '248 Patent; Claims 5, 13 in '609 Patent; Claims 1, 8 in '088 Patent | Inner curved edge. | *Joint Chart*: Round edge of the opening of the ring. | *Joint Chart*: Round edge of the opening of the ring. |
| | | | | *Brief*: The perimeter of the circular opening. [Marquis Br. 16] |

This claim, along with "outer circumference," implicates one of the more significant

disputes between the parties.  Each of these terms describes an edge: "inner circumference"

refers to the internal edge bounding the ring's opening, and "outer circumference" refers to the

external edge bounding the ring itself, except in the '088 Patent, where "outer circumference"

refers to the external edge of the ring *other than* that portion comprising a "flat upper edge," *see*

'088 Patent at 11:16–17 ("[S]aid ring comprising a flat upper edge, an inner circumference, and

an outer circumference . . . .").  The crux of the parties' dispute is whether the "circumference"

terms should be construed to connote only "circular" shapes, *see* Kartri Br. 10–12; Marquis Br.

8–16, or whether the terms contemplate other shapes that are curved, at least in part, *see* Dkt. 179

at 3–7.[6]

In customary usage, "circumference" often, but not always, refers to the perimeter of a

circle.  Dictionaries confirm that the term is not necessarily limited to circular shapes. *See, e.g.*,

*Circumference (n.)*, Webster's Third New International Dictionary, Unabridged,

http://unabridged.merriam-webster.com/unabridged/circumference (last visited Aug. 7, 2018)

(either "the line that bounds a circular plane surface" or "perimeter"); *Circumference (n.)*, New

Oxford American Dictionary, https://premium.oxforddictionaries.com/us/definition/american_

---

[6] Defendants allow that the '088 Patent contemplates a circular outer circumference with a flat upper edge. *See* Kartri Br. 10–12; Marquis Br. 16.

english/circumference (last visited Aug. 7, 2018) ("The enclosing boundary of a curved geometric figure, especially a circle."); *Circumference (n.)*, Oxford English Dictionary, http://www.oed.com/view/Entry/33281 (last visited Aug. 7, 2018) ("The line that forms the encompassing boundary, esp. of anything of a rounded form . . . ."). Accordingly, the term itself, as construed by a lay judge, does not definitively resolve whether the patents refer exclusively to a circle or also to other curved figures.

The patents' specification strongly suggests that the terms refer to shapes other than circles. The specification defines "inner circumference" simply as "inner edge . . . of the fastener or ring," without any reference to shape. *See, e.g.*, '248 Patent at 4:43–44. Likewise, they define "outer circumference" simply as "outer edge." *See, e.g., id.* at 4:42–43. Further, as noted above, the specification includes figures depicting vertically and horizontally elongated circles, *see, e.g., id.* at Figs. 4A, 4B, and provides that "the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral," *id.* at 5:7–9; *see also, e.g., id.* at 5:10–12 ("[T]he external and/or internal edges of the ring need not be rounded although they are preferably so.").[7] Were the analysis to end here, plaintiffs' view would prevail, as the specification clearly contemplates circumferences tracing shapes other than circles.

Defendants, however, offer two counterarguments arising from the patents' prosecution history. First, defendants argue that the patentee disavowed any non-circular shapes in response to a restriction requirement issued by the United States Patent and Trademark Office ("PTO") during prosecution of the '248 Patent. To wit, in June 2001, the PTO instructed the patentee to

---

[7] Indeed, Figure 4A, depicting a vertically elongated circle, is a preferred embodiment. *See id.* at 4:63–64. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) (quotation marks omitted).

elect from a series of nine patentably distinct species of the claimed invention. *See* Dkt. 174-5 at 52–53.[8] The PTO did not identify what was distinct about each species; rather, the notice identified only which figures corresponded to which species. In response, the patentee chose to proceed with one particular species ("Species IV") "without traverse"—*i.e.*, without objection. *See* Dkt. 174-5 at 55; Dkt. 173-5 at 51. That species, like certain others, was drawn only to figures depicting a ring with an approximately circular inner circumference and an approximately circular outer circumference, although the figures in this species featured projections directed upward from the top of the ring. *See* Dkt. 174-5 at 42; *see also* '248 Patent at Figs. 18–20. The patentee then proposed several new claims describing non-circular rings. *See* Dkt. 175-5 at 57. The PTO declined to consider those claims as "drawn to a nonelected species." *Id.* at 67.

Based on this history—*i.e.*, the patentee declining to object to a restriction that included only circular shapes, and the PTO characterizing claims describing non-circular rings as "drawn to a nonelected species"—defendants argue that Focus disavowed any non-circular construction of the "circumference" terms. *See* Kartri Br. 11; Marquis Br. 10–11; Dkt. 181-1 at 2–3. But defendants have failed to identify a "clear and unmistakable" disavowal sufficient to overcome the "heavy presumption that claim terms carry their full ordinary and customary meaning." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) (quotation marks omitted). Because several of the species identified by the PTO involved only circular rings, there is no indication that circularity was the basis for the restriction requirement. And as the Federal Circuit has made clear, where, as here, the PTO issues a restriction requirement "without

_____

[8] The PTO issued the same restriction requirement as to the '609 patent. *See* Dkt. 173-5 at 48–49.

providing any reasons why in its view the application presented differing inventions," "[t]he election of an invention [without traverse] in response to an ambiguous restriction requirement . . . cannot be said to provide any guidance forming a basis for narrowing a broadly drafted claim." *Id.* at 1351.[9]

Likewise, the PTO's conclusion that certain claims regarding non-circular rings were not drawn to the elected species does not demonstrate the patentee's disavowal of such shapes. On the contrary, the fact that the patentee responded to the restriction requirement by submitting claims describing non-circular rings demonstrates that the patentee did *not* unambiguously disavow such shapes. *Cf. Plantronics*, 724 F.3d at 1351 (no unambiguous disclaimer where patentee elected certain figures without traverse but disagreed with the PTO as to the scope of a certain claim).

Defendants' second argument sounding in prosecution history, raised only by Marquis, arises from a double patenting rejection issued by the PTO in connection with the '088 Patent. On September 15, 2008, the PTO notified the patentee that the application for the '088 Patent did not claim a patentably distinct invention over the '248 and '609 Patents. *See* Dkt. 173-6 at 51. The patentee responded by amending the patent application to include, *inter alia*, a "flat upper edge" ring. *See id.* at 66. In response, the PTO withdrew the double patenting rejection in part. It stated, "[i]nasmuch as the claims have been amended to incorporate the limitation of the flat upper edge which is drawn to a species which is not encompassed with the species as set forth in the applicant's prior patents the double patenting rejection is no longer applicable." *Id.* at 98.

---

[9] Marquis argues that the PTO did demarcate the differences between at least several of the species. *See* Tr. 15–16 (citing Dkt. 174-5 at 39). These minimalist demarcations, however, say nothing about the circularity of the rings. *See* Dkt. 174-5 at 39.

This exchange, Marquis argues, demonstrates that the patentee did not intend the '248 and '609 Patents to cover a ring with a "flat upper edge." Marquis Br. 13–14.

This dispute turns primarily on the ambiguous phrasing used by the PTO: "the limitation of the flat upper edge which is drawn to a species which is not encompassed with the species as set forth in the applicant's prior patents." Marquis reads the phrase as an acknowledgment that a flat upper edge is not encompassed by the prior patents. Focus, by contrast, reads the phrase as an acknowledgement that a *limitation* of a flat upper edge is not encompassed by the prior patents. In other words, Focus argues, the '088 Patent is patentably distinct (at least in part) not because it contemplates a ring with a flat upper edge, but because the flat upper edge is a *mandatory* feature of the '088 Patent, such that an infringing product must have such an edge in order to be found to infringing.

The Court is inclined toward Focus's reading on the grounds that the claims of the '248 and '609 Patents, as well as the specification, contemplate flat-topped rings. Indeed, Marquis' co-defendant appears to agree that those patents can be infringed by a flat-topped ring. *See* Kartri Br. 10 (acknowledging that the '248 and '609 Patents contemplate a "D-shaped or U-shaped" ring, as in figure 31b, a ring with a flat upper edge).

But in any event, the dispute is academic, as nothing in the prosecution history, including this ambiguous statement from the PTO, amounts to an *unambiguous* surrender of claim scope whereby the patentee disavowed any expectation that the '248 and '609 Patents would reach a flat-topped ring. *See Plantronics*, 724 F.3d at 1351 ("This exchange with the PTO thus does not amount to anything clear or unambiguous to disclaim claim scope otherwise encompassed by the broadly drafted claims.").

In summary, the prosecution history does not offer unambiguous evidence that the patentee sought to narrow the claims to describe only circular circumferences. Accordingly, the Court declines to import a circularity restriction. Consistent with the specification, which defines "inner circumference" as "inner edge," *see, e.g.*, '248 Patent at 4:43–44, and plaintiffs' concession that the patents contemplate only circumferences that are curved at least in part, *see* Dkt. 162-1 at 1, the Court construes "inner circumference" as "inner edge that is curved, at least in part."

### D.    "Outer circumference"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|-------------------------------|-------------------------------|
| **Outer circumference** | Claim 20, '248 Patent; Claims 1, 9 in '609 Patent; Claims 1, 8 in '088 Patent | Outer curved edge | *Joint Chart*: Outside edge of a circle or other curved shape; to wit, peripheral boundary of the ring. | *Joint Chart*: Outer circumference is the outer perimeter of a circular object. |
| | | | *Brief*: Round boundary or outside of the generally round ring. [Kartri Br. 12] | *Brief*: The perimeter of the circular ring. [Marquis Br. 16] |

For the same reasons, the Court declines to import a circularity restriction into the construction of "outer circumference." Instead, consistent with plaintiffs' concession that the circumference must be curved, *see* Dkt. 162-1 at 1, and the specification, which defines "outer circumference" as "outer edge," *see* '248 Patent at 4:42–43, the Court construes this term as "outer edge that is curved, at least in part."

### E. "[Inner circumference] comprising a top"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|------------------------------|-------------------------------|-------------------------------|
| [Inner circumference] comprising a top | Claim 1 in '248 Patent | The uppermost point of the inner circumference of the ring (*i.e.* the "12 o'clock position"). | *Joint Chart*: Top dead center of the ring's inner circumference. | *Joint Chart*: Inner circumference top is where a vertical radius at 0 degrees of the 360 degree inner circumference intersects the ring. |
| | | | *Brief*: The top is the upper portion of the inner circumference, *i.e.*, the top of the round opening where the item or ring rests on the shower curtain bar. [Kartri Br. 12] | *Brief*: Marquis has no objection to Plaintiffs' definition of "top" using a 12 o'clock position, if applied to the inner perimeter of a circle. [Marquis Br. 18] |

Leaving aside the parties' dispute over whether the ring must be circular—as explained above, the ring need not enclose a circle—the parties do not substantially disagree on the appropriate construction here. At argument, the Court proposed the following construction: "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point." Tr. 22. Plaintiff's counsel accepted this construction, but defense counsel objected that defining "top" in reference to a flat-topped oval creates a potential indefiniteness problem, as such a ring has a range of uppermost points. *See id.* 23–24. That objection, however, is precisely why the Court's proposed construction included the clause "where the ring has more than one [uppermost] point, the centermost such point." By identifying the top as the midpoint of a flat top, this construction avoids any ambiguity and substantially embraces each party's proposed construction. *See* Dkt. 162-1 (Focus proposing the "12 o'clock position," Kartri proposing the "top dead center," and Marquis proposing "where a vertical radius at 0 degrees of the 360 degree inner circumference intersects the ring"). Accordingly, the

Court construes this term as "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point."[10]

### F.   "Approximately horizontal component"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| **Approximately horizontal component** | Claim 1 in '248 Patent | Either level, or else tilted at a gradual incline. | *Joint Chart*: Curved portion of slit that proceeds in an arcuate path more-or-less concentric with the inner circumference of the ring; and configured such that the weight of the shower curtain urges the two edges of the slit to close together on one another rather than pull them apart. | *Joint Chart*: "Approximately horizontal" component refers to a linear or nonlinear component that starts and ends in the same horizontal plane passing over the inner circumference top. |
| | | | | *Brief*: Regardless of any definition of the phrase "approximately horizontal component," the specification requires that the phrase be curved and not straight. [Marquis Br. 22] |

At argument, the Court proposed a construction different from those proposed by the parties: "component that is either level or nearly so." Tr. 27. The use of "level," in the Court's view, reflects the customary and ordinary meaning of "horizontal," as is evident in dictionary definitions. *See, e.g., Horizontal (adj.)*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/unabridged/horizontal (last visited Aug. 7, 2018) ("[P]arallel to the horizon: being on a level . . . ."); *Horizontal (adj.)*, Oxford English Dictionary, http://www.oed.com/view/Entry/88460 (last visited Aug. 7, 2018) ("Parallel to the plane of the horizon; at right angles to the vertical line; level; flat . . . .").

---

[10] The Court can conceive of geometric figures (*e.g.*, fabiform shapes) as to which even this definition might create ambiguity. The Court does not understand such shapes to be at issue in this case.

Defendants object to this construction on several grounds. First, Kartri argues that "nearly" fails to remedy the fundamental problem with the term "approximately," which is that the term is so vague as to render the '248 Patent indefinite. *See* Tr. 28; *see also* Kartri Br. 12–13. As the Court will now explain, however, Kartri has not met its burden to prove indefiniteness, and the Court therefore will construe the term as proposed.

Indefiniteness is a matter properly taken up at claim construction. *See, e.g.*, *Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*, 310 F. Supp. 3d 457, 462–63 (S.D.N.Y. 2018). The party challenging patent validity on indefiniteness grounds bears the burden of proof. *See Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Interpreting the Supreme Court's decision in *Nautilus*, the Federal Circuit has held that "terms of degree are [not] inherently indefinite." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014); *see also id.* ("[A]bsolute or mathematical precision is not required . . . ."). Indeed, "words of approximation . . . are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) (quotation marks omitted); *see also Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1002 (Fed. Cir. 2015), *rev'd and remanded on other grounds*, 137 S. Ct. 429 (2016) (upholding as definite the phrase "substantially centered"); *Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821–22 (Fed. Cir. 1988) (noting that terms such as "closely approximate" are "ubiquitous in patent claims"). At bottom, the indefiniteness test "mandates clarity, while recognizing that absolute precision is

unattainable." *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1063 (Fed. Cir. 2017) (quoting *Nautilus*, 134 S. Ct. at 2129).

Kartri has declined to offer any evidence tending to show the relevant POSITA would not be able to ascertain the scope of the invention with reasonable certainty. *See* Dkt. 184 (parties agreeing not to offer expert testimony in connection with claim construction). Instead, Kartri argues only that the claim terms and specification are inherently "open to conjecture." Kartri Br. 13.

The Court is not persuaded. Although the words "substantially uniform" might similarly be described as "open to conjecture," the Federal Circuit rejected an indefiniteness challenge to that term, holding that the phrase, in context, "means what it says": "largely, but not wholly the same in form." *Ecolab*, 264 F.3d at 1369. Although the specification in *Ecolab* did not "reveal any special definition for the terms 'substantially' or 'uniform,'" the court held that the term "substantially" allowed the patentee to avoid a "strict 100% nonuniformity boundary." *Id.* at 1367. So too here: The term "approximately" allows the patentee to avoid an otherwise "strict 100%" horizontality boundary.

To be sure, the relevant POSITA here cannot determine with mathematical precision how far the component may deviate from the pure horizontal. But such precision is not required under the case law. *See One-E-Way*, 859 F.3d at 1060 (indefiniteness analysis "recognizes that all claims suffer from 'the inherent limitations of language'" (quoting *Nautilus*, 134 S. Ct. at 2128)). Instead, it is enough if the patent's claims, "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with *reasonable* certainty." *Nautilus*, 134 S. Ct. at 2129 (emphasis added).

Kartri offers no extrinsic evidence to suggest that the scope of the invention cannot be determined with reasonable certainty. And to the extent that Kartri relies on intrinsic evidence, that evidence confirms that the claim is susceptible to reasonable certainty. In the specification, the patentee explained that, in one embodiment, the "approximately horizontal component" is distinct from either an "upper vertical component" or a "radial" component. *See* '248 Patent at 8:16–18; *see also id.* at Fig. 20. The Court therefore understands the Patent to recite a component of a slit that is neither vertical nor radial, at least where the slit does not include any segment of a horizontal radius. Likewise, as Kartri concedes, the prosecution history contains "[s]ome important clues" as to the meaning of the term. Kartri Br. 15. Before the PTO, the patentee noted that the approximately horizontal component makes it "difficult for the hanging item to be pulled off the rod, since the weight of the hanging item on the ring will close the slit." Dkt. 169-7 at 6. Such a component, necessarily, is "either level or nearly so."[12]

Accordingly, the Court is satisfied that the phrase "approximately horizontal component" provides reasonable certainty in the specific context of the present invention. In the absence of any evidence to the contrary, the Court stands by its proposed construction.

Defendants also raise a second objection. In their briefs, *see* Kartri Br. 14–15; Marquis Br. 21–22, as at argument, *see* Tr. 29–30, defendants contend that "approximately horizontal component" necessarily refers to a "curved," rather than "straight," component. This construction, the Court notes, is inconsistent with Marquis' prior concession, in the amended

---

[12] From this evidence, Kartri argues that the Court should limit the term "approximately horizontal component" to *only* those components designed such that the weight of the curtain, when hanging from the curtain rod, pulls the slit closed. *See* Kartri Br. 15–17. Although this history has informed the Court's construction, the Court will not import the functional limitation into the construction. *See Ecolab*, 264 F.3d at 1367 ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation.").

joint claim terms chart, that the term may refer either to a "linear or nonlinear component." Dkt. 162-1 at 2. To be sure, the parties "reserve[d] the right to modify their positions in th[e] Joint Chart at any time . . . to facilitate agreement or the Court's proper construction of the terms in dispute." *Id.* at 1. But to generate an entirely new point of contention where the opposing party reasonably expected none subverts the purposes of S.D.N.Y. Local Patent Rule 11, which, among other things, promotes argument directed at stable points of opposition.

In any event, defendants' argument fails on the merits. Claim 1 of the '248 Patent says nothing about curvature. Defendants therefore rely on the following language from the specification: "As an alternative to a straight external slit, a curved external slit 232 can be provided as shown in FIG. 20. In one embodiment, curved slit 232 has an upper vertical component 232a, an approximately horizontal component 232b, and a radial component 232c." '248 Patent at 8:14–18. Defendants argue that this language indicates that the "approximately horizontal component" exists only where the slit is curved. *See* Kartri Br. 14–15; Marquis Br. 21.

Defendants misread the specification. The fact that the specification describes the approximately horizontal component in reference to a curved slit does not mean that the approximately horizontal component applies *only* to a curved slit. To hold in defendants' favor here would import a limitation from the written description of the claims—"one of the cardinal sins of patent law." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Further, the patentee, had he so desired, was fully capable of limiting a claim term to a curved slit, as he did in claim 20. *See* '248 Patent at 11:36–12:1 ("[S]aid item comprising a curved slit . . . ."). Given that claim 1 contains no reference to a curved slit, the Court will not import a curvature requirement into that claim. *See Nystrom v. TREX Co.*, 424

F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed.").

In light of the foregoing, the Court construes the term "approximately horizontal component" as "a component that is either level or nearly so."

### G. "Said slit exits said ring at said upper edge of said curtain"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|------------------------------|-------------------------------|-------------------------------|
| Said slit exits said ring at said upper edge of said curtain | Claim 1 in amended '248 Patent | The slit exits the ring at the part of the ring which is at the upper edge of the curtain. (No requirement that the slit simultaneously exit the ring and the upper edge of the curtain.) | *Joint Chart:* The slit must exit the "ring" at the upper edge of the ring, which then requires that the ring must be aligned with the very edge of the upper hem of the shower curtain. | *Joint Chart:* "Slit exits said ring at said upper edge of said curtain" refers to a slit that exits both the ring and upper edge of the curtain at the upper edge of the curtain. |

The phrase "said slit exits said ring at said upper edge of said curtain" appears in claim 1 of the '248 Patent as reexamined. *See* Amended '248 Patent at 2:14–15. During patent reexamination, the patentee proposed the following amendment to claim 1: "and wherein said slit simultaneously exits said ring and said upper edge of said curtain." Dkt. 169-10 at 3. The PTO rejected this amendment on the ground that the '248 Patent "does not describe the slit 232 as exiting the ring and the upper edge of the curtain 'simultaneously.'" Dkt. 169-11 at 2; *see also* '248 Patent at Fig. 20. The PTO therefore proposed the language that now appears at the end of claim 1 in the '248 Patent: "and wherein said slit exits said ring at said upper edge of said curtain." Dkt. 169-11 at 2. The PTO explained that "[t]his limitation is considered to better define the invention as disclosed in the '248 Patent and does not limit the exit of the slit from the ring to the precise (and unsupported) location defined by Patent Owner's proposed 'simultaneously.'" *Id.* at 3. The patentee accepted that language. *See* Dkt. 169-12 at 9.

Notwithstanding the foregoing, defendants argue that the disputed phrase must be construed to require that the slit exit the ring and upper edge of the curtain simultaneously. *See* Kartri Br. 17–19; Marquis Br. 21. To be sure, the phrase "the slit exits the ring at the upper edge of the curtain" can plausibly be read to connote that the slit exits the ring and the top of the curtain simultaneously. Yet the prosecution history squarely forecloses such a reading, as the patentee accepted the PTO's unambiguous rejection of a simultaneity requirement. Further, the specification abounds with figures in which the slit exits the ring at points other than the upper edge of the curtain. *See, e.g.*, '248 Patent at Figs. 4B, 12, 20, 30.

Accordingly, in light of the specification and prosecution history, the POSITA here would understand "said slit exits said ring at said upper edge of said curtain" to mean "the slit exits the ring at or near the upper edge of the curtain." The term "at" may be used to indicate not only precise contact, but also "presence in, on, *or near*." *At (prep.)*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/unabridged/at (emphasis added) (last visited Aug. 7, 2018). In any event, even if the plain meaning of "at" connoted only simultaneity, the specification and prosecution history together "communicate[] a deliberate and clear preference for this alternative definition." *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

Accordingly, the Court construes this term as "the slit exits the ring at or near the upper edge of the curtain."

## H. "Closed ring"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| **Closed ring** | Claims 2, 13, 22 in '248 Patent | A ring wherein the slit normally has its edges pressed together. | *Joint Chart*: A ring with a slit, in which the two sides of the slit are normally pushed closed, one against the other. | *Joint Chart*: The term "closed ring" refers to the fact that the external slit is normally "closed"— *i.e.* the two radial edges which form the slit are pressed together. |
| | | | *Brief*: A closed ring is where the slit has the two edges pressed against one another. [Kartri Br. 19] | *Brief*: Plaintiffs' meaning of the term is acceptable to defendant Marquis. [Marquis Br. 8] |

At argument, the Court proposed the following construction: "A slit where the ring is 'closed'—*i.e.*, the two radial edges adjacent to the slit are pressed together." Tr. 43. This construction is adapted from the specification itself, which defines the term as follows: "The term closed ring refers to the fact that the external slit is normally 'closed'—*i.e.*, the two radial edges which form the slit 17 are pressed together." '248 Patent at 4:8–10. The parties accepted the Court's construction as consistent with the specification. *See* Tr. 43–44.

Accordingly, the Court construes this term as "a slit where the ring is 'closed'—*i.e.*, the two radial edges adjacent to the slit are pressed together."

## I. "Projecting edge"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| **Projecting edge** | Claims 1, 9 in '609 Patent; Claims 1, 2, 8 in '088 Patent | An edge which projects from the outer circumference of the ring. | *Joint Chart*: An edge of a projecting member or salient that extends out and away from the round periphery of the ring. | *Joint Chart*: Projecting edge is a finger or extension that projects out away from the circumference or perimeter of the ring. |

*Brief*:
A projecting edge of
a structural member
that itself projects
out from the outer
boundary of the ring
or buckle.
[Kartri Br. 19–20]

The term "projecting edge" appears in the claims of the '609 Patent and the '088 Patent.

Each patent's claims themselves define the term: "[S]aid projecting edge being an edge which

projects from said outer circumference of said ring." *E.g.*, '609 Patent at 12:14–16; '088 Patent

at 11:21–23. Accordingly, at argument, the Court proposed the same language, albeit

substituting "that" for "which." *See* Tr. 45.

Defendants counter primarily by citing the specification, which provides as follows:

[I]n further embodiments of the invention, a ring 200, 210 or 220 is provided with
a projecting edge, flange, extension, or finger 206, 216 or 226. Extensions 206,
216 or 226 are projections off of the ring (preferably off of the ring's outer
circumference), which extend beyond the ring away from the hanging product (*e.g.*
toward the ceiling).

'609 Patent at 7:67–8:1–5. From this language, defendants argue that a projecting edge must be

a "finger or other structural element" that projects from the outer circumference. Kartri Br. 21;

*see also* Marquis Br. 22. But the specification does not suggest that the projecting edge *must* be

a structural element such as a finger. Rather, the specification provides only that such an

element would itself be a "projection." In any event, even assuming *arguendo* that defendants'

interpretation of the specification were correct, as noted above, the Court cannot import a

limitation from the specification. *See SciMed Life Sys.*, 242 F.3d at 1340. Given the plain

language of the claim terms (and, it bears noting, Marquis' own prior adoption of plaintiffs'

definition during inter partes reexamination, *see* Marquis Br. 23), the specification offers no

reason to depart from the Court's proposed construction.

23

Kartri also raises a brief, separate argument to the effect that Focus, in prior litigation, admitted that the term "projecting edge" requires "something that protrudes" or "juts out" from the outer circumference. *See* Kartri Br. 21. In a separate legal action, Focus described a figure of a flat-topped ring with a central, vertical slit as having no projecting edges. *See* Dkt. 173-11 at 3. But in the same discussion, Focus described another D-shaped ring, this one with a diagonal slit, as having a "projecting edge," notwithstanding that no portion of such a ring "protrudes" or "juts out." *See id.* at 1. Therefore, there is no basis for using Focus's prior representation to limit the clear scope of the claim terms.

Accordingly, as prefigured at argument, the Court construes this term as "an edge that projects from the outer circumference of the ring."

### J. "Next to said slit"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Next to said slit | Claims 1, 9 in '609 Patent | Adjacent to the slit. | *Joint Chart*: The edge of the projecting member or salient leaves off from the periphery of the ring where the slit itself ends. | *Joint Chart*: "[N]ext to said slit" means that the projecting member or salient leaves off from the periphery of the ring where the slit itself ends. |

At argument, the Court proposed the following construction: "adjacent to the slit." Tr. 45. No party objected to this construction. *See id.*

Accordingly, the Court construes this term as "adjacent to the slit."

### K. "Extends toward the ceiling"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Extends toward the ceiling | Claims 2, 10 in '609 Patent | Points upward (would hit a ceiling if extended). | *Joint Chart*: Points vertically upward. | *Joint Chart*: Projecting edge is a finger or extension that projects out away from the circumference or |

| | | | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| | | | *Brief*:<br>The edge that projects away from the curtain ring extends out from the edge of the ring or buckle, and upward in a generally vertical direction.<br>[Kartri Br. 22] | perimeter of the ring towards the ceiling when on a rod. |

At argument, the Court proposed the following construction: "points upward (would hit the ceiling if extended)." Tr. 45. No party objected to this definition. *See id.* 45–46.

Accordingly, the Court construes this term as "points upward (would hit the ceiling if extended)."

### L.    "Offset from said top"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Offset from said top** | Claim 1 in '248 Patent; Claims 5, 13 in '609 Patent | Set off center, *i.e.* to the side of the top. | *Joint Chart*:<br>To one side or the other away from top dead center. | *Joint Chart*:<br>A slit heading towards the top with an offset that avoids the top and exits at a point offset from the top. |
| | | | *Brief*:<br>The affected claims are indefinite.<br>[Kartri Br. 22–23] | *Brief*:<br>If "inner circumference" means inner perimeter of a circle, then Defendant Marquis does not object to Plaintiffs [sic] definition for this phrase.<br>[Marquis Br. 22] |

In the amended joint claim terms chart, this term is hardly disputed. *See* Dkt. 162. In briefing, however, defendants raised a concern that "top" is "indefinite" where the inner circumference is not a circle. *See* Kartri Br. 22–23; Marquis Br. 22.[14] The Court has previously addressed this concern. *See supra* Part III.E. Here too, the Court rejects this argument.

---

[14] Kartri also argues that "top" does not clearly refer to the "inner circumference," but may instead refer to the entire ring. *See* Kartri Br. 22–23. The claims of the '248 Patent clearly

At argument, the Court proposed the following construction: "to the side of the top." Tr. 46. At that point, defendants raised a new objection: that the offset from the top has a "functional component," as revealed "in the specification," and should be defined accordingly. Tr. 46–47. Whatever the merits of this argument, as noted above, the Court will not import a functional requirement not recited in the claim itself. *See Ecolab*, 264 F.3d at 1367.

The Court will, however, accommodate one final objection raised by Kartri's counsel. To ensure that the Court's construction allows for a deviation to *either* side of the top, the Court adopts the following construction, to which no party objected: "to a side of the top."

### M.  "Slit extends through"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Slit extends through | Claims 17, 18 in '609 Patent | Slit passes through. | *Joint Chart*: The slit proceeds straight from the outer periphery to the opening. | *Joint Chart*: "Slit extends through" refers to straight linear slits. |

Claims 17 and 18 of the '609 Patent describe a product in which the slit "extends through" certain positions on the ring. *See* '609 Patent at 12:38–43. Defendants do not dispute that the plain and ordinary meaning of "extends through" is, as Focus proposes, "passes through." Instead, they argue that the slit must extend *straight* through the ring—*i.e.*, that the term refers only to "straight linear slits." Dkt. 162-1 at 4. As Kartri puts it, the theory here is

---

identify the "top" as a part of the "inner circumference." *See* '248 Patent at 10:25–26 ("[S]aid inner circumference comprising a top when said item is hanging . . . ."); *id.* at 28–30 ("[A]t a point offset from said top . . . ."). The claims of the '609 Patent are somewhat less clear. *See* '609 Patent at 11:46–49 ("[S]aid ring comprises an inner circumference and a top, and . . . said slit intersects said inner circumference at an [sic] position offset from said top."). Nevertheless, the specification is clear: In describing a slit that is "curved and offset," the specification explains that the "slit 232 exits the inner circumference of the ring at a location which is offset to the side, rather than exiting the ring at the top of the inner circumference of ring 220." *Id.* at 8:48–54. This statement leaves no doubt that the "top" to which these claims refer is the top of the inner circumference.

that the relevant claims "are directed only to the 'projecting edge' curtain rings," and "[t]he only

clear examples of rings that comprise a projecting edge, and where the slit appears to extend

through the ring, are Figs. 18, 19, and 31b, which have a slit that extends straight through."

Kartri Br. 23.

The Court is skeptical of this argument, as it appears to ignore Figure 20, which has both

a projecting edge and a slit that does not extend "straight" through the ring. *See* '609 Patent Fig.

20. But in any event, the text of the specification inters Kartri's argument: "[T]he slit 344 need

not be in a straight line." *Id.* at 10:50–51. Thus even if the Court were empowered to import a

limitation such as that suggested by defendants, the specification itself precludes such a

construction.

Accordingly, adopting the plain and ordinary meaning, the Court construes this term as

"slit passes through."

### N. "O'clock position"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| O'clock position | Claims 17, 18 in '609 Patent; Claims 1, 3–6, 8–12 in '088 Patent | Corresponding to the position on a standard clock. | *Joint Chart:* No discernible meaning. *Brief:* This term is apparently intended to employ [a] clock's hour-hand positions for [a] particular angular relationship of the place where the slit enters the round opening of the ring with the orientation of the ring on the curtain. [Kartri Br. 24] | *Joint Chart:* From a defined point of reference, the division of a 360-degree field of view into 30 degree segments for a 12 hour clock and 15 degree segments for a 24 hour clock. |

Although defendants devote significant energy to litigating this term, the plain and

ordinary meaning of "o'clock position" is readily apparent. The term refers to a concept familiar

to virtually every adult: position on a standard clock face. Although Kartri originally contended that this term, ubiquitous in common usage, has "no discernible meaning," Dkt. 162-1 at 4, it concedes in its brief that the term refers to hour positions on a clock that are 30 degrees apart, with the one o'clock position "being thirty degrees from a vertical plumb line passing through the spindle of the clock hands." Kartri Br. 24. This is an accurate description, but the Court sees no reason to burden the factfinder with a hyper-technical description of what is assuredly a familiar concept.

Marquis, for its part, raises two objections. First, Marquis notes that the claims are "silent as to whether a standard 24-hour clock as used in Europe or by the US military or a standard 12-hour clock as used by civilians in the U.S. is used." Marquis Br. 18. The Court is quite confident that these patents, issued in the United States and directed to shower curtains, unambiguously refer to the 12-hour clock face in standard use in the United States.[15] Nevertheless, to avoid any possible confusion, the Court included in its proposed construction the phrase "standard, 12-hour clock face." Tr. 50.

Second, Marquis notes that the claims and specification are "silent as to where the hands should be positioned on an oval." Marquis Br. 19; *see also* Tr. 51–52. Instead, Marquis argues, the clock positions are described only "in connection with rings having a circular opening." Marquis Br. 19. To the extent this argument seeks to relitigate whether the openings must be circular, the Court has already resolved that dispute. *See supra* Part III.C. And to the extent that

---

[15] Further, the Patents describe spatial relationships. Even if a 24-hour clock may be used for timekeeping, spatial relationships are typically described with reference to a 12-hour clock. *See, e.g.*, Federal Aviation Administration, *Pilot's Handbook of Aeronautical Knowledge* 14-26 (2016), https://www.faa.gov/regulations_policies/handbooks_manuals/aviation/phak/media/ pilot_handbook.pdf ("[T]raffic is referenced by azimuth from the aircraft in terms of the 12-hour clock."); *id.* at 16-5 ("In most aviation operations, time is expressed in terms of the 24-hour clock.").

Marquis seeks now to argue that the Patents are ambiguous because a POSITA could not determine whence the clock's hands originate, the Court rejects that argument, too. Any lay interpreter would understand the term "o'clock position" to contemplate a clock superimposed on the ring, with hands projecting from the center of the ring, whatever the shape of the ring.

In sum, the Court is satisfied that any potential ambiguity as to this term is easily resolved with the following construction, which embraces the plain and ordinary meaning of the term "o'clock position": "corresponding to the position on a standard 12-hour clock face."

### O. "Approximately the 1 o'clock or 2 o'clock position on said ring"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| **Approximately the 1 o'clock or 2 o'clock position on said ring** | Claim 17 in '609 Patent | About 1 or 2 o'clock on a clock face (including anywhere in between). | *Joint Chart*: The slit goes straight through the ring at a position offset about 30 degrees from top dead center, or at about 60 degrees from top dead center.<br><br>*Brief*: The term or word "approximately" in the patent owner's chosen claim term subjects the claim to being indefinite and invalid . . . . [Kartri Br. 24] | *Joint Chart*: "Approximately the 1 o'clock or 2 o'clock position on said ring" is on a 360 degree inner circumference having an "approximate" center point, where 12 o'clock is a vertical radius from the "approximate" center point at 0 degrees of the 360 degree inner circumference, 1 o'clock is a radius 30 degrees right of 0 degrees, 2 o'clock is a radius 60 degrees right of 0 degrees. The "or" means the region between 1 or 2 o'clock position [sic] is not covered by the claim. |

The parties' dispute as to this term and the next concerns the meaning of the word "or." All agree that the term "approximately" allows for some flexibility, but the parties disagree as to

whether the term contemplates only the areas immediately surrounding the 1 and 2 o'clock

positions, or whether the term refers as well to the space between.[16]

To be sure, as Marquis suggests, the word "or" is often used to connote alternatives. *See* Marquis Br. 19 & n.12. In *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326 (Fed. Cir. 2001), for instance, the Federal Circuit held that in phrases such as "selecting either a greatest magnitude or highest frequency search," the term "or" referred to exclusive alternatives. *Id.* at 1330. "[W]hatever the meaning of 'or' as a logical operator," the Court held, "it is quite clear from the patent documents that Kustom was not using 'or' as a technical programming operator, but in its ordinary meaning as stating alternatives." *Id.* at 1331.

But to read *Kustom Signals* as controlling here, strictly because the Patent uses the word "or," is to ignore that meaning derives from context. *Cf. id.* at 1331 ("We agree with this construction, for there is no indication that Kustom used these words with a different meaning."). Here, unlike in *Kustom Signals*, there is ample indication that the patentee used "or" to express something other than alternatives.

First, there is the word "approximately." Consider the statement "the game starts around 1 o'clock or 2 o'clock." The statement conveys an intentional imprecision—that the game starts somewhere in the neighborhood of 1 or 2 o'clock. The term "approximately" refers not to the periods of time immediately surrounding 1 o'clock and 2 o'clock, but rather to the broader set of possibilities encompassed in the phrase "1 o'clock or 2 o'clock," including, potentially, 1:30.

Further, that the claim refers to one broad region of the ring's circumference, rather than two smaller regions, is confirmed by the patentee's use of the word "position." Consider the

---

[16] To the extent defendants argue that "approximately" is necessarily indefinite, *see* Kartri Br. 24, the Court has already rejected that argument, *see supra* Part III.F.

difference between "approximately the 1 o'clock or 2 o'clock position" and "approximately the 1 o'clock or 2 o'clock positions." Had the patentee chosen the latter term, defendants' argument would be strengthened. Instead, the patentee chose "position" and thereby described one broad region rather than two.

The specification, too, supports this reading. The specification provides that the slit "can extend through any position on the ring, whether the '12 o'clock' position, or to 1 o'clock, 2 o'clock, 10 o'clock, 11 o'clock, or so forth." '609 Patent at 4:12–14. Notwithstanding the reference to specific clock positions, the clear implication of this language is that the slit may extend through *any* point on the circumference. Thus the clock positions serve not to identify precise positions, but rather to place labels on certain *areas* of the ring.

To be sure, this concept might have been expressed more clearly in the patent claims. But the same is true of defendants' alternative constructions (*e.g.*, "the area immediately surrounding the 1 o'clock position or the area immediately surrounding the 2 o'clock position"). In the end, "the claims represent the final product of a sometimes imperfect process." *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1140 (Fed. Cir. 2003). The Court is left only to "focus objectively on the patent specification and claims." *Id.* And here, the specification and claims leave no doubt that the claim contemplates the region between the 1 o'clock and 2 o'clock positions.

Accordingly, the Court construes this term as "the area between and around the 1 o'clock and 2 o'clock positions on a standard 12-hour clock face."

### P. "Approximately the 10 o'clock or 11 o'clock position on said ring"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|------------------------------|-------------------------------|-------------------------------|
| Approximately the 10 o'clock or 11 o'clock position on said ring | Claim 18 in '609 Patent | About 10 or 11 o'clock on a clock face (including anywhere in between). | *Joint Chart*: [N/A] <br><br> *Brief*: The term or word "approximately" in the patent owner's chosen claim term subjects the claim to being indefinite and invalid . . . . [Kartri Br. 24] | *Joint Chart*: "Approximately the 10 o'clock or 11 o'clock position on said ring" is on a 360 degree inner circumference having an "approximate" center point, where 12 o'clock is a vertical radius from the "approximate" center point at 0 degrees of the 360 degree inner circumference, 10 o'clock is a radius 300 degrees right of 0 degrees, 11 o'clock is a radius 330 degrees right of 0 degrees. |

The parties agree that the construction of "approximately the 1 o'clock or 2 o'clock position on said ring" controls here too. Tr. 60. Thus the Court construes this term as "the area between and around the 10 o'clock and 11 o'clock positions on a standard 12-hour clock face."

## IV. Design Patent

Having construed all of the disputed terms of the utility patents, the Court turns now to the Design Patent. Focus's Design Patent consists of a series of figures depicting the same invention and, as is required by law, *see* 37 C.F.R. § 1.153, only one claim: "I claim the ornamental design for a shower curtain, as shown and described above." Design Patent, cover page.

Defendants offer proposed constructions of the terms "ornamental design" and "as shown and described above." To wit, they ask the Court to define the "non-functional elements" of the design as including "sharp corners, sharp edges, generally cylindrical inner side edge of opening,

lack of any tapering or rounding at the side, top or inner edges, and partly curved, partly straight shape of top hem of the shower curtain." Dkt. 162-1 at 5–6.[17]

To the extent that defendants seek a detailed verbal construction of the Design Patent, the Court declines the invitation. "Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc).

To the extent that defendants seek a judicial determination of which elements of the Design Patent are functional, however, the Court agrees that such an inquiry may be appropriate. To be sure, "[w]hether a patented design is functional or ornamental is a question of fact." *PHG Techs. v. St. John Cos.*, 469 F.3d 1361, 1365 (Fed. Cir. 2006). Thus if defendants were to argue that the Design Patent claimed a purely functional design (and was therefore invalid), any resolution of that dispute at claim construction would "unduly invad[e] the jury's fact-finding process." *Egyptian Goddess*, 543 F.3d at 680.

But where a design contains both functional and non-functional elements, as appears to be the case here, "a trial court can usefully guide the finder of fact by . . . distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Id.*

---

[17] The reference to a "top hem" is curious, as Marquis elsewhere argues that Focus has surrendered any entitlement to a hem in the Design Patent by virtue of a surrender of claim scope. *See* Marquis Br. 24–25 & n.15 (citing *Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 702 (Fed. Cir. 2014)); Tr. 60–61. But this argument is without merit. The design claim was not "narrowed to the hemless design . . . when the broken-line hem of the Figure 1 drawing was deleted," Marquis Br. 25, because broken lines are never part of a claim and therefore cannot affect the claim's scope. *See* Design Patent, cover page ("The broken lines on the shower curtain depict features of the article that form no part of the claimed design."); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1317 (Fed. Cir. 2012) ("The parts of the side beyond the bezel, as well as the phone's back, are disclaimed, as indicated by the use of broken lines in the patent figures.").

(citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)). That is because "a design patent, unlike a utility patent, limits protection to the ornamental design of the article," such that the jury may find liability only where the non-functional aspects of the design are infringed. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010). Thus, the Federal Circuit has "often blessed" claim construction decisions in which the district court identified the functional and ornamental features of the claimed design. *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (citing *OddzOn*, 122 F.3d at 1405; *Richardson*, 597 F.3d at 1293–94; *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1334 (Fed. Cir. 2015)).

The key question for a district court to consider, therefore, is whether breaking out the elements of the design patent as functional or non-functional would "usefully guide the finder of fact," or would instead "plac[e] undue emphasis on particular features of the design," thereby encouraging the jury to "focus on each individual described feature in the verbal description rather than on the design as a whole." *Egyptian Goddess*, 543 F.3d at 680. Unfortunately, Focus, in mounting a vigorous opposition to any verbal construction of the Design Patent, failed to address this question, let alone which elements of the Design Patent are functional and which are not. The same is true of Marquis.

Nevertheless, the ultimate goal here is to "usefully guide the finder of fact," *id.* at 680, and with no trial on the immediate horizon, there remains ample time to sort out what guidance, if any, this Court ought to provide a jury. Accordingly, the Court directs the parties as follows. By October 12, 2018, in the same joint letter described in this Court's August 2, 2018 Order, *see* Dkt. 195, the parties are directed to provide *brief* answers to the following questions: (1) whether the Design Patent contains both functional and non-functional elements; (2) whether instructions

distinguishing between functional and non-functional elements of the Design Patent would, on balance, assist the factfinder; and (3) whether the Court should take up the functional/non-functional analysis at summary judgment or in pretrial briefing concerning jury instructions. For avoidance of doubt, the Court does not at this time invite argument as to *which* elements of the Design Patent are functional and non-functional, except as necessary to answer the foregoing questions.

Thus, pending further submissions, the Court reserves decision on how best to instruct the jury as to the Design Patent. *See, e.g.*, *Depaoli v. Daisy Mfg. Co.*, No. 07-cv-11778-DPW, 2009 WL 2145721, at *5 (D. Mass. July 14, 2009) ("To the extent the scope of the [design patent's] claim must be limited by prosecution history or functionality, I will address those issues definitively if and when they are raised at some later stage in these proceedings, such as resolution of motions for summary judgment or as part of the jury instructions at trial.").

## CONCLUSION

For the foregoing reasons, the disputed terms, as set forth in the parties' claim construction submissions and at argument, are construed as set forth above.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 181.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 9, 2018
New York, New York

35