UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS
OF NORTH AMERICA, INC., SURE FIT HOME
PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS
CORP., and SF HOME DÉCOR, LLC,

                                        Plaintiffs,

                         -v-

KARTRI SALES CO., INC., and MARQUIS MILLS
INTERNATIONAL, INC.,

                                        Defendants.

---

15 Civ. 10154 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision sets out the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52 following a six-day bench trial in this case.

Plaintiffs manufacture, sell, and distribute shower curtains with hookless rings that are

coplanar with the curtain. These products have obtained considerable acclaim and commercial

traction within the hospitality industry, insofar as they enable shower curtains to be put up more

quickly and easily than conventional shower curtains that attach by means of hooks. Plaintiffs

claim that defendants have manufactured, sold, and distributed confusingly similar shower

curtains, and thus have infringed plaintiffs' utility and design patents, infringed plaintiffs'

trademarks and trade dress, and engaged in unfair competition under the Lanham Act and New

York law. Plaintiffs further claim that defendants' infringements were willful, warranting

enhanced damages. Defendants deny these claims and advance a host of affirmative defenses.

During lengthy pretrial litigation, the Court conducted a *Markman* hearing, resolved

many pretrial motions, and entered summary judgment for plaintiffs on their utility patent

infringement claims.  Trial was held on June 27–29 and July 26–28, 2022.  The Court received

testimony from 14 witnesses.  As to six, called by plaintiffs,[1] the Court received direct testimony

by affidavit, followed by live cross and redirect examination.[2]  As to nine, the Court heard

testimony in wholly live form.[3]  The Court also received testimony, in the form of deposition

excerpts, from five witnesses,[4] and received hundreds of exhibits.[5]

     The findings of fact that follow are based on the Court's review of the entire trial record.

Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility

determinations based on the Court's assessment of, *inter alia*, the relevant witness or witnesses'

experience, knowledge, and demeanor.

---

[1] The Court here lists witnesses by the party who presented their direct testimony.  A number of witnesses appeared on both sides' witness lists, but, at the Court's direction for economy's sake, testified on only one party's case, with unrestricted cross-examination.

[2] These were: Stacy Dubinski, Ryan Erickson, David Kreilein, Charles Kuehne, David Zahner, and Adrian Whipple.  Their affidavits are filed at Dkts. 455-2 ("Dubinski Aff."); 455-1 ("Erickson Aff."); 455-3 ("Kreilein Aff."); 455-4 ("Kuehne Aff."); 473-1 ("Zahner Aff."); and 473-2 ("Whipple Aff.").

[3] These were: Robert Burbank, Sandra Kemp, and John Elmore, called by plaintiffs; and Samantha Dolph, Karen Goskowski, Patricia Kubus, David Middleberg, Joseph Ranieri, and Graham Rogers, called by defendants.

[4] For plaintiffs, these were Goskowski, *see* Dkt. 455-6 ("Goskowski Dep. Tr."); Kubus, *see* Dkt. 455-7 ("Kubus Dep. Tr."); Lawrence Mayer, *see* Dkt. 455-5 ("Mayer Dep. Tr."); Middleberg, *see* Dkt. 455-8 ("Middleberg Dep. Tr."); and Ranieri, *see* Dkt. 455-9 ("Ranieri Dep. Tr.").  For defendants, this was Mayer.

[5] Citations herein to "PTX" refer to a plaintiff exhibit; "DTX" to a defendant exhibit; "Tr." to the trial transcript; and "Dep." to deposition designations of the person indicated.  The Court has reviewed the parties' most recent proposed findings of fact and conclusions of law, *see* Dkts. 494, 500; exhibits; and pertinent letters, *see* Dkts. 454, 475, 480, 481.  Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

For the reasons that follow, the Court finds for plaintiffs on all claims tried;[6] dismisses defendants' counterclaims and affirmative defenses; awards plaintiffs lost profits and reasonable royalty damages of $2,938,337, which reflects the trebling of certain damages; and commissions briefing on pre- and post-judgment interest and attorneys' fees.

## I.    Findings of Fact

### A.    The Parties and Other Relevant Entities

Plaintiff Focus Products Group International, LLC ("Focus Products") was a limited liability company organized under the laws of, and with its principal place of business in, Illinois. Kreilein Aff. ¶ 3; PTX 88. On March 6, 2017, Focus changed its name to Sure Fit Home Décor, LLC ("Sure Fit Home Décor"), also a plaintiff here. Kreilein Aff. ¶ 6; PTX 88 at 3. Plaintiff Sure Fit Décor Holdings Corp. ("SFD Holdings") is a Delaware corporation with a principal place of business in New York City. Kreilein Aff. ¶ 10. Plaintiff SF Home Décor LLC ("SF Home Décor") is a subsidiary of SFD Holdings and a Delaware limited liability company with its principal place of business in Pennsylvania. Id. ¶ 9. Plaintiff Sure Fit Home Products, LLC ("SF Home Products") is a subsidiary of SF Home Décor and a Delaware limited liability company with a principal place of business in Pennsylvania. See PTX 416. Non-party Hollander Sleep Products acquired the Sure Fit entities in 2021. See Dkt. 494 at 3. However, the Sure Fit entities continue to exist. Id.

Plaintiffs Zahner Design Group, Ltd. ("ZDG") and Hookless Systems of North America ("HSNA") are affiliated New York corporations each with a principal place of business in New

---

[6] Plaintiffs' design patent infringement claim was not tried. As explained below, the parties agreed to stay litigation on that claim pending the outcome of a reexamination of that patent's validity by the United States Patent and Trademark Office ("PTO").

York. Dkt. 323 ("JPTO") at 12. Non-party David Zahner, who invented the hookless shower rings forming the basis of this intellectual property dispute, wholly owns ZDG and HSNA.[7] *Id.*

Non-party Arcs and Angles, Inc. ("A&A Inc.") was a corporation registered and with its principal place of business in New York.[8] Non-party Arcs & Angles, LLC ("A&A LLC") was a limited liability company. On July 9, 2004, HSNA exclusively licensed its rights in the hookless shower ring patents to A&A Inc. PTX 387 at 1–14. On December 22, 2010, A&A Inc. assigned those rights to A&A LLC. *Id.* at 23–24. On October 10, 2012, Focus acquired A&A LLC and its intellectual property rights. *Id.* at 28–29; *see also* Dkt. 297 at 3 ("SJ Op.").

Defendant Kartri Sales Company, Inc. ("Kartri") is a Pennsylvania corporation with its principal place of business in Forest City, Pennsylvania. JPTO at 12; Tr. at 626.

Defendant Marquis Mills International, Inc. ("Marquis") was a New Jersey corporation with its principal place of business in New Jersey that went out of business in 2020. JPTO at 12; Tr. at 576. Marquis manufactured and sold the accused shower curtains to Kartri, which sold these to resellers, mostly in the hospitality market. Middleberg Dep. Tr. at 96; Kubus Dep. Tr. at 14–15.

Non-party Carnation Home Fashions, Inc. ("Carnation") once owned the EZ-ON Mark pertinent to the trademark infringement claims here.

Non-party Star Linen, Inc. ("Star Linen") is a company that resells Kartri's products to the hospitality and healthcare industries. Tr. at 549. Middleberg worked in acquisitions for both Marquis and Star Linen. *Id.*

---

[7] The Court will refer to all plaintiffs collectively as "plaintiffs," to Focus Products and all its successor entities by the shorthand "Focus," and to all the Sure Fit entities as "Sure Fit."

[8] *See Arcs & Angles, Inc. v. Carnation Home Fashions, Inc.*, No. 09 Civ. 1467 (JPO) (FM) (S.D.N.Y. Feb. 18, 2009), Dkt. 1 ¶ 1.

Non-party Ramtex is a manufacturer of hospitality products based in Shaoxing, China. It assisted Marquis in manufacturing the accused shower curtains. Middleberg Dep. Tr. at 46–47. Non-party Pong Hsu ("Pong") is an individual employed by Ramtex in 2012 and 2013. *Id.* at 58. Pong had formerly worked for Waytex, a manufacturer that supplied the HOOKLESS® product to Focus and its predecessor A&A LLC. Pong had been a "part of [Focus's] product development team and . . . manufacturing team." Tr. at 554.

### B.    Witnesses

Plaintiffs' witnesses were Burbank, Sure Fit's CEO; Dubinski, who from 2018 to May 2022 held leadership roles in marketing and branding for Sure Fit Home Décor and Hollander Sleep; Erickson, Sure Fit's vice president of mass-market retail sales; Kemp, Focus's former senior vice president of hospitality; Kreilein, Focus's former executive vice president; Kuehne, Focus's former CFO; Whipple, Sure Fit's CFO; Zahner; and Elmore, a damages expert.

Defendants' witnesses were Dolph, Kartri's sales operations manager; Goskowski, Kartri's co-owner and president; Kubus, Kartri's co-owner and president of sales and marketing; Mayer, Carnation's former owner; Middleberg, Marquis's director of global operations and president of Star Linen; Ranieri, Marquis's owner; and Rogers, a damages expert.[9]

---

[9] The Court found plaintiffs' witnesses consistently credible and relevant. The Court found the testimony of Kemp, who between 2008 and 2020 occupied a series of positions germane to this controversy, particularly illuminating and has drawn on it heavily. In 2008, Kemp was Focus's director of operations, overseeing the retail and hospitality distribution channels, and a member of the team that acquired Arcs & Angles Inc., which then held the intellectual property at issue. Tr. at 212–14. In late 2010 or January 2011, Kemp took charge of Focus's hospitality business. *Id.* at 214. From then until her 2020 retirement, Kemp served, sequentially, as vice president, senior vice president, and general manager of Focus and its successor entities.

### C.     The Intellectual Property in Dispute

#### 1.     The Patents

ZDG owns the four patents at issue—one design patent and three utility patents.  Zahner Aff. ¶¶ 2–3.

The first is Design Patent No. D746,078, entitled "Shower Curtain" (the "'078 Patent" or "Design Patent").  It covers the design of the shower curtain ring that is worked into the shower curtain at the curtain's upper edge.  It looks like this:



**FIG. 1**

The second patent is Utility Patent No. 6,494,248, entitled "Suspended Materials Having External Slits," (the "'248 Patent").  PTX 3 at 1.  The '248 Patent's abstract describes it as "openings each having a slit therein for attachment to a fixed rod, . . . reinforced with rings having projecting flanges . . . [which] make[] it easier to open up the ring" and thus "facilitate the placement of [a shower] curtain upon the fixed rod."  *Id.*  It looks like this:



*See id.* at 5.

The third and fourth patents are Utility Patent Nos. 7,296,609, entitled "Hanging Products" (the "'609 Patent"), PTX 4 at 1, and 8,235,088, entitled "Hanging Products," (the "'088 Patent"), PTX 5 at 1.  The abstracts for these patents describe them as "[h]anging products" with "an opening for suspending the item from a rod," where each opening is strengthened "with a ring having a gap," and the ring contains "a movable member for opening and closing the gap."  PTX 4 at 1; PTX 5 at 1.

Relevant here, the '248 Patent claimed an "approximately horizontal component," that is, a slit, when the shower curtain "is hanging from the rod," Dkt 148-2 at 13; the '609 Patent claimed a ring that included "a projecting edge, said projecting edge being an edge which projects from [the] outer circumference of" the shower curtain ring, and that "projecting edge . . . [is] provided next to said slit," Dkt. 148-3 at 15; and the '088 Patent similarly claimed "a projecting edge, said projecting edge being an edge which projects from [the] outer circumference of" the shower curtain ring, Dkt. 148-4 at 15.  ZDG has exclusively licensed each of these patents to Focus Products and Sure Fit through its affiliate HSNA.  *See* PTX 89; Kreilein

Aff. ¶ 4. Sure Fit sells shower curtains incorporating the patented inventions in the hospitality industry throughout the United States.

In its summary judgment decision on April 16, 2020, the Court held that defendants had infringed plaintiffs' three utility patents. *See* SJ Op.

### 2.  The EZ-ON Trademark and HOOKLESS® Trademark

The design patent and utility patents are incorporated into shower curtains and sold under the HOOKLESS® Trademark ("Hookless Mark") and the EZ-ON Trademark ("EZ-ON Mark") (collectively, the "Marks"). The HOOKLESS® Mark is registered with the PTO. It was registered to its inventor Zahner's company ZDG, initially under U.S. Trademark Registration number 2,355,554 (Principal Register), and then under the numbers 2,381,995 (Supplemental Register) and 4,127,283 (Principal Register). *See* PTXs 84, 86, 520. The EZ-ON Mark was not registered with the PTO as of the date this suit was filed. On September 26, 2017—within defendants' challenged conduct—it was registered to ZDG on the Principal Register under U.S. Trademark Registration number 5,296,144.[10] PTX 113.

Plaintiffs' HOOKLESS® product, as sold in curtains, looks like this:

 

Plaintiffs' EZ-ON product, sold by Carnation pursuant to a sublicensing agreement with Focus, looks like this:

---

[10] The Court will refer to the EZ-ON Mark as "EZ-ON," not "EZ-ON®."



PTX 270 excerpt (EZ-ON shower curtain product, as sold by Carnation).

### 3.    Plaintiffs' Trade Dress

Plaintiffs claim that they have trade dress rights in the overall appearance of shower

curtains sold under the HOOKLESS® and EZ-ON brands (the "Trade Dress"). Plaintiffs

circumscribe the scope of their claimed trade dress by four factors:

(1) a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

(2) and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

(3) wherein each ring includes a slit or gap in the ring;

(4) and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

Dkt. 148 ¶¶ 104–105; *see also* Erickson Aff. ¶ 28 (quoting same).

The claimed Trade Dress, plaintiffs clarified at trial, does not reach all shower curtains

that do not contain hooks above their upper edge. It does not, for example, reach the Zenna

Home Quik Hang Peva shower curtain, which contains rings partially embedded in the curtain's upper edge and partially jutting out above the edge, Erickson Aff. ¶ 31, and looks like this:



Partial screenshot of Dkt. 303-7.  The protruding rings, plaintiffs explain, put the Zenna design outside of the first element of plaintiffs' Trade Dress—"lack[ing] any hooks protruding above the upper edge of the curtain."  Erickson Aff. ¶ 34.

Similarly, plaintiffs disavow that their claimed Trade Dress covers products by Croydex, which include hooks preinstalled on the shower curtain to facilitate the installation of the shower curtain.  *Id.* ¶ 36.  Also outside the parameters of the claimed Trade Dress is a shower curtain named "InterDesign" that, lacking hooks, is affixed to the shower rod by buckles that hang from the rod and snap onto the shower curtain below.  *See* PTX 132; *see also* PTX 131 (Brown design, similar).  So, too, are a Pierce product that uses clips that protrude above the curtain's upper edge, *see* PTX 133; a Fields design that functions like a pull-down window shade and does not rely on hooks or rings, *see* PTX 129; and a Giumarra hookless spiral-notebook-like design in which rings, perpendicular to the curtain's surface and protruding above its edge, are threaded

onto the rod, *see* PTX 130.  Plaintiffs state that their Trade Dress does not constrain those non-hooked shower curtain designs, which have been sold commercially by Focus's competitors.[11]

As Erickson testified, plaintiffs' claimed Trade Dress leaves room for various forms of shower curtain designs that enable easier installation than installing hooks.  Tr. at 176 ("Croydex and Zenna have pre-installed rings, . . . or a mechanism to suspend or hang or put that shower curtain on the shower curtain rod.").[12]

### 4.    Defendants' Accused Ezy Hang Product

The product accused of infringement here is the shower curtain ring and corresponding curtains defendants have manufactured and sold under the unregistered "Ezy Hang" mark.  Marquis manufactures and sells the accused curtain to Kartri.  Kartri brands the accused curtains as "Ezy Hang" and resells them to distributors and end users in the hospitality market.  The accused products look like this:



PTX 26, Kartri's Accused Product No. 1 (excerpt of image).

[11] The Zenna design has been commercialized by Maytex Mills, Erickson Aff. ¶ 33.  The Croydex design has been commercialized by QK Supplies in the United Kingdom, *id.* ¶ 37.

[12] Some of Zahner's own designs fall outside Focus's claimed Trade Dress.  For example, Figures 15, 16, and 17 of the '248 Patent protrude above the curtain's upper edge.  *See* PTX 134.



PTX 27 Kartri's Accused Product No. 2 (excerpt of image).

### D.     Kartri's and Marquis's Businesses and Relationship

Kartri was founded in 1975 and incorporated in 1979.  Tr. at 626–28.  It is operated by—

and its name is derived from the first names of—Karen Goskowski and Patricia ("Trish") Kubus,

sisters who in 2005 took over Kartri from their father.  *Id.* at 630, 633–34.  Kartri manufactures

the Ezy Hang product in its facility in Forest City, Pennsylvania, and through a contractor in

Mexico and stores that supply in an Arizona warehouse.  *Id.* at 656–57.

Marquis is an importer and supplies to Kartri.  PTX 297 ("Elmore Rep.") ¶ 31.  The two

entities had a longstanding business relationship predating the challenged conduct.  *See* Tr. at

551.  Marquis sources its products, *inter alia*, from Ramtex in China.  *Id.* at 589.  Marquis

provided fully finished curtains to Kartri.  *Id.* at 712.  Kartri would manufacture more

individualized headers—the top part of the curtain containing the rings.  *See id.* at 642–43.  Until

the challenged conduct began, Marquis and Kartri manufactured and sold traditional, hooked

shower curtains.  They then sought to compete with Focus's HOOKLESS® product in the

hospitality market, which had significantly shifted the hospitality market "in the direction of

hook-free curtains," *id.* at 660, and in which Focus had established a dominant market share, *see,*

*e.g.*, *id.* at 472, 511, 743.  This set the stage for the parties' commercial—and now legal—battle.

### E.     Plaintiffs' Claims, Defendants' Counterclaims, and Rulings Narrowing the Issues to Be Tried

Plaintiffs' claims are in five categories: (1) against both defendants, for infringement of plaintiffs' utility and design patents under 35 U.S.C. §§ 101 *et seq.*; (2) against both defendants, for infringement of and unfair competition with plaintiffs' EZ-ON Trademark and trade dress under 15 U.S.C. § 1125(a); (3) against Kartri, for infringement of and unfair competition with plaintiffs' HOOKLESS® Mark under 15 U.S.C. § 1125(a); (4) against both defendants, for unfair competition with plaintiffs' EZ-ON Mark and Trade Dress under New York law; and (5) against Kartri, for unfair competition with plaintiffs' HOOKLESS® Mark under New York law.  Plaintiffs seek damages on the patent infringement claims and all infringement and unfair competition claims as they relate to the EZ-ON Mark and the Trade Dress, but not on the infringement claims relating to the HOOKLESS® Mark.  Plaintiffs seek injunctive relief on their Lanham Act and unfair competition claims, attorneys' fees, and pre- and post-judgment interest.

Defendants have raised affirmative defenses of lack of statutory standing, failure to join an indispensable party, non-infringement of plaintiffs' EZ-ON Mark, invalidity of plaintiffs' EZ-ON Mark, non-infringement of plaintiffs' trade dress, and invalidity of plaintiffs' trade dress.

Rulings on summary judgment and on motions *in limine* pruned the issues to be tried:

- In an April 16, 2020 decision, the Court granted summary judgment to plaintiffs on the claim that defendants infringed the utility patents ('248, '609, and '088), leaving unresolved whether the infringements were willful. *See* Dkts. 297 at 31; 312.[13]

---

[13] The Court also granted summary judgment for plaintiffs on (1) Kartri's first counterclaim alleging tortious interference and monopolization; (2) Marquis's first counterclaim alleging non-infringement of the utility patents; (3) Marquis's fourth counterclaim alleging invalidity of the '248 patent; (4) Marquis's fifth counterclaim alleging invalidity of the '609 patent; (5) Marquis's sixth counterclaim alleging invalidity of the '088 patent; (6) Marquis's eighth counterclaim alleging patent misuse; and (7) Marquis's tenth counterclaim alleging the invalidity of the HOOKLESS® trademark. *See* Dkt. 297 at 32.

- The parties later agreed to stay plaintiffs' claim that defendants infringed the fourth, design patent ('078)—and with it, Marquis's first counterclaim alleging non-infringement of that patent, and seventh counterclaim alleging the '078 patent's invalidity—in light of reexamination proceedings initiated by Kartri at the PTO as to that patent. See PF at 4, 7–8.

- In a January 4, 2021 decision, the Court ruled that plaintiffs' trade dress is non-functional, *see* Dkt. 312 at 7–8, thereby establishing that element of plaintiffs' trade dress infringement claim.[14]

Accordingly, the following claims were left for resolution at trial:

- On plaintiffs' claims that both defendants infringed the EZ-ON Trademark under the Lanham Act and engaged in unfair competition with that Mark under the Lanham Act and New York state law, the issues of liability, damages, and injunctive relief;

- On plaintiffs' claim that Kartri infringed the HOOKLESS® Mark under the Lanham Act and engaged in unfair competition with that Mark under the Lanham Act and New York state law, the issues of liability and injunctive relief;

---

[14] On May 14, 2021, the Court dismissed defendants' affirmative defense that plaintiffs lack patent standing. Dkt. 365. And on August 5 and November 23, 2021, in bench rulings resolving motions *in limine*, the Court precluded as abandoned or forfeited, these affirmative defenses: (1) nominative fair use and descriptive fair use of plaintiffs' trademarks; (2) equitable estoppel and unclean hands; and (3) all other affirmative defenses not timely raised. *See* Dkts. 412, 436. The parties have dismissed, on consent, Marquis's third counterclaim alleging patent invalidity for alleged lack of inventorship, and its second counterclaim alleging the non-infringement of the HOOKLESS® trademark. *See* Dkt. 297 at 31; PF at 7; Dkt. 412 (bench ruling resolving plaintiffs' motions *in limine*); 436 (bench ruling resolving defendants' motions *in limine*).

- On plaintiffs' claim that defendants infringed plaintiffs' trade dress under the Lanham Act and engaged in unfair competition under the Lanham Act and New York state law, the issues of liability, damages, and injunctive relief;

- On defendants' infringement of the '248, '609, and '088 patents, the issue whether defendants' infringement was willful, and the tabulation of damages; and

- On all claims, the issue of reasonable attorneys' fees, to be briefed and decided in post-trial proceedings.

The following defenses and counterclaims were also left for resolution at trial:

- The defense that plaintiffs lack standing to bring its claim that defendants infringed the EZ-ON Mark, in light of non-party Carnation's alleged ownership of the intellectual property at issue here, and the related defense that plaintiffs failed to join Carnation as an indispensable party;

- Marquis's ninth counterclaim alleging invalidity of the EZ-ON Mark;

- Marquis's second counterclaim alleging non-infringement of the EZ-ON Mark;

- Marquis's eleventh counterclaim alleging invalidity of plaintiffs' Trade Dress; and

- Marquis's second counterclaim alleging non-infringement of plaintiffs' Trade Dress.

**F.      History, Ownership, and Licensing of the Intellectual Property at Issue**

   **1.      1992–1997: Zahner's Invention, the '232 Patent, Early Commercialization Efforts, and "Game-Chang[ing]" Success**

In or about 1992, Zahner conceived of inventing a hookless shower curtain ring.  Zahner Aff. ¶¶ 5–6, 68; *see also id.* ¶ 69 ("I began experimenting with various shower curtain designs. My goal was to create a design that was both easy to install and aesthetically attractive."). Developing the invention involved manual labor, experimentation with rudimentary materials, and refinements by trial and error.  *Id.* ¶¶ 70–72.  On May 18, 1992, Zahner filed an application

to patent his invention with the PTO. PTX 303. On February 16, 1993, the PTO granted the application, under the original '232 Patent. *Id.*

For three or four years, Zahner attempted to commercialize his invention by meeting with investors and manufacturers. Those efforts failed. Zahner Aff. ¶¶ 77–82. In June 1996, Zahner joined forces with John Benis and Teddy Marcus to form HSNA. *Id.* ¶¶ 83–84. Benis supplied capital; Marcus was HSNA's marketing and sales expert. *Id.* ¶ 85. As of that time, Zahner testified, the idea of a curtain that attached without hooks was novel: "[N]o one had ever seen anything like that before. . . . It [had been] just, you know, shower curtains with hooks." Tr. at 121. By 1997, that three-person team, operating as HSNA, was seeking to market Zahner's hookless shower curtain technology. Zahner Aff. ¶¶ 86–88.

At some time between 1997 and 1999, Marcus pitched Zahner's technology to Kartri. *Id.* ¶ 89; Tr. at 724–25. Then a small company, Kartri declined. Zahner Aff. ¶ 91; Tr. at 725–26. After approximately a year of refining and pitching the product, and having spent $250,000 in research and development, Zahner Aff. ¶¶ 94, 99, HSNA made its first sale to Gracious Home, a retail store in New York City, *id.* ¶ 103.

Zahner's product soon swept the hospitality market, until then dominated by traditional hooked curtains. Focus's Dubinski termed it "revolutionary" and "a game changer." Dubinski Aff. ¶ 12. The design was "innovative," neat, and "unique," *id.* ¶¶ 12, 20; it saved hospitality providers installation time and reduced workers' compensation claims from injuries sustained installing hooked curtains, which required effort and balance. Kartri's Kubus acknowledged that HOOKLESS® was "known in the industry . . . . [I]t saves the housekeeper time and money to put this product up. It's just known. [Zahner has] done really well in that marketing direction." Kubus Dep. Tr. at 52–53.

The Court found illuminating two videos of live demonstrations of the HOOKLESS®

products' ease of installation.  These showed ZDG's Marcus installing the HOOKLESS® curtain

on the telemarketing channel QVC.  In each, Marcus snaps into place, with ease and in about 10

seconds, a HOOKLESS® curtain on a rod.  *See* PTXs 471, 472 (video exhibits).  The symmetric

placement of the curtain's slits—connecting pairs of adjacent rings—ensured that the curtain

billowed uniformly across the curtain rod.  As installed, the curtain had a "neat" appearance

consistent with plaintiffs' claimed trade dress.  The video demonstrations made apparent the

efficacy of the HOOKLESS® product relative to conventional shower curtains, and its appeal to

hotel and motel chains that must install and remove shower curtains in bulk daily.

### 2.     The HSNA-A&A License Agreement and Its Chain of Transfers

On March 2, 1999, ZDG licensed all of its patent, trademark, and trade dress rights (the

"Intellectual Property Rights") to HSNA.  DTX 89.

On June 6, 2000, ZDG registered the Hookless Mark with the PTO, turning HSNA's

common law rights in the previously unregistered Hookless Mark into the rights under the

Lanham Act accorded to a registered trademark.  PTX 84.  On May 31, 2004, HSNA licensed its

intellectual property rights to Arcs and Angles, Inc.  PTX 387 ("HSNA-A&A License

Agreement") at 1; Zahner Aff. ¶ 337.  On May 16, 2008, Arcs & Angles, Inc. was acquired by

Arcs & Angles Holdings, LLC, which owned Focus.  PTX 268; Zahner Aff. ¶¶ 345–346, Tr. at

214.  Kemp, Focus's then-director of operations, *id.* at 212–13, testified that Arcs & Angles

Holding, LLC acquired "all the assets, the inventory, open receivable records, everything," *id.* at

214.  Focus thus controlled Arcs & Angles Holdings, LLC, Arcs & Angles, Inc., and the

Intellectual Property Rights associated with Zahner's invention.

On December 14, 2010, Focus transferred the Intellectual Property Rights to Arcs &

Angles, LLC.  PTX 387 at 23–24.  Zahner executed the amendment to the HSNA-A&A License

Agreement on HSNA's behalf. *Id.*; Zahner Aff. ¶¶ 347–348. On October 10, 2012, Focus transferred the Intellectual Property rights to itself, that is, Focus Products Group International LLC. PTX 387 at 28–29; Zahner Aff. ¶¶ 350–351. This amendment to the HSNA-A&A License Agreement was executed by Zahner. PTX 387 at 29; Zahner Aff. ¶ 352; Kreilein Aff. ¶ 4.

On March 6, 2017, Focus was renamed Sure Fit Home Décor LLC. PTX 88 at 3; Kreilein Aff. ¶¶ 5–6. On July 13, 2017, Sure Fit Home Décor sold its license in the Intellectual Property Rights to SF Home Décor LLC. PTX 89; Kreilein Aff. ¶¶ 8–9. There were no further transfers of the Hookless Trademark and the Trade Dress or relevant licensing agreements.[15]

### 3.    The EZ-ON Trademark, Plaintiffs' Dispute with Carnation, and the Carnation Licensing Agreement

The parties dispute whether the unregistered EZ-ON Mark was among the Intellectual Property Rights subject to the series of transfers above. The history of that mark is complicated, on the one hand, by a course of dealings between ZDG and A&A, and on the other, third party Carnation, which had originally owned and used that then-unregistered mark. The Court here sets out the facts bearing on the ownership of the EZ-ON Mark. These are context for the Court's finding, *infra*, that, by the time Kartri's sales of the accused products began in 2013, plaintiffs, not Carnation, owned the EZ-ON Mark.

The EZ-ON Mark was undisputedly originally used and commercialized by Carnation. Until 2008, ZDG and A&A had produced hookless shower curtains under their FLEX-ON Trademark, registered with the PTO under the number 2,948,547 (the "FLEX-ON Mark"). *See* PTX 532. Carnation's owner and president, Lawrence Mayer, testified that Carnation had sold hookless shower curtain products under the unregistered EZ-ON Mark since 2009. Mayer Dep.

---

[15] ZDG has entered into license agreements with other companies that are not at issue here. *See, e.g.*, Tr. at 124 (Zahner, testifying about license agreement with On The Right Track).

Tr. at 15, 33. In fact, a letter adduced in discovery establishes that Carnation's use of this mark dated back to at least to 2008. *See* PTX 360. The letter, dated December 16, 2008, is from counsel for ZDG and A&A to Carnation. It challenges Carnation's use of the EZ-ON Mark. *See id.* ZDG and A&A there claimed that Carnation's sale of shower curtains under the EZ-ON Mark imitated their FLEX-ON Mark, was likely to cause consumer confusion between the two, and likely infringed ZDG's three utility patents. *Id.* The letter directed Carnation to cease the alleged infringement. *Id.* Carnation refused.

On February 18, 2009, ZDG and A&A filed suit against Carnation in this District for patent infringement and unfair competition. *See Arcs & Angles, Inc*, No. 09 Civ. 1467. On February 1, 2012, the parties resolved that lawsuit via a settlement agreement, PTX 390, and a separate licensing agreement, PTX 370 ("Carnation Licensing Agreement").

Salient here, the Carnation Licensing Agreement in § 4.1 granted Carnation a license to sell the shower curtains that had given rise to the dispute; in § 4.2 granted A&A a "sublicense" to Carnation to use intellectual property associated with these products, including the EZ-ON Trademark; and in § 5.3 required Carnation to assign any newly conceived, commercialized, or registered intellectual property not explicitly covered in §§ 1.6–1.9 to ZDG and HSNA. More fully, the Carnation Licensing Agreement contained these provisions, among others:

> ***Section 1.6 (definition of "Licensed Products")***: The 'Licensed Products' shall be defined herein as shower curtains having integrated rings of the form depicted in Appendix A. The term Licensed Products shall also include any rings having a substantially similar appearance to that shown in Appendix A, namely, rings having a flat upper edge, an opening for suspension of the shower curtain on a shower rod, and a diagonal slit for placement of the opening on the shower curtain rod, wherein the slit extends from the inner circumference of the opening to the outer circumference of the opening, and wherein said diagonal slit is within +/− 15 degrees from that shown in Appendix A.
>
> Appendix A looks like this:

Appendix A



Fig. 1

PTX 370 at 13.

**Section 1.7 (definition of "Licensed Patents")**:  The 'Licensed Patents' shall be defined herein as all patents and patent applications licensed by [Arcs & Angles, LLC] from HSNA pertaining to the Licensed Products that are issued, pending or filed in the future [worldwide].  The Licensed Patents include, but are not limited to, [patents '248, '609, and '402]; any divisions, reissues, reexaminations, continuations, continuations-in-part, extensions thereof, and all foreign counterparts thereto.

**Section 1.8 (definition of "Licensed Trademarks")**:  The "Licensed Trademarks" shall include U.S. Trademark Registration No. 2,381,995 for HOOKLESS®; U.S. Trademark Application No. 77/878,05 for HOOKLESS, and CTM Trademark Registration No. 847,355 for HOOKLESS®.

**Section 1.9 (definition of "Intellectual Property")**:  The "Intellectual Property" shall be defined herein defined as the Licensed Patents and the Licensed Trademarks.

**Section 4.1 (non-exclusive sublicense to Carnation)**:  [Arcs & Angles, LLC] hereby grants Carnation, upon and subject to all the terms and conditions of this Agreement, a sub-license under the Intellectual Property to make, have made on its behalf, use, import, offer for sale, have offered for sale on its behalf, sell, have sold on its behalf, and export, the Licensed Products [worldwide] for the Term of this Agreement.  Such sublicense to Carnation is non-exclusive with respect to ZDG's current licensees, namely, HSNA [and A&A LLC].

20

***Section 4.2 (rights sublicensed to Carnation)***:  As part of said sublicense, [A&A LLC] hereby grants sub-licensee the right to use the following trademark on the Licensed Products: 'EZ ON Shower Curtain'; and also may use the phrase 'with patented HOOKLESS® technology' in small print . . . .  However, sub-licensee shall not use the trademark HOOKLESS® as a brand name for the Licensed Products.

***Section 4.3***: Carnation shall provide an example of a pre-production proof or sample of any Licensed Products, packaging, advertising, or other marketing or promotional material to A&A [LLC] before commercialization[.]

***Section 4.4***: This section restricts Carnation's sublicense to sell to retailers.

***Section 4.5***: This section prohibits Carnation from sublicensing, transferring, or assigning its rights under the Carnation License Agreement to another party.

***Section 5.3 (assignment of newly registered intellectual property to ZDG)***:  In the event that any intellectual property falling within the scope of Licensed Patents, Licensed Trademarks, or Licensed Products is conceived, reduced to practice, or developed, or a patent or trademark application is filed for by sublicensee during the term of this agreement, such additional intellectual property shall be assigned to ZDG and deemed included within the scope of the present agreement.

PTX 370.  By the time the Carnation Licensing Agreement was executed on February 7, 2012, A&A Inc. had assigned its intellectual property rights to A&A LLC.  On October 10, 2012, Focus acquired A&A LLC and, with it, A&A LLC's intellectual property rights under the Carnation Licensing Agreement.  *See* PTX 387 at 28–29.

The parties dispute whether, upon execution of the Carnation License Agreement in February 2012, A&A (and soon thereafter Focus) or Carnation owned the EZ-ON Trademark. Plaintiffs advance two arguments as to why ownership rights in the EZ-ON Mark vested in them from the moment the agreement was executed.  First, § 4.2's provision that Arcs & Angles, LLC "grant[ed] sub-licensee [*i.e.*, Carnation] the right to use" the Mark "EZ ON Shower Curtain" and the phrase "with patented HOOKLESS® technology" on the packaging of the EZ-ON curtain supports the inference that Arcs & Angles owned the EZ-ON Mark.  That is because plaintiffs could not grant a sublicense to Carnation in a mark that plaintiffs did not own.  Second, § 5.3

21

created an obligation for Carnation to assign to ZDG any "intellectual property" not captured by §§ 1.7 and 1.8 that was "conceived, reduced to practice, or developed, or [on which] a patent or trademark application is filed for by [Carnation] during the term of [the Carnation Licensing Agreement]." Insofar as the EZ-ON Mark, which was not registered until Carnation received a registration from the PTO on September 26, 2017, PTX 113, fell outside the "Intellectual Property" defined in the agreement as later registered, this was covered by § 5.3 and was assigned to ZDG pursuant to that provision.

Defendants counter with three arguments. First, they note that Carnation—specifically its CEO Mayer—subjectively continued to believe, after the agreement, that it owned the EZ-ON Mark, both before and after its registration in September 2017. Defendants ask that Carnation's understanding be credited. Second, they argue that § 4.2 should be read not as a licensing by plaintiffs to Carnation of the right to use the EZ-ON mark, but as vesting ownership of those rights in Carnation. And third, they assert, § 5.3 does not change this result, because it does not include the EZ-ON Mark. The Court resolves this dispute *infra*, in plaintiffs' favor, in the course of rejecting Marquis's affirmative defense that plaintiffs lack standing under the Lanham Act to pursue the EZ-ON trademark infringement claim because they purportedly did not own the EZ-ON Mark.

In the years after the agreement, a disagreement arose between Focus and Carnation as to who owned the EZ-ON Mark. Focus, understanding the agreement to vest ownership of the mark in A&A, upon its acquisition by A&A began to sell shower curtains using the EZ-ON Mark. Kreilein Aff. ¶ 14; Erickson Aff. ¶ 14. Zahner, who signed the agreement, Tr. at 131, testified at trial that he understood "that once this agreement was executed, [ZDG] would own the rights to the EZ ON shower curtain trademarks . . . and [ZDG] would license it [to HSNA]

Systems, and [HSNA] would license it back to Carnation," *id.* at 126.  Carnation, however, took

a different view, and on March 3, 2017, issued a cease-and-desist letter to Focus objecting to

Focus's usage of the EZ-ON Mark.  DTX 127 (Carnation letter); Kreilein Aff. ¶ 15.  Carnation

proposed to consent to Focus's usage if Focus made payments to it.  DTX 127; Kreilein Aff.

¶ 15.  In this litigation, Carnation's president and owner, Mayer, gave deposition testimony in

November 2018, in which he admitted he was "not sure" which entity owned the EZ-ON Mark

following execution of the Carnation Licensing Agreement, Mayer Dep. Tr. at 31–32, but

refused to concede that plaintiffs owned it, *see, e.g., id.* at 111.  From his perspective, the

Carnation Licensing Agreement had allowed Carnation "to get out of the [protracted] lawsuit,"

while "creat[ing] a little space that would permit [Carnation] to sell the [EZ-ON] product."  *Id.* at

31.

On September 29, 2021, Carnation and Focus's successor, Sure Fit, resolved their dispute

over who owned the EZ-ON Mark, executing an amendment to the Carnation Licensing

Agreement that assigned all rights to the EZ-ON Mark to ZDG.  On October 1, 2021, plaintiffs

filed a letter attaching that amendment, *see* Dkt. 414-1 at 14–15; *see also* PTX 113 (registration

of EZ-ON Trademark under number 5,296,144 with PTO to ZDG), and Carnation recorded that

assignment with the PTO.  Dkt. 414-2.  This Court held that it would not consider the September

2021 amendment as evidence as to who had owned the EZ-ON Mark at the time of the Carnation

License Agreement, as the agreement was entered into after discovery had closed.  Tr. at 6–7.

G.    **Advertising, Promotion, and Recognition of Plaintiffs' Products**

In 1997, HSNA began promoting Zahner's shower curtain products.  On March 30, 1998,

shortly after HSNA began selling these through the retail store Gracious Home, *New York*

*Magazine* featured the products in its "Best Bets" column.  PTX 543 at 2.  Zahner's hookless

products gained national exposure on QVC, in a segment for new products called "The Big

Time." Zahner Aff. ¶¶ 109–110.  In it, Zahner's products competed with other new products—and won.  *Id.* ¶ 112.  HSNA received positive feedback from those appearances and presented its Hookless products several more times on the QVC segment "Today's Special Value."  *Id.* ¶¶ 115–118.  In 2000, HSNA entered into a sales licensing agreement with the home furnishing company CHF Industries, Inc.  PTX 368.

HSNA's successors-in-interest A&A Inc., A&A LLC, Focus Products, and Sure Fit, widely advertised their shower curtains through various channels.  From 2008 on, Focus "did television ads, print ad[]s, trade shows, catalogs, websites, distributor buying guides, et cetera," Tr. at 217 (Kemp), plus physical flyers and website banners, *id.* at 237; *see also id.* at 227.

Focus and its predecessors have also heavily advertised their shower curtain products on TV.  Between 1997 and 2005, HSNA promoted plaintiffs' shower curtain products on QVC.  Between 2005 and 2009, Arcs & Angles ran 91 separate programs promoting those products on QVC.  *See* Tr. at 227; PTX 521 at 117 (listing TV appearances).  Sales followed: Kemp testified that the Hookless® product "broke records. . . . They ran through the stock. . . . In fact, QVC continuously asked to air it because the product did so well for them."  Tr. at 229.  Focus's television marketing included the videos in which Marcus quickly installed the product onto a shower curtain rod, *see* Tr. at 228–30 (video demonstrated); PTXs 471, 472 (video exhibits), and advertisements that began to appear around 2011, Tr. at 230; PTX 470.  Plaintiffs today continue to promote the products on QVC, Tr. at 227 (Kemp); *see also* PTX 469, 470 (video exhibits), exposing the products to millions of viewers.  Zahner Aff. ¶ 155.

In the retail market, A&A LLC promoted the HOOKLESS® shower curtains for their "ease of installation"; "ten second[]" installation time, PTX 547; the absence of missing or broken rings, "draping perfectly [and] sliding effortlessly," PTXs 547, 552, 560; the reduced

"hassle" of changing shower curtains, PTX 548; "install[ation] like magic in just seconds" with "no need to remove the rod," PTX 552; and lower maintenance costs and increased safety, satisfaction, and morale among hospitality and housekeeping staff, PTX 550, 559. *See also* PTX 554 (reduced labor costs due to reduced installation time), 561 (same), 562 (same), 549, 553, 555, 558. Focus, after acquiring A&A LLC's intellectual property rights, similarly touted the products as "[s]imple and dependable, . . . install[ing] in seconds, eliminat[ing] snags, and draw[ing] perfect folds in the curtain." PTX 121. By 2013, Focus asserted, its HOOKLESS® shower curtain had been "a fixture in retail for a decade." *Id.*

On the hospitality side of its business, Focus advertised its shower curtains in annual catalogs, *see* PTXs 394 (2011 catalog), 393 (2012), 418 (2013), 419 (2014), 420 (2015); *see also* PTXs 474, 476, 480, 481, 545, 564. HOOKLESS® products have been prominently displayed in advertising catalogs by the American Hotel Register Company ("AHR"). Dubinski Aff. ¶ 17. That catalog distributed between 200,000 and 250,000 copies a year to hotel chains nationwide. *Id.* ¶¶ 17, 19. AHR was Focus's second-largest customer. Tr. at 237 (Kemp). Its catalog ads were often financed with so-called rebates, in which Focus subsidized a distributor's advertising by paying a lump sum or a share of sales toward the advertising cost. *Id.* at 140–41 (Dubinski). Percentages of sales could range between 1% (for example, at Bed Bath & Beyond) to 10% (for example, at Amazon). Tr. at 240 (Kemp). In 2013, such rebates amounted to a total of approximately $250,000 on the hospitality business side, and approximately $200,000 on the retail business side. *Id.* at 241. Between 2009 and 2013, Focus spent approximately $1.2 million in rebates, covering both the hospitality and retail arms of its business. *Id.*

In 2013, Focus's total advertising budget for its hospitality business exceeded $500,000. *Id.* at 246. Focus also promoted its products via approximately "150 field reps" who were

trained at distributor trade shows. *Id.* at 248. In its retail business, Focus also drew customers who had been exposed to its HOOKLESS® products during their stays at hotels. *Id.*

In 2013, HOOKLESS® curtains were hung in approximately 2.5 million hotel rooms. *Id.* at 251. At an average occupancy rate of 76% per hotel, and an average length of stay of 2.5 to three days, that meant "over 100 million individual exposures" per year. *Id.* (Kemp). This had "enormous value" in increasing brand awareness. *Id.* Focus received so many individual consumer inquiries from hotel guests about its curtains that it prepared a dialogue script for its customer service team specific to such inquiries. *Id.* at 252.

Plaintiffs also promoted their products at trade shows. Between 2005 and 2009, Arcs & Angles made 34 trade show appearances. *See* PTX 521 at 117–18 (listing appearances). These continued after Focus acquired Arcs & Angles in 2009. *See* Tr. at 242–43, 245 (Kemp). The trade shows promoted the products to retailers, hospitality chains, and other distributors. *Id.* at 242.[16] Before trade shows, Focus conducted short training sessions with some vendors. *Id.* A&A LLC and Focus also pitched their HOOKLESS® products at AHR's sales expos and gave rebates and advertising allowances to customers who agreed to promote the product. Dubinski Aff. ¶¶ 15–16, 32. HOOKLESS® products dominated attention at many trade shows, Tr. at 243; between 2008 and 2013, Focus promoted its HOOKLESS® products in at least 15–20 trade shows per year, and thus in 60–100 during a five-year period. *Id.* at 243–44 (Kemp). In 2013, Focus had an approximately $250,000 budget for trade shows in the hospitality business and a

---

[16] *See also* Tr. at 244 (Kemp) ("[I]f it's a retail industry show, it's going to be the retail buyers that are coming in, maybe some designers. If it's a hospitality industry show, it could be designers, independents, boutiques, chains, hotel owners, decision makers, basically, as well as like, I said the chain designers. And if it's a chain show, it's going to be the individual brand hotels, the owners of the hotels and decision makers coming.").

separate budget for retail-oriented trade shows, both of which increased over time. *Id.* at 245–46.

Arcs & Angles and Focus also advertised their shower curtain products on their websites. *See* PTXs 461, 566. Plaintiffs' distributors—such as Guest Supply and True North—have also advertised plaintiffs' products. *See* PTXs 462, 521 at 82.

Plaintiffs' products have received favorable, unsolicited media coverage. As mentioned, in 1998, *New York Magazine* featured HSNA's HOOKLESS® curtain in its "Best Bets" section, calling the curtain "cutting-edge" in sparing customers the effort of "contorting to attach ugly hooks." PTX 543 at 2. In September 2001, the American Society of Interior Designers' magazine, *Icon*, featured the "ingenious" HOOKLESS® curtain in an editorial. *See* PTX 429. In 2009, *Woman's Day* magazine featured plaintiffs' shower curtain as a product one has "gotta have." PTX 468 at 2. In 1997, after a multi-week competition, QVC named plaintiffs' shower curtain the "Best New Product." Zahner Aff. ¶ 183.

Plaintiffs also introduced evidence of the shower curtains' favorable recognition in the hospitality industry, *see, e.g.*, Dubinski Aff. ¶¶ 9, 12, 20, 28, unsolicited customer testimonials for Hookless curtains, *see, e.g.*, PTXs 438, 457 at 2, 467, and customers' brand loyalty, *see* Dubinski Aff. ¶ 55; Erickson Aff. ¶ 25. Kartri's Kubus acknowledged that plaintiffs' HOOKLESS® shower curtains "gained a lot of momentum" in the hospitality market. Kubus Dep. Tr. at 26.

## H.    Plaintiffs' Market Share and Revenues

By the time defendants were developing their accused product in 2012, plaintiffs were the leading seller of shower curtains in the hospitality market. *See* Tr. at 661 (Goskowski, conceding that Focus, by late 2012, had established dominant market share). Throughout defendants'

accused conduct—October 2013 to November 2018—plaintiffs' market share was approximately 50%. Elmore Rep. ¶ 80; Tr. at 512 (Elmore).

By 2005, plaintiffs' curtains were used by more than 25 hotel and motel chains, and in more than one million hotel or motel rooms across the United States. PTX 551; Zahner Aff. ¶ 186. In 2007, these had grown to 39 hotel and motel chains and more than two million rooms. These chains included Hilton, Holiday Inn, Motel 6, and Red Roof. PTX 563; Tr. at 521.

Between 2005 and September 2013, Focus sold more than $150 million of Hookless shower curtains, with about 65% of these revenues coming from hospitality customers and the balance from retail customers. Tr. at 252–53 (Kemp).[17]

Between 2013 and August 2017, Focus's revenues for its HOOKLESS® shower curtains exceeded $81 million in the hospitality market: $14.7 million in 2013; $16.5 million in 2014; $21.2 million in 2015; $16.9 million in 2016; and $12.1 million in January through August 29, 2017. PTX 518; Elmore Rep. ¶ 98. These reflected sales of approximately 5.76 million shower curtains. PTX 515. During the same period, revenues for the HOOKLESS® shower curtains in the retail market exceeded $54 million: $8.7 million in 2013; $11.4 million in 2014; $13 million in 2015; $12.5 million in 2016; and $8.9 million in January through August 29, 2017. These reflected sales of approximately 4.57 million shower curtains. PTX 514.

### I.    Plaintiffs' Actions Against Alleged Infringers

Plaintiffs have taken various legal actions to defend the intellectual property at issue here.

---

[17] Additional evidence of plaintiffs' sales during that early period comes from Arcs & Angles's reported sales figures. Between 2005 and 2010, Arcs & Angles reported that sales for products under the HOOKLESS® brand had reached a volume of $88 million. PTX 521 at 116; Zahner Aff. ¶ 189. Carnation independently reported more modest sales figures. Between 2009 and January 2013, Carnation has had a total sales volume of $225,710. PTX 591.

On September 25, 2007, Arcs & Angles filed a complaint against Royal Pacific Corporation, claiming infringement of its HOOKLESS® Mark and '248 patent. *See* PTX 99. On December 6, 2007, that litigation ended in settlement and Royal Pacific's agreement to desist from its challenged conduct.  PTX 537.  Plaintiffs brought similar such challenges, with similar outcomes, against Aim-Co., Inc., *see* PTXs 100 (complaint filed January 25, 2008), 594 (settlement and agreement to desist executed April 1, 2008); DFW Motel Supply & Textiles, Inc., *see* PTXs 102 (complaint filed October 1, 2007), 350 (agreement to desist executed in October 2007); Neilmax Industries, Inc., *see* PTXs 340 (complaint filed November 16, 2007), 117 (agreement to desist executed in January 2008); and Trend Supply, Inc., *see* PTXs 103 (complaint filed April 15, 2010), 118 (agreement to desist executed May 24, 2010).  Plaintiffs also sent cease-and-desist letters to alleged infringers, which ended in agreements to desist. Recipients included: Courtesy Products, Inc., *see* PTX 381 (November 27, 2007 letter); Linens4Less Inc., *see* PTXs 589 (June 16, 2009 letter), 590 (email noticing desistance sent June 16, 2009); and Champion Supply Co., Inc., *see* PTXs 585 (January 6, 2009 letter), 586 (letter noticing desistance; undated, but fax watermark indicating receipt on January 8, 2009).

Through such measures, the Court finds, plaintiffs maintained exclusive control over its hookless shower curtains in the hospitality market between 1997, when the trade dress was introduced, and 2013, when defendants' alleged infringement began.  The above entities either ceased the challenged conduct, or entered into license agreements with plaintiffs.

**J.      Defendants' Challenged Conduct**

**1.      Late 2012–Early 2013: Pong Pitches Samples to Marquis**

Middleberg testified as follows.  In late 2012 or early 2013, he traveled to China to meet Pong Hsu of the Chinese textile manufacturing company Ramtex. Tr. at 549–50.  Pong and Middleberg had known each other through business dealings for more than 20 years. *Id.* at 548.

Middleberg usually purchased products from Ramtex either on behalf of Star Linen, or on behalf of Marquis, to resell those products in the United States. *Id.* at 549, 551.[18]

At this meeting, Pong showed Middleberg a sample of a hook-free shower curtain with a "D-shaped grommet." *Id.* at 550. Pong represented that he had developed the idea himself, that he had obtained a Chinese patent for it, and that he was in the process of applying for a United States patent. *Id.* at 553–54. Pong showed Middleberg a document with Chinese characters, representing it to be a Chinese patent. Middleberg, who does not read Chinese, relied on Pong's representation. *Id.* at 602. The samples provided by Pong and the accused products at issue in this lawsuit were "[e]ssentially" the same. Middleberg Dep. Tr. at 94–95. Pong proposed that Marquis acquire the product design to sell it to a U.S.-based manufacturer. *Id.* at 59–60.

Middleberg and Pong knew of Focus Products and the HOOKLESS® product. The two had spoken about Focus "many times." Tr. at 554. And Pong had formerly worked for Waytex, a manufacturer that supplied the HOOKLESS® product to Focus and its predecessor A&A LLC, and was "part of [Focus's] product development team and . . . manufacturing team. *Id.* Pong stated that his product competed with Focus's HOOKLESS® product, but claimed his design was "original" and "unique." Middleberg Dep. Tr. at 61–62. Pong also represented that he had consulted with his attorney and understood that Focus's patents in the HOOKLESS® technology had expired or were due to expire soon, and that Pong would soon secure his own patent on the sampled shower curtain ring. *See* Tr. at 555 (Middleberg testifying that "[Pong] mentioned to me that it had become a public domain kind of product; that the patent had run out or was about to run out"). Middleberg concluded that, if Marquis and its U.S. customers "could come into the market with this new idea, we might be able to carve out a niche for ourselves." *Id.* Pong

---

[18] Star Linen and Marquis are owned and run by the same person—Joseph Ranieri. Tr. at 550.

connected Middleberg to Pong's lawyer, Tommy Wang, who stated "that [Pong's] patent was pending and . . . felt confident that it would be issued." *Id.* at 554; *see also id.* at 582.

Despite knowing of Focus's HOOKLESS® product, Middleberg did not investigate whether Marquis's plan to roll out Pong's proposed product was limited by any valid United States patent—including as owned by Focus or its affiliates. *Id.* at 554. No Marquis official, employee, or attorney investigated whether A&A LLC or Focus held valid intellectual property rights in the HOOKLESS® technology, or whether Pong's proposed design might infringe those. Middleberg "rel[ied] on what Pong told [him]" in forming his belief that there was no legal impediment to Marquis's ability to sell the accused product. Middleberg Dep. Tr. at 72–75.

Kartri's Goskowski similarly testified that, despite knowing of Focus's existing patents in the HOOKLESS® technology, she was not concerned that Kartri's Ezy Hang products might infringe Focus's rights. Goskowski Dep. Tr. at 41–43. Goskowski did not seek advice from counsel. *Id.* at 43; *see also* Tr. at 643 (Kubus, testifying that "[Middleberg and Marquis] came with the name EZY-Hang and moved forward with the design, listening to Mr. Middleberg and Marquis that there was a patent, that everything was clear and safe, as I use the word 'safe.' It may not be the right word, but that's the way we approached it").

### 2. Late 2012–August 2013: Marquis Presents the Design Samples to Kartri; Kartri Purchases Test Orders; Defendants Profess Ignorance of Legal Restrictions on Their Sales of the Accused Products

In late 2012 or early 2013, during a sales meeting between Star Linen and Kartri, Middleberg, acting as Marquis's representative, presented Pong's pitched ring to Dolph—and possibly Kubus—of Kartri. Tr. at 549, 553, 641; Middleberg Dep. Tr. at 58–59, 83–84. Kartri's representatives "expressed some interest and took the samples back to their offices." Middleberg Dep. Tr. at 81. By this time, as Goskowski admitted, "the hospitality market had . . . gone in the direction of hook-free curtains," and Focus had established a dominant market share, to the

31

detriment of sellers of hooked shower curtains, Tr. at 660–61. Kartri felt market pressure from

its customers to pivot toward vendors of non-hooked shower curtains. *Id.* at 663–64

(Goskowski). Thus, "in an effort to keep up with . . . the changing business in the hospitality

area, [Kartri] decided to purchase [the proposed curtain design] from Marquis." *Id.* at 661.

Marquis and Kartri, assisted by Pong, experimented with refinements to Pong's sample,

including because, in the initial product, "the fabric tended to pull away from the grommet." Tr.

at 553, 556; Middleberg Dep. Tr. at 84, 89. Although the D-shaped ring's initial design included

a straight slit with no angles, Marquis and Kartri ultimately settled on a D-shaped ring with a slit

in the shape of a "lightning bolt"—the angled slit visible in the accused product. Tr. at 557, 593

(Middleberg). This design choice was advantageous because such rings could be snapped onto

the shower curtain rod with one hand—allowing hospitality staff installing such curtains to

secure themselves with their free hand. *Id.* at 558 (Middleberg).[19]

In or about August 2013, Kartri began purchasing small "test orders" of the accused

product. Middleberg Dep. Tr. at 95–96, 124–25. Kartri sold those to other resellers. *Id.* Those

products were met with "positive reception," and Kartri, through Kubus, began to place larger

orders. Middleberg Dep. Tr. at 97–98. Although Marquis and Kartri knew they were competing

with Focus's HOOKLESS® products on price and design, Middleberg testified that he and other

executives believed Pong's representation—that Focus's patents were "running out"—until the

point that Focus accused Marquis of infringement, Middleberg Dep. Tr. at 99–100, 108–09. He

also testified that he believed—until the Court's 2018 ruling following the *Markman* hearing in

this case—that Focus's patents did not cover the particular design of the Ezy Hang curtain ring.

---

[19] At trial, Middleberg sought to demonstrate this by having an assistant hold up a shower rod and Middleberg execute a one-handed installation. The demonstration went less than smoothly; as Middleberg "very much used two hands throughout the entire process." Tr. at 567–71.

*See* Tr. at 587–88 ("The way it was described to me was that . . . it was like a whole pizza and that prior to the *Markman* hearing, that the [USPTO] had ruled that each slice of the pizza with its own toppings . . . had to be patented itself. After the *Markman* hearing, the [J]udge said no, that's too restrictive and you can patent the whole pizza, and that was the way I understood it."). Middleberg did not have any training or expertise in patent law. *Id.* at 595, 665.

### 3.  August 2013–February 2015:  Communications Within Defendants Admitting the Similarity Between the Accused Products

Kartri marketed its accused product under the brand "Ezy Hang." *See, e.g.*, Kubus Dep. Tr. at 18–20. When customers inquired whether Kartri sold hookless products, Kartri personnel were directed to respond that Kartri could not sell that exact product, but that its competing Ezy Hang products were an adequate substitute. *Id.* at 18–23. If a client was interested in Ezy Hang, Kartri would "take it from there." *Id.* at 24. Kartri adopted this approach because it was "just try[ing] to do business. . . . [F]or 25 years, I've sat on the sidelines because [the market has] been monopolized by Hookless. I could never supply anything." *Id.* at 24.

The following communications of or with Kartri employees and executives, plaintiffs argue, reflect Kartri's appreciation—even before February 2015, when Focus sent a cease-and-desist letter to Kartri—of the strong similarity between plaintiffs' and defendants' products:

- On August 30, 2013, Middleberg emailed Kubus, stating, "if I understand correctly [Fairfield Inn] want[s] the same product that [A&A LLC] is using. What was your understanding?" Kubus responded by proposing to fill an order of the accused product "thinking we might get lucky." Middleberg Dep. Tr. at 127, 128, 130.

- On December 18, 2013, Dolph, Kartri's sales operations manager, sent an email with the subject line "HOOKLESS" to Kimberly Ihsen, product manager at Best Western International. The email stated that Kartri has "a version of hookless called EZY

Hang, [and] we would like to know how we can go about getting this product

considered as an offering on Best [W]estern supply." PTX 230 at 2.

- On April 24, 2014, in an email exchange among Pam Cales of GMK Associates and,

  *inter alia*, Sarah Woody, a Kartri sales director, Cales requested a price quote for

  "Hookless shower curtain[s]." Woody, without correcting Cales's misperception,

  provided the requested quote. PTX 231.

- Between December 8 and 16, 2014, in an email exchange initiated by retail customer

  Rick Roberts, Roberts requested a price quote for "Hookless Shower Curtains."

  Dolph quoted a price for a "Hookless Double H Chevron pattern" curtain. PTX 232.

Kartri also frequently received phone calls from consumers attempting to order Focus's

products. Kubus testified that consumers often called Kartri demanding "Hookless" products,

and "they either have a picture attached from Focus's website. . . . And it's just known in the

industry. I mean, they've bombarded the industry with that particular product because it saves

the housekeeper time and money to put this product up. It's just known. [Zahner has] done

really well in that marketing direction." Kubus Dep. Tr. at 52–53. She estimated that 50% of

buyers inquiring about hookless shower curtains asked Kartri for Focus's products. *Id.* at 53.

In early 2014, Middleberg heard "from fabric suppliers, weavers, jobbers, people with

whom we've had years of relationships that the suppliers weren't getting paid; that Focus was in

financial trouble; that it was—that there was an opportunity in the market for us to get aggressive

and get out there and sell because they had been cut off by their suppliers." Tr. at 573.

### 4.     February 27, 2015–2017: Focus Issues a Cease-and-Desist Letter and Sues Kartri; Defendants Continue to Sell the Accused Products

On February 27, 2015, Focus, through counsel, sent a letter to Marquis stating that its

manufacture and sale of the accused products infringed Focus's intellectual property rights, and

demanding Marquis cease and desist. PTX 152 at 1.[20]  That day, Woody, Kartri's general office sales director, forwarded the letter to Kartri's owners Goskowski and Kubus, who brought the letter to Middleberg's attention. PTX 166. The same day, Middleberg replied: "Don't worry about this [Pong and I] will submit our pa[t]ent number. There is nothing they can do." PTX 166 at 1; Tr. at 608. Middleberg did not confer with counsel before so responding, and "did nothing in response to this letter." Tr. at 608. Kubus did not ask Middleberg whether he had conferred with counsel in reaching this conclusion. *Id.* at 773. At some point in this period, Goskowski conferred with Kartri's counsel, Bernhard Molldrem, and "came away with the understanding that [she was] complying with the law." *Id.* at 648–49.

Marquis and Kartri thereafter "continued to market the product," Middleberg Dep. Tr. at 113, 121, for another three-and-a-half years, until November 12, 2018, three months after this Court issued its *Markman* ruling on August 9, 2018. Tr. at 587, 615, 654. Communications during this period, including the following, bear on defendants' contention that until then, they did not appreciate that their Ezy Hang product might be infringing Focus's patents or marks.

***Reliance on purported Chinese patent***: On March 3, 2015, days after receiving the cease-and-desist letter, Goskowski emailed Middleberg and Kubus, asking, "David, how do we get away with a China patent? How does that cover us in the U.S.?" *See* Goskowski Dep. Tr. at 99 (quoting email in PTX 167). Goskowski nevertheless testified that, upon seeing Pong's purported patents, she believed—despite these being in Chinese and untranslated—that these

---

[20] Before receiving the cease-and-desist letter, Kubus knew that Focus manufactured and distributed hook-free shower curtains for hotels, but had not inquired into Focus's patents. Tr. at 645 (Kubus). At an unspecified date before receiving the letter, Goskowski received a phone call from Bucklew, Focus's then-president. In that call, Goskowski told Bucklew that in her view, Kartri was not infringing. Tr. at 648–49 (Goskowski).

covered Kartri's Ezy Hang products. *Id.* at 99–100.[21]  Goskowski never sought a translation of the Chinese-language patent. Tr. at 668.  Although she attested that she had received the Chinese-language patents in 2013, these bear the date March 19, 2014.  *See* PTX 28-1 at 12. Goskowski testified that she had relied on Middleberg's claim to have found reliable Pong's claim to own a Chinese patent that would protect the Ezy Hang design in the United States, and believed Kartri's products were covered by that patent. Tr. at 674.  Goskowski never contacted her attorney, Molldrem, about the purported Chinese patents. *Id.* at 675.[22]

*Filing of Focus's first lawsuit*:  On June 30, 2015, Focus filed the first of two lawsuits today consolidated in this action. Its Complaint alleged that Kartri had infringed design patent '232 and the utility patents '248, '609, and '088. *Focus Prods. Grp. Int'l, LLC et al. v. Kartri Sales Co.*, No. 15 Civ. 5108 (PAE) (S.D.N.Y.), Dkt. 1.  The lawsuit was served on Kartri on September 11, 2015. *See id.*, Dkt. 8.

*Discovery of Carnation's EZ-ON product*:  In summer 2015, Kartri discovered Carnation's nearly identical EZ-ON product. Tr. at 676 (Goskowski).  The packaging of Carnation's product, Goskowski admitted, displayed on the front the language "using patented hookless technology," and listed the applicable U.S. patents—the design and utility patents at issue in this suit—on the back. Tr. at 678; *see* PTX 28 (Goskowski declaration) at 1 ("During the summer of 2015, we discovered [a] shower curtain, sold by Carnation . . . which had

---

[21] *See* PTX 28-1 (declaration by Goskowski, stating that "[i]n 2013, Mr. David Middleberg, contacted us to introduce a new style shower curtain that had an embedded buckle incorporated in its top margin," that "Mr. Middleberg had his supplier in China send [Kartri] patents that the supplier had obtained for the shower curtain embedded buckle," and that one such patent was "Chinese Utility Model patent CN 203852180 U (in English translation)," and another was "Chinese Design Patent CN 302766325 S (no translation available).").

[22] Middleberg later abandoned his view that Kartri's sales were lawful after Pong admitted to him that he did not in fact own a valid Chinese patent. Tr. at 603. The record does not reflect whether or when Middleberg communicated this to Kartri.

embedded flat-top rings that have an overall shape similar to the buckles in Kartri's Ezy-Hang curtains.")

*Decision not to conduct an infringement analysis*: On September 21, 2015, Pong, prompted by Middleberg, emailed his lawyer Wang, asking for his view whether the Ezy Hang product likely infringed the Focus patents, whether Pong's patent was valid, and whether Wang would be prepared to defend Pong in a lawsuit. PTX 258 at 2. On September 22, 2015, Wang responded, offering to conduct an infringement analysis and draft an infringement report for $3,500. *Id.* Marquis did not commission this analysis, despite Middleberg's awareness that Focus had claimed infringement of its design ('232) and two utility ('248 and '609) patents. Tr. at 599, 601 (Middleberg). Middleberg testified that, "in retrospect," Marquis "probably shouldn't have" continued to manufacture the accused Ezy Hang product, "but at the time we thought we were right and we continued to move forward." Tr. at 600.

*Filing of Focus's second lawsuit*: On December 30, 2015, Focus filed the instant action against Kartri. *Focus Prods. Grp. Int'l, LLC et al. v. Kartri Sales Co., Inc.*, No. 15 Civ. 10154 (PAE) (S.D.N.Y.), Dkt. 1. On February 4, 2016, Kartri brought Marquis into this action by initially filing a third-party complaint against it. *Id.* Dkt. 11; *see also id.* Dkt. 19 (Marquis waiver of service executed February 10, 2016).

*Pong's statements to Middleberg about a pending U.S. patent*: After litigation began, Pong claimed to Middleberg that he had a pending United States patent on the Ezy Hang product. On February 2, 2016, Middleberg emailed Pong: "When we last spoke in China you mentioned that the US Patent on the shower curtain buckle would be given to you in February [of 2016]. Can you please update me on perhaps a more specific date on which you expect to receive the patent?" PTX 183 at 2. Pong responded that patent approval would take "another 6–

8 months." *Id.* at 1. Marquis's president, Ranieri, interjected that "6–8 months could prove to be a problem." *Id.* Marquis nonetheless continued to sell the accused products to Kartri, for resale to hospitality or retail customers, believing that "Focus [was] in deep financial trouble," and that it and Kartri could "take advantage of that vulnerability." Tr. at 610–11 (Middleberg).

***Kartri's wariness of Pong***: On January 19, 2016, Goskowski emailed Middleberg, expressing frustration that he had had asked Kartri to accept payments directly from Pong, of whom her counsel had urged Kartri to steer clear. PTX 182.[23]

***Continued sales to customers of "Hookless" curtains***: After litigation began, Kartri continued in internal and customer communications to hold out Ezy Hang as equivalent to the HOOKLESS® product. On July 1, 2015, Woody, in an email to Kubus, referred to a certain Ezy Hang product as "our equivalent of the Hookless Double H pattern." PTX 217. In an email exchange between May 11 and 23, 2016, Kubus and Cheryl Hicks, a Kartri customer support representative, discussed a price quote for a hospitality customer seeking a "sub[stitute] or similar item" for an out-of-stock Focus product. PTX 609. In an email exchange in June 2016, retail customer Karen Teska of Standard Textile requested a quote for "Hookless shower curtains using our matrix fabric." Dolph quoted a price for Ezy Hang. PTX 246.

### K.    Procedural History of This Litigation

#### 1.    December 30, 2015–December 21, 2017: The Prior Related Action

On June 30, 2015, ZDG, HSNA, and Focus (the "original plaintiffs") sued Kartri, alleging willful infringement of the utility patents '248, '609, and '088 and of the EZ-ON Trademark, and unfair competition under the Lanham Act and New York law. *Focus Prods.*, 15

---

[23] *See also* PTX 182 at 1 (Kartri email to Middleberg, stating "now you want me to take a check from [Pong] and put it thr[ough] my company and send something back to you, NOT GOING TO happen, I am not going to take the chance of an audit by them and have them see a check from Pong").

Civ. 5108, Dkt. 1.  On October 1, 2015, Kartri answered and filed counterclaims.  Dkt. 9.  On

October 26, 2015, the original plaintiffs answered.  Dkt. 16.  On February 8, 2016, Kartri filed a

third-party complaint alleging that Marquis was the liable party.  Dkt. 22.

### 2.       December 30, 2015–December 21, 2017:  Initial Stages

On December 30, 2015, the original plaintiffs filed the initial complaint in this litigation

against Kartri, alleging willful infringement of the design patent '078.  Dkt. 1; *see also* Dkt. 7

(refiling).  On February 4, 2016, Kartri filed a third-party complaint against Marquis, alleging

that Marquis was the liable party.  Dkt. 11; *see also* Dkt. 13 (refiling).  On February 9, 2016,

Kartri moved to dismiss.  Dkt. 16.  On March 1, 2016, the original plaintiffs filed the first

amended complaint against defendants, now alleging willful infringement of the design patent

and the utility patents, and willful infringement of, and unfair competition with, the EZ-ON and

Hookless Trademarks and the original plaintiffs' trade dress, and adding Marquis as a third-party

defendant.  Dkt. 20.  On March 22, 2016, Kartri filed, and on March 24, 2016, refiled, a partial

motion to dismiss and strike certain allegations from the amended complaint, a memorandum of

law, supporting exhibits, and a declaration in support.  Dkts. 26–29.  On April 11, 2016, the

original plaintiffs opposed the motion.  Dkts. 33–34.  On April 12, 2016, the original plaintiffs

voluntarily dismissed the related action at 15 Civ. 5108 and converted Kartri from a third-party

defendant into a defendant.  Dkts. 28, 32, 36.  On April 18 and 19, 2016, Kartri filed a reply in

support of its motion to dismiss.  Dkts. 39–41.  On May 5, 2016, the original plaintiffs filed the

second amended complaint, amending claims and adding factual allegations.  Dkt. 47.  On May

26, 2016, Marquis filed a partial motion to dismiss.  Dkt. 55.  On June 17, 2016, the original

plaintiffs opposed the motion, Dkt. 58, and, on June 24, 2016, replied, Dkt. 59.

On July 14, 2016, the Court denied both motions to dismiss in their entirety.  *See* Dkts.

63, 77 (bench ruling transcript).  On July 25, 2016, the Court approved a case management plan

and consolidated this case with 15 Civ. 5108. Dkts. 65, 67. On July 26, 2016, the original

plaintiffs filed a third amended complaint consolidating all allegations from the two actions.

Dkt. 68. On July 27, 2016, the Court dismissed 15 Civ. 5108 with prejudice. *See* 15 Civ. 5108,

Dkt. 30. On July 28, 2016, both defendants answered and filed counterclaims. 15 Civ. 10154,

Dkts. 69, 70. On August 17, 2016, the original plaintiffs answered defendants' counterclaims.

Dkts. 75, 76.

On the next 13 months, discovery proceeded, contentiously. *See, e.g.*, Dkts. 106, 112,

125. On September 19, 2017, the Court ordered the filing of a Fourth Amended Complaint.

Dkts. 145, 158. On September 29, 2017, that complaint—now entailing all plaintiffs in the

action—was filed. Dkt. 148 ("FAC"). On October 12, 2017, Kartri filed a motion to dismiss or

transfer for improper venue. Dkt. 149. On October 13, 2017, both defendants answered the

FAC and filed counterclaims. Dkts. 150, 151. On October 27, 2017, plaintiffs opposed Kartri's

motion and filed supporting declarations and exhibits. Dkts. 153–154.

On December 21, 2017, the Court denied Kartri's motion in a bench ruling. Dkt. 171.

### 3.   July 7, 2017–August 9, 2018: The *Markman* Hearing and Ruling

On July 7, 2017, the parties filed their original joint claims chart, Dkt. 124, and, on

November 22, 2017, an amended such chart. Dkt. 162.[24] On July 26, 2018, the Court held a

---

[24] On December 22, 2017, plaintiffs filed an opening *Markman* brief. Dkt. 169. On January 22, 2018, defendants filed *Markman* briefs and supporting exhibits. Dkts. 173, 174. On February 5, 2018, plaintiffs filed reply briefs. Dkts. 177, 179. On February 9, 2018, Marquis sought leave to file, and submitted, a sur-reply. Dkt. 181. On February 14, 2018, plaintiffs consented to Marquis's filing of the sur-reply, on the condition that the Court also consider plaintiffs' responsive letter brief. Dkt. 182.

*Markman* hearing.  *See* Dkt. 193 (transcript).  On August 9, 2018, the Court issued its *Markman*

ruling, construing 16 disputed terms relevant to the utility patents.  Dkt. 198.[25]

### 4.      March 5, 2019–January 4, 2021:  The Summary Judgment Decisions

On March 5, 2019, the Court held a pre-motion conference.  *See* Dkts. 230, 241

(transcript).  On March 26, 2019, plaintiffs filed a summary judgment motion and supporting

materials on their claims of design patent and trade dress infringement and on damages theories.

*See* Dkts. 243, 244.  They also moved to preclude defendants from offering revenue and cost

data—and expert testimony based on it—that they had not produced in fact discovery.  Dkt. 246.

On April 17, 2019, defendants filed a cross-motion and supporting materials,on their

counterclaims that plaintiffs' Hookless Trademark is invalid, that defendants had not infringed

the EZ-ON Trademark, and that plaintiffs lacked standing to allege infringement of the EZ-ON

Trademark.  Dkts. 253, 255.  They also opposed plaintiffs' motion to preclude.  Dkt. 254.  On

---

[25] The Court construed the utility patents' terms as follows.  For the '248 patent, the term "item" as "curtain," Dkt. 198 at 6; for all three utility patents, the term "ring" as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening," *id.* at 7; for all three utility patents, the term "inner circumference" as "inner edge that is curved, at least in part," *id.* at 13; for all three utility patents, the term "outer circumference" as "outer edge that is curved, at least in part," *id.*; for the '248 patent, the term "comprising a top" as "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point," *id.* at 15; for the '248 patent, the term "approximately horizontal component"—which referred to the slit in the ring—as "a component that is either level or nearly so," *id.* at 20; for the '248 patent, the term "said slit exits said ring at said upper edge of said curtain" as "the slit exits the ring at or near the upper edge of the curtain," *id.* at 22; for the '248 patent, the term "closed ring" as "a slit where the ring is 'closed'—that is, the two radial edges adjacent to the slit are pressed together," *id.* at 23; for the '609 and '088 patents, the term "projecting edge" as "an edge that projects from the outer circumference of the ring," *id.* at 25; for the '609 patent, the term "next to said slit" as "adjacent to the slit," *id.*; for the '609 patent, the term "extends towards the ceiling" as "points upward (would hit the ceiling if extended)," *id.* at 26; for the '248 and '609 patents, the term "offset said top" as "to a side of the top," *id.* at 27; for the '609 patent, the term "slit extends through" as "slit passes through," *id.* at 28; for the '609 and '088 patents, the term "o'clock position" as "corresponding to the position on a standard 12-hour clock face"; and for the '609 patent, the term "approximately the 1 o'clock or 2 o'clock position on said ring" as "the area between and around the 1 o'clock and 2 o'clock positions on a standard 12-hour clock face," *id.* at 33.

May 7, 2019, plaintiffs filed an opposition to defendants' cross-motion and reply, a reply in support of their motion to preclude, and supporting materials. Dkts. 272–275. On May 21, 2019, defendants filed their reply and supporting materials. Dkt. 288.

On April 16, 2020, the Court resolved the cross-motions for summary judgment, and held the motion to preclude in abeyance. Dkt. 297. On May 14, 2020, plaintiffs moved for limited reconsideration of the Court's holding that plaintiffs' trade dress was generic and a memorandum and exhibits in support. Dkt. 303. On May 27, 2020, defendants filed a memorandum in opposition. Dkt. 305. On June 5, 2020, plaintiffs replied. Dkt. 308. On June 30 and July 1, 2020, plaintiffs supplemented their briefing. Dkts. 309, 310.

On January 4, 2021, the Court granted plaintiffs' motion for reconsideration, reversing its holding that their trade dress was generic and reserving that issue for trial. Dkt. 312.

### 5.    April 15, 2021–June 24, 2022:  Final Pretrial Matters

On April 15 and 16, 2021, the parties filed their joint pretrial order and proposed *voir dire* and jury instructions. Dkts. 323, 329, 345, 346. On April 15, the parties filed motions *in limine*—five by plaintiffs, Dkts. 324–328, three by Marquis, Dkts. 338, 340, 342, and 12 by Kartri, Dkts. 330–337, 339, 341, 343, 344. On May 21, 2021, the parties filed oppositions. Dkts. 366–381. On May 28, 2021, the parties filed replies. Dkts. 383–387. On August 5, 2021, the Court resolved plaintiffs' motions *in limine* in a bench ruling. Dkts. 393, 412 (transcript). On November 23, 2021, the Court resolved defendants' motions *in limine* in a bench ruling. Dkts. 425, 433 (order), 436 (transcript).

On April 13, 2022, the parties consented to a bench trial. Dkt. 443. On April 25, 2022, the Court scheduled trial for June 15–17 and June 27–29, 2022. Dkt. 444. On May 14, 2022, defendants filed proposed findings of fact, conclusions of law, and a supporting exhibit. Dkt. 453. On May 20, 2022, defendants filed excerpts of supporting deposition testimony. Dkt. 454.

That same day, plaintiffs filed their proposed findings of fact, conclusions of law, and supporting exhibits and deposition testimony excerpts. Dkt. 455. On June 3, 2022, defendants filed objections to plaintiffs' witness declarations. Dkt. 463. On June 7, 2022, the Court adjourned the June 15–17 trial dates, kept the June 27–29 trial dates, and scheduled new trial dates for July 26–28, 2022. Dkt. 468. On June 10, 2022, plaintiffs responded to defendants' objections. Dkt. 471. On June 21, 2022, the Court overruled these objections. Dkt. 474. On June 24, 2022, defendants submitted further objections to plaintiffs' witness declarations. Dkt. 478.

On June 27–29 and July 26–28, 2022, the Court held a bench trial. On August 11, 2022, plaintiffs filed updated proposed findings of fact and conclusions of law. Dkt. 494. On August 25, 2022, defendants did the same. Dkt. 500.

## II.   Conclusions of Law as to Liability on the Claims Before the Court

### A.   Jurisdiction

The FAC brings claims of patent infringement under 35 U.S.C. §§ 101 *et seq.* (Count I), and of trademark infringement and unfair competition under 15 U.S.C. § 1125(a) (Count II). The Court has subject matter jurisdiction over these claims under 28 U.S.C. § 1331. *See Smith v. Harris*, No. 21 Civ. 571 (PAE), 2021 WL 4655943, at *2 (S.D.N.Y. Oct. 6, 2021) (citing *Bay Shore Union Free Sch. Dist. v. Rain*, 485 F.3d 730, 734–35 (2d Cir. 2007)).

Count III brings a New York common law claim of unfair competition with plaintiffs' Trade Dress. The Court has subject matter jurisdiction over this claim under 28 U.S.C. § 1367, as it arises from a common nucleus of fact as the federal claims, in that all turn on the same allegedly infringing conduct. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

### B.     Standing Under the Lanham Act

At the threshold, the Court must determine whether any plaintiff has standing under the Lanham Act to bring claims of infringement and unfair competition for the Hookless Mark, the EZ-ON Mark, and the Trade Dress. This turns on whether any plaintiff owns the two marks and Trade Dress. The parties particularly contest ownership of the EZ-ON Mark.

### 1.     Applicable Legal Framework

Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The Lanham Act "provides separate causes of action for, among other things, infringement of registered and unregistered trademarks." *Fed. Treasury Ent. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013); *see* 15 U.S.C. § 1114 (registered trademark); *id.* § 1125 (unregistered trademark or trade dress). An infringement action under § 1114 for registered trademarks—such as the HOOKLESS® Mark—is available only "to 'registrant[s]' of the trademarks at issue, which the Act defines to embrace the actual registrant's 'legal representatives, predecessors, successors and assigns.'" *SPI Spirits*, 726 F.3d at 72 (quoting 15 U.S.C. § 1127). By contrast, § 1125(a) allows "any person who believes that he or she is or is likely to be damaged" by a defendant's actions to bring an infringement action for an unregistered trademark or a trade dress. 15 U.S.C. § 1125(a). A plaintiff must also show that the trademark or trade dress is valid. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017).

### 2.    Ownership and Validity of the HOOKLESS® Mark

"A certificate of registration with the PTO is *prima facie* evidence that the mark is registered and valid (*i.e.*, protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 433 (S.D.N.Y. 2019) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 217 n.10 (2d Cir. 2012)) (alteration in *Capri Sun*). "As such, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden of production and persuasion to rebut the presumption of ownership." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 239 (S.D.N.Y. 2013) (citing, *inter alia*, *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976)).

Plaintiffs have produced certificates of registration that meet their *prima facie* burden. These show that, on June 6, 2000, ZDG registered the Hookless Mark on the PTO's Principal Register under registration number 2,355,554, PTX 84, and on August 29, 2000, ZDG registered the Hookless Mark on the PTO's Supplemental Register, PTX 85. On a date the record does not specify, the PTO refused to continue the Hookless Mark's registration, on the grounds that it was merely descriptive of the shower curtain product. *See* PTX 87. On November 23, 2009, ZDG filed a response opposing that determination. *Id.* On August 3, 2010, ZDG registered the Hookless Mark on the PTO's Supplemental Register under registration number 3,829,837. PTX 86. On April 17, 2012, ZDG registered the Hookless Mark on the PTO's Principal Register under registration number 4,127,283. PTX 520.

Defendants have not adduced evidence of the Hookless Mark's invalidity. As the Court explained in its summary judgment decision on April 21, 2020, plaintiffs have accused only Kartri of infringing the Hookless Mark. Marquis thus lacked standing to challenge the mark's validity. Dkt 297 at 20. And, the Court held, Kartri had failed to timely assert the defense and

thereby waived it. *See id.* ("Failure to plead an affirmative defense ordinarily results in forfeiture of that defense." (quoting *Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015))).

The Court accordingly finds the Hookless Mark valid and that plaintiffs own that mark. Plaintiffs have standing to bring their Lanham Act claims pertaining to the HOOKLESS® Mark.

### 3.     Ownership and Validity of the EZ-ON Mark

#### a.     Ownership

To establish ownership over an unregistered trademark, a plaintiff must show "prior use of the trademark." *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 573 (S.D.N.Y. 2013). "[A] plaintiff can demonstrate prior use through licensing the trademark to a licensee." *Id.* at 574 (citing *Haw.–Pac. Apparel Grp. Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006)). This is so even where the "first and only use of the mark was made . . . by the licensee," so long as the licensor "exercise[s] some control over the licensee's use of the mark." *Id.* (citing *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir. 2002)).

Plaintiffs argue that the February 1, 2012 Carnation License Agreement, PTX 370, unambiguously conferred ownership of the EZ-ON Mark on plaintiffs' predecessor A&A LLC, and thus gave plaintiffs standing to bring infringement and unfair competition claims as to that Mark. The Court must therefore interpret that Agreement to determine whether this is so.

"Under New York law, the interpretation of a contract 'is a matter of law for the court to decide.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 650 F. App'x 70, 71 (2d Cir. 2016) (summary order) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). "If the Court finds contract provisions to be unambiguous, then it must interpret those provisions in light of 'their plain and ordinary meaning.'" *Id.* (quoting *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011)). "However, if the

contract is ambiguous and relevant extrinsic evidence as to its meaning is available,

its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance*

*Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006).  "In interpreting an ambiguous contract

provision, the factfinder 'should, when possible, apply the same measure as the parties have

applied in performing their obligations.'" *Id.* at 112 (citations omitted).

　　The Carnation License Agreement unambiguously gave A&A LLC, Focus's predecessor,

control over Carnation's use of the intellectual property that is the subject of that agreement.

Section 4.1 states that the "sublicense to Carnation is non-exclusive with respect to ZDG's

current licensees, namely HSNA, A&A [LLC and others]."  Section 4.2 states that, "[a]s part of

said sublicense, [A&A LLC] hereby grants [Carnation] the right to use the following trademark

on the Licensed Products: 'EZ ON Shower Curtain[.]'"  And § 5.3 requires that Carnation assign,

*inter alia*, "any intellectual property falling within the scope of Licensed Patents, Licensed

Trademarks, or Licensed Products . . . or a patent or trademark application is filed for by

sublicensee during the term of this agreement."

　　The only point of contention between the parties is whether the EZ-ON Mark falls within

the scope of the Carnation License Agreement, that is, whether the agreement required Carnation

to assign the EZ-ON Trademark when it applied for its registration with the PTO.

　　For three independent reasons, the Court finds that, by its unambiguous terms, the

Carnation Licensing Agreement bound Carnation to assign its rights in the EZ-ON Trademark to

ZDG.

　　First, § 1.6 defines the "Licensed Products" as "shower curtains having integrated rings

of the form depicted in Appendix A" and "any rings having a substantially similar appearance to

that shown in Appendix A, namely, rings having a flat upper edge, an opening for suspension of

the shower curtain on a shower rod, and a diagonal slit for placement of the opening on the shower curtain rod, wherein the slit extends from the inner circumference of the opening to the outer circumference of the opening, and wherein said diagonal slit is within +/– 15 degrees from that shown in Appendix A." Comparing the images of Appendix A to the Carnation License Agreement and the EZ-ON Mark as Carnation used it at the time makes clear the two are "substantially similar."

## Appendix A



Fig. 1



Second, under § 4.2, A&A LLC "grants" Carnation the right to use the mark "EZ ON Shower Curtain"—at the time unregistered—on its licensed products. The restrictions that the Carnation License Agreement imposes on these products thus restrict the use of the EZ-ON Mark on those products. It would not have made sense for licensor A&A LLC to grant Carnation the right to *use* the EZ-ON Mark on its shower curtain products if Carnation *owned* the Mark.

Defendants argue that Carnation has professed a contrary subject understanding of § 4.2, and that Carnation's understanding should control. That contention does not fairly reflect the record. Mayer, Carnation's CEO, testified that he viewed § 4.2 to mean merely that A&A LLC and ZDG consented to Carnation's usage of the Mark, not that A&A LLC or ZDG owned it. Mayer Dep. Tr. at 121 ("A: I took it to mean that it was [a] recognition that we were already doing this, so, I wasn't aware that [ZDG and A&A LLC] were granting a right that [they] possessed."). But he did not dispute that, under § 4.2, plaintiffs had granted Carnation the right to use the EZ-ON Mark. *Id.* Pressed, Mayer acknowledged that "what [§ 4.2] says" was that A&A LLC had granted Carnation a sublicense in the EZ-ON Mark. *Id.* And when questioned whether "someone [could] sublicense rights if they don't own those rights," Mayer conceded, "I would think not." Mayer Dep. Tr. at 138–39. In any event, the plain language of the agreement controls, not one party's claimed understanding. *Lantheus Med. Imaging*, 650 F. App'x at 71. In light of the plain language of § 4.2, Carnation was undeniably required to assign the unregistered EZ-ON Mark and its trademark application to ZDG.[26]

Third, § 5.3 independently establishes that plaintiffs owned the EZ-ON Mark. It states: "In the event that any intellectual property falling within the scope of Licensed Patents, Licensed

---

[26] It is undisputed that Carnation filed a trademark application with the PTO for the EZ-ON Mark during the term of the Carnation License Agreement. Mayer Dep. Tr. at 134.

Trademarks, or Licensed Products is conceived, reduced to practice, or developed, or a patent or trademark application is filed for by sublicensee during the term of this agreement, such additional intellectual property shall be assigned to ZDG and deemed included within the scope of the present [a]greement." PTX 370 at 5. The phrases "intellectual property" and "additional intellectual property" are not capitalized in this provision; they are thus used in the vernacular, not in the defined sense that § 1.9 uses the capitalized term "Intellectual Property." And reading "intellectual property" in § 5.3 to refer to the "Intellectual Property" in § 1.9 would create an inconsistency, as "Licensed Patents, Licensed Trademarks, or Licensed Products" encompass the definition of "Intellectual Property" of § 1.9. It is also clear that the EZ-ON Mark is intellectual property that "falls within the scope" of the Intellectual Property defined in §§ 1.6–1.9, as the Court has found, *supra*, that the D-shaped ring under the EZ-ON Mark is "substantially similar" to the ring depicted in Appendix A. Further, the unregistered EZ-ON Mark was, between 2012 and the start of this suit in December 2015, "reduced to practice," and a trademark application as to it was filed only later. *See* Mayer Dep. Tr. at 33, 129 (conceding that Carnation, "at a subsequent date[,] . . . applied for and received [a] trademark for [the EZ-ON Mark]"). The unregistered EZ-ON Mark and its trademark application thus are "additional intellectual property" that Carnation was required to assign to ZDG.[27]

---

[27] Defendants' counterargument, as articulated by Mayer, fails. He contended that "EZ On [does not] fall[] within any of those categories [in § 5.3] to any rights that Focus [held]." Mayer Dep. Tr. at 125. He based this reading on a conflation of § 5.3's term "intellectual property" with § 1.9's term "Intellectual Property"—specifically defined as the "Licensed Patents" as defined in § 1.7 and the "Licensed Trademarks" as defined in § 1.8, but not covering the "Licensed Products" of § 1.6. *Id.* at 126. But § 5.3 in its entirety refers to lower-case "intellectual property falling within the scope of the Licensed Patents, Licensed Trademarks, or Licensed Products" as each term is defined in §§ 1.6–1.8. As noted, Mayer's construction would make the agreement internally contradictory. At trial, the Court questioned Zahner as to his understanding why "Intellectual Property" in § 5.2 was capitalized, but not capitalized in § 5.3, and whether it meant

In contesting plaintiffs' ownership of the EZ-ON Mark, defendants also point to Carnation's March 3, 2017 cease-and-desist letter to Focus. DTX 127. That letter is not cognizable, because the Court finds the Carnation License Agreement textually unambiguous. *See Lantheus Med. Imaging*, 650 F. App'x at 71. But even if considered, the letter would not guide the meaning of the Agreement. It would merely reflect a post-agreement dispute as to its terms, which the Court finds unambiguous. And, although disputing that § 5.3 covered and made assignable to ZDG newly developed intellectual property, Mayer conceded facts making the EZ-ON Mark such property, in that the Mark appeared on the packaging of a Licensed Product and that he had filed a trademark application for the Mark within the term of the Carnation License Agreement. Mayer Dep. Tr. at 129, 134, 179; *see* PTX 113 at 1 (Carnation application to register EZ-ON Trademark with PTO, filed March 3, 2017, granted September 26, 2017); *see also* Tr. at 131–32 (Zahner, testifying that PTX 270 contained a true and correct image of a packaged EZ-ON curtain product that Carnation used in selling the EZ-ON product).

The Court accordingly finds that plaintiffs own the EZ-ON Mark.[28] They thus have standing under the Lanham Act to bring their claims that defendants infringed and unfairly

---

that § 5.2 referred to the Intellectual Property extant at the time of the formation of the Carnation License Agreement, whereas § 5.3 referred to intellectual property to be generated. Tr. at 127–28. Non-lawyer Zahner initially could not explain the differing capitalization in the sections. *Id.* at 128. But, when later questioned as to his understanding as to who held proprietary rights under the Carnation Agreement, Zahner testified that it covered "anything that's developed by Carnation during this time that relates to the intellectual property that we're licensing them, whether it be a trademark, trade dress, or manufacturing method, a patent, an extension, an improvement, all those things would be assigned to [ZDG] and licensed to [HSNA] and [then] licensed to the appropriate person [at Carnation]." *Id.* at 130.

[28] In so finding, the Court does not rely on evidence plaintiffs adduced of a new agreement entered into deep in this litigation. On October 1, 2021, three years after the close of fact discovery, plaintiffs filed a letter and supporting exhibits representing that, on September 29, 2021, plaintiffs ZDG, HSNA, SF Home Décor, and Sure Fit Home Products, and non-party

competed with that Mark.  Defendants' affirmative defense that plaintiffs lack standing as to this claim is dismissed.

        *b.*      *Validity of the EZ-ON Mark, and Marquis's Counterclaim of Invalidity*

Marquis's only argument that the EZ-ON Mark is invalid is that, as of the alleged infringement in August 2013, not enough time had passed for Focus to acquire the consumer goodwill associated with the EZ-ON Mark.  But a licensee's use of a trademark—such as Carnation, the seller of the EZ-ON product—"inures to the benefit of the licensor," *E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000); *see also* 15 U.S.C. § 1055; *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F. Supp. 2d 1, 20–21 (S.D.N.Y. 2001), *aff'd in relevant part and remanded*, 277 F.3d 253 (2d Cir. 2002).  Marquis does not adduce authority that is contrary to this proposition.  The Court thus finds the EZ-ON Mark valid and denies Marquis's counterclaim that it is invalid.

---

Carnation had executed an agreement, Dkt. 414-1 (the "("AA"), that amended and clarified their existing Licensing Agreement of February 1, 2012. Dkt. 414.  The AA specified, in effect, that the intellectual property rights in the EZ ON Trademark and trade dress were owned by ZDG, and had been since the time of the License Agreement's execution.  The AA stated that: (1) "[p]ursuant to the [Licensing] Agreement, all intellectual property rights to the Ring and to the Shower Curtains incorporating that Ring . . . were owned and to be owned by ZDG," AA § 1(d); (2) "Carnation hereby irrevocably assigns to ZDG all rights, title, and interest that Carnation has or may have in the intellectual property associated with the Ring and Shower Curtain . . . including all rights in the EZ ON Trademark and EZ ON Trademark Registration and all good will associated therewith," *id.* § 2(a); (3) Carnation would not contest ZDG's ownership in the intellectual property rights in the HOOKLESS® Mark from February 1, 2012, *id.* § 3(a); and (4) Carnation would not contest ZDG's ownership in the intellectual property rights in the EZ ON mark from February 1, 2012, *id.* § 3(b).  On October 1, 2021, Carnation registered the AA with the PTO. Dkt. 414-2.  Plaintiffs contended that this letter confirms that they have owned the EZ ON Trademark and trade dress since at least February 1, 2012.  Although the Court does not rely on this letter as proof of ownership, the Court denies defendants' post-trial request, at Dkt. 480, to strike the letter or plaintiffs' counsel's references to it.

### C.    Failure to Join an Indispensable Party

Marquis asserted as its 11th affirmative defense that plaintiffs had failed to join an

indispensable party (Carnation) that had an ownership interest in, *inter alia*, the common law

trademark of EZ-ON, and the trade dress at issue here.[29]  Dkt. 151 at 21.

A party may seek dismissal under Rule 12(b)(7) at any stage of a proceeding before or

during trial, for failure to join a necessary party under Rule 19.  Rule 12(b)(7) requires a district

court to "dismiss an action where a party was not joined only if: (1) an absent party is required,

(2) it is not feasible to join the absent party, and (3) it is determined 'in equity and good

conscience' that the action should not proceed among the existing parties."  *In re Great Ail. &*

*Pac. Tea Co., Inc.*, 467 B.R. 44, 58 n.9 (S.D.N.Y. 2012) (quoting *Republic of Phil. v. Pimentel*,

553 U.S. 851, 862–63 (2008), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.*,

508 F. App'x 63 (2d Cir. 2013) (summary order)).

> Under Rule 19(a)(1), a person must be joined as a necessary party, if feasible, if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  The second prong of Rule 19(a) requires that "there must be more than

an unsupported assertion that [the non-joined party] has a claim to that interest."  *Jonesfilm v.*

*Lion Gate Int'l*, 299 F.3d 134, 140 (2d Cir. 2002) (citing Rule 19(a)(2)).

---

[29] The defense also asserted the indispensable party's ownership and interest in the design and utility patents.  As to the design patent, that issue is not before the Court, with the proceedings as to that patent presently stayed.  As to the utility patents, the Court found on summary judgment that defendants have infringed the utility patents; this defense is therefore meritless.

"Where a court makes a threshold determination that a party is necessary under Rule 19(a) and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must then determine whether the party is 'indispensable' under Rule 19(b)." *Dunn v. Standard Bank London Ltd.*, No. 05 Civ. 2749 (DLC), 2006 WL 217799, at *2 (S.D.N.Y. Jan. 30, 2006) (citing *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002)).

Carnation was not a necessary party to this suit. The Court therefore need not determine whether it was indispensable. Marquis's defense turns on its claim that Carnation, not plaintiffs, own the EZ-ON Mark. And while it is "obvious [that] trademark owners are treated as necessary parties to a trademark infringement action[,] . . . [a] party that has assigned its entire interest in United States trademark rights is generally not treated as a necessary party." *Alcon Vision, LLC v. Lens.com, Inc.*, No. 18 Civ. 407 (NG) (RLM), 2022 WL 1665453, at *9 (E.D.N.Y. May 25, 2022) (citing *Escamilla v. M2 Tech., Inc.*, 536 F. App'x 417, 420–21 (5th Cir. 2013) (summary order); and *Shima Am. Corp. v. S.M. Arnold, Inc.*, No. 88 Civ. 10064, 1989 WL 65014, at *2 (N.D. Ill. June 7, 1989)). Here, the Court has held that, under the 2012 License Agreement between plaintiffs and Carnation that settled the lawsuit between them, plaintiffs have owned the EZ-ON Mark. This alone supports denial of Marquis's Rule 19 defense. *See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, No. 04 Civ. 4099 (DLC), 2005 WL 1164073, at *11 (S.D.N.Y. May 18, 2005) (denying 19(a) motion where non-party had assigned its trademark rights to a party); *Shima Am. Corp.*, 1989 WL 65014, at *2 ("By the October 1988 agreement, Kanebo has assigned all rights and duties to Shima and cannot be considered a necessary party to this action.").

Nor is there a threat of duplicative future litigation. In an amendment to the 2012 License Agreement executed on September 29, 2021, Carnation explicitly contracted not to

challenge plaintiffs' ownership of the EZ-ON Mark and trade dress. *See* Dkt. 414-2 at 2[30]; *see also De Beers LV*, 2005 WL 1164073, at *10, *12 (rejecting concern about future litigation where non-party had assigned trademark rights to a party).

The Court accordingly denies Marquis's affirmative defense under Rule 19(a).

Having resolved all threshold issues and finding plaintiffs to have standing to bring all claims in this action, the Court proceeds to the merits.

### D.      Infringement of Plaintiffs' Patents

There are no live issues at liability for patent infringement.  The Court ruled, on summary judgment, that defendants have infringed plaintiffs' utility patents '248, '609, and '088. *See* Dkt. 297.  And, as noted, plaintiff's patent infringement claim as to the design patent '078 has been stayed on consent pending a decision by the PTO as to its validity.  JPTO at 4.

### E.      Infringement of the HOOKLESS® Trademark, EZ-ON Trademark, and Trade Dress Under Lanham Act Claims

Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  To prevail on a trademark infringement, false designation of origin, or unfair competition claim, a plaintiff must show, first, that it owns a valid mark entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods. *See, e.g.,*

---

[30] On the first day of trial, the Court notified counsel that it would not consider the amendment as evidence of ownership, but reserved doing so for other purposes, Tr. at 6–7, such as that here.

*Louboutin*, 696 F.3d at 224; *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003);

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

Section 43(a) protects "not just word marks, such as 'Nike,' and symbol marks, such as

Nike's 'swoosh' symbol, but also 'trade dress'—a category that originally included only the

packaging, or 'dressing,' of a product, but in recent years has been expanded by many Courts of

Appeals to encompass the design of a product." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S.

205, 209 (2000); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).

### 1.    Entitlement to Protection

Having found the EZ-ON and HOOKLESS® Marks valid and owned by Focus, the Court

turns to whether Focus's Marks and Trade Dress are protectable.

#### a.    *Applicable Legal Framework*

For a mark to be "protectable," it must be "distinctive." *Louboutin*, 696 F.3d at 216.  A

mark is "inherently distinctive" if its "intrinsic nature serves to identify a particular source."

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *see also Qualitex Co. v.*

*Jacobson Prod. Co.*, 514 U.S. 159, 162–63 (1995) (inherently distinctive marks "almost

*automatically* tell a customer that they refer to a brand" (citation omitted) (emphasis in

original)).  Inherently distinctive marks are classified as either "suggestive" or "arbitrary or

fanciful." *Morgans Grp. LLC v. John Doe Co.*, No. 10 Civ. 5225 (KMW) (HBP), 2012 WL

1098276, at *4 (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d

Cir. 1992)).  Even if a mark is not inherently distinctive, it may "acquire" distinctiveness by

achieving "secondary meaning" in the relevant consumer market. *Two Pesos*, 505 U.S. at 769.

A mark has acquired "secondary meaning" when, "'in the minds of the public, the primary

significance of a product feature . . . is to identify the source of the product rather than the

product itself.'" *Id.* at 766 n.4 (quoting *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851

n.11 (1982)). Such marks are termed "descriptive." *Rockland Exposition, Inc. v. All. of Auto.*

*Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 313–14 (S.D.N.Y. 2012), *as amended* (Sept. 19,

2012).

On the other hand, "generic marks . . . are deemed not to be distinctive and are not

afforded . . . protection, because they merely identify the class of goods or services offered,

rather than a particular characteristic of those goods." *Id.* "[T]he initial classification of a mark

to determine its eligibility for protection is a question of fact left to the determination of the

district court." *Bristol-Myers Squibb*, 973 F.2d at 1039–40; *see also Rockland*, 894 F. Supp. 2d

at 314.

A plaintiff asserting rights in a trade dress for product design must "surmount additional

hurdles." *Yurman Design*, 262 F.3d at 115. The Supreme Court and Second Circuit have

instructed that courts must exercise "particular 'caution,' when extending protection to product

designs." *Id.* at 114 (quoting *Landscape Forms, Inc. v. Colum. Cascade Co.*, 113 F.3d 373, 380

(2d Cir. 1997)); *see also Wal-Mart*, 529 U.S. at 215. That is because, unlike word marks and

product packaging, whose "predominant function [is often] source identification," *Wal-Mart*,

529 U.S. at 212, product design "almost invariably" serves another purpose: "to render the

product itself more useful or more appealing," *Yurman Design*, 262 F.3d at 114–15 (quoting

*Wal-Mart*, 529 U.S. at 213).[31] Accordingly, trade dress protection for product design "entails a

greater risk of impinging on ideas," *id.* at 116, and "hamper[ing] efforts to market competitive

goods," *Landscape Forms*, 113 F.3d at 380.[32]

---

[31] *See also* Restatement (Third) Unfair Competition § 16 cmt.b (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods.").

[32] *See also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1001 (2d Cir. 1997) ("[O]ver-inclusive protection of the product design risks conferring benefits beyond the intended

Relevant here, in *Wal-Mart*, the Supreme Court held that product design can never be inherently distinctive, and thus always requires secondary meaning to be protected. 529 U.S. at 216. Thus, whereas word marks and product packaging can be held distinctive by virtue of *either* inherent distinctiveness or secondary meaning, "[t]he product design plaintiff . . . must always make the second, more difficult showing." *Yurman Design*, 262 F.3d at 115 (citing *Wal-Mart*, 529 U.S. at 213–14).[33] Finally, the claimed product design cannot be "generic," that is, so broad that it refers only "to the genus of which the particular product is a species." *Id.* (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32–33 (2d Cir. 1995) (internal quotation marks omitted)).

The Court considers the distinctiveness of, in turn, the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress.

### b.    *Protectability of the HOOKLESS® Mark*

The HOOKLESS® Trademark has been a federally registered trademark on the Principal Register since August 3, 2010. *See* PTX 86 (PTO Trademark Reg. No. 3,829,837). Such registration "creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *see also* 15 U.S.C. § 1115(a). Where a defendant does not rebut

---

scope of the Lanham Act and entering what is properly the realm of patent law."); *Landscape Forms*, 113 F.3d at 380 ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

[33] An additional "doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is 'not functional.'" *Yurman Design*, 262 F.3d at 116 (quoting 15 U.S.C. § 1125(a)(3)). A design feature is functional, and thus not protectable, if it is "essential to the use or purpose of the article, . . . affects the cost or quality of the article," or, in cases involving an aesthetic feature, if its protection "would put competitors at a significant non-reputation-related disadvantage." *Id.* at 116 (quoting *TrafFix*, 532 U.S. at 32–33) (internal quotation marks omitted).

that presumption, a plaintiff need not make a showing of secondary meaning to establish that a

mark is protectable. *Id.* Neither Marquis nor Kartri has adduced evidence to rebut that

presumption. The Court accordingly finds the HOOKLESS® Mark inherently distinctive—and

entitled to Lanham Act protection.

c.    *Protectability of the EZ-ON Mark*

The EZ-ON Mark was not registered with the PTO until September 26, 2017—21 months

after this suit was commenced and some four years after defendants' challenged conduct began.

*See* PTX 113 (PTO Trademark Reg. No. 5,296,144).[34]  The infringing conduct lasted from

August 2013 until approximately November 12, 2018, when the Court issued its *Markman*

ruling.  Dkt. 198; *see* Tr. at 587 (Middleberg testifying that sales of infringing products stopped

on November 12, 2018), 613 (same on cross).  For the period of infringement before September

26, 2017, the Court therefore must assess the strength of the EZ-ON Mark by determining its

category of distinctiveness.

The Court finds that the EZ-ON Mark is suggestive—and thus inherently distinctive.

"Marks are classified, in ascending order of strength, as '(1) generic; (2) descriptive; (3)

suggestive; [or] (4) arbitrary or fanciful.'" *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373,

384–85 (2d Cir. 2005) (alteration in original) (citation omitted).  "Suggestive marks suggest

(rather than directly describe) the product on which they are employed, or its attributes,

sometimes requiring imagination to grasp the linkage." *RiseandShine Corp. v. PepsiCo, Inc.*, 41

F.4th 112, 121 (2d Cir. 2022).  "A suggestive mark 'employs terms which do not describe but

merely suggest the features of the product, requiring the purchaser to use imagination, thought[,]

---

[34] For this registration, too, defendants have not adduced evidence rebutting the presumption of
the EZ-ON Mark's inherent distinctiveness.

and perception to reach a conclusion as to the nature of the goods.'" *Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 28 (N.D.N.Y. 2003) (quoting *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997)). "A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities[,] or characteristics of the goods." *Stix Prods., Inc. v. United Merchants & Mfrs*, Inc., 295 F. Supp. 479, 488 (S.D.N.Y. 1968) (footnote omitted). Generic marks "are not at all distinctive and thus are not protectable under any circumstances." *Star Indus.*, 412 F.3d at 385. "Qualitatively, the distinction [between suggestive and descriptive marks] may be illustrated by the difference in the creativity which must be summoned to devise, as well as the sequential thought necessary to catch the linkage [between the product's mark and its source]." *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 197 (S.D.N.Y. 2000).

"EZ-ON" is a suggestive mark because it does not merely describe what the product is—a shower curtain that incorporates rings into its fabric just beneath the upper edge—but invites the mind to draw an inference as to the characteristics that make the product preferable to hooked shower curtains—namely, that it "easily" snaps "onto" the shower rod. "EZ-ON" is not a descriptive mark because, on its own, it does not convey that it is a shower curtain. Nor does the mark neutrally describe the features of its underlying product. The EZ-ON Mark, in other words, *suggests* a reason it is superior to competing products, leaving it for the customer to associate this attribute with the product upon engaging with it. Finding this mark suggestive aligns with caselaw. *See Big Star Ent.*, 105 F. Supp. 2d at 197 (contrasting suggestive name "PASSION" for a fragrance for which "creativity . . . must be summoned to devise, as well as the sequential thought necessary to catch the linkage" between the mark and the source with the descriptive name "LITTLE TAVERN" for a restaurant, in which no such creative effort was necessary

(citing *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal, S.A.R.L.*, 673 F. Supp. 1238 (S.D.N.Y. 1987); and *Little Tavern Shops v. Davis*, 116 F.2d 903 (4th Cir. 1941)); *Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 283, 289–90 (S.D.N.Y. 2008) (finding mark "Alpha Beta Peel" for a skincare product descriptive where the word mark referred to alpha and beta hydroxy acids contained in the product, not a purported "alpha step" and "beta step" in the product's application); *RiseandShine*, 41 F.4th at 121–22 (affirming finding that "Rise" mark for coffee product was suggestive because "the word 'Rise' evokes images of morning, which suggests a quality or qualities of the product through the use of imagination, thought, and perception" (cleaned up)); *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 72 (S.D.N.Y. 2021) (finding shoe trademark "Traveltime" suggestive, and thus inherently distinctive, because "'Traveltime' connotes that it is time to engage in movement, and movement often requires putting on a pair of shoes"); *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 164–65 (2d Cir. 2004) (upholding finding that "Wet Ones" is a suggestive mark for pre-moistened towelettes); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 302–03 (S.D.N.Y. 2021) (finding mark "Two Hands" for sit-down cafés serving food and coffee suggestive, and thus inherently distinctive, because the term "evoke[d] images of restaurants and eating food" but "require[d] some degree of imagination . . . to invest the mark with its intended mental association" (citations and internal quotation marks omitted)).

The EZ-ON Mark is suggestive—and, the Court finds, inherently distinctive.

### d.    *Protectability of the Trade Dress*

#### i.    The Trade Dress is not functional

To establish the protectability of a trade dress, a plaintiff must establish that it is not functional. This requires a showing that a trade dress is not "essential to the use or purpose of the article." *Cartier, Inc. v. Scardell Jewelry, Inc.*, 294 F. App'x 615, 620 (2d Cir. 2008) (summary

order) (quoting *Yurman Design*, 262 F.3d at 116). The Court has held, on reconsideration of its

summary judgment decision, that the Trade Dress is not functional. Dkt. 312 at 7–8. There is no

occasion to revisit this decision here.

ii.      The Trade Dress is not generic

The parties disagree whether the Trade Dress is generic (and thus unprotectable) or

descriptive (and thus protectable on a showing of secondary meaning). On summary judgment,

this Court initially held that it was generic, Dkt. 297 at 26, but was persuaded on reconsideration

to leave the question open for trial, Dkt. 312 at 14–16.

In determining the distinctiveness of a trade dress, courts must ultimately "look[] at all its

elements and consider[] the total impression the trade dress gives to the observer." *Fun-*

*Damental Too*, 111 F.3d at 1001. That determination must be made as of the date of the alleged

infringement. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 744–45 (2d Cir.

1998). Courts do not protect "an idea or concept" if it "is too broad or too general to warrant

protection." *Landscape Forms*, 113 F.3d at 380. Two factors guide this inquiry. "[F]irst,

overextension of trade dress protection can undermine restrictions in copyright and patent law

that are designed to avoid monopolization of products and ideas." *Id.* The Second Circuit has

therefore required "a precise expression of the character and scope of the claimed trade dress," to

enable courts "to evaluate how unique and unexpected the design elements are in the relevant

market." *Id.* at 381. "Second, just as copyright law does not protect ideas but only their concrete

expression, neither does trade dress law protect an idea, a concept, or a generalized type of

appearance." *Id.* (quotations marks and citation omitted). However, "trade dress may protect the

'overall look' of a product. [And] although each element of a trade dress individually may not

be inherently distinctive, . . . the combination of elements may be indicative of source." *Id.*; *see*

62

*also Steven Madden, Ltd. v. Yves Saint Laurent*, No. 18 Civ. 7592 (VEC), 2019 WL 2023766, at

*8 (S.D.N.Y. May 8, 2019).[35]

"Courts in this Circuit—or applying this circuit's law—have found an entire product

line's trade dress to be distinctive . . . both when the trade dress is virtually identical across the

product line and when certain strong features marking the trade dress are found throughout the

product line." *Kompan A.S. v. Park Structures, Inc.*, 890 F. Supp. 1167, 1174 (N.D.N.Y. 1995)

(citing, *inter alia*, *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1264 (Fed. Cir. 1995)

(furniture) (applying Second Circuit law); *Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d

42, 45–46 (2d Cir. 1994) (boat caulking products); and *Saban Ent., Inc. v. 222 World Corp.*, 865

F. Supp. 1047, 1055 (S.D.N.Y. 1994) (copyright, characters in children's television program)).

Unless otherwise noted, the following analysis covers the Trade Dress as manifested by

both the HOOKLESS® product and the EZ-ON product, which were co-branded. *See* PTXs

123, 194 (images of bagged EZ-ON curtains in which the packaging displayed).[36]

The Court finds that plaintiffs' Trade Dress is not generic—and that plaintiffs thus may

attempt to establish secondary meaning and hence protectability—for three related reasons.

---

[35] In deciding "whether a mark is descriptive or suggestive . . .[,] it is necessary to surmise the mental processes of those in the marketplace at whom the mark is directed." *Thompson Med.*, 753 F.2d at 213. Significantly, "the relevant purchasing public is not the population at large, but prospective purchasers of the product." *Lane Cap. Mgmt*, 192 F.3d at 344 (citations omitted). This is a heavily factual question. *Id.* The party asserting genericism must prove such assertions for each market in which it competes. *See Landscape Forms*, 113 F.3d at 379 ("[A]nalysis will always require a look at the product and the market in which it competes."). Here, the relevant market is the hospitality market.

[36] The use of the trademark and trade dress rights of the products sold by plaintiffs' licensees—such as Carnation, the vendor of the EZ-ON product—also "inure[d] to the benefit of [plaintiffs]." *E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000); *see also* 15 U.S.C. § 1055; *Twentieth Century Fox Film Corp.*, 155 F. Supp. 2d at 20–21. The rights arising from license Carnation's sales of the EZ-ON products accordingly accrue to plaintiffs, the licensors of the EZ-ON Mark effective 2009.

First, plaintiffs describe their Trade Dress with sufficient specificity. Second, the Trade Dress is narrow enough to permit competing commercial products and not confer a monopoly on plaintiffs. And third, the Court's ruling that the Trade Dress is non-functional bolsters the finding of secondary meaning. The bases for these conclusions are as follows.

As noted, plaintiffs circumscribe their claimed Trade Dress as outlined below:

[1] a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

[2] and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

[3] wherein each ring includes a slit or gap in the ring;

[4] and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

FAC ¶¶ 104–105; *see also* Erickson Aff. ¶ 28 (quoting same).

Plaintiffs' Trade Dress is drawn in clear and specific detail. It specifies that the affixture of the shower curtain to the rod is to be by rings, not hooks (or buckles, clasps, or any other means of affixing). Those rings are to be integrated into the shower curtain so as to be co-planar with it (not perpendicular or at any other angle relative to the fabric). The rings are not to protrude above the curtain's upper edge. The rings are to contain slits that are fixed in place that allow the user to snap the curtain onto the rod—either ring by ring where the slit connects to the curtain's upper edge, or in pairs of rings where the slit horizontally connects two rings and travels through the curtain's fabric. The resulting appearance of the curtain's surface billowing back and forth across the curtain rod makes the appearance "neat and orderly."

This level of specificity goes well beyond proposed trade dress descriptions that have

been held unprotectible and generic—for example, "the 'theme' of skeletons engaging in sexual

activities . . . used in [a] t-shirt design," *Jeffrey Milstein*, 58 F.3d at 32 (citation omitted), a

"'generalized concept' of grotesque figures in toys," *id.*, or a combination of the words "sports"

and "traveler" in a certain spatial arrangement, in a certain font, and enhanced by a model, *Sports*

*Traveler, Inc. v. Advance Mag. Pub's, Inc.*, 25 F. Supp. 2d 154, 162–63 (S.D.N.Y. 1998); *see*

*also Laurel Rd. Bank v. CommonBond, Inc.*, No. 18 Civ. 7797 (ER), 2019 WL 1034188, at *5

(S.D.N.Y. Mar. 5, 2019) (trade dress for advertisements generic where trade dress was described

as "[1] a color palette with a dark background; [2] a statement in large, light-colored, sans serif

font at the top of the advertisement; [3] a 'hierarchal' typography with smaller, sans serif font

under the large typeface sentences; [4] center or left-side alignment; and [5] a colored line under

a subset of words in the large typeface sentences" (brackets in original) (footnotes omitted));

*ID7D Co. v. Sears Holding Corp.*, No. 11 Civ. 1054 (VLB), 2012 WL 1247329, at *10 (D.

Conn. Apr. 13, 2012) (trade dress for portable grill generic where plaintiff described it as "shiny

exterior comprised of a rounded trapezoidal shaped lid on top, with a plastic handle and a

rounded trapezoidal base pan at the bottom[, with t]he entire grilling unit [being] secured on top

of four wire chrome legs with curved feet"). Plaintiffs' Trade Dress also does not capture a mere

idea, but a concrete expression of it. *Cf., e.g., Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935

(7th Cir. 1989) (trade dress protectable where it consisted of "beige, single-face (no fold) cards

containing sentimental verses and frequently using ellipses written in Roulo's handwriting with

brown ink"; "[f]lanking the messages on the left and right borders [were] a series of four stripes,

two silver-foil stripes, enveloping one brown and one colored stripe in the middle"), *cert. denied*,

493 U.S. 1075 (1990).

Second, plaintiffs' Trade Dress leaves ample room for competing hook-free products.  As reviewed above, these include the Brown design, featuring a curtain without hooks whose rings protruded above the upper edge and are perpendicular to, not coplanar with, the curtain, Zahner Aff. ¶¶ 287–290; the Zenna design, sold by Maytex, which contains rings worked into the shower curtain's fabric but protruding above its upper edge, Erickson Aff. ¶ 34; the Croydex design, sold by QK Supplies, which includes hooks pre-attached to the shower curtain, *id.* ¶ 36; and the Pierce design, which relies on clips instead of slitted rings, PTX 133; Zahner Aff. ¶¶ 292–293.  Kartri's patented design using gliders is also not outside plaintiffs' Trade Dress. *See* PTX 110; Zahner Aff. ¶¶ 304–307.

Finally, that a trade dress is not functional bespeaks a lessened threat to competition. Trade dress is functional "when it is 'essential to the use or purpose of the article.'" *Cartier*, 294 F. App'x at 620 (quoting *Yurman Design*, 262 F.3d at 116).  But where a design "operate[s] to perform a function, the trade dress is not 'functional' [if] there are many alternative designs that could perform the same function," because enforcing a plaintiff's rights in its design "will not inhibit its competitors from being able to compete effectively in the market." *Id.* at 621.  Before trial, the Court held plaintiffs' Trade Dress not functional. *See* Dkt. 312 at 7–8.  Trial reinforced that finding, insofar as the evidence revealed various alternative designs to plaintiffs', including the Pierce, PTX 133; Fields, PTX 129; and Giumarra, PTX 130 at 4, designs.

Plaintiff's Trade Dress is thus not generic.  Plaintiffs may establish its protectability by showing secondary meaning.  That showing is commonly made under the first factor of the second element of the infringement analysis: likelihood of confusion.

### 2.      Likelihood of Confusion

#### a.      *Applicable Legal Framework: The* Polaroid *Test*

To show a likelihood of confusion, a plaintiff need not show "actual or potential confusion *at the time of purchase*"; "initial-interest confusion" and "post-sale confusion" may alternatively be shown. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir. 1986) (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975) (emphasis in *Grotrian*)). But the plaintiff must demonstrate "'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'" *Star Indus.*, 412 F.3d at 383 (quoting *Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993) (internal quotation marks omitted).

Courts in this Circuit assessing the likelihood of confusion consider the "*Polaroid* factors," famously articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *Star Indus.*, 412 F.3d at 384. Those are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith, or lack thereof, in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the plaintiff's customers. *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999); *see also Polaroid*, 287 F.2d at 495. In applying the *Polaroid* test, "[t]he proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharm.*, 984 F.2d at 572 (citing *Lois Sportswear*, 799 F.2d at 873). "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco*

*Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020) (citations and internal quotation marks omitted).

### b.    *Strength of the HOOKLESS® Mark and EZ-ON Mark*

"The first *Polaroid* factor 'focuses on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source.'" *LVL XIII Brands*, 209 F. Supp. 3d at 667 (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991)). "Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace," that is, secondary meaning. *Id.* at 667– 68 (quoting *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).

The Court has found the HOOKLESS® and EZ-ON Marks inherently distinctive. This obviates the need to analyze their strength under *Polaroid*. *See Big Star Ent.*, 105 F. Supp. 2d at 197 ("The suggestive name does not depend upon a showing of secondary meaning to entitle it to trademark registration." (citing *Abercrombie & Fitch Co.*, 537 F.2d at 8)); *Easy Spirit*, 515 F. Supp. 3d at 72 ("The Traveltime trademark is therefore suggestive and inherently distinctive."). The Court thus finds the two Marks strong.

### c.    *Strength of the Trade Dress (Secondary Meaning)*

"[A] trade dress based on the design of a product can never be inherently distinctive." *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 363 (S.D.N.Y. 2003). The Court must instead analyze the Trade Dress's strength—its secondary meaning. A trade dress has secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Louboutin*, 696 F.3d at 216 (quoting *Inwood Labs.*, 456 U.S. at 851 n.11). "The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an

article because of its source," *id.* at 226 (citation omitted), that is, whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark," *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012) (quotation marks and citation omitted).  This question "requires a fact intensive examination of 'the probable reactions of prospective purchasers of the parties' goods.'" *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 309 (S.D.N.Y. 2019) (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990)).

The Second Circuit has identified six non-exclusive factors that bear on this inquiry: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Id.* (internal quotation marks and citation omitted). "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (internal quotation marks and citation omitted). "A plaintiff bears the burden of proving that his mark acquired secondary meaning by the time the allegedly infringing product came on the market." *LVL XIII Brands*, 209 F. Supp. 3d at 654 (citing *Thompson Med. Co.*, 753 F.2d at 217).

*(i) Advertising expenditures*:  Such expenditures are regarded as "indirect evidence of the possible effect that advertising may have on consumers' association of the trade dress with the source of the product." *Id.* at 654–55 (citing *Ergotron, Inc. v. Hergo Ergonomic Support Sys.*, No. 94 Civ. 2732 (SAS), 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996).  "Targeted, albeit low-cost advertising, may establish the advertising factor." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 425 (S.D.N.Y. 2012).  But "[m]erely showing that a certain amount was spent on

advertising provides little support for secondary meaning.  It must be shown that there was promotion of the mark as an identifier for the product." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 371 (E.D.N.Y. 2007) (alteration in original) (citation omitted).

Here, plaintiffs have adduced ample, uncontroverted evidence of extensive expenditures on advertising promoting their Trade Dress.  Focus "did television ads, print ad[]s, trade shows, catalogs, websites, [and] distributor buying guides," physical flyers and website banners, and rebates to distributors.  Tr. at 217, 237 (Kemp).  In 2013, Focus's ad budget for its hospitality business exceeded $500,000.  *Id.* at 246.[37]  It spent most such dollars on distributor rebates.  In 2013, these totaled approximately $250,000 for hospitality customers and $200,000 for retail customers, *id.* at 241 (Kemp); between 2009 and 2013, Focus spent approximately $1.2 million in rebates, *id.*  The balance was spent on television ads, print ads, trade shows, catalogs, websites, and distributor buying guides, all exclusively or prominently featuring the HOOKLESS® product and trade dress.  *See id.* at 217–51.  From 2005 to 2009, Arcs & Angles ran 91 separate programs promoting those products on QVC, on which Focus continues today to advertise.  *See id.* at 227 (Kemp); PTX 521 at 117 (listing TV appearances).

In addition, approximately 150 field representatives promoted Focus's products with its distributor customers.  Tr. at 248 (Kemp).  Focus's products also gained attention among retail customers from the fact that, by 2013, its curtains were hung in approximately 2.5 million hotel and motel rooms.  *Id.* at 248–51.  At an average hotel occupancy rate of 76% and an average stay of 2.5 to 3 days, this equated to "over 100 million individual exposures," and greater brand

---

[37] *See RVC Floor Decor*, 527 F. Supp. 3d at 319 (ad spend favored secondary meaning where ad "budget started at $10,000 in 1975, grew to $100,000 per year by 1981, and surpassed $100,000 per year ever since").

awareness. *Id.* at 251.  To address the resulting volume of customer inquiries about its curtains, Focus prepared a script for its customer service team. *Id.* at 252.

That plaintiffs' advertising efforts were focused on promotion of its Trade Dress is reflected in TV and print ads for the HOOKLESS® product line.  In these, Focus touted the "ease of installation," the "ten second[]" installation time, PTX 547; the enhanced experience of a curtain that lacks missing or broken rings and "drap[es] perfectly [and] slid[es] effortlessly," PTX 547, 560; the reduced "hassle" of changing shower curtains, PTX 548; and "install[ation] like magic in just seconds" with "no need to remove the rod," PTX 552.  The evidence at trial was persuasive that these ads succeeded.  Kemp testified that the HOOKLESS® product "broke records. . . . They ran through the stock. . . . In fact, QVC continuously asked to air it because the product did so well for them."  Tr. at 229 (Kemp).[38]  To hospitality customers, Focus's ads also touted the benefits including lower maintenance costs and increased safety, satisfaction, and morale among hospitality and housekeeping staff, PTX 550, 559; *see also* PTXs 554 (reduced labor costs due to reduced installation time), 561 (same), 562 (same), 553, 555, 558.  Focus also promoted its shower curtains in its AHR catalogs, *see* PTXs 394 (2011 catalog), 393 (2012), 418 (2013), 419 (2014), 420 (2015).  Between 2006 and 2012, Focus annually distributed between 200,000 and 250,000 catalogs to nationwide hotel chains.  These prominently displayed the HOOKLESS® products.  Dubinski Aff. ¶¶ 17, 19.[39]  These effective efforts and expenditures easily satisfy this factor.

---

[38] *See Lopez*, 883 F. Supp. 2d at 425 ("[T]o support a finding of secondary meaning, such advertising must have reached the targeted audience.").

[39] *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 218 (S.D.N.Y. 2012) ("GRG Stripe" mark appeared on 20% of all Gucci accessories, making it an effective identifier).

*(ii) Consumer studies linking the Trade Dress to Focus*: "[C]onsumer surveys are the

most persuasive evidence of secondary meaning," as the determination whether a mark or trade

dress has acquired secondary meaning is "an 'empirical question of consumer association.'"

*LVL XIII Brands*, 209 F. Supp. 3d at 638–39 (quoting *Two Pesos*, 505 U.S. at 770–

71).[40]  Plaintiffs have not come forward with such a survey.  *See* Dkt. 494 at 38–39.  But that is

not dispositive as to secondary meaning.  *Shen Mfg. Co. v. Suncrest Mills, Inc.*, 673 F. Supp.

1199, 1204 (S.D.N.Y. 1987) (internal quotations and citations omitted).[41]

Cognizable alternative proof of consumer recognition of a trade dress's source may

include direct testimony of customers as evidence of secondary meaning.  *27-24 Tavern Corp. v.*

---

[40] *See also, e.g.*, *Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) ("[C]onsumer surveys have become the usual way of demonstrating secondary meaning."); *Ergotron, Inc.*, 1996 WL 143903, at *8 ("A consumer survey is the most persuasive element in demonstrating secondary meaning, because such a survey provides direct evidence." (citations omitted)).

[41] *See also Rubik's Brand v. Flambeau, Inc.*, No. 17 Civ. 6559 (PGG) (KHP), 2021 WL 363704, at *17 (S.D.N.Y. Jan. 31, 2021) ("[T]he extensive evidence of secondary meaning . . . could support a finding, even without survey evidence, that consumers identify the Rubik's Cube and its 3x3 Cube Design as source identifiers."); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) ("[A]lthough plaintiffs have failed to present consumer survey evidence of secondary meaning, 'every element need not be proved' for a determination of secondary meaning to be made"); *PAF S.r.l. v. Lisa Lighting Co.*, 712 F. Supp. 394, 406 (S.D.N.Y. 1989) (where plaintiffs did not come forward with a survey, granting permanent injunction based on other evidence of secondary meaning); *Pan Am. World Airways, Inc. v. Panamerican Sch. of Travel, Inc.*, 648 F. Supp. 1026, 1035 (S.D.N.Y. 1986) ("[T]he "absence of [a consumer survey] here is damaging to plaintiff [where it] has offered nothing but its own conclusion[s]."), *aff'd*, 810 F.2d 1160 (2d Cir. 1986); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1582 (Fed. Cir. 1988) (The "absence of consumer surveys need not preclude a finding of acquired distinctiveness."); *E.T. Browne Drug Co. v. Cococare Prods.*, 538 F.3d 185, 201 (3d Cir. 2008) ("We never have held, and do not hold today, that a party seeking to establish secondary meaning must submit a survey on that point.").  *Cf. Brown v. Quiniou*, 744 F. Supp. 463, 470 (S.D.N.Y. 1990) ("[A]lthough failure to undertake a consumer survey concerning recognition of [its] mark is not by itself fatal to [a] plaintiff['s] assertion of secondary meaning, where the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiff['s] position.").

*Dutch Kills Centraal*, No. 14 Civ. 1625 (FB) (RER), 2015 WL 5772158, at *9 (E.D.N.Y. Sept. 29, 2015) (citing *Rockland*, 894 F. Supp. 2d at 320). Plaintiffs did not call customers on this point, but they elicited probative admissions from Kartri owner Kubus. She testified that customers frequently called Kartri demanding "Hookless" products, or "either have a picture attached from Focus's website"; she estimated that 50% of buyers inquiring about hookless shower curtains asked Kartri for *Focus*'s products. Kubus Dep. Tr. at 52–53 Such unprompted inquiries strongly indicate secondary meaning. In a survey context, a 19.4% rate of unaided brand awareness has been held indicative of secondary meaning. *See Stix Prods.*, 295 F. Supp. at 491 n.43. The high rate of unsolicited calls to Kartri evincing confusion between the parties' products—and the mistaken belief that Kartri was the source of Focus's products—is indicative of secondary meaning.

The second factor, too, weighs, albeit just to a slight degree because of the lack of a data set prepared with rigor, in favor of finding secondary meaning.

*(iii) Unsolicited media coverage of the Trade Dress*: "[E]xtensive, unsolicited media coverage of a product is a strong indication that a [trade dress] has obtained secondary meaning." *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am.*, 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021) (collecting cases) (emphasis in original). In contrast, "isolated incidents of . . . unsolicited media coverage in several industry-specific publications are insufficient to show secondary meaning." *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112 (AJP), 2014 WL 814532, at *12 (S.D.N.Y. Mar. 3, 2014), *appeal dismissed*, No. 14-1156 (2d Cir. May 19, 2014).

Plaintiffs have adduced modest evidence on this point. In 1997, QVC named their shower curtain the "Best New Product." Zahner Aff. ¶ 183. In 1998, *New York Magazine* featured the HOOKLESS® product in its "Best Bets" section, calling the curtain "cutting-edge"

in sparing customers the effort of "contorting to attach ugly hooks." PTX 543 at 2. In September 2001, the American Society of Interior Designers' magazine, *Icon*, featured the "ingenious" HOOKLESS® curtain in an editorial. PTX 429. In 2009, *Woman's Day* magazine featured plaintiffs' shower curtain as a product one has "gotta have." PTX 468 at 2. Although these four affirmations over a 12-year period benefit plaintiffs, they are not, measured by the case law, strong enough to assign this factor heavy weight for plaintiffs.[42] *See Strange Music, Inc. v. Strange Music, Inc.,* 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004) ("dozen or so unsolicited articles that praise[d plaintiffs' product]" not probative of secondary meaning).

*(iv) Sales success*: A product's sales success may indicate whether a substantial portion of the purchasing public associates the trade dress with the product's source. *RVC Floor Decor*, 527 F. Supp. 3d at 320. In assessing sales success, courts have considered sales volume, *Easy Spirit*, 515 F. Supp. 3d at 64–65; market share, *Conn. Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 414–15 (D. Conn. 2008); whether sales grew over time, *RVC Floor Decor*, 527 F. Supp. 3d at 320; whether sales data was broken down by year, *Rockland*, 894 F. Supp. 2d at 321 (citing cases); and whether sales data was convincingly linked to the mark-bearing product, *Therapy Prods., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009), *aff'd in relevant part sub nom. Erchonia Corp. v. Bissoon,* 410 F. App'x 416 (2d Cir. 2011) (summary order).

This factor strongly favors plaintiffs, given Focus's substantial sales figures, both in the hospitality industry and among retail customers. Focus adduced convincing documentary evidence and testimony, largely via Kemp, on this point. Revenues for HOOKLESS® brand products between 2005 and September 2013 exceeded $150 million, with revenues from

---

[42] Plaintiffs note that their products were distributed through third-party websites, such as kaboodle.com, QVC.com, SignatureHardware.com, and thefind.com. PTX 521 at 90–100. But distribution through these channels does not speak to the extent of media coverage.

hospitality market sales being $14.7 million in 2013; $16.5 million in 2014; $21.2 million in 2015; $16.9 million in 2016; and $12.1 million in January through August 29, 2017. PTX 518. Spread across roughly 250 distributors, these reflected sales of some 5.76 million shower curtains in that market. PTX 515. This data corroborated Kemp's and Elmore's testimony that, as of October 2013, HOOKLESS® was "the number one shower curtain in [the] hospitality [sector]," Tr. at 253 (Kemp), in which Focus (with a more than 50% market share) was the dominant player, with Karti second, *id.* at 512 (Elmore).

In the retail market, Focus's sales revenues for its HOOKLESS® shower curtains were also formidable: $8.7 million in 2013; $11.4 million in 2014; $13 million in 2015; $12.5 million in 2016; and $8.9 million between January 2017 and August 29, 2017. These reflected retail sales during these years of approximately 4.57 million shower curtains. PTX 514. Sales by plaintiffs' licensee Carnation of EZ-ON products are properly included in the analysis of the retail sales success of products bearing plaintiffs' Trade Dress. Between 2009 and January 2013, Carnation had sales volume of $225,710. PTX 591.

The sales success factor thus strongly favors plaintiffs. *See, e.g.*, *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ($4 million sales indicative of secondary meaning); *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) ($3 million revenues held "indisputable sales success"); *Easy Spirit*, 515 F. Supp. 3d at 65 (finding sales success where plaintiff's data "reflect[ed] millions-of-dollars in sales revenue"); *Conn. Cmty. Bank*, 578 F. Supp. 2d at 414–15 finding sales success to favor plaintiff whose market share was 3.95% in a competitive market).

*(v) Attempts to plagiarize the Trade Dress*: "Evidence that a [trade dress] has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the

[dress] has become a 'strong source identifier in the eyes of the purchasing public.'" *Lopez*, 883 F. Supp. 2d at 428 (quoting *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993)); *accord, Centaur Commc'ns*, 652 F. Supp. at 1109. "Proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent." *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (footnote omitted) (citing *Bristol-Myers Squibb*, 973 F.2d at 1042). The key question is "whether the copying was done deliberately, so as to benefit from [the plaintiff's] name and good will." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004).

Here, plaintiffs have introduced extensive evidence that third parties—not only Kartri and Marquis—have attempted to copy and commercially exploit Focus's intellectual property by marketing products with its Trade Dress. Each time, Focus responded by sending the malefactor a cease-and-desist letter—which resulted in agreements to desist—or by filing complaints, which resulted in similar agreements.[43] Competitors' efforts to parrot the Trade Dress reinforce that it has acquired secondary meaning in the hospitality market. *See Edible Arrangements, LLC v. Provide Com., Inc.*, No. 14 Civ. 250 (VLB), 2016 WL 4074121, at *7 (D. Conn. July 29, 2016) ("numerous attempts to plagiarize the mark" probative of secondary meaning where plaintiff had sent "dozens of cease and desist letters" to "large and small businesses"). *But cf. MZ Wallace*

---

[43] Most apposite here, given these competitors' similar designs to Focus's, are the copying efforts by(1) Aim-Co., Inc., *see* PTXs 100 (complaint filed January 25, 2008), 594 (agreement to desist executed April 1, 2008); (2) DFW Motel Supply & Textiles, Inc., *see* PTXs 102 (complaint filed October 1, 2007), 350 (agreement to desist executed in October 2007); (3) Neilmax Industries, Inc., PTXs 340 (complaint filed November 16, 2007), 117 (agreement to desist executed in January 2008); (4) Trend Supply, Inc., PTXs 103 (complaint filed April 15, 2010), 118 (agreement to desist executed May 24, 2010); and (5) Royal Pacific, *see* PTXs 99 (cease-and-desist letter sent September 25, 2007, 537 (agreement to desist reached December 6, 2007).

*Inc. v. Fuller*, No. 18 Civ. 2265 (DLC), 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (few letters not probative of attempts to plagiarize where trade dress described in the letters "is inconsistent and often contains significant variations from that" in the case).

The attempts by Kartri and Marquis to capitalize on Focus's Trade Dress also strongly indicate intentional plagiarism. Before developing their Ezy Hang product, Kartri and Marquis demonstrably were aware of Focus's HOOKLESS® product and its success in the hospitality market. Tr. at 743 (Kubus). Kartri, in fact, had declined to commercialize the Hookless patent when HSNA's Marcus had pitched it to Kartri's president in the late 1990s. Tr. at 724–25, 727–28, 772; Zahner Aff. ¶ 387.

As to Marquis, the facts overwhelmingly reflect that it willfully closed its eyes to the high probability that the Ezy Hang design it was obtaining in China and furnishing to Kartri to sell in the U.S. was infringing Focus's intellectual property rights. Middleberg and Pong had spoken about Focus "many times" when Pong—whom Middleberg knew had worked for a manufacturer of Focus's in China—pitched the D-shaped shower ring. Tr. at 554, 593–94. Middleberg accepted, uncritically, Pong's unsubstantiated representations that Focus's utility patents "had become a public domain kind of product" and/or were "about to run out." *Id.* at 555. Marquis did not investigate whether the product they proceeded to market was covered by a valid patent—whether owned by Focus, an affiliate, or anyone else—in the United States. *Id.* at 554, 596–97. And when Pong's patent attorney offered to conduct a patent analysis for $3,500, PTX 258 at 2, Middleberg spurned the offer, Tr. at 599. Instead, he chose to credit Pong's dubious claims—based on an untranslated Chinese language document—to own a Chinese patent on the D-shaped ring. *Id.* at 554. Middleberg also put weight on Pong's statement that Focus was "in deep financial trouble," *id.* at 611 (quoting PTX 159 at 1). But while that statement appears to

have emboldened Middleberg to conclude that Focus would be too weak to fight, it said nothing about Focus's intellectual property rights.Notably, Marquis continued to develop the accused products even after Focus's 2015 cease-and-desist letter to Kartri, which was forwarded to Marquis.  Its sales to Kartri of EZY-Hang curtains for sales in the United States persisted until November 2018, nearly three years after Focus brought this lawsuit.

Kartri, too, ignored the obvious.  Kubus admitted deferring to Marquis's representations that, in light of Pong's purported patent, "everything was clear and safe." *Id.* at 643.  Kartri did not investigate whether Focus (or others) had intellectual property rights to the shower curtains, despite her familiarity with Focus's products and her admission that Focus's hookless curtains had upended shower curtains sales in the hospitality market in which the parties competed.  And Kartri openly described its Ezy Hang product as a "version of HOOKLESS®," despite knowing that Focus's product was widely referred to by that name.[44]

This factor strongly favors a finding that the Trade Dress had secondary meaning at the time of defendants' accused conduct.

*(vi) Length and exclusivity of the Trade Dress's use*:  "[T]he longer and more exclusive the trade use, the more likely it is that a [trade dress] has acquired secondary meaning." *BigStar Ent.*, 105 F. Supp. 2d at 203.  In contrast, "[t]he use of part or all of the mark by third parties" cuts against exclusivity of use and thus "weakens its overall strength." *Time, Inc.*, 173 F.3d at 118 (citing *Streetwise Maps*, 159 F.3d at 744); *see also Kind LLC v. Clif Bar & Co.*, No. 14 Civ. 770 (KMW) (RLE), 2014 WL 2619817, at *6 (S.D.N.Y. June 12, 2014) (same).  Although "no

---

[44] *See, e.g.*, PTXs 230 (December 18, 2013 email exchange between Dolph and Best Western representative, subject line "HOOKLESS," and discussing Ezy Hang as "a version of hookless"), 231 (April 14, 2014 email exchange between Kartri and GMK Cales Associates discussing price quote for "Hookless shower curtain[s]"), 232 (December 8–16, 2014 email exchange discussing price quote for "Hookless Shower Curtains").

absolute time span can be posited as a yardstick, courts have indicated that continuous exclusive usage of a trade dress over a five-year period may support—but does not necessitate—a finding of secondary meaning." *Easy Spirit*, 515 F. Supp. 3d at 67.

That standard and benchmark are easily met here. Zahner invented his Hookless product around 1992, and obtained his first patent—the '232 Patent—on February 16, 1993. PTX 303. In 1997, Zahner, through Hookless Systems of North America, introduced the invention to the market, where such Trade Dress was new. *See* Zahner Aff. ¶¶ 83–84; Tr. at 121 ("[N]o one had ever seen anything like that before." (Zahner)). Kubus agreed that the HOOKLESS® product was an innovative new design. Tr. at 772. Defendants first began to sell the accused product in 2013. Thus, for 16 years, between 1997 and 2013, plaintiffs had exclusivity over their product. And plaintiffs vigorously defended that exclusivity via cease-and-desist letters or lawsuits. This factor strongly favors plaintiffs. *See Landscape Forms*, 117 F. Supp. 2d at 366–67 ("[P]laintiff's five year period of continuous use of the Petoskey trade dress provides additional evidence of the secondary meaning that these products had obtained."); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 375 ("[G]iven the well-defined nature of plaintiff's market . . . three to four years of exclusive use is somewhat significant.").

*(vii) Weighing the subfactors*: Four of the six relevant factors—advertising spend, sales success, attempts to plagiarize the Trade Dress, and length and exclusivity of use—strongly favor plaintiffs. The second—consumer confusion studies—is not required, and plaintiffs have adduced other proof to the same effect. The third—unsolicited media coverage—lightly aids plaintiffs' claim. Weighing these factors, the Court finds plaintiffs' Trade Dress strong. The first *Polaroid* factor as to the Trade Dress infringement claim weighs heavily in plaintiffs' favor.

        d.      Polaroid *Factors (2) Through (8) for the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress*

Having found the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress all strong, the Court now considers the remaining *Polaroid* factors. In conducting this analysis, the Court notes that while plaintiffs' Lanham Act claims of infringement of the EZ-ON Mark and Trade Dress are pursued against both defendants, their claim of infringement of the HOOKLESS® Mark is brought against Kartri only. Thus, although analyses of the three sets of infringement claims overlap—including because plaintiff's Trade Dress embraces curtains containing the EZ-ON Mark rings and curtains containing HOOKLESS® Mark rings—the Court has considered as bearing on Marquis only that evidence relevant to EZ-ON and Trade Dress claims.

*(2) Similarity*: "[C]ourts look to the overall impression created by the [marks and] trade dress and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr*, 991 F.2d at 1078. "[T]he test . . . is whether confusion is probable among numerous customers who are ordinarily prudent." *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 480–81 (S.D.N.Y. 2020) (quoting *Estee Lauder Inc. v. The Gap*, 108 F.3d 1503, 1511 (2d Cir. 1997)); *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004). Courts compare the marks "in their entirety, because 'juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar,'" *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 315 (S.D.N.Y. 2000), *aff'd*, 234 F.3d 1262 (2d Cir. 2000) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984)), and "look[] at the visual and aural similarity of the marks, in addition to how they are presented in the marketplace," *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 447 (S.D.N.Y. 2016) (internal citations omitted).

*Visual similarity between the Trade Dress as manifested by the EZ-ON Mark and the Ezy Hang curtain*: Focus's Trade Dress is manifested in both the HOOKLESS® Mark and the EZ-

ON Mark.  A side-by-side comparison of each with the accused Ezy Hang product shows that the Ezy Hang product is exceptionally similar to the trade dress manifested by EZ-ON Mark, and quite similar to the Trade Dress manifested by the HOOKLESS® Mark.

As to EZ-ON, the juxtaposition looks like this:



*Ezy Hang product, regular finish, ring slits facing in the same direction.*  See *PTX 26.*



*Ezy Hang product, chrome finish, ring slits facing each other.*  See *PTX 27.*



*EZ-ON product, as sold by Carnation.*  See *DTX 90.*

The dresses are nearly identical.  Both rings are integrated into the curtain's fabric, are D-shaped, have their flat edge align with the curtain's upper edge, and display an upward-pointing slit that reaches the ring's upper edge near one of its corners.  The only nominal difference—and it is nominal, indeed—is that Carnation's ring has a straight slit, while the Ezy Hang ring has an

angle in its slit. *See* Tr. at 557 (Middleberg referring to angle as a "lightning bolt"). That angle does not change the big picture: that the two marks are overwhelmingly similar. Were it not for the lightning bolt angle, the Court might have found the two marks effectively identical.

*Visual similarity between the Trade Dress as manifested by the HOOKLESS® Mark and the Ezy Hang curtain*: A side-by-side comparison of the Ezy Hang product with the Trade Dress as manifested by the HOOKLESS® product looks like this:



*Side-by-side comparison of the HOOKLESS® and Ezy Hang curtain rings*

The strong similarity between these products is apparent. Although the slit of the HOOKLESS® product protrudes horizontally and into the curtain's fabric to connect with an adjacent ring, the overall appearance is of a ring with a slit designed to accommodate a curtain rod. In both, the ring portion of the curtain occupies a small percentage of the overall curtain and its appearance. The "neat and orderly appearance" of the evenly billowing curtain that results from its affixture by rings that are coplanar with its fabric is a prominent feature of the Trade Dress. Its appearance does not depend on the placement or angulation of the slits, but on the curtain's arrangement on the rod that rings using such technology make possible.

*Aural similarity between EZ-ON Mark and Ezy Hang mark*: The names "EZ-ON" and "Ezy Hang" are confusingly similar. The first half of each name is pronounced "easy."[45] "Easy" modifies the second half in each mark—"on" and "hang." Both words evoke the act of (easily) affixing the curtain on the rod. Although phonetically different, the respective second halves are semantically similar because the curtain is intended to facilitate the easy *hanging on* of the rod. *See Heartland Trademarks, Ltd. v. Dr. Flax LLC*, No. 17 Civ. 795 (MAD) (ATB), 2017 WL 3278905, at *4 (N.D.N.Y. Aug. 1, 2017) (finding "obvious similarity between the FLAX mark and the different variations of Dr. Flax, which simply add the title 'doctor' before the word 'flax'" and that, "[d]espite the addition of the title 'doctor,' the dominant word remains 'flax'"); *Classic Liquor Importers*, 201 F. Supp. 3d at 447 ("[T]he ELITE and ELIT components of the marks are functionally equivalent in meaning and commercial impression,"," and "there is no genuine dispute that ELITE and ELIT are intended to be pronounced identically"). The marks are used in the same context: the packaging and sale of shower curtains to customers in the hospitality market.[46]

The Court accordingly finds that the Ezy Hang mark is so strongly similar in look and sound to the EZ-ON Mark as to be nearly identical. *See, e.g., Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013) (finding defendant's marks "similar in both

---

[45] The Court found highly unpersuasive Goskowski's claim that EZ-ON could be pronounced "ezzon." Tr. at 688. Throughout trial, all parties otherwise pronounced the mark "Easy On."

[46] There is no aural similarity between the word marks "HOOKLESS®" and "Ezy Hang."

name and design to a number of Plaintiff's marks,"[47] and noting that the branded products "appear[ed] in similar contexts as both are used in the sale, packaging and promotion of women's apparel and accessories").  The Court finds that the Ezy Hang mark is strongly similar to the HOOKLESS® Mark, albeit in look only, not sound.

These findings compel a similar outcome as to the Trade Dress.  Regardless whether the Court considers the HOOKLESS® manifestation of the Dress or the EZ-ON manifestation, the similarity of the Ezy Hang curtain's overall look and appearance is clear.

*(3) Competitive proximity of the products*:  "The 'competitive proximity' factor concerns whether and to what extent products bearing the two parties' marks compete with each other." *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045 (PAE), 2020 WL 5758917, at *12 (S.D.N.Y. Sept. 28, 2020); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). Courts consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal." *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) (internal quotation marks and citation omitted); *see also Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993) ("Factors to consider in determining the competitive proximity of the products include appearance, style, function, fashion appeal, advertising orientation and price." (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d

---

[47] The marks at issue that were found similar looked like this:


**Juicy Couture**
(Samuelson Decl. Ex. A)


(Suen Deposition Ex. 20.)

*Juicy Couture*, 930 F. Supp. 2d at 500.

Cir. 1979), *superseded on other grounds by Fed. R. Civ. P. 52(a) as stated in RiseandShine*, 41

F.4th at 120)).  Where the products "serve the same purpose, fall within the same general class,

or are used together, the use of similar designations is more likely to cause confusion." *Lang*,

949 F.2d at 582.

*Ezy Hang's proximity to HOOKLESS® products*:  The parties' products are exceedingly

proximate.  Both sell shower curtains without hooks, compete for the same consumers in the

hospitality market, and extol the same product virtues.  Those are—as reflected in the products'

names and advertisements—the ease and speed of installation, which, of importance to the

hospitality market, are associated with lower maintenance and labor costs.  *Compare* PTXs 547

(Focus ad touting HOOKLESS®'s "ease of installation," its "ten second[]" installation time),

548 (Focus ad promoting reduced "hassle" of changing shower curtains), 552 (same, praising

"install[ation] like magic in just seconds" with "no need to remove the rod"), 121 (same), 554

(Focus ad breaking down reduced labor costs due to reduced installation time), 561 (same), 562

(same), *with* Tr. at 558 (Middleberg testifying that design choice of D-shaped ring for Ezy Hang

was advantageous because such rings could be easily snapped onto the shower curtain rod,

allowing hospitality staff installing such curtains to secure themselves with their free hand).

*Ezy Hang's proximity to EZ-On products*:  The products' markets are adjacent.  Focus's

licensee, Carnation, sells the EZ-ON curtain in the retail market, while Kartri is active in the

hospitality market.  These markets are proximate and interrelated.  The evidence reflected that

individual consumers often develop interest in buying a hook-free shower curtain product based

on exposure to it during a hotel stay.  Accordingly, as "these products 'serve the same purpose

[and] fall within the same general class,' they have market proximity and thus are 'likely to

cause confusion.'" *RVC Floor Decor*, 527 F. Supp. 3d at 325 (alteration in original) (citation omitted).

The proximity factor weighs overwhelmingly in plaintiffs' favor as to the HOOKLESS® Mark; very strongly in plaintiffs' favor as to the EZ-ON Mark; and overwhelmingly in plaintiffs' favor as to the Trade Dress, which is embodied by both products, and thus even more likely to be confused with the Ezy Hang curtain than either of plaintiffs' Marks in isolation.

*(4) Bridging the gap*:  This factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387 (citation omitted).  This factor "protects the plaintiff's interest in being able to enter a related field at some future time." *Cartier*, 294 F. App'x at 619 (citing *Savin Corp.*, 391 F.3d at 459–60).  Where the parties' products are already in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant the *Polaroid* analysis." *Star Indus.*, 412 F.3d at 387 (treating factor as neutral where both parties used marks on liquor bottle labels); *accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (same, where both parties used marks in connection with sale of coffee products); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015) (same, where both parties' marks appeared on sunglasses).

*Gap between Ezy Hang and the HOOKLESS® product*:  As to the HOOKLESS® product, as explained, there is no gap to bridge.  Both the HOOKLESS® curtain and defendants' Ezy Hang curtain are sold in the hospitality market.

*Gap between Ezy Hang and the EZ-ON product*:  Kartri argues that the products are not proximate because Carnation sold its licensed EZ-ON curtains in the retail market, while Kartri served the hospitality market.  That does not preclude finding proximity.  As the Second Circuit

has emphasized: "[T]he assumptions of the typical consumer . . . must be taken into account." *Cadbury*, 73 F.3d at 482 ("Because it is surely plausible that a manufacturer of branded products such as Cadbury would enter the private-label market, it is also plausible that a wholesale purchasing agent would conclude that Cadbury *had already done so—i.e.,* that Cadbury had already bridged the gap."). That principle applies with force here. Focus's HOOKLESS® product had been a fixture in the hospitality market for over a decade by the time defendants' accused conduct began. Having a dominant foothold in that market with HOOKLESS® would have enabled Focus, through Carnation, to handily introduce the EZ-ON product in the hospitality market. Indeed, under Focus's licensing agreement with Carnation, the EZ-ON products were co-branded with the HOOKLESS® Mark on its packaging. PTXs 123 (images of packaging showing cobranding), 194 (same), 370 § 4.2 (licensing agreement so agreeing).

Moreover, the retail and hospitality markets are closely linked because hotel guests are exposed to the curtains at issue during their stay and often then seek to buy one for at-home use. *See* Dubinski Aff. ¶¶ 53–54. Kemp testified that, as a result of its curtains' presence in more than 2.5 million U.S. hotel and motel rooms, Focus received so many retail customer inquiries that it developed a script for its service team to use in processing those inquiries. Tr. at 251–52.

The Court accordingly finds the following. For the infringement claim as to the HOOKLESS® Mark, the bridging-the-gap factor is neutral, as the Ezy Hang and HOOKLESS® already compete in the hospitality market. For the infringement claim as to the EZ-ON Mark, this factor strongly favors plaintiffs, as the retail and hospitality markets are closely related, and it would have been easy for plaintiff to introduce the EZ-On product into that market. As to the Trade Dress infringement claim, the factor moderately favors plaintiffs, as 65% of plaintiffs'

sales volume occurred in the hospitality market (to which the bridging-the-gap factor is not

germane), and 35% occurred in the retail market (to which this factor is germane).

*(5) Actual confusion*:  Although "actual confusion need not be shown to prevail under

the Lanham Act," *Lois Sportswear*, 799 F.2d at 875, "[t]here can be no more positive or

substantial proof of the likelihood of confusion," *Malletier v. Dooney & Bourke, Inc.*, 561 F.

Supp. 2d 368, 385 (S.D.N.Y. 2008) (quoting *Savin Corp.*, 391 F.3d at 459) (alteration in *Dooney

& Bourke*).  Accordingly, "courts have concluded that the absence of such evidence may favor

the junior user."  *Paco Sport*, 86 F. Supp. 2d at 319 (collecting cases).  But "it is black letter law

that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion

is very difficult to prove and the Act requires only a likelihood of confusion."  *Lois Sportswear*,

799 F.2d at 875 (citation omitted).

"Evidence of actual confusion may consist of anecdotal or survey evidence."  *Paco

Sport*, 86 F. Supp. 2d at 319.  To be germane under the Lanham Act, the confusion must be of a

type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of

sales, damage to goodwill, or loss of control over reputation."  *Lang*, 949 F.2d at 583; *see

also Trs. of Colum. Univ. v. Colum./HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y.

1997) ("[T]here is a difference between isolated expressions of momentary confusion and

confusion that leads to actual purchasing decisions.").

*Confusion of the HOOKLESS® Mark and Trade Dress with the Ezy Hang curtain*:

Plaintiffs have adduced significant anecdotal evidence of actual consumer confusion.  Burbank

testified that Focus had received Kartri products in its warehouse from customers attempting to

return it to seller.  Tr. at 40.  Although Burbank did not know the nature of the customers who

did so—"could be distributor, could be a franchisee," *id.*—such events bespeak *some* consumers'

misapprehension that the source of the Ezy Hang product was Focus. Kemp similarly recounted

calls Focus's customer service department received from confused customers. These typically

came from a hotel's head of housekeeping or general manager, lodging a quality complaint. Tr.

at 267. In these calls, in which the Focus representative would "run through a series of questions

about the product to verify a production date," it would become apparent that the caller was

complaining about an Ezy Hang product, usually because, as described by the customer, the tag

was a Kartri tag. *Id.* at 267, 269–70. Kemp testified that customers were mystified how they

ended up with a Kartri product—notwithstanding the nominal difference in appearance.[48]

Distributors also mistakenly lodged complaints with Focus about Kartri curtains. *Id.* at 273.

These reached Focus about "three to four times a month." *Id.* at 268 (Kemp).

  This anecdotal evidence is compelling. That hotel chains would realize their confusion

only *after* they had purchased and used the Ezy Hang product and called Focus powerfully

establishes that this confusion "inflict[ed] commercial injury [on Focus] in the form of . . . a

diversion of sales." *Lang*, 949 F.2d at 583. It also bespeaks likely harm to Focus's goodwill and

reputation, *id.*, insofar as the calls concerned the malfunctioning or poor performance of a

purported Focus product.[49] *See Mejia & Assocs., Inc. v. Int'l Bus. Machines Corp.*, 920 F. Supp.

540, 550 (S.D.N.Y. 1996) (actual confusion factor moderately favored plaintiff where plaintiff

---

[48] *See* Tr. at 267 ("A lot of times—some of the time the . . . hotel manager would respond, what do you mean? This is Hookless. And we'd say, that's not made by Focus Hookless. And they'd say, I thought I was buying Hookless, you know, how did I get this product?"); *id.* at 269 ("Q: So as far as you understand, there was actually confusion between your horizontal slit product and the Kartri product? A: That's correct. It has the same design look to a hotel property or a general manager. They don't always notice where the slit location is.").

[49] A member of Kartri's own executive staff was also demonstrably confused by the parties' products. Dolph, a 30-year employee and Kartri's sales operations manager from 2013 on, was shown a Kartri shower curtain during her deposition. *See* PTX 642 at 15–18. She mistakenly identified it as a Focus curtain, before looking at the tag and correcting herself. *Id.* at 22–23.

documented 27 incidents of potential customers mistaking plaintiff for a company that already
serviced them); *De Venustas v. Venustas Int'l, LLC.*, No. 07 Civ. 4530 (LTS) (THK), 2007 WL
2597122, at *6 (S.D.N.Y. Sept. 11, 2007) (actual confusion factor weighed in plaintiff's favor
where confused callers "were fashion and beauty field insiders, and thus are important potential
sources of referrals for its consulting work"); *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045
(PAE), 2020 WL 5758917, at *13 (S.D.N.Y. Sept. 28, 2020) (actual confusion factor weighed in
plaintiff's favor where, "[t]ellingly, [defendant's] consumers are contacting Goat Fashion and
searching for [defendant]'s items on [plaintiff]'s website").

        *Confusion of the HOOKLESS® Mark and Trade Dress with the Ezy Hang curtain*:  As to
the confusion between the Ezy Hang curtain and the EZ-ON curtain sold by Carnation, plaintiffs
have not adduced evidence of actual consumer confusion.

        In sum, the actual confusion factor weighs in Focus's favor as to the infringement claim
of the HOOKLESS® Mark and, by virtue of the HOOKLESS® Mark's embodiment of the
Trade Dress, as to the infringement claim of the Trade Dress.  However, as to the infringement
claim of the EZ-On Mark, the actual confusion factor weighs against Focus.

        *(6) Bad faith*:  This inquiry "'considers whether the defendant adopted its mark with the
intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between
his and the senior user's product.'"  *De Beers LV Trademark Ltd. v. DeBeers Diamond
Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp.*, 391 F.3d at
460).  "Evidence of intentional copying by a junior user may be indicative of an intent to create a
confusing similarity between the products." *Bristol-Myers Squibb*, 973 F.2d at 1044 (citation
omitted).  Where the junior user's mark is not fully identical to the senior mark, the Second
Circuit has upheld findings of bad faith where the junior user knew of the prior mark and the

junior mark showed "similarities so strong that it seems plain that deliberate copying has occurred." *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993) (citation omitted).  But "[t]here is a considerable difference between an intent to copy and an intent to deceive." *Starbucks Corp.*, 588 F.3d at 117 (citations omitted).  "The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps*, 159 F.3d at 745. Where the junior user "prominently displays" its own mark and "uses a trade dress dissimilar to" the senior user's, such efforts "negate[] an inference of intent to deceive consumers as to the source of the product." *Kind LLC*, 2014 WL 2619817, at *11 (citation omitted).

Here, for the reasons reviewed in connection with defendants' attempts to plagiarize Focus's Trade Dress, the evidence is compelling that defendants, aware of the inroads Focus's innovation had made in the shower curtain market, intentionally sought to mimic Focus's Trade Dress to deceive customers to purchase Ezy Hang and thereby to capitalize on Focus's goodwill. The close similarity—in both looks and sound—between Kartri's Ezy Hang product and Focus's EZ-ON product reinforces this conclusion.  These similarities are "so strong that it seems plain that deliberate copying has occurred," *Paddington Corp.*, 996 F.2d at 587.  Defendants did not offer a benign justification for these similarities—especially not for the strong similarities in look *and* sound between the Ezy Hang product and EZ-ON product.  It is unavoidably clear that defendants intentionally, and in bad faith, sought to all-but-replicate the EZ-ON Mark so as to capitalize on competitor Focus's intellectual property and good will.  *See, e.g., Playboy Enters. Inc. v. Chuckleberry Pub'g, Inc.*, 687 F.2d 563, 565 (2d Cir. 1982) (affirming finding of bad faith where defendant offered no credible explanation for the similarity to the senior user's product).

The Court accordingly finds that the bad faith factor, too, favors Focus. Although the proof of bad faith is especially obvious in connection with the Ezy-Hang product, the Court finds that the factor of bad faith cannot be logically cabined to the EZ-ON Mark. Defendants' strategy of deliberate infringement, the Court finds, was holistic.

*(7) Quality of defendants' product*: This factor "directs courts to weigh cross-cutting considerations." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013). "On the one hand, the court must determine 'whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two.' On the other hand, if the products are roughly equal in quality, the court must also consider whether 'that very similarity of quality' may tend to create confusion as to source by bringing the products into even closer proximity." *Id.* (quoting *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999)). *But see Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 152 (2d Cir. 2003) ("[T]he quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion."); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009) (same).

Here, defendants' inferior products, coupled with the source confusion that consumers demonstrably expressed, tended to tarnish Focus's reputation. This factor favors plaintiffs, as to all three infringement claims. And the evidence strongly showed that the Ezy Hang product was inferior to Focus's. Kemp testified that, in 2015, Focus sent several Ezy Hang product specs to its China-based factory for quality testing of individual components. Tr. at 264. This resulted in a finding that "compared to the Focus Hookless product, [each tested product] was . . . inferior." *Id.* The overall fabric of the Ezy Hang curtain was of lower quality, the fabric window was lower weight, and the "snaps on the snap-in liner were thinner, flimsier material." *Id.*

Kemp also persuasively testified that, based on her observations, the Ezy Hang product was of lower quality. During a meeting with its customer HD Supply, which resells Focus's products, HD Supply's senior buyer Greg Syrek confronted Kemp with Kartri's proposal that HD Supply replace Focus's snap-in liners with Kartri's. *Id.* at 265. Syrek pulled a sample Kartri curtain from a rack, "[a]nd when he pulled it out, two or three of the snaps broke on the floor as he was pulling them." *Id.* at 266. In light of the quality concern, Syrek lost interest in switching HD Supply's account to Kartri. *See id.* Where the junior product consists of lower-quality materials than the senior product, the quality factor favors plaintiff. *See Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 455 (S.D.N.Y. 2017) (quality factor favored plaintiff where junior fragrance product "use[d] less expensive, synthetic oils, rather than the natural oils used in [plaintiff's] fragrances, and it employ[ed] less expensive packaging components").

Other evidence is in accord. Focus's Dubinski testified that she had heard of consumer complaints that the Ezy Hang product did not slide on the curtain rod as easily as Focus's. Tr. at 148–49. Defense witnesses gave testimony to similar effect. Middleberg testified that, at least initially, the fabric was coming off the grasp of the Ezy Hang ring, *id.* at 590–91; he did not testify whether quality issues were remedied. Kubus testified that, during Ezy Hang's initial commercialization in 2013 and 2014, "[w]e had a lot of issues getting it resolved with quality," *id.* at 766; *see also id.* at 767. Kartri encountered problems of curtains that were "falling apart"; it replaced those curtains for its customers. *Id.*; *see also Tiffany & Co.*, 127 F. Supp. 3d at 253 (finding disparity in quality between engagement rings where, unlike the senior user, junior user faced issues with diamond falling out of its ring, did not use quality control standards, and did not use highest quality diamonds), *grant of summary judgment vacated and remanded for reconsideration of other* Polaroid *factors*, 971 F.3d 74 (2d Cir. 2020).

The assembled evidence persuasively establishes that the Ezy Hang curtain suffered from quality issues. And defendants have not adduced evidence of deficiencies with Focus's curtain. Thus, "the junior user's product [was] of inferior quality," creating a risk that "the senior user's reputation could be jeopardized." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (internal quotations and citation omitted); *see also Sunny Merch. Corp.*, 97 F. Supp. 3d at 498 (factor favored plaintiff where "[t]here [was] no dispute that [defendant's] products are of an inferior quality to [plaintiff's]").

The quality factor accordingly weighs in plaintiff's favor as to the HOOKLESS®, EZ-ON, and Trade Dress infringement claims.

*(8) Consumer sophistication*: The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (internal quotation marks and citation omitted) (alteration in original). "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011). Confusion is thus more likely "where the goods are cheap and bought casually." *Dooney & Bourke*, 561 F. Supp. 2d at 389 (quoting MCCARTHY ON TRADEMARKS § 23:96) (internal quotation marks omitted). And where "there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." *Morningside*, 182 F.3d at 143.

With the Court's having found that the Ezy Hang product is nearly identical to the EZ-ON product and strikingly similar to the HOOKLESS® product, there is a presumption that the likely customers of Focus's and Kartri's products would be confused among them, unless they

are exceedingly sophisticated. *See id.* The evidence does not establish such sophistication. To the extent defendants operated through distributors, as was often the case for Focus's HOOKLESS® product, Kemp testified that such distributors usually buy hundreds, even thousands, of different products pertaining to bedding, bath, and related categories. Tr. at 274–75. Given the breadth of this suite of products, she testified, distributors "will never be experts [in non-hooked shower curtain products], no matter how hard we train them." *Id.* at 275. Where a distributor relies on a field team, expertise may be particularly unlikely. *Id.* at 273 (Kemp). As to the parties' ultimate purchasers, these are, on the whole, of either medium sophistication (particularly as to hospitality-market purchasers) or low sophistication (retail-market purchasers). In the hospitality market, to the extent the purchasing decision is made by a higher-up executive, these are unlikely to be expert in particular shower curtain products. Erickson Aff. ¶ 13. In the retail market, individual customers may purchase a HOOKLESS® or Ezy Hang products based on encountering it at a hotel, not on comparison shopping or research. Such consumers are unlikely to be savvy to the differences between the parties' products. *See id.*

The inexpensive cost of a shower curtain is also consistent with lower sophistication. The shower curtains at issue in this litigation typically range in price between $12–31 for a Focus curtain, and $12–28 (in some instances $45) for a Kartri curtain. Elmore Rep. ¶ 91. They thus fall within the "inexpensive [product category that] does not require any sophistication on the part of the buyer." *Snuggly Plushez*, 809 F. Supp. 2d at 156; *see also Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011) ("[p]urchasing fashionable yet affordable ladieswear" did not require any heightened degree of sophistication (internal quotation marks omitted)); *see Capri Sun GmbH v. Am. Beverage Corp.*, No. 19 Civ. 1422 (PAE) (DCF), 2022 WL 976270, at *56 (S.D.N.Y. Mar. 31, 2022) (juice pouches, sold in cartons

priced between $2 and $20, did not require consumer sophistication), *motion to certify interlocutory appeal denied*, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022); *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 398–99 (S.D.N.Y. 2014) (similar).

Kartri responds that some customers knew they had bought Kartri's products and proceeded anyway. That does not refute confusion. "[T]o be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *PAF S.r.l. v. Lisa Lighting Co.*, 712 F. Supp. 394, 411 (S.D.N.Y. 1989) (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinemas Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979)). Kartri has not adduced evidence that its customers knew what they were purchasing was unconnected to—and not sponsored or endorsed by—Focus. On the contrary, Kartri blurred the distinction between the two products by, for example, referring to the Ezy Hang curtain as "a version of hookless" to inquiring customers. PTX 230; *see also* PTXs 231 (similar), 232 (similar). And Kartri's attempt to bring in customers seeking a "version of hookless" stood to mislead customers, from the outset, that they were buying a product allied with the HOOKLESS® product. Where a customer is

> [m]isled into an initial interest, a potential . . . buyer may satisfy himself that the less expensive [product] is at least as good, if not better, than [the senior product]. Deception and confusion thus work to appropriate [plaintiff]'s good will. This confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company.

*Grotrian*, 523 F.2d at 1341 (internal quotation marks and citation omitted).

The final *Polaroid* factor thus also favors plaintiffs as to all three infringement claims.

***Weighing the* Polaroid *Factors*:** "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to

be confused." *Tiffany & Co.*, 971 F.3d at 85.  "The *Polaroid* factors are to be weighed

holistically in determining whether the party seeking to establish an infringement claim has

demonstrated the probability of confusion of a substantial number of consumers of the relevant

class." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 366

(S.D.N.Y. 2003).  "[T]he Second Circuit has explained that strength, similarity, and proximity

are generally the three most important *Polaroid* factors." *Bath & Body Works*, 7 F. Supp. 3d at

399 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).

   The Court finds, on balance, that the *Polaroid* factors establish a likelihood of confusion

as to the HOOKLESS® Mark infringement claim as to Kartri, and the EZ-ON Mark and Trade

Dress infringement claims as to both defendants.  The assessments differ slightly by issue.

   *HOOKLESS® Mark*:  The Court found the HOOKLESS® Mark inherently distinctive

due to its suggestiveness.  That established the Mark's strength without the need of a showing

that it had acquired secondary meaning over time.  There is also a strong similarity between the

marks (and between the curtains bearing the HOOKLESS® Mark and the Ezy Hang curtains).

And plaintiffs' and defendants' marks compete in the same market.  The first three factors of

*Polaroid*—which the Second Circuit has recognized as the most important—decisively favor

plaintiffs.  The balance of the factors—bridging the gap, actual confusion, bad faith, quality, and

consumer sophistication—also handily favors plaintiffs.  Although bridging the gap is neutral

here because the parties operate in the same market, the remaining factors—anecdotal evidence

of actual confusion, the clear record of defendants' bad faith in imitating plaintiffs' design, the

lower quality of defendants' Ezy Hang curtain, and the low-to-medium sophistication of

purchasers and end users—all strongly favor a finding of likelihood of consumer confusion.

*EZ-ON Mark*: As to the EZ-ON Mark, the Court found it, too, inherently distinctive, but weaker than the HOOKLESS® Mark. That is of no moment, however, because the second factor—similarity—almost single-handedly establishes a finding of likelihood of confusion. That is because the similarity between the EZ-ON and the Ezy Hang Marks is extreme; the two are so alike as to be almost identical. And the markets in which the two products are sold—EZ-ON in retail, Ezy Hang in hospitality—are proximate. The first three *Polaroid* factors—carried decisively by the second—thus strongly favor a finding of likelihood of confusion. Of the remaining factors, only the absence of evidence of actual confusion weighs in defendants' favor. But the others—bridging the gap between the adjacent markets, quality issues, and consumer sophistication—favor plaintiffs. Most important, the Court has found overwhelmingly that defendants acted in bad faith in attempting to imitate the EZ-ON Mark.

*Trade Dress*: The Trade Dress is embodied by curtains under the HOOKLESS® Mark and the EZ-ON Mark. The finding of a likelihood of confusion as to the two Marks compels a similar finding of likelihood of confusion as to the Trade Dress.

Having found that both Marks and the Trade Dress are entitled to protection, and that plaintiffs have shown the requisite likelihood of confusion as to each, the Court finds that Kartri infringed the HOOKLESS® Mark, and that both defendants infringed the EZ-ON Mark and the Trade Dress.

### 3.      Marquis's Counterclaim of Non-Infringement as to the EZ-ON Mark

Marquis has counterclaimed that it did not infringe the EZ-ON Mark. In light of the above analysis and findings, that counterclaim is denied.

### F.      Unfair Competition with Focus's EZ-ON Mark, Hookless Mark, and Trade Dress

The elements of an unfair competition claim under New York common law "mirror" those of Lanham Act claims for trademark or trade dress infringement. *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018) (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)). But the proponent of such a claim "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant]'s bad faith." *LVL XIII Brands*, 209 F. Supp. 3d at 678 (citing *Info. Superhighway, Inc. v. Talk Am., Inc.,* 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (alteration in *LVL XIII Brands*)); *see also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 383 (2d Cir. 2000). A plaintiff "must prove: (1) actual confusion or a likelihood of confusion; and (2) the defendant's bad faith." *LVL XIII Brands*, 209 F. Supp. 3d at 678 (citing *Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 346 F. App'x 721, 723 (2d Cir. 2009) (summary order)).

The findings above resolve this claim. The Court has found a likelihood of confusion based on the *Polaroid* factors' application to both Marks and the Trade Dress, and that, with respect to these, defendants acted in bad faith. The Court thus finds that Kartri engaged, under New York common law, in unfair competition with the HOOKLESS® Mark, and that both defendants engaged in unfair competition with the EZ-ON Mark and the Trade Dress.

## III.    Findings of Fact and Conclusions of Law as to Damages

### A.    Overview

Plaintiffs pursue three types of damages. First, they request disgorgement of defendants' profits arising from their infringement of plaintiffs' EZ-ON Mark and Trade Dress.[50] *See* PTX

---

[50] Plaintiffs do not seek monetary damages for the infringement of the HOOKLESS® Mark. And disgorgement for patent infringement is not available. *See SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 964 & n.6 (2017).

637 at 10.  Second, as an alternative, they seek their own lost profits arising from defendants'

infringement of the utility patents and Trade Dress, that is, from defendants' sales of the

infringing products.  To the extent that a lost-profits award does not assume that defendants'

sales would have gone to plaintiffs but for the infringement, they ask to receive a reasonable

royalty award keyed to such sales, and for the infringement of the EZ-ON Mark.  *See id.*  Third,

if a lost-profit award is not ordered, plaintiffs request the royalty awards from all of Kartri's sales

infringing plaintiffs' patents or Trade Dress, and from the infringement of the EZ-ON mark.  *See*

*id.*  Plaintiffs measure each proposed award for two possible periods of infringement, each

beginning October 16, 2016: one would end July 31, 2018, the other November 15, 2018.  The

Court thus must choose the proper measure of damages and the proper period of infringement.

The damages that plaintiffs calculate on each theory are as follows:

| Damages Theory | Infringement Period Ending July 31, 2018 | Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| • *Profit disgorgement* | Total:   $4,083,259 | Total:   $4,468,268 |
| • *Lost profits* (assuming plaintiffs would have captured 90% of Kartri's illicit sales) | $987,155 | $1,078,137 |
| • *Reasonable royalty* from Patent/Trade Dress infringement (based on uncaptured 10% of Kartri's sales) | $54,842 | $59,897 |
| • *Reasonable royalty* from EZ-ON Mark infringement | $87,747 | $95,834 |
| | Total:   $1,129,744 | Total:   $1,233,868 |
| • *Reasonable royalty* from all of Kartri's Patent or Trade Dress Sales | $548,419 | $598,965 |
| • *Reasonable royalty* from EZ-ON Mark infringement | $87,747 | $95,834[51] |

---

[51] The trial demonstrative displayed $94,834, a $1,000 difference from the same item in the second set of damages calculations.  Elmore testified that this was a typo.  *See* Tr. at 476.

| | Total:  $636,166 | Total:  $694,799[52] |
|---|---|---|

Under each theory, plaintiffs also seek enhanced—trebled—damages for defendants'
allegedly willful conduct.

Plaintiffs base their damages calculations on the report of expert John Elmore.  PTXs 297
("Elmore Rep."), 297-1.  Defendants rebut with a report by expert Graham Rogers.  DTX 47
("Rogers Rep.").  The Court first reviews the governing legal framework and then applies these
principles to the facts.

### B.    Applicable Legal Frameworks

#### 1.    Disgorgement of Defendants' Profits

Plaintiffs first seek to disgorge defendants' profits as a remedy for their infringement of
the Trade Dress and the EZ-ON Mark.  "Under the Lanham Act, [a plaintiff] is entitled 'to
recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of
the action.'"  *Brooks v. Dash*, 454 F. Supp. 3d 331, 341 (S.D.N.Y. 2020) (quoting 15 U.S.C. §
1117(a)), *aff'd*, 852 F. App'x 40 (2d Cir. 2021) (summary order).  In tabulating such profits, it is
plaintiff's burden "to prove defendant's sales"; it is defendant's burden to "prove all elements of
cost or deduction claimed."  15 U.S.C. § 1117(a); *see Hilton v. UK Fragrances, Inc.*, No. 12 Civ.
6346 (JFB) (AKT), 2014 WL 794304, at *6 (E.D.N.Y. Feb. 25, 2014).  "[D]isgorgement is an
inherently equitable remedy."  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics
GmbH*, No. 14 Civ. 585 (AJN), 2018 WL 4253181, at *16 (S.D.N.Y. Sept. 5, 2018).  Under
principles of equity, "a trademark defendant's mental state is a highly important consideration in
determining whether an award of profits is appropriate"—albeit not an "inflexible precondition."

---

[52] The trial demonstrative incorrectly calculated a total of $1,173,971.  The Court has corrected
this error in its determination.

*Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).[53] "The Second Circuit recognizes three theories under which a court may order disgorgement of defendant's profits: unjust enrichment, compensation, and deterrence." *River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13 Civ. 3669 (DLC), 2015 WL 3916271 (June 25, 2015), at *5 (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014)).

## 2.      Plaintiffs' Lost Profits

Plaintiffs also seek lost profits for the patent and Trade Dress infringement that resulted from the sales of the Ezy-Hang product. *See* PTX 637 at 2. Because the sales underlying both infringements are the same, plaintiffs have elected to request a lost profits award as calculated based on a showing of liability patent infringement. *See* Elmore Rep. ¶ 63; PTX 637 at 3–6. The Court accordingly sets forth that framework only.

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "Lost-profits damages are appropriate whenever there is a reasonable probability that, 'but for' the infringement, the patentee would have made the sales that were made by the infringer." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263 (Fed. Cir. 2013) (cleaned up). "In *Panduit Corp. v. Stahlin Bro[ther]s Fibre Works[, Inc.*, 575 F.2d 1152 (6th Cir. 1978)], the Sixth Circuit set forth the widely used four-factor test to determine when lost profits damages are available." *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075 (LJL), 2022 WL 2757643, at *26 (S.D.N.Y. July 14, 2022); *see also Rite-Hite Corp. v.*

---

[53] This holding abrogates the holding of *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992), that willfulness is a prerequisite for a profits award under 15 U.S.C. § 1125(a). *See Experience Hendrix*, 2020 WL 3564485, at *6 n.4 (clarifying that equitable principles historically used in deciding whether to award profits "continue to be applicable").

*Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*); *Grp. One Ltd. v. GTE GmbH*, No. 20

Civ. 2205 (MKB) (JRC), 2022 WL 4010850, at \*25 (E.D.N.Y. Sept. 2, 2022).  The factors

governing a showing of but-for causation under *Panduit* include: "(1) demand for the patented

product, (2) absence of acceptable noninfringing alternatives, (3) [capacity] to exploit the

demand, and (4) the amount of profit [the patentee] would have made."  *Am. Tech. Ceramics

Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 630 (E.D.N.Y. 2020) (quoting

*Panduit*, 575 F.2d at 1156) (alterations in *Presidio*).  Under "the second prong, the patent owner

may rely on proof of its established market share rather than proof of an acceptable

noninfringing substitute."  *Bic Corp. v. First Prominence Co.*, No. 00 Civ. 7155 (SHS) (RLE),

2001 WL 1597983, at \*2 (S.D.N.Y. Dec. 10, 2001) (citing *State Indus. v. Mor-Flo Indus.*, 883

F.2d 1573, 1578 (Fed. Cir. 1989)).  The burden of making this showing is on the patentee.  *FCX

Solar, LLC v. FTC Solar, Inc.*, No. 21 Civ. 3556 (RA) (VF), 2022 WL 3584946, at \*2 (S.D.N.Y.

Aug. 22, 2022) (citing *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir.

2003)).  And "where lost profits are the best measure of damages in the but-for world where the

defendant had not infringed, they are available to fully compensate the patent holder for

the infringement."  *Town & Country Linen Corp.*, 2022 WL 2757643, at \*26 (citation omitted).

### 3.    Reasonable Royalties

Plaintiffs also seek two types of reasonable royalties.  The first is for the infringement of

the utility patents and Trade Dress, which resulted from the same sales of the Ezy-Hang product.

Plaintiffs propose varying awards, based on whether such an award is made in addition to a lost

profits award, or stands alone.  The second is for Kartri's unlawful branding of its Ezy-Hang

products with the EZ-ON Mark.  Here, plaintiffs propose a fixed award regardless of whether the

Court awards lost profits.

### a.    *Reasonable Royalties for Patent and Trade Dress Infringement*

"For sales in which the patentee cannot prove the elements necessary to establish entitlement to lost profits, [35 U.S.C. § 284] guarantees the patentee a reasonable royalty for those sales." *Grp. One Ltd.*, 2022 WL 4010850, at *26 (quoting *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017)).  A "common approach used to calculate a reasonable royalty is the 'hypothetical negotiation,' which 'attempts to ascertain the royalty upon which the parties would have agreed [*ex ante*] had they successfully negotiated an agreement just before infringement began.'" *FCX Solar*, 2022 WL 3584946, at *3 (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)).  "In calculating a reasonable royalty under this approach, courts rely on the . . . fifteen factors detailed in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *ResQNet.com, Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688, 692 (S.D.N.Y. 2011); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 853 & n.3 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

The *Georgia-Pacific* factors are:

[1] the past and present royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty;

[2] the rates paid by the licensee for the use of other patents comparable to the patents in suit;

[3] the nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted;

[4] the licensor's policies and practices regarding the grant of licenses to its technology;

[5] the commercial relationship between the licensor and the licensee;

[6] the effect of selling the patented specialty in promoting sales of other products of the license, the existing value of the invention to the licensor as a generator of sales of its non-patented items, and the extent of such derivative convoyed sales;

[7] the duration of the patent and term of the license;

[8] the established profitability of the product made under the patent; its commercial success; and its current popularity;

[9] the utility and advantage of the patent property over the old modes or devices, if any that has been used for working out similar results;

[10] the nature of the patented invention as well as its commercial embodiments and benefits;

[11] the extent the infringer used invention and evidence of the value of that use;

[12] the customary profit for use of the invention or analogous inventions;

[13] the portion of the infringer's profit that should be credited to the invention;

[14] the opinion of qualified experts; [and]

[15] the amount that a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement.

*See ResQNet.com, Inc.*, 828 F. Supp. at 692–93 (citing *Ga.-Pac.*, 318 F. Supp. at 1120).

### b.   *Reasonable Royalties for EZ-ON Mark Infringement*

Unlike the Patent Act, the Lanham Act does not expressly provide for a reasonable royalty remedy, 15 U.S.C. § 1117(a).  Instead, "[a] plaintiff in a trademark action may recover a 'reasonable royalty' under the [Lanham Act's] heading of actual damages." *Gucci Am., Inc. v. Guess? Inc.*, 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012).  "However, because they are inherently difficult to calculate in a vacuum, courts often decline to award such damages unless the parties had a prior licensing agreement." *Id.*; *see also Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203 (DLC), 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006) (in trademark context, reasonable royalties "generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty"); *The Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02 Civ. 10037 (DLC), 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005) (royalty award a "seldom-used method for computing trademark damages").  Absent a prior licensing agreement, "courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to

calculate them." *Gucci Am., Inc.*, 858 F. Supp. 2d at 254. In such instances, the *Georgia-Pacific*

factors serve as a guiding framework.

   C.   **Plaintiffs' Damages Report**

       1.   **The Elmore Report and Its Relation to Plaintiff's Damages Requests at Trial**

   In his report, plaintiffs' expert Elmore provides the calculations and data underpinning

plaintiffs' three damages theories: (1) disgorgement of profits, (2) plaintiffs' lost profits,

complemented by reasonable royalties for defendants' (i) infringement of the utility patents and

infringement of and unfair competition with the Trade Dress and (ii) infringement of and unfair

competition with the EZ-ON Mark, and (3) a larger, standalone reasonable royalties award for

defendants' (i) infringement of the utility patents and infringement of and unfair competition

with the Trade Dress and (ii) infringement of and unfair competition with the EZ-ON Mark.[54]

*See* Elmore Rep.; PTXs 297-1 (appendices); 637 at 2 (damages requests).[55]

   The Court will supplement its summary with expansions and clarifications that Elmore

supplied in his trial testimony. Elmore's report covers an infringement period from October 16,

2013 to July 31, 2018. But, at trial, plaintiffs urged an extended infringement period for which

to calculate damages: from October 16, 2013 to November 15, 2018. *See* PTX 637. That was to

correct a lapse by the defense, which produced defendants' sales data only through July 31,

2018, whereas the infringement extended until November 15, 2018. *See* Tr. at 401–04; *id.* at

---

[54] For infringement of the HOOKLESS® Mark, plaintiffs seek only injunctive relief because, unlike with the EZ-ON Mark "readily associated" with plaintiffs' products, it was not possible to reliably quantify the damages for infringement of that mark. Tr. at 405–06 (Elmore).

[55] Elmore's report was issued January 14, 2019. The cover page of the original report gave a date of January 14, 2018, notwithstanding setting out damages calculations for a period ending July 31, 2018. Elmore's updated report at trial repeated this date. *See* PTX 637 at 2 *et seq.*; Tr. at 505–06. The 2018 date was a typographical error. Tr. at 503–10.

545.  Elmore tabulated damages for the added period between August 1, 2018 and November 15,

2018 by extrapolating each defendant's revenues from its respective monthly average revenue

between January 2017 and July 2018 and applying that average to August–October and

November (prorated) 2018.  *Id.* at 519–20; *see also id.* at 402 ("Same methodology just

extending the date range." (Elmore)), 404–05, 520, 532.

## 2.      Qualification of Elmore as an Expert Witness

Trial courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*

*Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir.

2004).  "Whether a witness is qualified as an expert is a threshold question that precedes the

court's relevance and reliability inquiries." *LVL XIII Brands*, 209 F. Supp. 3d at 636.  Under

Rule 702, the witness must be "qualified as an expert by knowledge, skill, experience, training,

or education." *Id.* (quoting Fed. R. Evid. 702).  "To determine whether a witness qualifies as an

expert, courts compare the area in which the witness has superior knowledge, education,

experience, or skill with the subject matter of the proffered testimony." *In re Mirena Ius*

*Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018)

(quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)), *aff'd*, 982 F.3d 113 (2d

Cir. 2020).  These words must "be read in light of the liberalizing purpose of" Rule 702.  *United*

*States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), *cert. denied*, 475 U.S. 1141 (1986).

Elmore is qualified to opine on the computation of damages on plaintiffs' claims.  On

November 23, 2021, the Court rejected defendants' motion *in limine* to exclude Elmore's report,

finding Elmore amply qualified under Rule 702 and *Daubert*.  *See* Dkt. 436.  Elmore holds a

bachelor's degree in economics, a Master of Business Administration, and a Juris Doctor, and is

a Certified Public Accountant, "accredited in business valuations, certified in financial forensics,

and holds a designation as a Master of Financial Forensics." *Id.* at 35.  In 2017, Elmore joined

the financial advisory firm Ernst & Young LLP as a manager in its valuation and business

modeling, and before then led the intellectual property valuation services practice at a different

business valuation firm.  *Id.*  Elmore had done valuation and damages analyses on more than 200

matters, many involving patent and trademark issues, across numerous industries.  *Id.* at 35–36;

*see also* Elmore Rep. ¶¶ 10–15 (qualifications).  Elmore's qualifications were not objected to at

trial.  *See* Tr. 398–400.

### 3.    Admissibility of Elmore's Report

Under Rule 702, after the witness is qualified as an expert, the party seeking to admit

expert testimony must show that "(1) 'the testimony is based on sufficient facts or data,' (2) 'the

testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably

applied the principles and methods to the facts of the case.'" *United States v. Pryor*, 474 F.

App'x 831, 834 (2d Cir. 2012) (summary order) (quoting Fed. R. Evid. 702).  The proponent

must further show that (4) "the testimony is relevant and will assist the [trier of fact]," *In re*

*Mirena*, 341 F. Supp. 3d at 240, and "has the burden of establishing by a preponderance of the

evidence that the admissibility requirements of Rule 702 are satisfied," *United States v.*

*Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

The Court again affirms its ruling, denying defendants' motion *in limine* to exclude

Elmore's report.  *See* Dkt. 436 at 36–38.  The Court there rejected defendants' arguments that

Elmore relied on unreliable data by (1) partially relying on data that a third-party analyst had

synthesized from data that defendants provided in discovery; (2) failing to update the sales data

through December 2018; and (3) introducing inconsistencies suggesting his report had been

prepared in 2017.  *See id.*  The Court also rejected arguments by the defense questioning the

persuasiveness of the Elmore Report.  *See id.*

### 4.    The Elmore Report's Damages Calculations[56]

*a.    Disgorgement of defendants' profits*

**Defendants' revenues**: Elmore presents data of each defendant's relevant sales:

| | Marquis | Kartri | Totals |
|---|---|---|---|
| Oct. 16–Dec. 31, 2013 | $2,753 | $886 | $3,639 |
| 2014 | $50,364 | $70,055 | $120,419 |
| 2015 | $285,981 | $344,802 | $630,783 |
| 2016 | $252,312 | $874,964 | $1,127,276 |
| 2017 | $932,522 | $227,405 | $1,159,927 |
| Jan. 1–July 31, 2018 | $365,650 | $675,565 | $1,041,215 |
| **Totals** | $1,889,582 | $2,193,677 | $4,083,259 |

Elmore Rep. ¶ 185; *id.* Att. 4.0.

Marquis's and Kartri's figures are based on records that each produced in discovery.

Elmore Rep. ¶ 185.  Marquis's data captures its sales of accused Ezy Hang curtains to Kartri. *Id.*

Kartri's data captures its sales to its customers. *Id.*[57]

At trial, Elmore offered updated sales figures covering the period through November 15,

2018, based on extrapolations from the initial infringement period:

| | Marquis | Kartri | Totals |
|---|---|---|---|
| Total sales Oct. 16, 2013–July 31, 2018 | $1,889,582 | $2,193,677 | $4,083,259 |

---

[56] Where relevant, the Court supplements the report's figures with the updated figures to which Elmore testified at trial, capturing the infringement period ending November 15, 2018.

[57] The data and computations underlying Marquis's sales figures are set out in Attachments 7.0 and 7.1.  Attachment 7.1 lists all Marquis invoices from November 27, 2013, through May 4, 2017.  Marquis provided this data to Elmore in the form of a generated accounting.  Tr. at 494.  He did not receive the underlying invoices themselves.  *Id.*  Each line specifies the date, invoice, number, item number, item description, the quantity ordered, the dollar cost per unit, the dollar sales price per unit, the total cost incurred for the order, and the total revenue Marquis gathered from the order.  Each line further included a gross margin percentage, which Elmore calculated by dividing the total cost by the total revenue, and subtracting that percentage from 100%.  Some such profit margins show a negative percentage.  Elmore explained that such figures, based on Marquis's own disclosures, resulted from its selling to Kartri at a loss.  Tr. at 490–93.

| | | | |
|---|---|---|---|
| Sales Aug. 1–Nov. 15, 2018 | $182,825 | $202,184 | $385,009 |
| **New Totals** | $2,072,407 | $2,395,861 | $4,468,268 |

PTX 637 at 4.

*Estimates of defendants' profits*:  Elmore next estimates each defendant's profits,

notwithstanding the fact that defendants bear the burden of "proving appropriate costs and

deductions."  15 U.S.C. § 1117(a); Elmore Rep. ¶ 187.

*Marquis's profits*:  For Marquis, Elmore does not rely on Marquis's cost data.  That is

because Marquis, in discovery, did not break out the fixed costs independent of Marquis's sales

volume.  Elmore Rep. ¶ 188; *see* Tr. at 421 ("[Marquis's cost data] reflected some other measure

of cost, and it's not certain as to whether that cost—what Marquis included in computing that

level of cost.").  Elmore uses "incremental profits" in calculating profits, which entails applying

the variable costs associated with the products sold against those products' revenues.  Elmore

Rep. ¶¶ 188–189.

Accordingly, Elmore calculates Marquis's gross profits and profit margins for each year

by looking at the revenues and costs associated with the Ezy Hang curtain.  Those figures are:[58]

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | **Total** |
|---|---|---|---|---|---|---|---|
| Revenue | $2,753 | $50,364 | $285,981 | $252,312 | $932,522 | $365,650 | $1,889,582 |
| Costs | ($2,423) | ($44,320) | ($250,347) | ($231,708) | ($798,810) | ($305,165) | ($1,632,773) |
| Gross profit | $330 | $6,044 | $35,634 | $20,604 | $133,712 | $60,485 | **$256,809** |
| Gross margin | 12.0% | 12.0% | 12.5% | 8.2% | 14.3% | 16.5% | 13.6% |

---

[58] PTX 637 did not provide updated figures as to this chart.

*Id.*, Att. 7.0; *see also id.* ¶¶ 189–190. Marquis's minimum profit for disgorgement is thus $256,809. This figure, Elmore states, may understate Marquis's profits, in that the variable cost figures that Marquis provided may include fixed costs that he would have excluded. *Id.* ¶ 190.[59]

*Kartri's profits*: As to Kartri, the data and computations underlying its sales figures are contained in Attachments 6.0, 6.1, and 6.2.[60] Elmore testified that, in compiling his report, he observed that Marquis's reported number of curtains sold to Kartri was significantly higher than the number of curtains Kartri sold in the hospitality market. This suggested that Kartri may have underreported its sales figures. Tr. at 421–22. Kartri's data, as noted, lacks cost figures, despite cost being a defendant's burden to prove. *Id.* ¶ 191.[61] Elmore nonetheless calculates gross margins as best he can—by matching a product's identification number to an entry in Marquis's data, where possible. Where such a match exists, Elmore uses Marquis's sales price to Kartri as reflecting Kartri's cost for that item, and calculates the corresponding gross margin. Tr. at 523–24.

Elmore's tabulation of Kartri's total revenue was as follows:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|

[59] Attachment 7.1 does not provide sales data beyond May 4, 2017. But Attachment 7.0, whose only identified source is Attachment 7.1, provides sales, profit, and gross margin figures through July 31, 2018. This was not explained at trial.

[60] Attachments 6.1 and 6.2 list all invoices Kartri provided from November 27, 2013, through May 4, 2017. For the period January 1, 2017 through July 31, 2018, Kartri provided total sales figures to plaintiffs' counsel in a letter dated September 4, 2018 (the "September 2018 Letter"). *See* Att. 6.0 n.2. That total figure was $657,565. *Id.* Attachment 6.1 covers sales from Ezy Hang curtains that Kartri purchased from Marquis. Each line specifies the order's date, a "detail" number, order ID, invoice number, unit price, quantity, total revenue for the order, and a product identification number. Attachment 6.2 covers sales from Ezy Hang curtains that Kartri made itself by, for example, filling orders made to certain specifications. *See* Tr. at 513–14.

[61] As noted, on August 5, 2021, the Court excluded the cost data Kartri provided its rebuttal damages expert Graham Rogers, on account of defendant's discovery violation. Dkt. 412.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue, Att. 6.1 | $353 | $11,042 | $45,596 | $359,271 | $114,066 | n/a | n/a |
| Revenue, Att. 6.2 | $544 | $59,829 | $303,222 | $525,883 | $115,987 | n/a | n/a |
| Total | $896 | $70,871 | $348,818 | $885,154 | $230,053 | $675,565[62] | $2,211,357 |
| Credits | ($10) | ($816) | ($4,016) | ($10,190) | ($2,648) | 0 | ($17,680) |
| Net Revenue | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | **$2,193,677** |

Elmore Rep., Att. 6.0.

To calculate Kartri's disgorgeable profits, Elmore does not rely on the spotty gross margin data he was able to derive from matching Kartri's data to Marquis's. Instead, he takes as a proxy *Focus*'s profit margins in the hospitality industry. *Id.* ¶ 192. That margin, across the board, is 50%. *Id.* ¶ 194.[63] Kartri's profits subject to disgorgement thus amount to:

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Net Revenue | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |
| Margin | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Disgorgeable Profit | $443 | $35,028 | $172,401 | $437,482 | $113,703 | $337,783 | **$1,096,839** |

*Id.* Applying this profit margin, Kartri's total profit to be disgorged, for the infringement period ending on July 31, 2018, is $1,096,839.

At trial, plaintiffs argued that because defendants had not met their burden to reliably prove their costs, defendants' entire revenue should be disgorged. *See* PTX 637 at 9. For the

---

[62] In tabulating revenues for the period after May 4, 2017, the last date for which Kartri provided invoice data, Elmore referred to the September 2018 Letter. It provided a total sales figure for January 1, 2017–July 31, 2018. Elmore Rep., Att. 6.0 n.2. Elmore subtracted the sales figure for January 1–May 4, 2017 from the figure in the September 2018 Letter. *Id.*; Tr. at 538–42.

[63] Elmore arrived at this figure by reducing Focus's 54.1% profit margin to account for distribution costs of 2% of sales, sales commissions of 0.6% of sales, and other contingent factors. *See* Elmore Rep. ¶¶ 106, 108–109, 193.

infringement periods ending on July 31, 2018 and November 15, 2018, these revenues are, respectively:

| Defendant | Disgorgeable Revenues for Infringement Period Ending July 31, 2018 | Disgorgeable Revenues for Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| Marquis | $1,889,582 | $2,072,407 |
| Kartri | $2,193,677 | $2,395,861 |
| Totals | $4,083,259 | $4,468,268 |

### b.    Lost profits

Lost profits are available under the Patent Act and the Lanham Act. Because defendants' infringement of the utility patents and Trade Dress arose from the same accused sales, Elmore tabulated lost profits by applying the four *Panduit* factors, which guide the determination of lost profits for patent infringement. Elmore's report analyzed whether (1) demand for the patented product exists; (2) there were no acceptable non-infringing substitute products to satisfy that demand; (3) the owner of the patent possessed the manufacturing and marketing capability to exploit the demand; and (4) the amount of lost profits can be quantified. Elmore Rep. ¶¶ 65–66.

**Panduit *factor 1 (consumer demand)*:** According to Elmore, demand for the patented products exists because both plaintiffs and defendants have generated substantial revenues and profits from selling their respective products. Focus, between 2013 and August 2017 alone, sold HOOKLESS® curtains for total revenues of $81.4 million in the hospitality market and $54.4 million in the retail market. *Id.* ¶ 74. Its hospitality market profit margins were, on average, 54.1% each year, and 33.5% in the retail market. *Id.*; *see also id.* Att. 8.1, Att. 8.2.[64]

---

[64] Plaintiffs did not include their own sales data beyond August 2017—more than 14 months before the last date of the infringement period—or update those figures at trial. Although in theory Focus's profitability might have changed between August 2017 and November 15, 2018, defendants did not argue at trial that Focus's dataset was unrepresentative or inadequate.

Marquis's total sales for the Ezy Hang product were $1,889,582 between October 16, 2013 and July 31, 2018. *Id.* ¶ 75; Att. 7.0.[65] Through November 15, 2018, those sales were $2,072,407. PTX 637 at 7, 16. Kartri's estimated net sales revenue for the Ezy Hang product for the period through July 31, 2018 was $2,193,677. *See* Elmore Rep. ¶ 75; Att. 6.0. Through November 15, 2018, those were $2,395,861. PTX 637 at 7, 9.

This, Elmore opines, establishes the existence of demand for the patented products in-suit. Elmore Rep. ¶ 76.

***Panduit* factor 2 (*no non-infringing products to satisfy demand, market share approach*)**: To establish that no non-infringing alternatives to Focus's hook-free products were available to customers, Elmore first opines that the hook-free shower curtain market essentially consisted of two players—Focus and Kartri.[66] *Id.* ¶ 94. The only other player to sell hook-free curtain products in the hospitality market was Carnation, a licensee of Focus's. *Id.* ¶ 81.[67] Even though consumers in the hospitality market have the choice of buying "traditional hook-based" shower curtains, such have essentially been displaced by hook-free shower curtains. *Id.* ¶ 79. Elmore's report, and testimony, are that, with defendants' infringing products on the market, Focus captured a share of roughly 50%, with the rest allocated to Kartri due to its infringing sales. *Id.* ¶ 80. Kartri's products directly competed with Focus's. *Id.* ¶ 89.

---

[65] Elmore's report erroneously states an amount of $1.9 million and refers to Attachment 7.0. Elmore Rep. ¶ 75. But that amount and attachment refer to Marquis's revenues, whereas the revenues in question are those of Kartri, the party selling the Ezy Hang product to end consumers in the hospitality market. Elmore clarified at trial that this was a transposition error. *See* Tr. at 501. The Court has used the correct figures here.

[66] Although Elmore does not so state explicitly, the analysis for lost profits damages is necessarily restricted to the hospitality market, as Kartri sold its products—and deprived plaintiffs of profits—only in that market.

[67] A company offering a third hook-free curtain product in the *retail* market—Hospi-Tel Manufacturing Company—failed and went out of business in 2016. Elmore Rep. ¶ 81.

Elmore next opines that, but for defendants' infringement, Kartri's customers would have purchased their curtains from Focus. Elmore establishes this in two ways. First, he relies on deposition testimony by Kartri's Kubus and Goskowski that customers came to Kartri looking for a HOOKLESS® product and were persuaded to buy a Kartri product instead, *id.* ¶¶ 83–84, 86; on email records and testimony to the effect that Kartri sometimes exploited the confusing similarity between its products and Focus's, *id.* ¶¶ 87–89; on testimony that Focus and Kartri charged almost the same prices for their products, *id.* ¶ 91 ($12–31 for a Focus curtain and $12–28, and in some instances $45, for a Kartri curtain, according to Kubus); and on evidence that Focus and Kartri often sold to the same distributors, *id.* ¶ 92. He concludes that, but for Kartri's infringing conduct, there would not have been a non-infringing alternative to Focus's patented products that Kartri's customers could have purchased—and thus that, but for the infringing conduct, Focus would have captured Kartri's sales. *Id.* ¶ 95. Second, because Focus and Kartri operate in a two-player market, the sales captured by Kartri's similar, directly competing product would have likely gone to Focus. *Id.* ¶¶ 94–95.

**Panduit *factor 3 (manufacturing and marketing capability)*:** To show that Focus had the manufacturing capacity to meet the demand Kartri and Marquis served with their infringing products, Elmore takes the parties' sales figures as proxies for their ability to meet demand. He compares Focus's sales figures in the hospitality and retail markets for the period between November 2013 and August 2017 to Kartri's accused sales for that period. Those figures are:

|  | **2013** | **2014** | **2015** | **2016** | **2017** | **Total** |
|---|---|---|---|---|---|---|
| Focus Hosp Sales | $14,657,045 | $16,517,346 | $21,232,118 | $16,875,520 | $12,069,562 | $81,351,591 |
| Focus Retail Sales | $8,717,162 | $11,395,366 | $12,978,872 | $12,475,069 | $8,872,335 | $54,438,804 |
| Total | $23,374,207 | $27,912,712 | $34,210,991 | $29,350,589 | $20,941,897 | $135,790,395 |

| Kartri Accused Sales | | | | | | $1,518,112 |
|---|---|---|---|---|---|---|

Elmore Rep. ¶ 98.

Elmore calculates that Kartri's sales volume constitutes 1.1% of Focus's sales. *Id.* This, he opines, establishes that Focus would have needed only to modestly expand its manufacturing capacity to meet the additional demand associated with a 1.1% increase of its sales. *Id.* ¶ 99.

As to marketing capabilities, Elmore reasons that, based on plaintiffs' 20-year presence in the market, the scale of HOOKLESS® curtain sales, its broad brand recognition, and its established distribution network, Focus would have easily been able to do the marketing necessary for the additional output it would have had but for the infringement. *Id.* ¶¶ 100–101.

**Panduit *factor 4 (lost profits can be quantified)*:** Elmore quantifies Focus's lost profits as follows. He assumes a two-player hospitality market, divided between Focus and Kartri, *id.* ¶ 103, and that Kartri's infringing sales would have gone to Focus absent Kartri's infringement. *Id.; see also id.* ¶¶ 104 (noting that Focus's pricing was comparable to Kartri's), 107 (reasoning, based on Kubus's testimony that approximately 90% of Kartri's sales are in the hospitality business, that most of Kartri's sales would have gone to Focus and at Focus's profit margin).

To calculate the sales Focus lost, Elmore starts with Kartri's accused sales—$2,193,677 for the period ending July 31, 2018, *id.* ¶ 110,[68] and $2,395,861 for the full infringement period ending November 15, 2018, PTX 637 at 9. And, "to account for any contingencies such as small marketplace participants or other factors that impact [p]laintiffs['] ability to capture all of the

---

[68] This figure corrects the confusion of Marquis's and Kartri's sales figures in the Report. *See* Elmore Rep. ¶ 110; *see also supra* note 65; PTX 637 (showing corrected figure).

accused sales," Elmore reduced these sales figures by 10 percent.[69] Elmore Rep. ¶¶ 103, 110. The resulting figures are $1,974,309 and $2,156,275, respectively for the partial and full infringement periods. *Id.* ¶ 110; PTX 637 at 9.

Elmore then derives Focus's profit. He tabulated a 50% profit margin, which, as noted, *see* note 63, *supra*, reflected deductions totaling 4.1% Focus's profit margin of 54.1%, which in turn was determined by taking the average (weighted by sales volume) of Focus's reported yearly margins in the hospitality sector between 2013 and August 2017. *See id.* ¶¶ 106, 108–109.

Elmore's full lost profits calculation for both infringement periods, with corrections for erroneous figures, thus amounts to:

|  | Infringement Period Ending July 31, 2018 | Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| Kartri's total accused revenue | $2,193,677 | $2,395,861 |
| Percentage of Kartri's accused sales captured by Focus absent infringement | 90% | 90% |
| Focus's lost revenue | $1,974,309 | $2,156,275 |
| Focus's average profit margin, applied to lost revenue | 50% | 50% |
| Focus's lost profits | **$987,155** | **$1,078,137** |

*Id.* ¶ 110 (corrected); *id.*, Att. 2.0; PTX 637 at 7.

c.      *Reasonable Royalties*

---

[69] The Elmore Report states that a 10% reduction of Kartri's accused sales figure corresponds to a 10% reduction of Focus's market share. *See* Elmore Rep. ¶ 103 ("I have included a 10 percent reduction to Plaintiffs' but-for market share. Accordingly, for purposes of my analysis, I have used a 90 percent market share to allocate the accused sales to Plaintiffs."). That is incorrect, in that, assuming a 50% market share for Focus, Kartri's gross accused sales reflect the remaining 50% of the market, and reducing *Kartri's sales* by 10% would leave it with 45% of the total market. Allocating that share to Focus would in turn leave it with 95% of the total market.

Elmore calculates two reasonable royalties.  The first is for defendants' infringement of the utility patents and Trade Dress.  He urges that this award should be added to any lost profits award, but be calculated to apply only to the market share unaddressed by the lost profits award, such that, the smaller the market share used to calculate a lost profits award, the proportionately larger the reasonable royalty award for defendants' patent and Trade Dress infringement should be.[70]  The second royalty is for infringement of the EZ-ON Trademark.  *See* PTX 637 at 10.[71]

Elmore measures such damages for both the period ending July 31, 2018, and the full infringement period from October 16, 2013 to November 15, 2018:

| Damages Theory | Infringement Period Ending July 31, 2018 | Infringement Period Ending Nov. 15, 2018 |
| --- | --- | --- |
| (Assuming award of lost profits based on a 90% market share)<br>• Reasonable royalty from Patent/Trade Dress infringement<br>• Reasonable royalty from EZ-ON Mark infringement | $54,842<br><br>$87,747<br><br>Total:  $142,589 | $59,897<br><br>$95,834<br><br>Total:  $155,731 |
| (Assuming no award of lost profits)<br>• Reasonable royalty from Patent/Trade Dress infringement<br>• Reasonable royalty from EZ-ON Mark infringement | $548,419<br><br>$87,747 | $598,965<br><br>$95,834 |

---

[70] *See* Tr. at 475 ("THE COURT: . . . If one were to use the lost profits approach, from your perspective, if that approach is applied to anything less than 100 percent of the sales, the remaining percentage method logically needs to be captured by a reasonable royalty calculation.  That's the bottom line?  THE WITNESS:  Yes . . .").  On this reasoning, were lost profits awarded based on the assumption that (but for the infringement) plaintiffs would have captured 90% of the market in the two-player market, it would calculate a reasonable royalties award for the remaining 10% of uncaptured infringing sales.  *See* PTX 637 at 14.

[71] Elmore argued that the two royalty calculations should be cumulative because the infringing sale of the patented products and Trade Dress was a distinct wrong from the infringing promotional use of the EZ-ON Mark.  Tr. at 477–78.  *But see id.* 446–47, 478 (noting that as an alternative, the royalty remedy from the EZ-ON infringement could be treated as subsumed into royalty damages for the patent and Trade Dress infringement).

| | Total: $636,166 | Total: $693,799 |
|---|---|---|

Elmore's reasoning in support of each award was as follows.

    *i.*  *Reasonable royalty for the patent and Trade Dress infringement*

Elmore gives varying weight to the 15 *Georgia-Pacific* factors. Elmore Rep. ¶ 118. The weightiest is the 15th, *id.* ¶ 115—the reasonable royalty that would be "'willingly negotiated' by both parties in a hypothetical negotiation [at] or around the time of the first infringement," *id.* ¶ 114. He posits such a negotiation as the start of defendants' infringement "during or around October 2013." *Id.* ¶ 119. He assumes that the parties came to the negotiation with the following knowledge. Plaintiffs (1) own several utility and design patents protecting their hook-free shower curtains; (2) have a track record of commercializing their patented technology by manufacturing and selling their products through licensees; (3) recognize that defendants are direct competitors; and (4) recognize that a license to defendants would likely harm plaintiffs' profitability. *Id.* ¶ 120. Defendants recognize (1) the advantages and utility of the patented shower curtain technology and that such drives customer demand of the accused Ezy-Hang product; (2) that for over 20 years, plaintiffs have taken on risks and expenditures to research, develop, and market their patented product; and (3) that no acceptable non-infringing shower curtain ring design was available to them. *Id.* All parties would thus appreciate, he posits, that plaintiffs' bargaining position is strong. *Id.* ¶ 121. That understanding informed Elmore's analysis under the remaining *Georgia-Pacific* factors. *Id.* ¶ 115.

Of these, Elmore first finds six factors (1–4, 7, and 12) inconclusive.

**Factor 1**: Elmore parses five agreements—some amended over time—in which Focus or its predecessors (Arcs & Angles and HSNA) licensed the utility and design patents to its hook-free shower curtain technology to licensees at royalty rates. These are:

- HSNA Agreement: In March 1999, ZDG entered into a license agreement with plaintiff HSNA. *Id.* ¶ 125. Elmore discounts this agreement as not probative of an established royalty rate because Zahner owned both ZDG and HSNA, such that there was not an arms-length negotiation between the parties. *Id.*

- CHF Agreement: On July 9, 1999, HSNA entered into a joint venture agreement with CHF Industries ("CHF"). *Id.* ¶ 126. It granted CHF a worldwide, exclusive license to the '232 Patent—the original design patent that Zahner registered in 1993 which is not in suit here—and proprietary business and intellectual property not pertinent to this royalty determination. *Id.* CHF was to pay HSNA an annual royalty of 10% of gross sales or $300,000, whichever was greater. *Id.*

- Arcs & Angles Agreement: On May 31, 2004, HSNA entered into a joint venture agreement with Arcs & Angles. *Id.* ¶ 127. It granted Arcs & Angles a worldwide, exclusive license to the Design Patent and the three Utility Patents in this suit, trademarks including the HOOKLESS® Mark, and other proprietary information. *Id.* Arcs & Angles was to pay HSNA an annual royalty of 3.25% of gross sales or $130,000, whichever was greater. *Id.* On July 1, 2007, HSNA and Arcs & Angles amended the agreement to increase the annual royalty 4.5% of gross sales (excepting sales to its customer Wal-Mart). *Id.* ¶ 128.

- OTRT Agreement: On May 28, 2007, HSNA entered into a joint venture agreement with On The Right Track Systems ("OTRT"). *Id.* ¶ 129. Under it, OTRT was to pay HSNA an annual royalty of 3.25% of gross sales or certain minimum amounts not specified in the Elmore Report, whichever was greater. *Id.*

- A&A Holdings Agreement:  On October 24, 2014, HSNA and Focus, which inherited the intellectual property rights and obligations set out in the Arcs & Angles Agreement, *id.* ¶¶ 131–133, amended that agreement, to define four tiers of Focus customers, and four corresponding royalty rates.  The rates were 2%, 2.5%, 3%, and 4.5%, respectively, and applied to Focus's gross sales to each tier of customers.  *Id.* ¶ 134.

Elmore opines that these agreements are non-probative of an established royalty rate because they involved related parties, contemplated joint venture transactions, and/or were entered in non-comparable circumstances.  *Id.* ¶ 136.  Accordingly, "there is no established royalty."  *Id.*

*Factors 2–4, 7, and 12*:  As to factor 2—past royalties paid by the licensee—Elmore is unaware of any relevant patent royalties paid by defendants.  *Id.* ¶ 143.  As to factor 3, Elmore states that licenses tend to command higher royalties if they are exclusive, geographically broad, and expansive in the know-how and commercialization they permit.  *Id.* ¶ 140.  He observes that the hypothetical negotiations between the parties would have resulted in a non-exclusive, U.S.-based, "minimal license," *id.* ¶ 142, but concludes that this would not have a downward effect on the royalty rate.  As to factor 4, Elmore is not aware of a formal licensing policy of plaintiffs.  *Id.* ¶ 138.  As to factor 7, Elmore states that royalty rates increase where the remaining term of the underlying patent is short.  *Id.* ¶ 141.  Because the utility patents were due to expire in 2019, Elmore concludes that this fact would have had an upward effect on the royalty rate agreed upon by the parties.  *Id.* ¶ 142.  And as to factor 12—customary or standard royalty rates in the field—Elmore's research did not find usable benchmarks.  *Id.* ¶¶ 144–146.

*Factors 9–11*:  These are (9) the utility and advantages of the patented invention over the old modes or devices; (10) the nature, commercial embodiment, and benefits of the patented

invention; and (11) the extent to which the infringer used the invention. *Id.* ¶ 147. As to these, Elmore canvasses testimony by Goskowski admitting that the advantages of Focus's patented shower curtain rings include quicker and safer installation, corresponding reduced costs, and a lower number of parts to be assembled compared to a hooked curtain. *Id.* ¶ 148. He notes, too, Kubus's concession that the advantages of Focus's patented products made it the leading shower curtain in the hospitality industry. *Id.* ¶ 149.

*Factors 5, 6, 8, and 13*:  These are (5) the commercial relationship between the licensor and the licensee; (6) the extent to which sales of other products by the licensee benefit from the promotional effect of selling the licensed patented products; (8) the profitability of the patented licensed product; and (13) the portion of the infringer's profit that should be ascribed to the patented invention. *Id.* ¶ 154. The commercial relationship between the parties, according to Elmore, is one of direct competitors, which "has an upward impact on the royalty." *Id.* ¶ 155. He opines that he cannot identify any collateral commercial benefits that defendants derived from their sale of the infringing curtains. *Id.* ¶ 156. As to the profitability of the patented products, Elmore points to Focus's own gross margins on hook-free shower curtains of 50%, and to Table 5.4 of the January 2019 *Global Shower Curtains Industry Market Research Report* by the HeyReport Market Data Survey Center (the "Curtain Industry Report"), according to which the typical gross margin for *traditional* shower curtains is around 25%. *Id.* ¶ 160 & n.173. From the disparity in profitability between hook-free and hooked shower curtains, Elmore concludes that "the patented technology contributes substantially to the commercial success and profitability of the hook-free shower curtain products." *Id.* ¶ 160.

Finally, Elmore calculates the proposed reasonable royalty rate attributable to defendants' infringement of plaintiffs' utility patents and Trade Dress. Given the absence of non-infringing

alternatives and the parties' direct competition in a two-player market, he opines that plaintiffs were in a strong bargaining position in the hypothetical royalty negotiation, *id.* ¶¶ 161–164. He selects—as the base against which the royalty amount is to apply—the sales of the accused products by Kartri, the defendant that sold the infringing products to the end-customers in the hospitality market. *Id.* ¶¶ 165–166. He then calculates the royalty rate to be applied to that base. He reasons that a reasonable royalty is the difference between the profit margin typically earned on sales of the accused products and the profit margin typically earned on sales of traditional hooked shower curtains. *Id.* ¶ 167. As evidence for Kartri's margin for hook-free curtains, Elmore, in his report, relies on Kubus's testimony—estimating that margin to be 50%—and Elmore's calculation estimating Kartri's average gross margin, based on Kartri's sale price and per-unit costs paid to Marquis, as approximately 52%. *Id.* ¶ 169; *id.*, Att. 3.0; *id.*, Att. 6.0. He chooses the lower, 50% figure. As to the profit margin in the sale of traditional hook-based curtains, Elmore relies on the 25% figure of the Curtain Industry Report. *Id.* ¶ 170.

The resulting royalty rate is 25%: 50% (the margin for hook-free curtains) minus 25% (the margin for hooked curtains). Elmore applies this rate to the revenue Kartri derived from its sales of the accused products. He arrives at the following royalty figures:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | **Total** |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |
| Royalty Rate | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| Reasonable Royalty | $222 | $17,514 | $86,201 | $218,741 | $56,851 | $168,891 | $548,419[72] |

---

[72] Attachment 3.0 erroneously listed the total figure as $379,528. *See* Elmore Rep. ¶ 172. At trial, the figure was corrected. *See* PTX 637 at 2.

*Id.* Att. 3.0.

The total figure of $548,419 covers the period through July 31, 2018. *See id.*, At trial, Elmore extended his analysis to Kartri's infringing sales of $2,395,861 over the full infringement period ending November 15, 2018. There, he arrived at a royalty award of $598,965. *See* PTX 637 at 14.

ii.     *Reasonable royalty for the EZ-ON Mark infringement*

In assessing a reasonable royalty for Kartri's infringement of the EZ-ON Mark, Elmore uses the same *Georgia-Pacific* framework, albeit in abbreviated fashion. He did not consider factors 9–11 and 13. *See* Elmore Rep. ¶ 197. As in its reasonable royalty analysis pertaining to Kartri's patent/Trade Dress infringement, he finds factor 15—the hypothetical reasonable royalty negotiation between the parties—the weightiest, and decisive, factor. *Id.* ¶¶ 198–199. The hypothetical negotiation is assumed to occur at the start of the infringement (October 2013), *id.* ¶ 200, and to concern only Kartri's hospitality market sales, which make up 90% or more of Kartri's business. *Id.* ¶ 201.

**Factors 1–4, 7, and 12**: As to factor 1, he finds non-probative the licensing agreements entered into by Focus and its predecessors. *Id.* ¶¶ 202–204. As to factor 2, he is not aware of any past royalties that the defendants paid for licenses to similar trademark rights. *Id.* ¶¶ 211–212. As to factor 3, he opines that the hypothetical license would likely be a non-exclusive license to sell plaintiffs' EZ-ON-marked products in the hospitality and retail industries that lasted from October 2013 until the date of trial. *Id.* ¶ 210. As to factor 4, he observes that plaintiffs have actively licensed their trademarks to joint venture partners to promote their hook-free shower curtain products and distinguish them from competitors. *Id.* ¶ 206. As to factor 7, no predetermined end term exists for trademarks—rather, they exist for as long as its owner is

124

willing and able to maintain and protect it. *Id.* ¶ 208. And as for factor 12, he finds two data points useful in assessing customary royalties for comparable trademark licenses in the shower curtain industry. One was obtained from Markables, an online database on trademark data licenses. *Id.* ¶ 215. It estimates an implied royalty of between 3.5% and 5.15% of net sales. *Id.* ¶ 216. The other is from the 2013 guidebook *Licensing Royalty Rates*, which, based on proprietary data accumulated since 1996, estimates royalty rates for trademarks associated with curtains as generally between 3% and 6.5%. *Id.* ¶ 217.

*Factor 5*: As to the parties' commercial relationship, Elmore again notes that they are direct competitors, which tends to drive up the royalty. *Id.* ¶¶ 219–220. The advantages of the EZ-ON Mark (factor 6) and the product's profitability and popularity (factor 8) are the same as with respect to the patent/Trade Dress infringement royalties, he opines. *Id.* ¶¶ 221–222.

Synthesizing these assessments, Elmore concludes that the parties would reasonably have agreed on a royalty rate of 4% of gross sales for the EZ-ON mark. *Id.* ¶ 228. That rate is based on the ranges found in the Markables database (3.5% to 5.1% with a mean of 4.3%) and the *Licensing Royalty Rates* guidebook (3% to 6.5% with a mean of 4.75%). *Id.* ¶ 227. He lowers these means to 4% to allow for downside contingencies during the negotiation. *Id.*

Applying this 4% rate to the revenue Kartri derived from its sales of the Accused Products, the Elmore Report arrives at the following royalty:

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |
| Royalty Rate | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| Reasonable Royalty | $35 | $2,802 | $13,792 | $34,999 | $9,096 | $27,023 | |

| | | | | | | | $87,747[73] |
|---|---|---|---|---|---|---|---|

*Id.* Att. 5.0.

The total figure of $87,747 covered the period through July 31, 2018.  *See id.*  Applying

the 4% reasonable royalty rate to Kartri's revenue of $2,395,861 through November 15, 2018

from the sales of the accused products yields an award of $95,834.  *See* PTX 637 at 10.

### D.   Defendants' Rebuttal Report to Elmore's Damages Report

#### 1.   Overview of Rogers's Report

Rogers's report seeks to rebut Elmore's calculations of disgorgeable profits,[74] lost profits

damages, and reasonable royalty damages.  Rogers Rep. ¶ 34.  Like Elmore, Rogers opines that a

damages award must avoid "double compensat[ion]."  *Id.* ¶ 49.

#### 2.   Qualification of Rogers as an Expert

As the Court found at trial, Rogers is qualified to opine as to damages.  *See* Tr. at 833.

He has extensive experience testifying on damages in intellectual property disputes.  *See* Rogers

Rep., Ex. A at 45–47.  He has authored dozens of expert reports on damages—for plaintiffs and

defendants.  *Id.*  He has taught on valuation issues relating to intellectual property.  *Id.* at 43.  He

has done damages assessments at accounting firms, including, today, his own.  *Id.* at 38.  He has

pertinent certifications and degrees.  *Id.* at 44; *see generally* Tr. at 831–32.

#### 3.   Admissibility of Rogers's Report

"The 'task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal

expert, by nature, criticizes the methodology and/or opinions of another.  There is no

---

[73] Attachment 5.0 erroneously listed the total figure as $60,724.  At trial the figure was, again, corrected, and the Court included it here.  *See* PTX 637 at 10.

[74] Rogers's report also addresses damages for design patent infringement.  Rogers Rep. ¶¶ 29–30.  Because that claim has been stayed, the Court does not address that aspect of the report.

requirement that a rebuttal expert himself offer a competing analysis.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (citation omitted). Rebuttal experts thus "have a less demanding task because they have no burden to produce models or methods of their own; they need only attack those of plaintiff['s] expert[]." *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) (internal quotation marks omitted) (second alteration in original). "[H]owever, rebuttal experts must [still] meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (collecting cases). Important here, under Federal Rule of Civil Procedure 26, the rebuttal expert's opinion must also rely on data disclosed to opposing counsel during discovery.[75]

In light of a flagrant breach of Rule 26 by defendants that led to an August 5, 2021 bench ruling excluding Kartri's cost data, the Court received a heavily redacted version of Rogers's report. Redacted—and not considered by the Court—were Rogers's calculations and opinions based on the excluded cost data. *See* Dkts. 324 (plaintiffs' motion *in limine* to exclude cost data for Kartri's failure to produce it in fact discovery), 412 (bench ruling transcript), 246 (original motion *in limine*, filed March 26, 2019).[76] The Court, however, permitted Rogers to rely upon Marquis's cost data, as to which there had not been a discovery breach.

---

[75] *See* Fed. R. Civ. P. 26(a) (requiring party to turn over either a "copy—or a description by category and location—of all documents . . . the disclosing party has in its possession, custody, or control and may use to support its claims or defenses"); Fed. R. Civ. P. 26(e) (requiring disclosing party to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect").

[76] The Court found that Kartri had knowingly failed to produce this data in discovery, in violation of Rules 26(a) and (e)t. The Court accordingly precluded Rogers "from referring to or relying on such materials in trial testimony." Dkt. 412 at 7, 11–12, 17. As the Court's bench

### 4.    Rogers's Rebuttals

#### a.    Disgorgement

Rogers agrees with Elmore that, in calculating disgorgeable profits for trademark or trade

dress infringement, the plaintiff has the burden to adduce evidence of defendant's revenues, and

the defendant has the burden as to applicable costs and deductions.  Rogers Rep. ¶ 44.

***Marquis's disgorgeable profits***: Rogers's revenue and cost data differ from Elmore's.

Rogers admits that this was because defendants produced "more complete and more current

information" to him than to plaintiffs.  *Id.* ¶ 104.  Whereas the Court excluded Kartri's cost data

as a result of this discovery violation, plaintiffs did not move for such relief as to Marquis, as the

data Rogers presented proved *more* favorable to plaintiffs than that available to Elmore.  For

2013 through 2017, the sales data Rogers presents are identical to Elmore's and the cost data are

only negligibly different.  But as to 2018, Rogers's report shows far higher sales—$918,653,

compared to Elmore's $365,650—and far higher costs—$800,402, compared to Elmore's

---

ruling recited, on July 29, 2016, Focus had served discovery requests.  These sought financial
information as to defendants' "revenue, expenses, and profits derived, from Defendants' sale of
said Accused Products, from inception of sales through the present," and "all manufacturing
costs per unit on an itemized basis, [the] selling costs per unit, the amount of gross profit and net
profit realized per unit, [and] other expenses which in any way include or relate to the sale of the
Accused Products."  Dkt. 246 at 5; *id.*, Ex. 6 at 2.  On September 27, 2016, Focus served
defendants with interrogatories.  These sought, for each product, total sales revenues by year
"from inception of sales through to the present," *id.*, Ex. 7 at 2, 6 (Interrogatory No. 7), and "all
relevant data pertaining to those profits . . . [and] alleged costs," *id.* (Interrogatory No. 9).
Although defendants produced some summary sales figures, they failed to provide full sales
information, such as cost and product descriptions.  To address the noncompliance, Magistrate
Judge Ellis held a telephonic conference on May 17, 2017 with counsel, Dkt. 235, and, on June
14, 2017, ordered defendants to supplement their discovery, including with "any documents that
need to be produced in response to the interrogatories," Dkt. 114.  Defendants did not do so,
although they furnished such data to Rogers on January 26–27, 2019, for use in his rebuttal
report. Dkt. 246, Ex. 30 at 24, 52.  Focus discovered that this evidence existed and had been
shared with Rogers during its deposition of Rogers on February 21, 2019.  Dkt. 274 at 6.

$305,165. *Id.* ¶¶ 104–105. Marquis's gross profit, according to Rogers, is $314,414, as compared to Elmore's tabulation of $256,809. *Id.* ¶ 106.

Marquis's sales, costs, and profits, according to Rogers, were as follows:

|  | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **Total** |
|---|---|---|---|---|---|---|---|
| Revenue | $2,753 | $50,364 | $285,981 | $252,312 | $932,522 | $918,653 | $2,442,585 |
| Costs | ($2,423) | ($44,320) | ($250,233) | ($231,622) | ($799,171) | ($800,402) | ($2,128,171) |
| Gross profit | $330 | $6,044 | $35,748 | $20,690 | $133,351 | $118,251 | **$314,414** |
| Gross margin | 12.0% | 12.0% | 12.5% | 8.2% | 14.3% | 12.9% | 12.9% |

*Id.*

**Kartri's disgorgeable profits**: As to Kartri, in light of the preclusion of the late-produced data, Rogers's report had no non-redacted data to add to that considered by Elmore. *See id.* ¶¶ 110, 113–114.

> b.   Lost Profits

Rogers's report takes issue with Elmore's reasoning as to the second, third, and fourth *Panduit* factors. *See* Tr. at 848 (not disputing Elmore's analysis of factor 1).

**Panduit *factor 2 (absence of non-infringing alternatives)***: Rogers concedes that "[f]or the most part," Elmore's analysis of this factor "is correct." *Id.* ¶ 54. But Rogers makes two objections. First, "more than 50 percent of Kartri's sales of their alleged infringing product are custom made products." *Id.* ¶ 55. These fall into two categories: in one, the curtain is made of "specific fabric identified by a customer or even provided by a customer"; in the other, the curtain is made at "custom length or width." *Id.* Focus generally did not fill such custom orders, but sought to persuade customers to buy an existing product. *Id.* Rogers does not address how similar or different the custom products were to Focus's, but suggests that these products do not compete in the hospitality market with Focus's. *Id.* ¶ 57. Had Focus accepted custom orders, it

might have required "up to four months" to obtain materials from their manufacturers. *Id.* ¶ 56. This, he opines, also undermines Elmore's premise of direct competition. *Id.* ¶ 58.[77]

**Panduit** *factor 3 (manufacturing and marketing capabilities)*: Rogers offers two rebuttals to Elmore's analysis. First, as to plaintiffs' marketing capabilities, Elmore should have focused on the capacities of only ZDG and HSNA, the owners of the infringed patents and Trade Dress, and disregarded those of Focus and its Sure Fit successors, which were sublicensees of ZDG and HSNA. *Id.* ¶ 61. Because parent companies do not market the products sold by their sublicensees, they would not have had the marketing capability necessary to advertise the volume of Kartri's sales. *Id.* Second, as to manufacturing capability, Rogers again notes that most of Kartri's orders were low-quantity custom orders, whereas plaintiffs' manufacturing capacities were geared towards uniform orders of larger quantities. *Id.* ¶ 63. Elmore, he urges, did not fully analyze Focus's ability to handle such orders. *Id.*

**Panduit** *factor 4 (quantification of plaintiffs' profits)*: Rogers has three objections as to this factor.[78] The first two reprise objections above: that Elmore conflated sublicensee Focus's lost profits with those of right-owners HSNA and ZDG, *id.* ¶ 65, and that Elmore does not show a precise match between Focus's infringed products and defendants' infringing products, *id.* Third, he opines that Elmore's reduction of Focus's market share, but for Kartri's infringement, to 90%, is "arbitrary," making his lost profit estimate short of "reasonably certain." *Id.* ¶ 70.

---

[77] At trial, Rogers briefly appeared to fault Elmore for, purportedly, failing to compare Focus's products to the infringing products. Tr. at 849–50. That is wrong. Elmore's report explained his bases for finding no non-infringing alternatives to plaintiffs' products. These include the parties' products' similar pricing, the confusing similarity between the HOOKLESS® and the Ezy Hang products, and Kartri's having attempted to persuade customers looking for HOOKLESS® curtains to purchase Ezy Hang curtains. *See* Elmore Rep. ¶¶ 82–93.

[78] A fourth objection was redacted, pursuant to the Court's preclusion of Kartri's cost data.

c.   *Reasonable Royalties*

*Patent and Trade Dress claims*:  Rogers objects on four grounds to Elmore's reasonable royalty analysis, each keyed to a *Georgia-Pacific* factor.

*Factor 15*: Rogers argues that Elmore wrongly included Focus, alongside ZDG and HSNA, as a party on plaintiffs' side in the hypothetical reasonable-royalty negotiation, on the grounds that Focus did not own the patent rights at issue. *Id.* ¶ 76.  Were Focus not at the table, Rogers opines, plaintiffs' bargaining position would have been different, in that (1) the patents are commercialized through royalty-generating sub-license agreements (not by manufacturing and selling patented products, as Focus did); (2) unlike Focus, ZDG and HSNA did not directly compete with defendants, but would have seen defendants as revenue-generating promoters of ZDG and HSNA's invention; and (3) any license with defendants would have likely increased ZDG and HSNA's royalty income (instead of decreasing its profits from direct competition). *Id.* ¶¶ 79–82.  Rogers agrees, however, that ZDG and HSNA would still have a "relatively strong" bargaining position vis-à-vis defendants. *Id.* ¶ 83.

*Factor 1*: Rogers objects to Elmore's discounting of four prior license agreements: those between HSNA and CHF, HSNA and Arcs & Angles, HSNA and OTRT, and the A&A Holdings agreement acquiring Arcs & Angles and its intellectual property rights later assigned to Focus. These set out royalty rates between 2% and 10% of the licensee's gross sales. *Id.* ¶ 85.  Rogers contends that these were probative of an established royalty rate. *Id.* ¶¶ 85–86.  He finds that a reasonable royalty rate should be around 4.5% percent, on the lower end of the band of rates used in the four pertinent agreements. *Id.*

*Factor 12*: Rogers faults Elmore for discounting as insufficiently comparable 55 license agreements Elmore found on RoyaltySource.com.  Elmore, he states, should have described

these licenses in more detail. *Id.* ¶ 87. Elmore explains that none of the 55 licenses "were directed to a means of hanging curtains or involved technologies and terms that are sufficiently comparable to this matter." Elmore Rep. ¶ 145. Rogers does not state why more information was needed to support this conclusion, or identify any feature of any such agreement that stood to undermine Elmore's conclusion.

*Factor 8*: Rogers objects to Elmore's calculation of the royalty rate based on Focus's profit margin of 50% in the hospitality market, and the usual 25% profit margin for hook-free shower curtains in that market. Rogers Rep. ¶ 89. This objection is based on Kartri's cost data, which was redacted from Rogers's Report.

In summary, Rogers advocates for a royalty rate of 4.5%. He notes that ZDG and HSNA had frequently sub-licensed their patents for 10 percent of gross sales or less. *Id.* ¶ 98.

**EZ-ON Mark claims**: Rogers's rebuttal consists effectively of a legal argument. He states that, in his experience, courts rarely award a reasonable royalty for trademark infringement under circumstances factually akin into these here. *Id.* ¶¶ 115–119. The Court disregards this opinion—essentially distinguishing past court decisions—as impermissible expert testimony.

### E.     The Damages Award

#### 1.     Applicable Period of Infringement

The Court must first decide the end date of the infringement period—July 31, 2018 or November 15, 2018—for the purpose of calculating damages. Although the earlier date was used in Elmore's expert report, that was attributable to discovery violations by the defense, and the evidence at trial convincingly showed that the infringement extended until mid-November 2018. The Court accordingly uses the later date.

It is undisputed that defendants' sales continued until November 12, 2018, and that data as to those sales existed. Marquis's Middleberg admitted at trial that sales of the accused

curtains continued until that date. Tr. at 587, 613. As Elmore testified, however, he had not received any data from the defense as to sales of the Ezy Hang curtain after July 31, 2018, Tr. at 401–04, 545, despite the fact that defendants provided such data to their rebuttal expert, Rogers, for use in his analysis. Dkt. 246, Ex. 30 at 24, 52.

A court may draw an adverse inference where a party with control over evidence "had an obligation to timely produce it," failed to do so with a "culpable state of mind," and the missing evidence would "support [a] claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *see also id.* ("purposeful sluggishness" may constitute a culpable state of mind). "[T]he party seeking the adverse inference must show both that its opponent defied a court order or an obligation under the Federal Rules of Civil Procedure, and that the evidence it has requested in fact exists." *Odyssey Marine Expl., Inc. v. Shipwrecked & Abandoned SS Mantola*, 425 F. Supp. 3d 287, 293 (S.D.N.Y. 2019) (citations omitted); *Hendrix, LLC v. Chalpin*, 461 F. Supp. 2d 165, 172 (S.D.N.Y. 2006) (in bench trial, court itself may draw adverse inference; court inferred that non-produced documents would have supported plaintiff disadvantaged by defendant's discovery breach).

Those standards are met here. As reflected in the August 5, 2021 bench ruling precluding late-produced data, *see* Dkt. 412, defendants admittedly possessed and had an obligation to produce in discovery records of infringing sales between August 1 and November 12, 2018; they did not do so in the face of unambiguous orders and despite producing these to their own expert. This gives rise to an inference of a culpable state of mind. Elmore was thereby forced to limit his report to the period ending July 31, 2018, despite the fact that data covering the ensuing 3.5 months was clearly germane to damages. With the Court's permission, Elmore at trial extrapolated as to what the missing underlying revenue data would show for the period of

August 1 through November 15, 2018.[79]  He did so by averaging Kartri's monthly revenue

between January 1, 2017 and July 31, 2018, and applying that average to the 3.5-month period.

Tr. at 519–20.  This inference accords with record data and evidence.  Accordingly, applying its

"broad discretion" whether to grant an adverse inference, *Valenti v. Penn Mut. Life Ins.*, 850 F.

Supp. 2d 445, 452 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir. 2013) (summary order);

*Glover v. Costco Wholesale Corp.*, 153 F. App'x 774, 776 (2d Cir. 2005) (summary order), the

Court finds October 16, 2013 through November 15, 2018 to be the appropriate infringement

period for the purpose of calculating damages.

### 2.    Legal Framework for the Damages Award

#### a.    Damages available under the Lanham Act and Patent Act

The Lanham Act provides for money damages for trademark and trade dress infringement

in the form of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the

costs of the action," subject to "the principles of equity."  15 U.S.C. § 1117(a).  Where a court

finds an award "inadequate or excessive," it may, in its discretion, "enter judgment for such sum

as the court shall find to be just, according to the circumstances of the case."  *Id.*  Courts have

accordingly awarded disgorgement and lost profits under the act, but absent a prior licensing

arrangement, generally have not awarded reasonable royalties.  *See Apollo Theater Found.*, 2005

WL 1041141, at *13 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d

197, 208–09 (3d Cir. 1999)); *Microban Prod. Co. v. Iskin Inc.*, No. 14 Civ. 5980 (RA) (DF),

2016 WL 4411349, at *8 (S.D.N.Y. Feb. 23, 2016), *report and recommendation adopted*, No. 14

---

[79] Although the evidence at trial showed that the infringement continued until November 12, 2018, Elmore's extrapolation covered three additional days, till the mid-point of the month, presumably for convenience.  Although using November 12, 2018 would have been more precise, the defense did not object to Elmore's use of November 15, 2018.  The Court therefore will not recalculate Elmore's damages calculation to eliminate the three additional days.

Civ. 5980 (RA), 2016 WL 4411414 (S.D.N.Y. Aug. 18, 2016); *Gucci Am., Inc.*, 858 F. Supp. 2d at 254 (courts grant royalty awards only where "the evidence provides a sufficiently reliable basis from which to calculate [that award]" (collecting cases)).

The Patent Act, in turn, provides that a court should award a successful claimant damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Courts have recognized lost profits and reasonable royalty awards under this statute, but not "disgorgement of ill-gotten profits," which "Congress abolished in the patent context." *SCA Hygiene Prod. Aktiebolag*, 137 S. Ct. at 964.

> b.    *Choosing between a disgorgement and actual damages award*

Courts applying the Lanham and Patent Acts "have often [held] that awarding the disgorgement of the defendant's profits and plaintiff's own lost profits based on the same sales would constitute 'an impermissible double recovery.'" *Church & Dwight Co.*, 2018 WL 4253181, at *16 (quoting *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 264 (E.D.N.Y. 2008) (citation omitted)). Because "disgorgement is an inherently equitable remedy," a plaintiff may not elect disgorgement over an award of actual damages—such as an award of lost profits or based on a reasonable royalty—merely because a disgorgement award is "the greater of the two." *Id.* Rather, the Second Circuit has recognized three purposes for which it may be proper to order disgorgement of defendant's profits: "unjust enrichment, compensation, and deterrence." *River Light V*, 2015 WL 3916271, at *5 (citing *Merck Eprova*, 760 F.3d at 262). In determining whether a disgorgement award is proper, a court must also balance equitable factors. These include "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by

plaintiff; and (5) plaintiff's clean (or unclean) hands." *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 214 (2d Cir. 2019) (citing *George Basch Co.*, 968 F.2d at 1540). "[T]he statute's invocation of equitable principles as guideposts in the assessment of monetary relief vests the district court with some degree of discretion in shaping that relief. Nevertheless, that discretion must operate within legally defined parameters." *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta Inc.*, No. 09 Civ. 5517 (RMB) (AJP), 2009 WL 4351962, at *2 (S.D.N.Y. Dec. 1, 2009) (quoting *George Basch Co.*, 968 F.2d at 1537), *report and recommendation adopted*, No. 09 Civ. 5517 (RMB) (AJP), 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009).

In contrast, in fixing an award of actual damages, the "quantum of damages," as opposed to the plaintiff's entitlement to damages, ordinarily "must be demonstrated with specificity." *Hilton v. UK Fragrances, Inc.*, No. 12 Civ. 6346 (JFB) (AKT), 2014 WL 794304, at *7 (E.D.N.Y. Feb. 25, 2014) (internal quotation marks and citations omitted). "[A]n award of actual damages under the Lanham Act must be based on an evidentiary showing, not sheer speculation that plaintiffs suffered a financial loss." *Solid 21, Inc. v. Jomashop Inc.*, No. 19 Civ. 1179 (MKB), 2020 WL 9816843, at *10 (E.D.N.Y. Nov. 30, 2020) (citation omitted) (alteration in original).

### 3.   Overview of the Court's Damages Analysis

The Court awards plaintiffs actual damages for the full infringement period between October 16, 2013 and November 15, 2018, and declines to award disgorgement of defendants' profits. The Court first explains its analysis of the damages it awards: lost profits and reasonable royalties for the patent and Trade Dress infringement, and lost profits but no reasonable royalty for the EZ-ON Mark infringement, with both are trebled for the period between February 27, 2015 and November 15, 2018. The Court first addresses lost profits and then reasonable royalties. The Court then explains, in light of these awards, its decision not to award

disgorgement of defendants' profits. The Court's approach tracks Judge Nathan's thoughtful

analysis in *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, No. 14 Civ. 585

(AJN), 2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018), in which she granted a lost profits award

under the Lanham Act (for false advertisement); assessed whether to treble that award; and then

set out the reasons for not ordering disgorgement of the defendant's profits, *see id.* at *13–17.

### 4.    The Lost Profits Award

As to lost profits, the Court applies the four-factor *Panduit* framework.

**Panduit *factor 1 (consumer demand)*:**  Focus's impressive sales figures easily establish

that consumer demand existed; Kartri's sales figures independently support the point. By 2013,

approximately 2.5 million HOOKLESS® curtains were hung in hotel and motel rooms

nationwide. Tr. at 248–51. And Focus's HOOKLESS® sales in the hospitality market—the

market in which it mostly competed with defendants—were $81.4 million between 2013 and

August 2017 alone. Elmore Rep. ¶ 74.  That figure represented sales of approximately 5.76

million shower curtains. PTX 515.  Kartri's sales in the same market were also substantial, viz.

$2.1 million. Elmore Rep. ¶ 75; *id.*, Att. 6.0.

Defendants' expert Rogers conceded that such demand existed, Tr. at 848, and did not

rebut Elmore's factor 1 analysis. Defendants' executives admitted the same. Kubus admitted

that the product "took off," "exploded" onto the scene, and "started a whole marketing trend."

Tr. at 730. The first *Panduit* factor is thus satisfied. *See Stryker Corp. v. Intermedics

Orthopedics, Inc.*, 891 F. Supp. 751, 820 (E.D.N.Y. 1995) (finding "overwhelming evidence

of demand for the patented product" in, *inter alia*, the "sales of the

patent's commercial embodiment" and of the infringing product), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996).[80]

  **Panduit** *factor 2 (no non-infringing alternatives to satisfy demand)*:   Under this factor, "the patent owner may rely on proof of its established market share rather than proof of an acceptable noninfringing substitute." *Bic Corp.*, 2001 WL 1597983, at *2 (citing *Mor-Flo Indus.*, 883 F.2d at 1578).  Use of this approach is particularly sensible where the parties effectively operate in a two-player market.  Such is so here, given the uniform testimony that hook-free shower curtains are a distinct market and that the only non-minor sellers of such curtains were Focus, its licensee Carnation, and Kartri. Elmore Rep. ¶¶ 81, 94.  Defendants' expert Rogers acknowledged that it was appropriate to apply *Mor-Flo*'s market share analysis. Tr. at 848–49; *see also* Rogers Rep. ¶ 54 (*Panduit* factor 2 analysis "[f]or the most part . . . correct").  Elmore also opined, without dispute, that Focus captured a market share of approximately 50%, and Kartri captured the rest.  *Id.* ¶ 80 (citing Kubus and Goskowski deposition testimony).  To account for contingencies, Elmore further reduced the market share Focus would have captured but for Kartri's infringing sales to 90%.  Elmore Rep. ¶ 103; Tr. at 512.  In such a two-player market, the Court finds that, but for Kartri's infringing sales, those sales would have gone to the plaintiff.

  The evidence, in fact, establishes that Kartri knowingly exploited the similarity of the products.  For example, in a July 1, 2015 email to Kubus, Kartri's sales director, termed the Ezy-Hang product as "our equivalent of the Hookless Double H pattern."  PTX 217.  And, between

---

[80] "This factor presupposes that the patented product and infringing product are sufficiently similar to compete in the same market for the same customers, and thus that demand for the infringer's and patent owner's products are interchangeable." *Stryker Corp.*, 891 F. Supp. at 819–20 (citation omitted).  Defendants do not dispute this.

May 11 and 23, 2016, a customer support representative quoted a price for an Ezy-Hang product for a hospitality customer seeking a "sub[stitute] or similar item" for a Focus product that was out of stock. *See* PTX 609.

Defendants' expert resisted that the parties' products were interchangeable, on the ground that Kartri's sales purportedly consist of "custom-made" curtains. Rogers Rep. ¶ 55; *see* Tr. at 849–50. But the Ezy-Hang products, whether manufactured according to custom orders or pre-fabricated specifications, were confusingly similar to plaintiffs' products and clearly infringing. And as Elmore demonstrated in his report, they sold for similar prices to plaintiffs' curtains. The label "custom made" does not alter the analysis as to this factor. And damages awards for lost profits have been upheld where the infringing product was deemed to have taken away market share not only from products protected by the patents-in-suit but also from related products. *See Rite-Hite Corp.*, 56 F.3d at 1547–48. The second *Panduit* factor is met.

**Panduit *factor 3 (manufacturing and marketing capability)*:** Plaintiffs easily establish their manufacturing and marketing capability to fill the orders they would have received but for Kartri's infringing sales. As Elmore notes, Focus's total sales between 2013 and 2017 comprised $81.4 million in the hospitality market, and $54.4 million in the retail market. Elmore Rep. ¶ 98. In that same period, Kartri's accused sales were $1.5 million. Using Focus's sales figures as proxies for its capacity to manufacture HOOKLESS® curtains, Focus would have been able to meet the additional volume represented by Kartri's sales—a mere 1.1% increase.[81]

---

[81] Kartri's modest sales figures relative to Focus's contrast with the approximate parity in market shares between the two. The Court cannot resolve this tension here, save to note that Kartri's sales and market-share calculations turn on information provided in discovery by Kartri, whose discovery compliance was shoddy and incomplete. As to market share, the testimony on this point of Kartri's leaders, Kubus and Goskowski, supplied Elmore's basis for his conclusion as to market share. *See* Elmore Rep. ¶ 80. In any event, the ultimate damages award turns on Kartri's sales—figures to which neither Kartri's counsel nor its rebuttal expert objected.

Defendants counter by asserting that Focus's practice was to refuse custom orders or orders for less than 200 curtains. Their expert, Rogers, testified that Focus was "stringent" about not accepting an order below 200. Tr. at 851. He opined that, had Focus accepted custom orders, it might have required "up to four months" to obtain the source products and materials from their manufacturers. Rogers Rep. ¶ 56. This, he opined, raised doubt about the extent to which Focus could have met the manufacturing demand of Kartri's infringing products. *Id.* ¶ 58.

This argument is unpersuasive. A product-by-product mapping is not required to demonstrate manufacturing capability. *See Rite-Hite Corp.*, 56 F.3d at 1547–48. Beyond that, the record refutes Rogers's claim that Focus would have been unable to fill custom orders specifying the curtain's fabric, length, or width. On the contrary, several plaintiffs' witnesses credibly testified that Focus's customers routinely specified characteristics such as fabric, dimensions, color, or ring shape, and that Focus met these specifications. Kemp, for example, testified that custom orders could be filled and turned around within approximately 30 days for the first such order, and one week for follow-on orders. Tr. at 276–77. Focus also routinely received "soft spec" orders which left room for variations. *Id.* at 249–50 (Kemp). As to Rogers's basis to opine that Focus had a minimum quantity requirement of 200 curtains per order, he admitted at trial that he relied not on information from Focus, but on Middleberg's testimony. *Id.* at 851. Pressed, Rogers could not point to evidence of a single instance in which Focus rejected an order below 200 curtains. *Id.* at 853–55. He conceded that he was unaware of any evidence that, had Focus taken on the custom and other orders Kartri handled, Focus's "economics[,] profits[,] or costs would have been materially different." *Id.* at 903.

The evidence also established that Focus had the marketing and distribution capabilities to handle the additional orders. It established Focus's 20-year history of energetically marketing

its curtains, and its regular sales channels, customer relations, and market presence.  As to this,

Rogers urged that Elmore should have disregarded the capacities of Focus and its successors and

considered the marketing capacity only of the owners of the infringed patents—ZDG and HSNA.

Rogers Rep. ¶ 61.  But defendants did not cite any authority why the capacities of the owners'

licensees, who handle the manufacturing and marketing of these goods, should be disregarded.

The third *Panduit* factor is therefore met.

**Panduit** *factor 4 (quantifying lost profits)*:  In the main, the Court finds Elmore's

tabulation of plaintiffs' lost profits persuasive.  It is logical to conclude—in a two-player

hospitality market, shared by Focus and Kartri, with the competitors having similar price

points—that, but for Kartri's infringement, its sales generally would have gone to Focus.  Elmore

Rep. ¶¶ 103–104.  Elmore's conservative assumption that something short of 100% of Kartri's

sales—he proposed 90%—would have shifted to Focus "to account for any contingencies such

as small marketplace participants or other factors," *id.* ¶¶ 103, 110, was well taken.  Finally, the

Court accepts as reasonable Elmore's proposed downward adjustment of Focus's profit margin

(54.1%) to 50%, *id.* ¶¶ 106, 108–109.

The Court makes a minor adjustment to Elmore's analysis: to the sales figure used as the

baseline for calculating Focus's lost profits.  At trial, Elmore used a sales figure of $2,395,861

for the full infringement period, ending November 15, 2018.  PTX 637 at 13.  But those sales

cover both the hospitality and retail markets.  Elmore's analysis, however, was restricted to the

hospitality market, which Elmore opined accounts for 90% of Kartri's revenue from sales of the

accused shower curtain.  Elmore Rep. ¶ 107.  Accordingly, the Court will treat the sales that

Focus lost in the hospitality market due to Kartri's infringement as 90% of $2,395,861—,that is,

$2,156,275.  With that one adjustment to Elmore's math, Focus's lost profits are as follows:

| | 2013 | 2014 | 2015 | 2016 | 2017 | Jan. 1–Nov. 15, 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749 | $2,395,861 |
| Percentage of accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Focus's market share but for infringement | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue but for infringement | $717 | $56,745 | $279,290 | $708,721 | $184,199 | $710,977 | $1,940,647 |
| Profit margin | 50% | 50% | 50% | 50% | 50% | 50% | |
| Lost profits | $359 | $28,373 | $139,645 | $354,361 | $92,099 | $355,488 | **$970,325** |

Rogers's rebuttal on this point is again unpersuasive. He found Elmore's 10% reduction of Focus's market share "arbitrary." *Id.* ¶ 70.[82] But Elmore's market share approach sensibly "allows the plaintiff to recover lost profits by establishing with reasonable probability sales it would have made 'but for' the infringement." *Bic Corp.*, 2001 WL 1597983, at *2 (internal quotation marks omitted); *see also Church & Dwight Co.*, 2018 WL 4253181, at *10 ("In the absence of complete information, courts have credited the application of a market share allocation methodology because it inherently accounts for a range of market factors."). And

---

[82] Rogers also reprises his objections that Elmore should have examined only the lost profits of HSNA and ZDG, and did not precisely match Focus's infringed products to defendants' infringing products, Rogers Rep. ¶ 65. These objections fail for the reasons addressed above.

Elmore's 10% reduction of Focus's market share is prudent to account for contingencies that could "impact [p]laintiffs['] ability to capture all of the accused sales." Elmore Rep. ¶¶ 103, 110. At trial, Rogers retreated from this position, stating that he "[did]n't necessarily disagree with" Elmore's assessment to impute a 90%, rather than 100%, market share to Focus. Tr. at 848.[83]

The Court accordingly tabulates a lost profits award of $970,324.

### 5.    Reasonable Royalties—Patent and Trade Dress Infringement

"A patentee receives a reasonable royalty for any of the infringer's sales not included in the lost profit calculation." *Crystal Semiconductor Corp. v. TriTech Microelec's Int'l, Inc.*, 246 F.3d 1336, 1354 (Fed. Cir. 2001) (citing *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996); and *Mor-Flo*, 883 F.2d at 1577). "Thus, a patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation and reasonable royalties for any remaining infringing." *Id.* (citing *King Instruments Corp. v. Perego*, 65 F.3d 941, 952–53 (Fed. Cir. 1995)); *see also Mor-Flo*, 883 F.2d at 1573 (affirming award of lost profits for 40% of market share, and reasonable royalty for the remainder of infringer's sales).

Here, plaintiffs have demonstrated in their *Panduit* analysis that, but for Kartri's infringement, 90% of its sales would have gone to Focus. The issue thus is the royalties attributable to the remaining 10% of Kartri's sales, which the Court has, conservatively, assumed would have gone elsewhere. As to these, the Court finds Elmore's reasonable royalty analysis, in which he applies the *Georgia-Pacific* factors to derive a 25% royalty rate, persuasive.

---

[83] Had the Court not reduced Focus's assumed market share, damages would have been higher.

Elmore's starting assumption (factor 15) is correct that plaintiffs' bargaining position vis-à-vis Kartri would be strong, supporting a high royalty rate. Elmore Rep. ¶ 121. As he notes, plaintiffs own the utility patents, have widely and successfully commercialized those through joint venture and licensing agreements, including with Focus, and would directly compete with Kartri in a two-player market; to license their products to competitors in a market in which Focus is dominant would likely harm the profitability of the patented products. *Id.* ¶ 120. And the licensees would appreciate that to offer a product that (like Ezy Hang) used plaintiffs' hook-free technology would infringe plaintiffs' patent rights, and that no non-infringing alternative was available to meet the demand for HOOKLESS® products in the market. *Id.*[84]

Elmore also rightly excluded existing license agreements with affiliated entities as non-probative of an established royalty rate. Elmore Rep. ¶¶ 125–136. Those entailed rates between 2% and 10% of the licensee's gross sales. *See id.* Rogers objected that Elmore did not explain disregarding these agreements, Rogers Rep. ¶ 85, but Elmore did so, on the ground that they "involve[d] related parties or contemplate[d] joint venture transactions," Elmore Rep. ¶ 136. By contrast, a licensee such as Kartri would enter the hospitality market as a direct competitor, to whom Focus would not rationally cede market share for less than a formidable royalty. *See Panduit*, 575 F.2d at 1158 (in royalty analysis, the plaintiff and the infringer "cannot be treated" as if engaged in "ordinary royalty negotiations among truly 'willing' patent owners and licensees," as "the infringer would have nothing to lose and everything to gain if he could count

---

[84] Rogers seeks to diminish plaintiffs' bargaining power by urging that only the owners of the patent-in-suit, and not licensee Focus, would not have been included among the parties in the hypothetical reasonable royalty negotiation. Rogers Rep. ¶¶ 79–83. That is unpersuasive. Had ZDG and HSNA negotiated without Focus, they would still have been mindful that the license payments Focus paid them, tied to its sales, would have come under downward pressure had they allowed a competing licensee into the market.

on paying only the normal, routine royalty non-infringers might have paid"). The Court rejects Rogers's proposed 4.5% royalty rate, which is at the lower end of ordinary such rates.

Also unpersuasive is Rogers's attack on Elmore's assessment (factor 12) that a search did not yield probative benchmarks of customary or standard royalty rates in the field, Elmore Rep. ¶¶ 144–146. Rogers faults Elmore for inadequately explaining why he put aside the 55 license agreements he found on RoyaltySource.com. Rogers Rep. ¶ 87. But Rogers does not identify from this dataset a single example undermining Elmore's explanation that none involved "a means of hanging curtains or involved technologies and terms that are sufficiently comparable to this matter." Elmore Rep. ¶ 145.

Elmore's basis for choosing a royalty rate of 25% (factor 8) is convincing. He explains that Kartri's alternatives to infringing would have been to continue to sell traditional, hooked shower curtains, or to obtain a license to sell the patented hookless shower curtains. Hooked curtains had a hospitality-market profit margin of approximately 25%. Elmore Rep. ¶ 160 & n.173. Hookless shower curtains had a margin of approximately 50%. *Id.* Because Kartri would not have rationally agreed to pay above the rate it otherwise could have garnered, Elmore inferred agreement on a 25% rate.[85] Although Rogers objected based on Kartri's own profit margins, Rogers Rep. ¶ 89, this was based on redacted data, and the Court disregards it.[86]

The Court accordingly adopts Elmore's 25% royalty calculation and applies it to the 10% of Kartri's sales in the hospitality market that the Court has found would not have gone to Focus. This yields the following:

---

[85] This rate gives Kartri the benefit of the doubt, in that such terms would have denied Focus the 50% rate it stood to gain on such sales, had the customer come to Focus.

[86] Rogers does not find fault with Elmore's analyses of factors 2–7, 8–11, and 13–14, and the Court finds these analyses——some yielding inconclusive answers—persuasive.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749[87] | $2,395,861 |
| Percentage of Kartri's accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Market share not captured by Focus after recovering lost profits | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Accused sales on which to apply reasonable royalty rate | $80 | $6,305 | $31,032 | $78,747 | $20,466 | $78,997 | $215,628 |
| Royalty Rate | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| Reasonable Royalty | $20 | $1,576 | $7,758 | $19,687 | $5,117 | $19,749 | **$53,907** |

### 6.      Reasonable Royalties—EZ ON Mark Infringement

The Court declines to award reasonable royalty damages for defendants' infringement of

the EZ ON Mark.  Courts have generally granted such an award where an infringer "continued

[to] use . . . a product beyond authorization" of a license agreement, "and damages were

measured by the license the parties had or contemplated." *The Apollo Theater Found.*, 2005 WL

---

[87] This number adds together Kartri's sales figures for January 1 to July 31, 2018, and August 1 to November 15, 2018.

1041141, at *13 (quoting *A & H Sportswear, Inc.*, 166 F.3d at 208–09); *see also Microban*

*ProdsProd. Co.*, 2016 WL 4411349, at *8; *Koninkijke Philips Elecs. N.V. v. Hunt Control Sys.,*

*Inc.*, No. 11 Civ. 3684 (SRC) (CLW), 2016 WL 3545529, at *29 (D.N.J. June 29, 2016) ("'[T]he

use of royalties in trademark is 'atypical.'" (quoting *A & H Sportswear*, 166 F.3d at 208

(collecting cases))).  Here, there was no license agreement, actual or contemplated, between the

parties.

Otherwise, courts have granted royalty awards for trademark infringement only where

"the evidence provides a sufficiently reliable basis from which to calculate [that award]." *Gucci*

*Am., Inc.*, 858 F. Supp. 2d at 254 (collecting cases).  There is none here.  Focus's expert, Elmore,

acknowledged that "[t]here is no established royalty rate for the trademark rights at issue."

Elmore Rep. ¶ 224.  He noted that (1) the licensing agreements entered into by Focus and its

predecessors did not help calculate a royalty for infringement of that mark, *id.* ¶¶ 203–204; (2)

defendants had not paid past royalties for a similar product, *id.* ¶¶ 211–212; and (3) although

plaintiffs had actively licensed their trademarks to other licensees, *id.* ¶ 206, the terms of those

licenses varied by licensee and industry, *see id.* ¶ 209.

Elmore did recommend a royalty rate of 4% of gross sales, but his analysis on this point

was threadbare.  He did not address *Georgia-Pacific* factors 9–11 and 13, *see id.* ¶ 197, or

identify apt licensing history between Focus and third parties.  His sole basis for proposing this

royalty was Markables, an online database on trademark licenses, *id.* ¶¶ 215–216, and the 2013

guidebook *Licensing Royalty Rates, id.* ¶ 217.  These sources are unreliable for this purpose.

The Markables estimate was for a trade name (not a trademark), and was "implied" from the

terms of a larger acquisition of a company that sold, among other products, shower curtains. *Id.*

¶ 216.  The *Licensing Royalty Rates* estimate was drawn from trademark licenses "associated

with the promotion of *curtains*." *Id.* ¶ 217 (emphasis added).  It does not identify the industry (for example, hospitality or retail) in which these were sold or limit its analysis to *shower* curtains.  Elmore's royalty determination thus rests on just three *Georgia-Pacific* factors (12, 14, and 15).  *See Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*, No. 08 Civ. 573, 2009 WL 5876245, at *2–4 (E.D. Va. July 23, 2009) (denying reasonable royalty on trademark claim where expert relied on scant evidence and applied only three factors).  The Court cannot fashion a *reasonable* royalty on such tenuous evidence.  *See Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14 Civ. 1254 (SHS), 2022 WL 4554480, at *3 (S.D.N.Y. Sept. 29, 2022) (denying royalties in trademark action where plaintiff had produced vague data on royalties received from third parties on the trademark at issue); *cf. QS Wholesale, Inc. v. World Mktg., Inc.*, No. 12 Civ. 451, 2013 WL 1953719, at *5 (C.D. Cal. May 9, 2013) (royalty award available for trademark infringement where there was "a detailed record of business negotiations between [the parties] regarding the outright *purchase* of the mark" (emphasis in original)).

In sum, the Court awards, before trebling, the following damages amount to plaintiffs: lost profits in the amount of $970,324, and reasonable royalties in the amount of $53,907.

### 7.    Treble Damages

Under the patent statute, a "court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.  Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," that is, behavior that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016).  A plaintiff must establish such willfulness by a preponderance of the evidence. *Adrea, LLC v. Barnes & Noble, Inc.*, 227 F. Supp. 3d 303, 312 (S.D.N.Y. 2017) (citing *Halo Elecs.*, 579 U.S. at 107).

"[A]wards of enhanced damages are discretionary," *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017) (citing *Halo Elecs.*, 579 U.S. at 106), and "a finding of willful infringement does not command the enhancement of damages," *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018) (summary order). Rather, on a finding of willfulness, a court should "take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Kewazinga Corp. v. Microsoft Corp.*, 558 F. Supp. 3d 90, 118 (S.D.N.Y. 2021) (quoting *Halo Elecs.*, 579 U.S. at 104), *reconsideration denied*, No. 18 Civ. 4500 (GHW), 2022 WL 4236301 (S.D.N.Y. Sept. 14, 2022). A court "must "explain the basis for the [enhanced damages] award, particularly where the maximum amount is imposed." *Grp. One Ltd.*, 2022 WL 4010850, at *27 (quoting *Polara Eng'g, Inc. v. Campbell Co.*, 894 F.3d 1339, 1355 (Fed. Cir. 2018) (alteration in *Grp. One Ltd.*) (further citations omitted)). Analysis is typically guided by the non-exclusive factors set out in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). *Georgetown Rail Equip. Co.*, 867 F.3d at 1244. The *Read* factors are: "(1) 'whether the infringer deliberately copied the ideas of another'; (2) 'whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed'; (3) 'the infringer's behavior as a party to the litigation'; (4) the '[d]efendant's size and financial condition'; (5) the '[c]loseness of the case'; (6) the '[d]uration of the defendant's misconduct'; (7) '[r]emedial action by the defendant'; (8) the '[d]efendant's motivation for harm'; and (9) '[w]hether the defendant attempted to conceal its misconduct.'" *Grp. One Ltd.*, 2022 WL 4010850, at *26–27 (quoting *Georgetown Rail Equip. Co.*, 867 F.3d at 1245 n.6).

For the reasons that follow, the Court finds that both Marquis and Kartri acted willfully from February 27, 2015, the day that Focus's counsel sent its cease-and-desist letter to Kartri, which was forwarded to Marquis's Middleberg on the same day. The Court thus holds that an enhancement of Focus's lost profits and reasonable royalty awards for patent infringement is warranted for the period between February 27, 2015 and November 15, 2018. And because the *Read* factors decisively favor plaintiffs, a trebling of such damages for that period in in order.

**_Marquis's state of mind before the February 27, 2015 cease-and-desist letter_**: In the period before it received Focus's February 27, 2015 cease-and-desist letter, Marquis, through its president Middleberg, was careless as to Focus's intellectual property rights. When Pong, whom Middleberg knew had been a manufacturer for Focus, presented his D-shaped ring design to Middleberg in late 2011 or early 2012, both were well aware of Focus's HOOKLESS® product. Tr. 548–50, 555. Middleberg, however, chose to believe Pong's claims that he owned a Chinese patent for the ring design, that he was in the process of obtaining a United States patent for it, and that Focus's patents relating to its HOOKLESS® products had expired or were due to expire soon. Middleberg did nothing to verify these self-serving claims, and instead accepted Pong's representation that a document comprised of Chinese characters was a Chinese patent on the ring design. Given its awareness that Focus then or recently had patent rights in the HOOKLESS® product, Marquis should have inquired into the state of Focus's rights, by, for example, consulting counsel. "Notice of [Focus's] patent to . . . [Marquis] gave rise to an affirmative duty of care requiring [Marquis] to obtain competent legal advice before engaging (or continuing to engage) in conduct that might potentially infringe on [Focus's] patent." *WeddingChannel.com, Inc. v. The Knot, Inc.*, No. 03 Civ. 7369 (RWS), 2004 WL 2984305, at *3 (S.D.N.Y. Dec. 23, 2004) (citing *Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998)).

Instead, Middleberg testified, he relied on the word of Pong's Chinese counsel, a Tommy Wang, who summarily stated "that [Pong's] patent was pending and [that Wang] felt confident that it would be issued." Tr. at 554.

Marquis's lax efforts fell short of its duty to ascertain that its D-shaped ring was not infringing any existing patents. The legal opinion sought by an infringer as to another's patent rights "must be 'competent' or it is of little value in showing the good faith belief of the infringer." *Comark Comm'ns*, 156 F.3d at 1191. Such an opinion "must be authoritative, not just conclusory, and objective," which ordinarily "include[s] a thorough review of the cited prior art and prosecution history." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996) (citations omitted). The summary statement of Wang—who represented the self-interested Pong——does not come close to satisfying this standard. *See also Berger & Gorin, Inc. v. Gary Plastic Packaging Corp.*, 691 F. Supp. 740, 752 (S.D.N.Y. 1988) ("The law is not designed to permit patent counsel to market casually rendered opinions as immunizations against findings of willful infringement.").

However, although the question is close, the Court does not find, by a preponderance, *Adrea, LLC*, 227 F. Supp. 3d at 312, that Middleberg's actions were so flagrant and egregious as to support trebling. Instead, based on the facts and its assessment of Middleberg's demeanor, credibility, and limited sophistication, the Court finds that he acted negligently but not willfully in failing to seek out competent legal advice. *See Radware, Ltd. v. F5 Networks, Inc.*, No. 13 Civ. 2024 (RMW), 2016 WL 4427490, at *4 (N.D. Cal. Aug. 22, 2016) (rejecting, in light of *Halo*, that "willfulness can be proven by negligence"). Marquis was surely opportunistic in moving to commercialize Pong's design—Middleberg admittedly sought to capitalize on an early 2014 rumor that "Focus was in financial trouble," perceiving "an opportunity in the market

for us to get aggressive and get out there and sell[.]" Tr. at 573.  But Marquis's competitive motive, even coupled with its inattention to legality, does not establish "egregious infringement behavior" that was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo Elecs.*, 579 U.S. at 103–04.  The Court finds that, until February 27, 2015, Marquis, in selling Pong's infringing product, acted with naiveté and negligence, but not willfulness.

*Marquis's state of mind after the February 27, 2015 cease-and-desist letter*:  Marquis's claim of ignorance of infringement on Focus's rights, however, is unsustainable after February 27, 2015, the date it received Focus's cease-and-desist letter to Kartri. *See* Tr. at 606 (letter was forwarded to Middleberg).  That letter documented that the manufacture and sale of the accused products infringed Focus's intellectual property rights, and demanded that Marquis cease and desist. *See* PTX 152.  Almost unimaginably, Middleberg—notwithstanding the letter's clear articulation of the basis of Focus's rights—disregarded the letter, in favor of his unfounded belief that Pong would soon obtain U.S. patents.  He told Kartri's Goskowski and Kubus not to "worry" and that "[t]here's nothing [Focus] can do." PTX 166 at 1.  Marquis continued to sell the accused products to Kartri for it to resell.  It still did not seek advice of counsel. Tr. at 608.

On September 11, 2015, Focus served Kartri with the Complaint in the related action to this, alleging, *inter alia*, infringement of the utility patents '248, '609, and '088.  No. 15 Civ. 5108 (PAE) (S.D.N.Y.), Dkt. 8.  On September 21, 2015, Pong, at Middleberg's request, emailed his lawyer Wang, seeking an assessment whether, *inter alia*, Ezy Hang infringed Focus's patents. PTX 258 at 2.  The next day, Wang offered, for $3,500, to conduct an infringement analysis and draft an infringement report. *Id.*  Marquis still did not commission such an analysis. Tr. at 599, 601 (Middleberg).  Nor did it do so when this action was filed against Kartri on December 30,

2015, or when Marquis was impleaded and executed a waiver of service on February 10, 2016. No. 15 Civ. 10154 (PAE) (S.D.N.Y., filed December 30, 2015), Dkts. 1, 11, 19. Instead, Marquis continued to sell infringing products to Kartri through November 12, 2018. *See* Tr. at 600.

Marquis's repeated failure to desist, investigate, or consult counsel, in the face of clear notice that its shower curtains infringed on the patents identified in Focus's letter, was plainly willful. *See, e.g., Etna Prod. Co. v. Q Mktg. Grp., Ltd.*, No. 03 Civ. 3805 (SAS), 2004 WL 1769794, at \*14 (S.D.N.Y. Aug. 6, 2004) ("question of willfulness [was] not close" where defendant had "blatantly infringed [plaintiff]'s patent for over a year" and "[w]hen confronted with a cease and desist letter . . . did virtually nothing to remedy its infringement"); *Keystone Glob. LLC v. Auto Essentials Inc.*, No. 12 Civ. 9077 (DLC) (GWG), 2014 WL 4897104, at \*5 (S.D.N.Y. Oct. 1, 2014) (recommending finding willfulness where defendant "was notified of its infringing conduct [by cease-and-desist letters] on October 25, 2012, and again on November 7, 2012, but still continued to distribute the infringing product" (citations omitted)), *report and recommendation adopted*, No. 12 Civ. 9077 (DLC), 2015 WL 224359 (S.D.N.Y. Jan. 16, 2015); *Stryker Corp.*, 891 F. Supp. at 816 (patent infringement willful where infringer had actual notice of plaintiff's patent, "ignore[d] its own patent attorney's requests for a search of similar technology, [and] failed to seek competent legal advice and conduct a patent search until after [defendant received a] cease and desist letter"), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996). A defendant's continued sales of infringing products after a complaint has been filed against it can also, on its own, warrant a finding of willfulness. *See Apple Inc. v. Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1027 (N.D. Cal. 2017) ("[P]ost-filing conduct alone can serve as the basis of a jury's willfulness finding and an award of enhanced damages."). Middleberg himself testified

that, "in retrospect," Marquis "probably shouldn't have" continued to sell the accused products for as long as it did.  Tr. at 600.

The Court accordingly finds that, between February 27, 2015 and November 15, 2018, Marquis infringing conduct was willful.

***Kartri's state of mind before the February 27, 2015 cease-and-desist letter***:  As with Marquis, the evidence shows, throughout, a striking lack of concern about infringing on others' intellectual property rights on the part of Kartri owners Kubus and Goskowski.  Through the cease-and-desist letter of February 27, 2015, this concern is properly found negligent, not willful.

Kartri had long been aware of the existence of Focus's HOOKLESS® products and their earlier iterations.  In the late 1990s, HSNA's Marcus unsuccessfully pitched the invention to Kartri's then-president, who was Kubus and Goskowski's father.  Tr. at 724–28.  Kubus also was aware that plaintiffs had commercialized the hookless curtain and that it had been tremendously successful.  *Id.* at 730–31 (Kubus).  And, when Kartri began developing and rolling out the Ezy Hang product, she was aware of Focus's patent rights on the slit in the HOOKLESS® product and its trademark rights.  But, she testified, she concluded that the Ezy Hang product was not infringing.  *Id.* at 772–73.  Her basis was Middleberg's assurance that the Ezy Hang product did not infringe.  *Id.* at 773.  Kubus testified that she relied on these representations despite knowing that non-lawyer Middleberg had no qualifications in patent law and that Middleberg was relying on Pong's self-serving statements.  *Id.* at 773–74.

The state of mind of Kartri co-owner Goskowski before February 27, 2015 was less clearly developed.  In a declaration, she attested to having received two Chinese patents from Pong—one translated into English and one in Chinese.  *Id.* at 667–68; PTX 28-1 at 2.  She stated that, based on the Chinese patents, she had determined that Kartri was not infringing any of

Focus's U.S. patent rights. *See* Tr. at 668.[88]  She also did not seek guidance from counsel before February 27, 2015, nor otherwise inquire whether Ezy Hang infringed on patent rights. *Id.* at 669.  In this, she, too, relied on Middleberg's assurances. *Id.*

In sum, between early 2013 and February 27, 2015, there is substantial evidence that Kartri's owners had notice that the product with which they proposed to compete—Focus's HOOKLESS® curtains—was patented.  Besides relying on their suppliers' conclusory, self-interested, and suspect remarks, they took no action to ascertain whether Ezy Hang infringed on others' patent rights.  Kartri thus abandoned its duty to competently ascertain whether its product infringed existing patent rights. *WeddingChannel.com*, 2004 WL 2984305, at *3.

Nonetheless, the Court, as with Marquis, cannot find that Kartri's pre-February 27, 2015 conduct crossed the line from negligent to "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo Elecs.*, 579 U.S. at 103–04.  Having carefully evaluated the testimony of Kubus and Goskowski, the Court finds that they acceded to the helm of a modest-sized family business without sophistication in intellectual property matters.  Until Focus squarely put them on notice of Kartri's breaches, their failure to investigate is best ascribed to naiveté and ignorance of legal obligations, not willfulness.

***Kartri's state of mind after the February 27, 2015 cease-and-desist letter***:  In contrast, Kartri's infringing conduct after receiving the cease-and-desist letter was clearly willful.  There is no evidence that Goskowski received, let alone, reasonably relied upon, advice of counsel to

---

[88] Goskowski's declaration stated that she had received copies of the two patents in 2013.  The copies reflect issuance dates in 2014.  Tr. at 670–71.

the effect that it was lawful to market Ezy Hang.[89]  Instead, on March 3, 2015, she emailed Middleberg, asking "David, how do we get away with a China patent?  How does that cover us in the US?" PTX 167.  And Kartri continued to sell the accused Ezy Hang product.  Tr. at 587. It continued to do so after it was served, on September 11, 2015, with plaintiffs' initial complaint (in Dkt. 15 Civ. 5108) alleging infringement of the utility patents.  *See* No. 15 Civ. 5108 (PAE), Dkt. 8.  And it continued to do so, even after receiving notice of this action, filed December 30, 2015, Dkt. 1, and served on Kartri on February 9, 2016, *see* Dkt. 15.  Kartri's sales continued until November 12, 2018, more than three months after the Court, on August 9, 2018, issued its *Markman* ruling.  Dkt. 198.  Kartri's flagrant and prolonged disregard of plaintiffs' intellectual property rights compels a finding that, like Marquis, Kartri, after February 27, 2015, acted willfully, deliberately, and in bad faith.  *Halo Elecs.*, 579 U.S. at 103–04.

The Court accordingly finds that, for both Marquis and Kartri, enhanced damages are warranted for the period between February 27, 2015 and November 15, 2018.

***Trebling Marquis's and Kartri's damages for February 27, 2015 to November 15, 2018***:  The nine *Read* factors, in combination, strongly favor the maximum enhancement of treble damages.

First, defendants "deliberately copied [Focus's] ideas." *Grp. One Ltd.*, 2022 WL 4010850, at *26.  They were well aware of Focus's innovative product and success.  Middleberg and Pong discussed Focus's HOOKLESS® as early as the meeting in 2012 at which Pong

---

[89] At trial, Goskowski volunteered that, after receiving the letter, she had conferred with Kartri's counsel in this case, Bernhard Molldrem, Esq.., and "came away with the understanding that [she was] complying with the law." Tr. 648–49.  Because Kartri did not advance an advice-of-counsel defense or waive attorney-client privilege, the content of any such communications were not developed.  The Court considered this aspect of Goskowski's testimony solely as evidence of her asserted state of mind.

pitched his D-shaped ring. Tr. at 548–50. Marquis, in 2014, saw a chance to break into Focus's market share, in light of Focus's rumored financial trouble. *Id.* at 573 (Middleberg) ("[T]here was an opportunity in the market for us to get aggressive and get out there and sell because they had been cut off by their suppliers."); Kubus Dep Tr. at 24 ("[F]or 25 years, I've sat on the sidelines because [the market has] been monopolized by Hookless."). Defendants' introduction of their infringing product reflects deliberateness and opportunism. This factor strongly favors plaintiffs.

Second, Marquis, aware that Focus's HOOKLESS® technology was patent protected, did not investigate the scope of those patents. Middleberg declined the offer of Pong's lawyer to conduct an infringement analysis. Kartri's Kubus and Goskowski did not investigate either. This factor also strongly favors plaintiffs.

Third, in this litigation, both defendants repeatedly dallied. They reiterated arguments the Court had rejected. *See, e.g.*, Dkts. 297 at 20, 412 at 12, 436 at 23. They breached discovery obligations by withholding its cost data from plaintiffs in discovery while furnishing it to their expert. *See Apple Inc.*, 258 F. Supp. 3d at 1032 ("Typically, 'litigation misconduct' refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." (quoting *i4i Ltd.*, 598 F.3d at 859)). This, too, favors plaintiffs.

Fourth, in contrast, defendants' relatively small size and financial condition, compared to Focus's, favors defendants. On Focus's estimation, Marquis's infringing sales in the hospitality market were $2,072,407 and Kartri's were $2,395,861, whereas Focus's were $81,351,591—all in the hospitality market alone. *Cf. Radware*, 2016 WL 4427490, at *8 (infringer's large size weighed in favor of enhanced damages).

157

Fifth, liability in this case is clear. The Court granted summary judgment for plaintiffs on the utility patent infringement claims. Dkts. 297, 312. And here, in resolving the trademark and Trade Dress infringement claims, the Court has found (1) ownership, validity, and protectability of the HOOKLESS® and EZ-ON Marks, (2) standing to sue for the infringement of the EZ ON Mark, (3) the strength of the Trade Dress given its acquired secondary meaning, and (4) that the *Polaroid* factors measuring the likelihood of confusion overwhelmingly favored Focus both as to the marks and the Trade Dress. The fifth *Read* factor strongly favors plaintiffs.

Sixth, "a long duration [of misconduct] tends to support enhanced damages more than a short duration." *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 118 (D. Conn. 2022). Defendants' misconduct lasted nearly three years before litigation commenced, and then persisted for nearly another three years. *See id.* (citing, *e.g.*, *I-Flow Corp. v. Apex Med. Tech., Inc.*, No. 07 Civ. 1200, 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) (six years of misconduct "substantial," favoring enhancement)); *Broadcom Corp. v. Qualcomm Inc.*, No. 05 Civ. 467 (JVS), 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) (two years of infringement before lawsuit, and continued infringement thereafter, favored increased damages), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007). The sixth *Read* factor favors plaintiffs.

Seventh, the record does not reflect any remedial actions taken by defendants. On the contrary, they continued to infringe until after the Court's *Markman* ruling three years into this litigation. This factor, too, favors plaintiffs.

Eighth, as to motivation to harm, "[w]hen the infringer is a direct competitor, this factor generally weighs in favor of enhanced damages." *Probatter Sports, LLC*, 586 F. Supp. 3d at 119 (citation omitted); *see also Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1116–17 (N.D. Cal. 2009) (where "the infringer engages in infringing conduct to gain an edge

over the patentee in a competitive market, this factor favors an award of enhanced damages"). Kartri undisputedly is a direct competitor of Focus in the two-player hospitality market. And Marquis's economic incentives align with those of Kartri, its supplier; Middleberg pitched Pong's design to Kartri as a means to break into Focus's market. This factor favors plaintiffs.

The ninth factor does not favor plaintiffs, in that defendants did not conceal their conduct, but openly infringed. *See Probatter Sports, LLC*, 586 F. Supp. 3d at 119 (factor did not favor of enhancement where infringer "put [its] product and the infringement in the open marketplace").

In sum, seven of the *Read* factors favor plaintiffs; only two favor defendants. Viewing the factors in totality, these do not mitigate the gravity of defendants' willful infringements.

The Court accordingly imposes the maximum enhancement and trebles defendants' damages to the extent incurred between February 27, 2015, and November 15, 2018.

Defendants' overall damages thus are as follows. For lost profits:

| | 2013 | 2014 | 2015 | 2016 | 2017 | Aug. 1–Nov. 15, 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749[90] | $2,395,861 |
| Percentage of accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Focus's market share but for infringement | 90% | 90% | 90% | 90% | 90% | 90% | 90% |

---

[90] This figure adds Kartri's sales for January 1 to July 31 and August 1 to November 15, 2018.

159

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Focus's Lost revenue but for infringement | $717 | $56,745 | $279,290 | $708,721 | $184,199 | $710,977 | $1,940,648 |
| Profit margin | 50% | 50% | 50% | 50% | 50% | 50% | |
| Lost profits | $359 | $28,372 | $139,645 | $354,360 | $92,099 | $355,488 | $970,324 |
| Enhancement | 0 | 0 | 300%[91] | 300% | 300% | 300% | |
| Final Award | $359 | $28,373 | $349,112 | $1,063,081 | $276,297 | $1,066,465 | **$2,783,687** |

For the reasonable royalty award:

| | 2013 | 2014 | 2015 | 2016 | 2017 | Aug. 1– Nov. 15, 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749[92] | $2,395,861 |
| Percentage of accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Focus's uncaptured market share | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Focus's lost revenue but for infringement | $80 | $6,305 | $31,032 | $78,747 | $20,466 | $78,997 | $215,627 |
| Royalty Rate | 25% | 25% | 25% | 25% | 25% | 25% | 25% |

---

[91] Having found that defendants acted willfully after February 27, 2015, the Court, treating each month's revenue as comparable, trebles 10/12, or 83.3%, of the lost profits award for that year.

[92] This figure totals Kartri's sales for January 1 to July 31 and August 1 to November 15, 2018.

| Reasonable Royalty | $20 | $1,576 | $7,758 | $19,697 | $5,117 | $19,749 | $53,907 |
|---|---|---|---|---|---|---|---|
| Enhancement | 0 | 0 | 300%[93] | 300% | 300% | 300% | |
| Final Award | $20 | $1,576 | $19,395 | $59,060 | $15,350 | $59,248 | **$154,649** |

Adding those two awards yields a final award of $2,938,337. Plaintiffs are entitled to recover that sum from defendants.

### 8. Disgorgement Is Not Available

In light of the above analysis, a disgorgement remedy is not warranted here. In *Church & Dwight Co.*, Judge Nathan found disgorgement of profits unwarranted because the lost profits award adequately achieved compensation and deterrence. 2018 WL 4253181, at *1, 17; *see also 4 Pillar Dynasty*, 933 F.3d at 214. So too, here. The enhanced award above is sufficient to compensate Focus for its losses, divest defendants of any unjust enrichment, and deter similar misconduct by Kartri (Marquis went out of business in 2020, Tr. 576).

In so holding, the Court is mindful that the remaining four nonexclusive factors identified as considerations in whether to award disgorgement award do, or may, favor plaintiffs.[94] But on review, the Court finds that the award above, which reflects trebled damages for much of the infringement period, will in practice achieve the objectives served by disgorgement. The award here also has the virtue of being anchored in reliable data. A disgorgement award, in contrast, would be impossible to tabulate with anything close to precision, given defendants' lapses in producing evidence of their expenses. Although a court may resolve doubts against a defendant

---

[93] Having found that defendants acted willfully after February 27, 2015, the Court, treating each month's revenue as comparable, trebles 10/12, or 83.3%, of the reasonable royalty award for that year.

[94] These are "the degree of certainty that the defendant benefited from the unlawful conduct," "the role of a particular defendant in effectuating the infringement," "any delay by plaintiff," and "plaintiff's clean (or unclean) hands." *4 Pillar Dynasty*, 933 F.3d at 214.

whose inadequate recordkeeping prevents precise tabulations, *Aris Isotoner Inc. v. Dong Jin Trading Co.*, No. 87 Civ. 890 (RO), 1989 WL 236526, at *5 (S.D.N.Y. Sept. 14, 1989), "some reasonable basis for computation has to be used," *Chloe v. Zarafshan*, No. 06 Civ. 3140 (RJH) (MHD), 2009 WL 2956827, at *5 (S.D.N.Y. Sept. 15, 2009). Here, plaintiffs pursue disgorgement of all of defendants' revenue. That request is plainly unreasonable, as plaintiffs' own damages expert has estimated that Marquis's yearly profit margin likely averaged around 13.6%, Elmore Rep., Att. 7.0, and there is no basis to assume that Kartri's costs were negligible so as to justify an assumed 100% profit margin. Plaintiffs' alternative proposal, which assumes profit margins for Marquis and Kartri of 75% and 44%, respectively, PF at 96–97, is based on isolated, anecdotal data taken from a stray facet of Kubus's testimony, which the Court is unprepared to credit as accurately capturing the company's revenues and costs. *See* Tr. at 763–64.

Accordingly, the Court declines to award disgorgement on top of, or as an alternative to, the lost profits and reasonable royalty awards set out above.

### 9.    Reasonable Attorney's Fees

The Patent Act and the Lanham Act, in identical language, provide that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285; 15 U.S.C. § 1117(a). "[A]n 'exceptional' case . . . is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 46 (S.D.N.Y. 2015) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (applying 35 U.S.C. § 285 standard)); *see also Sleepy's*

*LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (*Octane Fitness* standard applies to identically worded 15 U.S.C. § 1117(a) provision). "The 'exceptional' standard 'demands a simple discretionary inquiry; it imposes no specific evidentiary burden.'" *Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, No. 18 Civ. 6504 (NRB), 2020 WL 729518, at *2 (S.D.N.Y. Feb. 13, 2020) (quoting *Octane Fitness*, 572 U.S. at 557). District courts are "given wide latitude" in the "case-by-case exercise of their discretion, considering the totality of the circumstances[,] . . . frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *4 Pillar Dynasty*, 933 F.3d at 215; *see also Blair v. Alstom Transport., Inc.*, No 16 Civ. 3391 (PAE), 2020 WL 4504842, at *7 (S.D.N.Y. Aug. 5, 2020). And while "fraud, bad faith, or willful infringement are no longer required for a fee award," they remain "highly relevant" post-*Octane*. *Hello I Am Elliot, Inc. v. Sine*, No. 19 Civ. 6905 (PAE), 2021 WL 1191971, at *3 (S.D.N.Y. Mar. 30, 2021) (internal quotation marks and citations omitted). Thus, "courts continue to hold claims of baselessness to a high bar, [and] most post-*Octane* cases awarding fees continue to involve substantial litigation misconduct." *Id.* (internal quotation marks and citations omitted).

Neither party has briefed attorney's fees, properly treating it as reserved for after trial. *See* PF at 6; Elmore Rep. ¶ 230; Rogers Rep. ¶ 35. The Court orders plaintiffs, within four weeks of the date of this opinion and order, to file an opening brief as to such fees, with supporting documentation and calculations. Defendants' opposing brief is due four weeks later. Plaintiffs' reply is due two weeks after that.

### 10.    Prejudgment and Postjudgment Interest

In a patent infringement case, "prejudgment interest should ordinarily be awarded," even though such an award is not "requir[ed] . . . whenever infringement is found." *Metso Mins., Inc.*

*v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 343 (E.D.N.Y. 2011) (quoting

*Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–57 (1983)).  Although "there is no

mandatory interest rate and no standard rate for calculating an award of prejudgment interest,"

*TiVo, Inc. v. EchoStar Comm'ns Corp.*, No. 04 Civ. 1, 2006 WL 6830818, at *5 (E.D. Tex. Aug.

17, 2006), "[t]he Federal Circuit has given district courts great discretion when determining the

applicable interest rate for an award of prejudgment interest," *Metso Mins., Inc.*, 833 F. Supp. 2d

at 343 (citations omitted).  "[M]ost often courts will award either the prime rate or the U.S.

Treasury rate." *Id.* (citation omitted).  By contrast, the Lanham Act "does not provide for

prejudgment interest." *Merck Eprova*, 760 F.3d at 263 (citation omitted).  But "such an award is

within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Id.* at

263–64 (citation omitted).

Post-judgment interest is available in Lanham Act actions and Patent Act actions

pursuant to 28 U.S.C. § 1961(a).  *See WowWee Grp. Ltd. v. Haoqin*, No. 17 Civ. 9893 (WHP),

2019 WL 1316106, at *4 (S.D.N.Y. Mar. 22, 2019) (Lanham Act); *Rentrop v. Spectranetics

Corp.*, 514 F. Supp. 2d 497, 507 (S.D.N.Y. 2007) (Patent Act), *aff'd*, 550 F.3d 1112 (Fed. Cir.

2008).  Consistent with § 1961(a), the rate of post-judgment interest is the weekly average one-

year constant maturity Treasury yield for the week preceding entry of judgment.  Post-judgment

interest is compounded annually.  28 U.S.C. § 1961(b).

The Court orders the parties to address, in their briefs as to attorneys' fees, the issues of

pre- and post-judgment interest.

### F.    Injunctive Relief as to Both Defendants' Infringement of and Unfair Competition with the EZ-ON Mark and Trade Dress, and Kartri's Infringement of and Unfair Competition with the HOOKLESS® Mark

The Lanham Act "authorizes the Court to 'grant injunctions, according to the principles

of equity and upon such terms as the court may deem reasonable, to prevent the violation of any

right of the registrant of a mark registered in the Patent and Trademark Office[.]'" *Ideavillage Prods. Corp. v. Shenzen City Poly Hui Foreign Trade Co.*, No. 17 Civ. 8704 (JGK) (BCM), 2019 WL 12339638, at *7 (S.D.N.Y. Dec. 12, 2019) (quoting 15 U.S.C. § 1116(a)). To obtain a permanent injunction, a plaintiff that has established liability under the Lanham Act "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (*eBay* factors apply to trademark infringement action under Lanham Act), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (summary order).

   *Irreparable harm*: This is established where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused." *Lobo Enters., Inc. v. Tunnel Inc.*, 822 F.2d 331, 333 (2d Cir. 1987). The Court has found a likelihood of confusion among shower curtain purchasers. This satisfies the first *eBay* factor.

   *No adequate remedies at law*: This "is satisfied where the record contains no assurance against defendant's continued violation of Plaintiff's trademark." *Ideavillage Prods. Corp.*, 2019 WL 12339638, at *7 (citation omitted). There is none here. That defendants eventually ceased their infringing sales "[does] not prevent [a] court from considering [defendant's] previous infringing behavior as justification for an injunction." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 405 (2d Cir. 2004); *accord Balady, Inc. v. Elhindi*, No. 14 Civ. 855 (SJ) (RER), 2014 WL 7342867, at *11 (E.D.N.Y. Dec. 23, 2014). Here, defendants ceased infringing nearly three years into this litigation. Later, they sought to reprise their baseless claims that the

HOOKLESS® Mark was generic, and thus invalid, *see* Dkt. 297 at 20, and Marquis continues to assert the invalidity of the EZ ON Mark and Trade Dress. A court is entitled to consider a defendant's cessation of infringing conduct skeptically where it "has already infringed, continues to contest the lawfulness of its actions, and ceased its infringing conduct only after the initiation of this lawsuit. If not enjoined, [the defendant] would have little incentive not to employ [plaintiff's] trademarks in advertising its product in the future." *Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866 (RWS), 2001 WL 913894, at \*3 (S.D.N.Y. Aug. 14, 2001); *see also Nat'l Geographic Soc'y v. Conde Nast Pubs. Inc.*, 687 F. Supp. 106 (S.D.N.Y. 1988) (injunction issued where defendant agreed to cease trademark infringement only after lawsuit). The Court finds that a remedy at law for defendants' violations is inadequate. The second *eBay* factor is met.

*Balance of hardships*: This factor overwhelmingly favors plaintiffs, who may continue to suffer irreparable harm to their business, profits, goodwill, and reputation as a result of defendants' willful infringement of the trademarks and Trade Dress. *Kelly Toys Holdings, LLC v. alialialiLL Store*, No. 21 Civ. 8434 (AKH) (RWL), 2022 WL 2072567, at \*12 (S.D.N.Y. June 9, 2022). Defendants, in contrast, have not identified any cognizable hardship they could experience from an injunction. *See Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011). Lost business attributable to unlawful infringement does not qualify as a hardship. *See Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986). The third *eBay* factor is met.

*Public interest*: The public has an interest in not being deceived and "in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344

(S.D.N.Y. 2010); *accord Ideavillage Prods. Corp.*, 2019 WL 12339638, at *10. Such is so here. A permanent injunction also favors the public interest, and the fourth *eBay* factor is met.

The Court thus enjoins defendants from further infringement or unfair competition with the EZ-ON Mark and Trade Dress, and Kartri from further infringement or unfair competition with the HOOKLESS® Mark. Such conduct includes, but is not limited to, manufacturing, selling, advertising, or in any way commercializing the Ezy Hang product. Defendants are also enjoined from branding or advertising their products in any way that suggests an affiliation with the EZ-ON or HOOKLESS® Marks or Trade Dress.

## CONCLUSION

For the reasons above:

1. The Court finds Marquis and Kartri liable to plaintiffs for infringement of and unfair competition with plaintiffs' EZ-ON Trademark and trade dress under 15 U.S.C. § 1125(a); and for unfair competition with plaintiffs' EZ-ON Mark and Trade Dress under New York law.

2. The Court finds Kartri liable to plaintiffs for infringement of and unfair competition with plaintiffs' HOOKLESS® Mark under 15 U.S.C. § 1125(a); and for unfair competition with plaintiffs' HOOKLESS® Mark under New York law.

3. The Court denies all of defendants' affirmative defenses, namely: lack of statutory standing, failure to join an indispensable party, non-infringement of the EZ-ON Mark, invalidity of the EZ-ON Mark, non-infringement of the Trade Dress, and invalidity of the Trade Dress.

4. The Court finds that defendants' infringement of the utility patents and Trade Dress was willful between February 27, 2015 and November 15, 2018.

5. The Court awards plaintiffs lost profits, in the amount of $970,324, for defendants' infringement of the utility patents and Trade Dress. That award covers the period from October

16, 2013 to November 15, 2018. The award is trebled for the period March 1, 2015 to November 15, 2018. The final, enhanced lost profits award amounts to $2,783,687.

6.    The Court awards plaintiffs a reasonable royalty of $53,907, for defendants' infringement of the utility patents and Trade Dress. That award covers the period from October 16, 2013 to November 15, 2018. The award is trebled for the period March 1, 2015 to November 15, 2018. The final, enhanced reasonable royalty award amounts to $154,649.

7.    The Court enjoins both defendants from infringing or unfairly competing with the EZ-ON Mark and the Trade Dress under the Lanham Act, and from unfairly competing with the EZ-ON Mark and the Trade Dress under New York law. The Court further enjoins Kartri from infringing or unfairly competing with the HOOKLESS® Mark under the Lanham Act, and from unfairly competing with the HOOKLESS® Mark under New York law.

8.    The Court denies plaintiffs' claim for a disgorgement of defendants' profits, and their claim for a reasonable royalty for defendants' infringement of the EZ-ON Mark.

9.    The Court orders plaintiffs, within four weeks of the date of this opinion and order, to file their opening brief, with supporting documentation, on the issues of reasonable attorney's fees, prejudgment interest, and postjudgment interest. Defendants are ordered to file their opposing brief within four weeks of plaintiffs' due date. Plaintiffs are ordered to file their reply brief within 14 days thereafter.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: December 22, 2022
     New York, New York