UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS
OF NORTH AMERICA, INC., SURE FIT HOME
PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS
CORP., *and* SF HOME D DÉCOR, LLC,

Plaintiffs,

-v-

KARTRI SALES COMPANY, INC., *and* MARQUIS MILLS,
INTERNATIONAL, INC.,

Defendants.

15 Civ. 10154 (PAE) (SDA)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves—and grants—a motion by the prevailing plaintiffs for an award of

reasonable attorneys' fees in this litigation under the fee provisions of the Patent Act, 35 U.S.C.

§ 285, and the Lanham Act, 15 U.S.C. § 1117(a). The Court also grants plaintiffs' motions for

awards of permissible costs, and pre- and post-judgment interest.

## I.    Background

The long and tangled history of this case is set out in detail across various opinions and

orders in this case, including in the Court's 168-page bench trial decision, issued December 22,

2022, resolving the claims in the case not previously resolved on summary judgment. *See* Dkt.

501 ("Trial Decision"). The following brief overview is limited to the context necessary for the

present motions.

### A.    Key Pretrial Events

Plaintiffs—to whom the Court collectively refers as "Focus"—manufacture, sell, and

distribute distinctive "hookless" shower curtains. These have obtained considerable acclaim and

success in the hospitality industry for their ease of installation and replacement. In this litigation, Focus alleges that defendants Kartri Sales Company, Inc. ("Kartri"), and Marquis Mills, International, Inc. ("Marquis"), together manufactured, sold, and distributed confusingly similar shower curtains, and in so doing, unlawfully exploited Focus's intellectual property, in violation of federal and state law.

On June 30, 2015, Focus initiated this litigation. It came, in short order, to include claims of willful infringement of three utility patents and one design patent, in violation of the Patent Act; willful infringement of and unfair competition with two trademarks and trade dress, in violation of the Lanham Act; and unfair competition, in violation of New York law.

On July 14, 2016, in a bench ruling, the Court denied, in their entirety, motions to dismiss by both defendants. Dkt. 77.

On April 16, 2020, after a *Markman* hearing and long and contentious discovery, the Court resolved cross-motions for partial summary judgment. These resulted predominantly in (1) entry of summary judgment for plaintiffs on certain infringement claims under each of the three utility patents; and (2) dismissal of numerous counterclaims brought by Marquis. Dkt. 297; *see id.* at 31 (design patent not before Court).

On August 5, 2021, the Court resolved plaintiffs' motions *in limine* in a bench ruling. Dkt. 412. On November 23, 2021, the Court resolved defendants' motions *in limine* in a bench ruling. Dkt. 436.

### B.     The Bench Trial and Decision

On June 27–29 and July 26–28, 2022, the Court held a bench trial as to the remaining claims. On December 22, 2022, the Court issued a lengthy decision resolving the outstanding claims. Dkt. 501.

As to liability, the Court: (1) found both defendants liable for infringement of and unfair competition with plaintiffs' EZ-ON[1] trademark mark and trade dress under 15 U.S.C. § 1125(a), and for unfair competition with plaintiffs' EZ-ON mark and trade dress under New York law; (2) found Kartri liable for infringement of and unfair competition with plaintiffs' HOOKLESS mark under 15 U.S.C. § 1125(a) and for unfair competition with plaintiffs' HOOKLESS mark under New York law; (3) denied all of defendants' affirmative defenses; and (4) found defendants' infringement of the utility patents and trade dress to have been willful between February 27, 2015 and November 15, 2018.

As to damages, the Court (1) awarded plaintiffs lost profits, in the amount of $970,324, for defendants' infringement of the utility patents and trade dress, covering the period October 16, 2013, to November 15, 2018; the Court trebled the award for the period March 1, 2015 to November 15, 2018, resulting in a final, enhanced lost profits award of $2,783,687; (2) awarded plaintiffs a reasonable royalty of $53,907 for defendants' infringement of the utility patents and the trade dress, covering the period October 16, 2013 to November 15, 2018; the Court trebled the award for the period March 1, 2015 through November 15, 2018, resulting in a final, enhanced reasonable royalty award of $154,649; (3) enjoined both defendants from future infringements of, and unfair competition with, the EZ-ON mark and trade dress; and Kartri from the same as to the HOOKLESS mark; and (4) denied plaintiffs' claims for disgorgement of defendants' profits and a reasonable royalty for defendants' infringement of the EZ-ON mark.

The Court also set a schedule for the briefing of the issues of reasonable attorneys' fees, prejudgment interest, and post-judgment interest.

C.    **The Motions for a Fee Award, Prejudgment Interest, and Post-Judgment Interest**

---

[1] As in its trial decision, the Court will refer to the mark as "EZ-ON." Trial Decision at 8 n.10.

On January 19, 2023, plaintiffs filed a memorandum of law in support of their motion for attorneys' fees, prejudgment interest, and post-judgment interest. Dkt. 505 ("Focus Mem."). In support, plaintiffs filed two sets of invoices, Dkt. 505-1; Dkt. 505-2; a spreadsheet summarizing these, Dkt. 505-3; and other materials, Dkts. 505-4–7. Plaintiffs sought a fee award of $1,549,544.91. On February 16, 2023, Kartri filed a memorandum of law in opposition, Dkt. 524 ("Kartri Mem."), with attached exhibits, Dkts. 524-1–4. On February 17, 2023, Marquis filed a brief memorandum of law in opposition, Dkt. 525 ("Marquis Mem."), with attached exhibits, Dkts. 525-1–2, that principally adopted Kartri's arguments. On March 2, 2023, Focus filed a reply, Dkt. 530 ("Focus Rep."), with attached exhibits, Dkts. 530-1–5, and a supplemental declaration, Dkt. 531.

## II.     The Motion for an Award of Fees and Costs

### A.     Governing Legal Principles

"Ordinarily, under the 'American Rule,' each party must bear its own attorneys' fees." *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2018 WL 3574864, at *5 (S.D.N.Y. July 25, 2018), *aff'd*, 771 F. App'x 71 (2d Cir. 2019) (summary order). "However, where there is 'explicit statutory authority,' courts may award attorneys' fees." *Id.* (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602–03 (2001)). In identical language, the Patent Act and Copyright Act each confer such authority, stating that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *See* 35 U.S.C. § 285; 15 U.S.C. § 1117(a).

In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), the Supreme Court construed the Patent Act provision. The Second Circuit has since adopted that

construction as governing fee applications under the Lanham Act. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530–31 (2d Cir. 2018).

Under *Octane*, an "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 572 U.S. at 554. District courts have wide latitude to determine whether a case is exceptional; the inquiry is a case-by-case exercise that considers the totality of the circumstances. *Id.*

In applying this standard, courts may consider a nonexclusive list of factors including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)); *see Manhattan Rev. LLC v. Yun*, 765 F. App'x 574, 578 (2d Cir. 2019) (summary order) (district courts are "encourag[ed]" to apply "the *Fogerty* factors from the Copyright Act context" in exercising discretion as to fee requests under the Lanham Act).

Although highly relevant, fraud, bad faith, or willful infringement are no longer required for a fee award under the Lanham Act. *See 4 Pillar Dynasty LLC. v. N.Y. & Co.*, 933 F.3d 202, 215–16 (2d Cir. 2019) (precedents requiring a showing of willfulness have been overtaken by *Octane*). However, "although *Octane* reduced the showing required for an award on the ground of objective baselessness, courts continue to hold claims of baselessness to a high bar." *Small v. Implant Direct Mfg. LLC*, No. 06 Civ. 683 (NRB), 2014 WL 5463621, at *3 (S.D.N.Y. Oct. 23, 2014). As a result, "most post-*Octane* cases awarding fees continue to involve substantial litigation misconduct." *Hockeyline, Inc. v. STATS LLC,* No. 13 Civ. 1446

(CM), 2017 WL 1743022, at *5 (S.D.N.Y. Apr. 27, 2017); *see, e.g., Small*, 2014 WL 5463621, at *4 (collecting cases).

## B. Discussion

### 1. Whether a Fee Award Is Warranted

Focus undisputedly was the prevailing party here. It prevailed virtually across the board, securing findings in its favor as to infringement—indeed, of willful infringement—of its three utility patents, of its two trademarks, and of its trade dress.[2] And it obtained substantial, and enhanced, damages on these claims. Kartri and Marquis, although disputing that this was an exceptional case, do not dispute that Focus was the prevailing party.

The Court, however, finds this to have been an "exceptional case" justifying a fee award for two reasons identified in *Octane*: the strength of plaintiffs' litigating position and the objective unreasonableness of the manner in which the case was defended. The Court addresses these in the order set out in *Octane*, although the second reason is by far predominant in the Court's assessment.

#### a. *Strength of Focus's Litigation Position*

Focus's litigating position was uncommonly strong, as reflected in the Court's detailed analysis of Focus's claims in the summary judgment decision and especially the bench trial decision.

What particularly distinguishes this case from a garden-variety one in which a trademark or patent holder has successfully established infringement of such rights, however, is defendants' willful infringement, which the Court found with respect both to Focus's trademarks and patent

---

[2] The Court did not resolve plaintiffs' patent infringement claims as to its design patent '078, which was stayed on consent pending a decision by the United States Patent and Trademark Office as to its validity. *See* Trial Decision at 55.

for much of the relevant period. In its bench decision, the Court reviewed the evidence that Kartri and Marquis, in long marketing nearly identical products, had intentionally plagiarized Focus's trade dress and patents. *See* Trial Decision at 77–78. This evidence overwhelmingly showed, the Court held, that Marquis had "willfully closed its eyes to the high probability that the Ezy Hang design [Marquis] was obtaining in China and furnishing to Kartri to sell in the U.S. was infringing Focus's intellectual property rights." *Id*. at 77.

For example, Marquis uncritically accepted an unsubstantiated representation of a Chinese vendor, whom it knew had worked for a manufacturer of Focus's in China, that Focus's utility patents "had become a public domain kind of product" and "were about to run out"; Marquis and Kartri chose not to investigate whether the shower curtain product they proceeded to market was covered by a valid patent in the United States or elsewhere. *Id*. And when the vendor's patent attorney offered to conduct a patent analysis for $3,500, Marquis spurned the offer. *Id*. Marquis chose instead to credit the vendor's unsubstantiated claims that it owned a Chinese patent and that Focus, being "in deep financial trouble," was too weak to fight to vindicate its intellectual property rights. *Id*. at 77–78. Even after Focus sent a 2015 cease-and-desist letter, which spelled out the legal basis for its rights in terms that prefigured the Court's eventual ruling, Kartri and Marquis stood pat, disregarding the letter and outrageously declining to investigate Focus's representation to have superior rights. *Id*. at 78. Instead, the defendants persisted in marketing their infringing product, openly describing it as a "version of HOOKLESS," the name by which they knew Focus's product was known. *Id*.

For these and related reasons, the Court found, in its Lanham Act rulings, bad faith on the part of defendants.

> [T]he evidence is compelling that defendants, aware of the inroads Focus's innovation had made in the shower curtain market, intentionally sought to mimic

Focus's Trade Dress to deceive customers to purchase Ezy Hang and thereby to capitalize on Focus's goodwill. The close similarity—in both looks and sound—between Kartri's Ezy Hang product and Focus's EZ-ON product reinforces this conclusion. These similarities are so strong that it seems plain that deliberate copying has occurred. Defendants did not offer a benign justification for these similarities—especially not for the strong similarities in look *and* sound between the Ezy Hang and the EZ-ON product. It is unavoidably clear that defendants intentionally, and in bad faith, sought to all-but-replicate the EZ-ON Mark so as to capitalize on competitor Focus's intellectual property and good will. . . . Although the proof of bad faith is especially obvious in connection with the Ezy-Hang product, the Court finds that the factor of bad faith cannot be logically cabined to the EZ-ON Mark. Defendants' strategy of deliberate infringement, the Court finds, was holistic.

*Id.* at 91–92 (emphasis in original) (internal citations omitted).

And in connection with its findings as to damages on the patent claims, the Court found enhanced—treble—damages in order as a punitive sanction for "'egregious infringement behavior,' that is behavior that is 'willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant or—indeed—characteristic of a pirate.'" *Id.* at 148 (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016)). Analyzing the "*Read* factors" that guide the treble damages analysis, the Court found that both defendants had acted willfully from the point at which they had received Focus's cease-and-desist letter on or about February 27, 2015, and that they had continued to do so for more than 42 months, through November 15, 2018. *Id.* at 150; *id.* at 152–54 (analyzing willfulness of Marquis during this period, and noting that its executive, Middleberg, "[a]lmost unimaginably[]—notwithstanding the letter's clear articulation of the basis of Focus's rights—disregarded the letter," and that Kartri's owners continued to sell the accused products to Kartri without seeking advice of counsel, and that such continued for three years after being served the original complaint in this case); *id.* at 155–56 (analyzing willfulness of Kartri during this period, and noting that it, too, engaged in "flagrant and prolonged disregard of plaintiffs' intellectual property rights" after being put on explicit notice of

them).  Other *Read* factors favoring enhanced damages, the Court found, included defendants' failures to investigate, the duration of their misconduct, the absence of any remedial actions, and their profit motivation, as direct competitors of Focus, to infringe.  *Id.* at 157–58.

The strength of Focus's case, and the willfulness and egregiousness of the conduct giving rise to defendants' liability, "stand[] out from others," *Octane*, 572 U.S. at 554, finding trademark or patent infringement (or, as here, both).  The Court bases this finding on the distinctive facts of this case, as measured against the assembled case law, and against the many such cases under these statutes that this Court has supervised.  This factor supports an award of fees.  *See, e.g., NetSoc, LLC v. Chegg Inc.*, No. 18 Civ. 10262 (RA), 2020 WL 7264162, at *4–5 (S.D.N.Y. Dec. 10, 2020) (awarding fees under § 285 where plaintiffs pursued "exceptionally weak arguments" by, *inter alia*, failing to correct errors in their pleadings for months despite being informed of them); *Advanced Video Techs. LLC v. HTC Corp.*, No. 11 Civ. 06604 (CM), 2015 WL 7621483, at *5–9 (S.D.N.Y. Aug. 28, 2015) (same), *aff'd*, 677 F. App'x 684 (Fed. Cir. 2017); *Microban Prods. Co. v. Iskin Inc.*, No. 14 Civ. 05980 (RA) (DF), 2016 WL 4411349, at *11 (S.D.N.Y. Feb. 23, 2016) (awarding attorneys' fees under Lanham Act where defendants' infringement was willful), *report and recommendation adopted*, 2016 WL 4411414 (S.D.N.Y. Aug. 18, 2016); *Sub-Zero, Inc. v. Sub Zero N.Y. Refrigeration & Appliances Servs., Inc.*, No. 13 Civ. 2548 (KMW) (JLC), 2014 WL 1303434, at *7 (S.D.N.Y. Apr. 1, 2014) (same); *Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 358–59 (S.D.N.Y. 2010) (same).

> b.  *Objective Unreasonableness of Kartri and Marquis's Conduct in This Litigation*

In a host of ways, Kartri and Marquis defended this case in an objectively unreasonable, thoughtless, and unprofessional manner.  They thereby materially and needlessly prolonged this litigation, drove up costs for their prevailing adversary, and burdened the Court.

A thoroughgoing canvass of the docket in this case would reveal a dismaying collection of unreasonable acts and omissions ill-befitting the standards of this District. A decidedly nonexclusive summary of defendants' litigation improprieties includes conduct in the following four categories[3]:

*i.*     *Flagrant Breaches of Discovery Obligations Relating to Damages*

In 2016, plaintiffs served discovery requests on defendants seeking financial information, including relating to revenues, costs, and profits arising from sales of the accused products. Defendants failed to provide such information in full. Plaintiffs raised the issue with Magistrate Judge Ellis, identifying these (and other) discovery deficiencies; Judge Ellis ordered defendants promptly to supplement their discovery. *See* Dkt. 114 (6/14/17 order). Defendants, however, did not do so. In late January 2019—some 19 months later, now more than three years into the litigation, and after the close of fact discovery, and after plaintiffs had submitted their expert report based on the limited damages discovery defendants had furnished—defendants furnished financial data to their damages expert, Graham Rogers. These data were squarely responsive to plaintiffs' earlier discovery demands and Judge Ellis's order. As this Court later summarized in resolving a motion *in limine* in which it imposed the sanction of precluding defendants and the expert from relying on the late-produced data:

> [T]he Court finds that defendants had access to financial evidence during fact discovery, which they did not disclose until well after fact discovery closed and well after Magistrate Judge Ellis ordered them to comply with Rule 26. Defendants admit this latter point . . . . Nor do the defendants dispute that their expert witness relied on this material.

---

[3] Plaintiffs' motion for fees fairly chronicles, in addition to the above, other missteps by defendants and their counsel during this litigation. *See* Focus Mem. at 4–14.

*See* Dkt. 412 at 11; *see also id.* at 7–16 (8/5/21 conference, recounting pertinent history, in explaining imposition of sanctions under Fed. R. Civ. P. 37). Further, in the course of litigating this point, defendants dissembled to the Court, falsely representing that they had produced the data in question. As the Court ruled in imposing sanctions:

> [D]efendants also claim to have "provided the additional financial information as soon as defendants were aware." That is simply false. The record demonstrates that defendants provided the information to their expert a month before they gave it to Focus and that it was not defendants' initiative to provide it to Focus. They did so only after Focus, having ascertained during Rogers' deposition that defendants had provided him with information that Focus had never been given, demanded such information.

*Id.* at 13–14 (internal citation omitted).

These breaches were consequential. Indeed, defendants admitted that the evidence they had willfully denied plaintiffs was "critical" and "important to the ultimate truth of this case." *Id.* at 14. Defendants' breaches caused the parties and the Court to devote substantial time attempting to enforce defendants' discovery obligations and later litigating and fashioning a remedy for defendants' breaches. Further, defendants' brazen failure to produce their sales and profit data from the accused profits stymied plaintiffs in attempting to reliably establish their damages. *See id.* at 15 (recounting ways in which defendants' failure to produce data relevant to damages impaired Focus's fact discovery, expert analysis, questioning of defendants' damages expert, and ability to investigate pertinent topics). And, as reflected in the bench trial decision, defendants' breach denied the Court, in its capacity as factfinder, the best evidence of damages, forcing the Court to base aspects of its damages calculations on reasonable assumptions rather than on hard and complete data. *See, e.g.*, Trial Decision at 110, 132–34.[4]

---

[4] Relatedly, the sales data Kartri did produce was demonstrably false. As plaintiffs' expert John Elmore persuasively testified at trial, Kartri's data underreported its sales, so as to create the

In a host of contexts, defendants breached basic court protocols and rules. Albeit generally by modest margins, they repeatedly missed filing deadlines—including for their summary judgment brief, *compare* Dkt. 230, *with* Dkt. 253, for their motion for reconsideration, *see* Dkt. 307, and for their expert report, *see* Dkt. 217, and filed an unauthorized and untimely motion *in limine*, *see* Dkt. 364 at 9. Their submissions on summary judgment were grossly deficient, compelling the Court to state the following in its summary judgment decision:

> [Defendants'] Rule 56.1 statement and response persistently fails to conform to the local rules and regularly lacks citations to the record. Factual propositions declared by the defense for which defense counsel has not submitted admissible evidentiary support have not been credited by the Court. The defense's 56.1 statement is a striking replica of defendants' memoranda of law, suggesting a lack of appreciation of the purpose of such a statement. This, along with the 56.1 statements' sometimes maddeningly incomprehensible formatting, makes it particularly unhelpful to the Court.

Dkt. 297 at 2 n.1 (internal citations omitted). Defendants also persistently failed to meet and confer before raising issues, as the Court's Individual Rules required. *See, e.g.*, Dkt. 424. And they improperly raised defenses at the brink of trial that they had not raised earlier, including in the parties' joint pretrial order; these included purported defenses of a lack of standing, of "non-infringing fair use," of "profit disgorgement preclusion," of a "terminal disclaimer" defense, and of unclean hands and equitable estoppel. *See* Dkt. 365 at 5 ("Defendants have utterly failed to explain their abject failure to raise these defenses years ago, and their delay in doing so until the 11th hour in this litigation."); *see also* Dkt. 412 at 19–24. The Court ultimately was required,

---

impression that it had long sold its accused shower curtains at a loss. Dkt. 488 at 421–22. This was both improbable and inconsistent with the fact that Kartri elsewhere had admitted making a profit. *See* Dkt. 490 at 716; *see* Focus Mem. at 6 & n.6 (elaborating on basis for asserting such falsity).

after hearing plaintiffs' response, to preclude these and any additional defenses not raised or listed in the joint pretrial order, and to admonish defendants—at a point when the case was headed for a jury trial—as follows:

> Because the defendants have demonstrated an intention to continue to pursue untimely and indeed some explicitly precluded defenses, the Court admonishes defendants to carefully measure their trial defenses so as to assure that any defense they intend to raise at trial was previously timely raised. The Court admonishes defendants that any attempt before the jury to inject defenses that the Court has now precluded, or that defendants later conjure that were not pled, will merit a rebuke in front of the jury. Defendants' continued attempts to raise defenses and make arguments that have already been forfeited or rejected has wasted counsel[s'] and the Court's time. The Court will not allow the defendants to reprise such conduct before the jury.

Dkt. 412 at 26.[5]

### iii.    Flouting or Ignoring Court Rulings

On multiple occasions, defendants flouted prior court rulings, requiring the Court (and plaintiffs) to revisit these issues. Three examples suffice. First, although the Court had ruled that plaintiffs had shown the non-functionality of their trade dress, defendants listed that in their joint pretrial order as a defense they intended to pursue at trial. The Court thus had to preclude it expressly, in bench rulings. *See id.* at 20; Dkt. 436 at 7. Second, in the joint pretrial order, defendants stated that they planned to pursue at trial a defense that the HOOKLESS trademark is generic. The Court thus had to preclude that defense expressly, too. *See* Dkt. 412 at 21–22. Third, the Court had denied defendants' motion for summary judgment on the issue of whether the February 1, 2012 Carnation license agreement conferred ownership of the EZ-ON mark on

---

[5] *See also, e.g.*, Dkt. 204 (rejecting defendants' attempt, years after the *Markman* hearing and the Court's issuance of the *Markman* order, to propose a new claim construction, of the word "from," stating: "The time for proposing claim constructions has long since passed. Despite ample opportunity, Kartri never placed the term "from" in dispute. It therefore forfeited the opportunity to do so now. The Court is confident that the jury will have no difficulty understanding this commonplace term.").

plaintiffs' predecessor, ruling that this was a question of fact that required resolution at trial. Defendants, however, pursued the same relief in the form of a motion *in limine*, which the Court denied. *See* Dkt. 436 at 4–5 ("[D]efendants have already moved for summary judgment on the same claim, and the Court has denied that motion . . . who owns the EZ[-]ON mark remains a question of fact, to be decided by a jury. The Court will not revisit it here.").

### iv. Taking Baseless Positions

Defendants at numerous points took indefensible and unsubstantiated litigation positions. Some, like some of the arguments above, were unreasonable on account of preclusive earlier court rulings; others were substantively unreasonable; others were devoid of legal authority or factual support. The following are representative examples.

At the outset, Kartri brought a counterclaim appearing to allege tortious interference and monopolistic conduct. But Kartri did not adduce any evidence in support, and it did not defend (or address) the counterclaim when plaintiffs moved against it at summary judgment, leaving the Court to grant plaintiffs' motion as unopposed. Dkt. 297 at 27. Marquis similarly brought a counterclaim for "patent misuse," but it did not adduce—or attempt to adduce—any evidence in support, resulting in its dismissal, too, on summary judgment. *Id.* at 28. At summary judgment, defendants also argued that plaintiffs' three utility patents were invalid, but did not offer any admissible evidence in support. The Court rejected that claim as baseless. *Id.* at 17–19.

Later, in the joint pretrial order, defendants stated that they intended to defend on the ground that "[p]laintiffs and/or their licensees have failed to mark product packaging and/[]or marketing materials displaying [p]laintiffs' common law trademark and trade dress with notice to identify the source of the goods to establish secondary meaning." Dkt. 323 at 9. After plaintiffs called out this argument as meritless and contrary to established law, Dkt. 325 at 12–13, the

Court gave defendants until August 12, 2021 to indicate whether they intended to pursue such a defense, and to identify case law in support, Dkt. 412 at 21. Defendants did not do so, resulting in the Court's striking this defense. In the joint pretrial order, defendants also indicated that they intended to argue that Focus's trade dress definition was required to have been "recited in plaintiffs' business records." *Id.* at 23. The Court granted plaintiffs' motion *in limine* to preclude that line of defense. It ruled: "Focus is right. Defendants have not provided any support for their legal claim in their opposition. They have not identified any statute or case law requiring a plaintiff to produce business records establishing a trade dress definition. Nor has the Court found any." *Id.* at 23–24.[6]

### c. Overall Assessment

Given defendants' multifaceted and protracted litigation misconduct, this case easily qualifies as an "exceptional case" when measured against Lanham Act and Patent Act precedents applying that standard. Cases found "exceptional" based on the unreasonable manner in which the losing party conducted itself in litigation have relied on comparable, and indeed less glaring, records of vexatiousness. *See, e.g.*, *Am. Exch. Time LLC v. Tissot S.A.*, No. 17 Civ. 4737 (VM), 2022 WL 17414348, at *4–5 (S.D.N.Y. Dec. 5, 2022) (finding case exceptional and awarding attorneys' fees where defendants litigated in "unreasonable manner" by filing opposition to trademark application that forced plaintiff to commence litigation; appearing in action and requesting conferences, and then asking to participate as an observer rather than appearing; and filing a new trademark application that led to plaintiff's application being suspended after a year of settlement discussions); *Venus by Maria Tash, Inc. v. Prinatriam Ltd.*, No. 21 Civ. 2098

---

[6] Plaintiffs' motion for fees lists numerous other baseless arguments that defendants pursued. *See* Focus Mem. at 11–13.

(LGS) (RWL), 2022 WL 4085747, at *6 (S.D.N.Y. Aug. 24, 2022) (same, where, *inter alia*, defendants "frustrated the litigation process" by failing to appear), *report and recommendation adopted*, 2022 WL 5110594 (S.D.N.Y. Oct. 4, 2022); *Experience Hendrix, L.L.C. v. Pitsicalis*, No. 17 Civ. 1927 (PAE) (GWG), 2020 WL 3564485, at *15–16 (S.D.N.Y. July 1, 2020) (same, where defendants disobeyed court orders, refused to participate in discovery, and defaulted), *report and recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix*, 2020 WL 4261818 (S.D.N.Y. July 24, 2020); *Cognex Corp. v. Microscan Sys., Inc.*, No. 13 Civ. 2027 (JSR), 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (same, where defendants offered particularly weak arguments and submitted post-trial motions on issues court had already decided). And where a party found to have willfully infringed engages in unreasonable litigation practices, courts have not hesitated to find this standard met. *See, e.g., Abbott Lab'ys v. H & H Wholesale Servs., Inc.*, No. 15 Civ. 5826 (CBA) (LB), 2022 WL 17977495, at *11 (E.D.N.Y. Dec. 28, 2022); *Experience Hendrix, L.L.C.*, 2020 WL 3564485, at *11, *16; *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 434 (S.D.N.Y. 2013).

Defendants' arguments in opposition largely whitewash or minimize its abusive litigation conduct, in contravention of the formidable record reviewed above. Kartri makes two broader points, but neither carries the day.[7]

---

[7] Marquis likewise, in an anemic four pages, minimizes its litigation misconduct. Marquis Mem. at 1–4. Although this lapse has not formed a basis for the Court's finding that a fee award is warranted, the Court rejects Marquis's claim that it had the Court's permission to file publicly an unredacted version of documents, in violation of the governing protective order. *Id.* at 4. That argument fails for the reasons in plaintiffs' Reply, including that plaintiffs had already provided the initially requested redacted version; that Marquis was aware of the same; and that Marquis failed to consult with plaintiffs before submitting the unredacted version. Marquis violated the protective order on numerous other occasions. *See* Focus Mem. at 9–10.

Kartri notes that it is a family-owned business, owned by its founders' daughters, with fewer resources than Focus. Kartri Mem. at 1. To the extent Kartri seeks thereby to excuse its willful infringement, that argument fails. Whatever the initial sophistication level of its owners, Kartri was explicitly put on written notice of Focus's patent rights, chose to disregard Focus's letter, declined to investigate Focus's claims, spurned an offer of legal assistance on this point, and persisted in blatantly infringing sales, all while designing its trade dress in a manner the Court found to reflect deliberate copying so as to capitalize on competitor Focus's goodwill. *See* Trial Decision at 77–78, 91–92. And the claimed naivete of Kartri's owners does not, at all, excuse its—and its counsels'—persistently disobedient and unreasonable litigation tactics.

Kartri also notes that in defending this case, it took "multiple sound positions" and that some of these were rejected not on their merits, but as untimely. Kartri is correct that some of its unsuccessful litigation positions were nonfrivolous. But to the extent that Kartri suggests that a party who has engaged in wide and protracted unreasonable litigation conduct cannot be found liable for fees where it can cite examples of defensible conduct, that is wrong. No case applying *Octane* has so held. Where a fee application is based on a party's unreasonable litigation conduct, the issue is whether that conduct, *in toto*, rendered the case "exceptional," not whether this misconduct was uninterrupted. *See, e.g.*, *Octane*, 572 U.S. at 554 ("District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the *totality* of the circumstances." (emphasis added)); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013) (noting that "many forms of misconduct can support a district court's exceptional case finding, including . . . litigation misconduct, vexatious, unjustified, and otherwise bad faith litigation; [or] a frivolous suit"); *Am.*

*Exch. Time*, 2022 WL 17414348, at *5 (totality of defendants misconduct "evinces exactly the kind of 'unreasonable' litigation that justifies an award of attorneys' fees").

The Court accordingly finds this case "exceptional" under *Octane*, warranting an award of reasonable attorneys' fees to prevailing party Focus.

## 2. The Amount of the Reasonable Fee Award

Once a court determines that a party has prevailed, it must calculate what constitutes a reasonable attorneys' fee. *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). A presumptively reasonable fee is calculated by using the "lodestar" method, under which the Court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183, 189–90 (2d Cir. 2008); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).

"In determining the amount of the reasonable fee award, the district court is to broadly consider case-specific variables, mindful of the idiosyncratic quality and path many litigations take." *HomeAway.com, Inc. v. City of New York*, 523 F. Supp. 3d 573, 588 (S.D.N.Y. 2021). The Second Circuit has clarified the relationship between the lodestar method and a widely used multifactor test (the "*Johnson* test") that some courts had treated as an alternative mode of calculation. *See Arbor Hill*, 522 F.3d at 188–91 (recapping history of award-calculation methodology). The Circuit concluded:

> We think the better course—and the one most consistent with attorney's fees jurisprudence—is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district

court should consider, among others, the *Johnson* factors[8]; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

*Id.* at 190 (emphasis in original); *see Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983) ("The district court also may consider other factors identified in [*Johnson*], though it should note that many of these factors usually *are subsumed* within the initial calculation of hours reasonably expended at a *reasonable* hourly rate." (emphasis added) (internal citation omitted)); *see also Lilly v. City of New York*, 934 F.3d 222, 228–30 (2d Cir. 2019). "A district court has considerable discretion in determining what constitutes a reasonable fee award." *Ahmed v. City of New York*, No. 17 Civ. 3044 (SHS), 2020 WL 6487521, at *3 (S.D.N.Y. Nov. 4, 2020) (internal quotation marks omitted); *see also Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 307 (2d Cir. 2011).

The Court here first calculates the lodestar. Focus seeks $1,549,544.91 in fees, incurred over the seven-plus year duration of this litigation, based predominantly on the work of three

---

[8] The *Johnson* factors were developed by the Fifth Circuit, which directed lower courts to consider 12 factors in setting a reasonable fee. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). These are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

attorneys (Morris E. Cohen, Lee A. Goldberg, and Limor Wigder) and one paralegal (Sherika Sterling).[9] These fees have been paid by Focus.

Defendants do not dispute the propriety of the billing rates Focus claims for these professionals. These, for Cohen and Goldberg, began at $600/hour and increased in 2021 to $675/hour; for Wigder, began at $425/hour and increased in 2021 to $475/hour; and for Sterling, at all times was $225/hour. The Court agrees that these rates are reasonable. Patent and trademark matters are often complex; in cases calling upon sophistication and expertise, litigators in these disciplines command rates that often exceed those of general commercial litigators. Even putting aside the work occasioned by the defense's obfuscatory submissions and improper tactics, this litigation was undeniably complicated. As the overall record and the Court's bench trial decision reflect, the litigation implicated three patents, two trademarks, trade dress, and unfair competition, and a host of complex issues. Courts in sophisticated intellectual property matters have often approved rates for experienced litigators matching or exceeding those here.[10]

---

[9] Focus also seeks a modest amount of reimbursement of certain fees for the work of a pre-law intern, John Stadler, who assisted with trial preparation and trial in June and July 2022. *See* Focus Mem. at 16–17. The rate at which Stadler's time ($150/hour) was billed, and the work and hours reflected in his time entries, are, the Court finds, reasonable. *See, e.g., Asare v. Change Grp. of N.Y., Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) (rate of $150/hour for staff time reasonable).

[10] *See, e.g., Stuckey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 15 Civ. 6639 (CM), 2015 WL 5547441, at *12 (S.D.N.Y. Sept. 17, 2015) (rates of $625 to $725 per hour for partners and $285 to $475 per hour for associates reasonable); *Sub-Zero, Inc.*, 2014 WL 1303434, at *8–9 (finding partner's rate of $485/hour, senior partner's rate of $785/hour, and paralegal's rate of $200/hour reasonable); *Asare*, 2013 WL 6144764, at *19 (rates of $750 per hour for partner time; $500 per hour for senior associate time; $300 per hour for associate time; and $150 per hour for paralegal time reasonable); *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 Civ. 7493 (VB), 2013 WL 4080946, at *17 (S.D.N.Y. May 30, 2013) (hourly rates ranging from $795 for partners

The legal personnel representing Focus have experience and credentials consistent with these rates. Cohen has more than 27 years' experience as an intellectual property litigator and is an adjunct professor of patent and advanced patent law; Goldberg has 32 years' litigation and extensive trial experience; Wigder has 10 1/2 years' experience; and Sterling has 18 years' experience. Cohen Declaration ¶¶ 8–15. Cohen, Goldberg, and Wigder are also registered patent attorneys. *See id.* Courts in this District have approved the rates charged here though 2020 by Messrs. Cohen and Goldberg, *see Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod., Inc.*, No. 19 Civ. 3766 (GHW), 2021 WL 2333242, at *4 (S.D.N.Y. June 8, 2021); *Best Brands Consumer Prod., Inc. v. Versace 19.69 Abbigliamento Sportivo S.R.L.*, No. 17 Civ. 04593 (VSB) (SDA), 2020 WL 8678085, at *9 n.21 (S.D.N.Y. Oct. 1, 2020); there are no reported cases involving contrary findings as to them.[11] And this Court's assessment of Focus's counsel's work during this extended litigation confirms that the claimed rates are reasonable. Counsel were learned, vigorous, effective, punctilious, and consistently highly professional.

As to the hours component of the lodestar assessment, a party seeking court-ordered compensation for its attorneys' work must document the application with contemporaneous time records. *N.Y. State Ass'n for Retarded Child. v. Carey*, 711 F.2d 1136,1147–48 (2d Cir. 1983). Focus has done so here, submitting the detailed and expansive time records that its counsel

---

and $675/hour or $325/hour for an associate, with bulk of work handled by partner who charged $525/hour, reasonable).

[11] Although another court in this district reduced the fee for Wigder—noting that the case at issue was only her second copyright case—the Court finds her rate reasonable here. *See Beverly Hills Teddy Bear Co.*, 2021 WL 2333242, at *4. Over her 10 1/2 years' experience, Wigder has assisted with numerous patent and trademark cases. Cohen Decl. ¶ 11.

submitted to it, on the basis of which Focus paid counsel's invoices. *See* Cohen Decl., Exs. 1–2 (invoices containing time records); *id.*, Ex. 3 (summary spreadsheet).

To the very limited extent that defendants challenge the adequacy of the billing records, these challenges fail. With few exceptions, defendants—in assailing these records—do not point to specific line entries as problematic. And, based on the Court's review, such a challenge could not viably be made. Running 160 pages, plaintiffs' time records specify, for each timekeeper, the date, hours expended, and the nature of the work done, as the case law requires of a fee application to a court. *See Carey*, 711 F.2d at 1148. Far from being vague or using improper block-billing, plaintiffs' counsels' time records are commendably detailed—among the most thorough this Court has seen in reviewing fee applications. These time records are notable, too, in that they reflect lean—not excessive—staffing. Such discipline was on display at the bench trial, at which plaintiffs brought two attorneys, far from the size of the trial teams that the Court commonly observes in connection with bench trials in comparably complex commercial cases. Defendants' critiques that Focus seeks reimbursement for invoices from other cases or that billed for expense items only, or that Focus seeks to bill defendants for the entirety of fees for which Focus was eligible for a prompt payment discount, *see* Kartri Mem. at 13, 17–18, are errant, for the reasons Focus explains in its reply, *see* Focus Rep. at 15–17.

Defendants do rightly fault two discrete timekeeper line entries that include descriptions of work for Focus unconnected to this litigation. *See* Kartri Mem. at 13–14 (citing time entries billing $4,989, and $360, respectively). But, as Focus fairly rejoins, reasonably reducing the fees attributable to extraneous work covered by these two-time entries to eliminate work on extraneous matters would only marginally reduce Focus's overall fee request. Focus proposes an overall reduction of $680. *See* Focus Rep. at 16 (proposing reductions for these entries of $500,

and $180, respectively). In the interest of assuring that defendants are not made to pay for work unrelated to this matter, the Court will reduce the lodestar by a larger sum—$1,000—on account of these errant entries.

More broadly, based on its close review of counsels' time records and its familiarity with this litigation, the Court's assessment is that the hours worked by its timekeepers—1,300.7 by Cohen, 859.5 by Goldberg, 175.3 by Wigder, and 297.6 by Sterling—were otherwise reasonable and proportionate to the demands of this case. Dkt. 533. As the overall record, including the Court's trial decision, reflects, this 7 1/2-year litigation was one of the most complex intellectual property cases the Court has supervised. It was factually ornate, implicated wide legal issues, and was hard-fought from the start. To master the many challenges and overwhelmingly prevail, counsel reasonably logged the hours reflected.

Defendants make one substantial point warranting a meaningful reduction in plaintiffs' fee request. As they note, Focus, although overwhelmingly the victor, did not prevail on literally every point. In particular, defendants note, the parties agreed mid-litigation to stay plaintiffs' claim of infringement of one of Focus's patents—its design patent—in deference to the ongoing reexamination proceedings as to that patent, initiated by Kartri, by the United States Patent and Trademark Office ("USPTO"). Kartri Mem. at 14–15; *see* Trial Decision at 14, 55. Defendants note that the USPTO has since sided with Kartri in rejecting that patent. Kartri Mem. at 14. Defendants argue that dozens of time entries refer to the design patent and/or to Focus's expert witness Ronald Kemnitzer, whose sole role was to defend the design patent. *See* Dkts. 524-1 ¶ 4, 524-4. They ask that any fee award not include counsel's work on this claim. Kartri Mem. at 14. Focus rejoins that its infringement claim with respect to the design patent was intertwined with its claims of infringement of its other patents and trade dress, and that its infringement

claims overwhelmingly derived from common facts—namely, the visual similarities between the EZ-ON design patent and trademark—such that its counsels' workstreams bearing on the design patent were largely necessary for other claims. Focus Rep. at 17–18; *id.*, Ex. 5. It notes case law declining to reduce fee awards where a plaintiff pursued alternative and related legal grounds to the same end, as opposed to grounds distinct from those on which the plaintiff prevailed. *See id.* at 17–18 (citing *LeBlanc-Sternberg*, 143 F.3d at 762 (citing, *inter alia*, *Hensley*, 461 U.S. at 433–37)).

The Court's assessment, with defendants, is that a reduction in Focus's fee award is warranted to capture the work on the design patent infringement claim that would not have been undertaken had that claim not been brought. *See, e.g.*, *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 58 (S.D.N.Y. 2015) (reducing fees by 20% to reflect work that, but for Lanham Act claim that did not support a fee award, would not have been done); *Robinson v. City of New York*, No. 05 Civ. 9545 (GEL), 2009 WL 3109846, at *9–10 (S.D.N.Y. Sept. 29, 2009) (reducing fee award by 25% where plaintiffs achieved limited success in relation to relief originally sought). Even if targeting the same offensive product, plaintiffs' design patent claim sought to protect distinct underlying rights, through distinct legal theories, from its other claims. Neither its merits nor counsels' workstreams were inherently intertwined in whole—and they were separated where, as here, the design patent claim was stayed prior to summary judgment briefing and the bench trial. *See, e.g.*, Dkt. 323 at 6; Dkt. 241 at 28 (3/5/2019 conference transcript; Court excludes design patent claim from summary judgment briefing); *see Green v. Torres*, 361 F.3d 96, 99 (2d Cir. 2004) ("Although full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case.").

Beyond broadly stating that its legal work generally applied to multiple claims, Focus has not granularly analyzed its time entries to isolate—if even possible today—the work specific to its design patent claim. *See Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 133–34 (E.D.N.Y. 1998) (reducing fee by 50% where, *inter alia*, court could not discern which attorney hours were devoted to unsuccessful claims). The Court need not "become enmeshed in a meticulous analysis of every detailed facet of the professional representation" to determine the proper award. *Vogelmann v. Comm'r of Soc. Sec.*, No. 15 Civ. 8717 (PGG) (KNF), 2021 WL 6127077, at *2 (S.D.N.Y. Dec. 28, 2021) (internal quotation mark omitted) (quoting *Seigal v. Merrick*, 619 F.2d 160, 164 n.8 (2d Cir. 1980)). Nor should "[a] request for attorney's fees . . . result in a second major litigation." *Hensley*, 461 U.S. at 437. Accordingly, in light of this case's procedural history, facts, and the degree of plaintiffs' overall success, the Court has estimated the appropriate reduction in the fee award for this circumstance generously in defendants' favor. The Court will reduce the lodestar by 10%. This modest reduction, in the Court's assessment, still reflects the absolute maximum share of plaintiffs' counsels' work that could conceivably be uniquely attributable to the challenge to the design patent.[12] And, given the scale of the award plaintiffs will receive even after this reduction, their fee award reflects their overall success in this litigation. *See LeBlanc*, 143 F.3d at 760 ("The most important factor in determining a reasonable fee for a prevailing plaintiff is the degree of success obtained." (internal quotation marks omitted)).

---

[12] Focus has not sought reimbursement for Kemnitzer's work throughout the litigation, but rather for the attorneys' work in reviewing Kemnitzer's expert report and preparing him for trial. Had Focus sought such costs, they would have been struck. *See, e.g.*, *Valvo v. City of New York*, No. 13 Civ. 6562 (NG) (SMG), 2018 WL 3999011, at *6 (E.D.N.Y. Jan. 23, 2018) (plaintiff could not recover costs paid to expert economist for testimony that was relevant only to failed claim).

The Court, finally, has considered whether further reduction is warranted to assure that the fee award—while achieving the statutory goals of deterrence and compensation, but not excessively—accounts for the treble damages that the Court has imposed with respect to a significant portion of plaintiffs' successful claims under the Patent and Lanham Acts. As reflected in the trial decision, the Court has found treble damages warranted for defendants' infringement during the period after February 27, 2015. This adds $1,813,363 to the lost profits damages award, *see* Trial Decision at 160, and $100,742 to the complementary reasonable royalties award, *see id.* at 161. The trebling accounts for $1,914,105 of the overall award of $2,938,337.

Although defendants have curiously not pressed this argument, the Court's judgment is that the reasonable fee award is properly reduced in light of the large treble damages award that plaintiffs stand to receive. That is because the presence of the treble damages award bears on the extent to which a fee award is necessary to achieve the deterrent and compensation goals of the Patent Act and Lanham Act fee provisions. *See Octane*, 572 U.S. at 554 n.6.

As to deterrence, insofar as the Court has anchored its finding of an "exceptional case" here in part on the willfulness of defendants' infringements, defendants' willful conduct was also a basis of the Court's decision to treble damages. The large treble damages award itself can be expected to deter primary conduct by defendants or others who would willfully infringe patents or trademarks. *See, e.g., id.* (discussing deterrence purposes of enhanced damages under § 285); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 263 (2d Cir. 2014) (enhanced damages may be awarded under Lanham Act where "deterrence of willful infringement is needed"); *Streamlight, Inc. v. Gindi*, No. 18 Civ. 987 (NG), 2019 WL 6733022, at *14 (E.D.N.Y. Oct. 1, 2019) (same), *report and recommendation adopted*, 2019 WL 6726152 (E.D.N.Y. Dec. 11, 2019); *All-Star*

*Mktg. Grp., LLC v. Media Brands Co.*, 775 F. Supp. 2d 613, 622–23 (S.D.N.Y. 2011) (collecting cases); *Polo Ralph Lauren, L.P. v. 3M Trading Co.*, No. 97 Civ. 4824 (JSM) (MH), 1999 WL 33740332, at *6 (S.D.N.Y. Apr. 19, 1999) ("[A] fairly substantial financial award is appropriate, if for no other reason, to ensure adequate deterrence against the continuation of this conduct by these defendants."). Although a fee award separately is warranted to deter unreasonable litigation conduct such as that here, the Court is unpersuaded that an award of plaintiffs' entire legal fee is necessary to achieve that purpose. *See 4 Pillar Dynasty LLC*, 933 F.3d at 215 (district courts should consider, *inter alia*, need for deterrence in determining fee award); *Venus by Maria Tash, Inc.*, 2022 WL 4085747, at *6 (awarding fees, *inter alia*, to deter similarly willful conduct by defendants and other possible infringers); *Streamlight, Inc.*, 2019 WL 6733022, at *17 (same); *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 24 F. Supp. 3d 329, 336 (S.D.N.Y. 2014) (same, under Patent Act), *aff'd*, 811 F.3d 479 (Fed. Cir. 2016).

As to compensation, plaintiffs, if fully paid on the judgment including the treble damages, stand to receive an award that will more than compensate them for the combined total of compensatory damages and their legal fees, even before payment of a fee award. As such, the fee award need not be as high as would be warranted absent a treble damages award. *See Experience Hendrix, L.L.C.*, 2020 WL 3564485, at 17 (court should exclude hours from fee award if excessive, redundant, or otherwise unnecessary); *cf., e.g., Gurung v. Malhotra*, 851 F. Supp. 2d 583, 598 (S.D.N.Y. 2012) (reducing attorneys' fees by 25% where excessive); *Days Inn Worldwide, Inc. v. Amar Hotels, Inc.*, No. 05 Civ.10100 (KMW) (KNF), 2008 WL 2485407, at *10 (S.D.N.Y. June 18, 2008) (reducing fees by 75% where substantial amount of work redundant or unnecessary); *see also Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109 (2d Cir. 1988) (under Lanham Act, enhancement or reduction of damages award

permitted to correct inadequacy of excessiveness); *Merck Eprova AG*, 920 F. Supp. 2d at 428 (granting enhanced damages because proven damages would not fully compensate plaintiff, but not as high as the number requested because requested award would be excessive); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987) (across-the-board percentage cuts in hours are practical means of "trimming fat from a fee application").

After considered judgment, the Court's determination is that a further 30% reduction in the fee award best synchronizes the amount of the award to these purposes. The award as results thus will represent 60% of the requested award (less the $1,000 reduction made earlier). The fee award is thus $929,126.95—60% of $1,549,544.91, less $1,000. This sum is necessary, and sufficient, to achieve the goals of a fee award under § 285 of the Patent Act and § 1117(a) of the Lanham Act. *See Benihana of Tokyo, LLC*, 2018 WL 3574864, at *16 (awarding attorneys' fees in Lanham Act case, and determining size of fee award to be "merited," where plaintiffs—based on testimony of their then-attorney—"brought and pursued this case in bad faith with the admitted ulterior goal of driving up [defendant's] legal expenditures" (emphasis added)); *cf. Pirri v. Cheek*, No. 19 Civ. 180 (PAE), 2020 WL 2520593, at *12 (S.D.N.Y. May 18, 2020) (fee award under § 285 "serve[d] important purpose of deterring the bringing of lawsuits without foundation" (internal quotation marks omitted)), *aff'd*, 851 F. App'x 183 (Fed. Cir. 2021); *Beastie Boys*, 112 F. Supp. 3d at 59 (awarding fees in copyright infringement action as "sufficient, but not greater than necessary, to deter future would-be infringers"); *see also Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items.").

### 3. Amount of the Reasonable Cost Award

An award of costs normally includes those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged to fee-paying clients. *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987). Recoverable disbursements include such items as legal research, photocopying, postage, transportation, and filing fees. *See, e.g., Best Brands Consumer Prod., Inc.*, 2020 WL 8678085, at *11 (awarding filing fees, postage, local transportation costs, and FedEx costs); *Venus by Maria Tash, Inc.*, 2022 WL 4085747, at *8 (awarding costs for service, delivery other than for service, and research); *Malletier*, 687 F. Supp. 2d at 365 (awarding costs for photocopies, filing fees, court reporter fees, Westlaw research, postage, faxes, and transportation).

Routine costs are normally awarded to the prevailing party. The Court awards such here. *See, e.g., River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13 Civ. 3669 (DLC), 2015 WL 3916271, at *15 (S.D.N.Y. June 25, 2015); *Lumen View Tech., LLC*, 24 F. Supp. 3d at 337 (awarding costs under § 285); *Sub-Zero, Inc.*, 2014 WL 1303434, at *10 (awarding costs under Lanham Act); *Malletier*, 687 F. Supp. 2d at 365 (same); *Union of Orthodox Jewish Congregations of Am. v. Royal Food Distribs. Liab. Co.*, 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009) (same).

To the extent that defendants intend to challenge Focus's costs on a line-item basis, *see, e.g.*, Kartri Mem. at 19, the Clerk of the Court, and not this Court, must resolve those disputes in the first instance. Local Rule 54.1 provides:

> Within thirty (30) days after the entry of final judgment, or, in the case of an appeal by any party, within thirty (30) days after the final disposition of the appeal, unless this period is extended by the Court for good cause shown, any party seeking to recover costs shall file with the Clerk a notice of taxation of costs by Electronic Case Filing. . . . A party objecting to any cost item shall serve objections by Electronic Case Filing. . . . The Clerk will proceed to tax costs at the time scheduled and allow such items as are properly taxable.

Accordingly, Focus is directed to present a bill of costs to the Clerk within 30 days of the final disposition of defendants' appeal or, if no appeal is taken, within 30 days of the entry of final judgment by this Court. After the Clerk awards costs, the parties will have seven days to appeal that award to this Court. Fed. R. Civ. P. 54(1)(d). For the time being, the Court does not reach the merits of defendants' objections to the tabulation of costs presented by Focus. *See, e.g.*, *River Light V, L.P.*, 2015 WL 3916271, at *15; *Beastie Boys*, 112 F. Supp. 3d at 60–61.

### 4. Prejudgment Interest

Focus also moves for prejudgment interest, to be applied at the average yearly prime rates for the infringement period and compounded annually. Focus Mem. at 22–24. Neither Kartri, Kartri Mem. at 19, nor Marquis, Marquis Mem. at 5, disputes the award of prejudgment interest; Kartri solely argues, and anemically, that Focus has offered insufficient documentation to award a specific interest rate at this stage.

The Supreme Court has long recognized that "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). And the Second Circuit has affirmed the award of prejudgment interest in Lanham Act cases where, as here, the factual record readily supported findings of willfulness and bad faith. *See, e.g.*, *Merck Eprova AG*, 760 F.3d at 263–64 ("Although Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases."). The Court, accordingly, awards prejudgment interest here on plaintiffs' actual damages—that is, the damages before trebling—during the infringing period. *See Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020) (typically, "prejudgment interest should be awarded from the date of the infringement to the date of the judgment" (alterations

omitted)); *Beatrice Foods Co. v. New Eng. Printing & Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991) (under § 284, prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced damage portion of a damage award); *Acticon Techs. v. Heisei Elecs. Co.*, No. 06 Civ. 4316 (KMK), 2008 WL 356872, at *4 (S.D.N.Y. Feb. 5, 2008) (same).

However, the Court declines to award prejudgment interest at the prime rate Focus requests. It instead bases the interest rate on the yield of a one-year U.S. Treasury bill, compounded annually. Where a court awards prejudgment interest, "it is within the trial court's discretion to choose what rate to apply." *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, No. 14 Civ. 6911 (VEC) (JLC), 2016 WL 658310, at *11 (S.D.N.Y. Feb. 17, 2016) (citation omitted), *report and recommendation adopted*, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016). In reaching this determination, the Court is guided by the principal purposes of prejudgment interest, in both patent and trademark infringement contexts, of "mak[ing] the patent owner whole, for damages properly include the foregone use of money of which the patentee was wrongly deprived." *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 634 (E.D.N.Y. 2020); *see also 4 Pillar Dynasty LLC*, 933 F.3d at 216 n.12 (courts exercising discretion as to prejudgment interest may consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court"). Particularly when considered alongside the trebled damages already imposed, the Treasury bill rate adequately compensates Focus. *See, e.g.*, *Samsonite IP Holdings S.ar.l. v. Shenzhen Liangyiyou E-Com. Co.*, No. 19 Civ. 02564 (PGG) (DF), 2021 WL 9036273, at *18 (S.D.N.Y. Apr. 27, 2021) (awarding prejudgment

interest at the Treasury yield, the lower of the two rates at issue, where plaintiffs had not demonstrated justification for the higher); *Metso Mins., Inc. v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 344 (E.D.N.Y. 2011) (same); *cf. Abbott Lab'ys*, 2022 WL 17977495, at *12 (awarding lower of proposed prejudgment interest rates where damages had already been doubled under Lanham Act).

Notably, Focus has not offered evidence that it borrowed money during the infringement period, such that the higher prime rate—which is approximately double the U.S. Treasury rate during the applicable years, *see* Focus Mem. at 23 nn.45–46—might be appropriate. *See, e.g.*, *Enzo Biochem, Inc. v. Applera Corp.*, No. 04 Civ. 929 (JBA), 2014 WL 29126, at *4 (D. Conn. Jan. 3, 2014) (declining to adopt prime interest rate where plaintiff had not provided evidence that use of the higher prime rate was necessary to compensate it adequately); *Tomita Tech. USA, LLC v. Nintendo Co., Ltd.*, No. 11 Civ 4256 (JSR), 2013 WL 4101251, at *10 (S.D.N.Y. Aug. 14, 2013) ("Because Tomita fails to suggest that it borrowed money during the infringement period and therefore should be compensated at the higher prime rate, the Court hereby awards prejudgment interest at the Treasury Bill rate."); *see also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996) ("Prejudgment interest has no punitive, but only compensatory, purposes. Interest compensates the patent owner for the use of its money between the date of injury and the date of judgment.").

### 5. Post-Judgment Interest

Focus also requests an award of post-judgment interest under 28 U.S.C. § 1961(a). Focus Mem. at 24. Section 1961 provides for interest on "any money judgment in a civil case recovered in a district court" to be calculated "from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week

preceding the date of the judgment," "computed daily to the date of payment," and "compounded annually." 28 U.S.C. §§ 1961(a)–(b).

Accordingly, the Court awards post-judgment interest at the statutory rate. *See, e.g.*, *Venus by Maria Tash, Inc.*, 2022 WL 4085747, at *9 (awarding post-judgment interest in Lanham Act action); *WowWee Grp. Ltd. v. Haoqin*, No. 17 Civ. 9893 (WHP), 2019 WL 1316106, at *4 (S.D.N.Y. Mar. 22, 2019) (same); *Bumble & Bumble, LLC*, 2016 WL 658310, at *12 (same); *Rentrop v. Spectranetics Corp.*, 514 F. Supp. 2d 497, 507 (S.D.N.Y. 2007) (same, as to Patent Act), *aff'd*, 550 F.3d 1112 (Fed. Cir. 2008).

## CONCLUSION

For the foregoing reasons, the Court grants $929,126.95 in attorneys' fees, as well as costs and pre- and post-judgment interest. The Court orders plaintiffs to file, upon issuance of a final judgment, a letter calculating the pre- and post-judgment interest as outlined above. Plaintiffs are also ordered to file a bill of costs, as directed by Local Rule 54.1, with the Clerk of the Court.

The Clerk of the Court is respectfully directed to terminate the motion pending at docket 505. The Court also directs the Clerk of Court to enter judgment in the amounts of $2,938,337 in damages and $929,126.95 in attorneys' fees, as well as costs and pre- and post-judgment interest.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 5, 2023
 New York, New York