UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, ZAHNER DESIGN GROUP, LTD., HOOKLESS SYSTEMS OF NORTH AMERICA, INC., SURE FIT HOME PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS CORP., *and* SF HOME DÉCOR, LLC,

Plaintiffs,

-v-

KARTRI SALES COMPANY, INC., *and* MARQUIS MILLS, INTERNATIONAL, INC.,

Defendants.

15 Civ. 10154 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case, on remand from the Federal Circuit, concerns shower curtains that attach to curtain rods using embedded rings rather than hooks. The plaintiff companies (collectively, "Focus") manufacture, sell, and distribute such curtains under the trademark HOOKLESS®. Defendant Marquis Mills, International, Inc. ("Marquis") manufactured and supplied competing curtains, which defendant Kartri Sales Company, Inc. ("Kartri") then sold under the name "EZY HANG." Focus alleges that Marquis and Kartri have infringed its patents and unregistered trade dress, and that Kartri has additionally infringed its registered trademark.

The Court today has issued a decision resolving open issues involving Focus's patent claims. This decision addresses open issues concerning Focus's trade dress and trademark claims, specifically: whether Focus's claimed trade dress is functional; whether Kartri infringed the HOOKLESS® mark in violation of federal law and New York common law; and, to the extent infringement is found as to either the dress or mark, whether such was willful. *See Focus*

*Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1284–85 (Fed. Cir. 2025) ("*Focus Fed. Cir. Dec.*").

For the following reasons, the Court finds that Focus's claimed trade dress is functional and therefore unprotectable. The Court further finds, based on a mark-to-mark comparison and a reconsideration of the factors set out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), that Kartri did not infringe Focus's HOOKLESS® mark. Because defendants infringed neither the trade dress nor the mark, they cannot be liable for the willful infringement of either.

## I. Background[1]

The Court assumes familiarity with this case, as set out in detail in its prior decisions. *See, e.g.*, *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 454 F. Supp. 3d 229, 236–39 (S.D.N.Y. 2020) ("*Focus I*"); *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 169–94 (S.D.N.Y. 2022) ("*Focus II*"). The background information here is limited to that relevant to the open issues concerning Focus's asserted trade dress and mark.

### A. HOOKLESS® Mark and Trade Dress

Focus sold its shower curtains under the HOOKLESS® trademark. The HOOKLESS® mark has been federally registered with the U.S. Patent and Trademark Office ("PTO") under U.S. Registration Nos. 2,355,554, 2,381,995, and 4,127,283. *Focus Fed. Cir. Dec.*, 156 F.4th at 1269.

[1] This factual account is drawn from the evidence adduced at trial and on summary judgment, as helpfully summarized in plaintiffs' opening brief on remand regarding trade dress and trademark issues, Dkt. 577 ("Ps' Opening Br."), defendants' opposition, Dkt. 582 ("Opp'n"), and plaintiffs' reply, Dkt. 584 ("Reply"). Where important, the Court cites to underlying documents and the trial record. For exhibits and briefs with both internal and Bates-stamped numbering, the Court cites the Bates-stamped page numbers.

Focus also asserted common law trademark rights in the unregistered "EZ ON" mark, which Focus alleges has been used on shower curtains sold throughout the United States. *Id.* Although the EZ ON mark was not registered when Focus first filed its complaint against Kartri and Marquis, on September 26, 2017, Focus registered it with the PTO under U.S. Registration No. 5,296,144. *Id.*; *Focus II*, 647 F. Supp. 3d at 204–05. In addition to the HOOKLESS® and EZ ON marks, Focus asserted unregistered trade dress rights (the "Trade Dress") in the overall appearance of HOOKLESS® shower curtains. As described by Focus, these shower curtains lack hooks protruding above the upper edge of the curtain. *Focus II*, 647 F. Supp. 3d at 207–08. Instead, they bear a row of rings along the upper portion of the curtain, which are coplanar with the curtain's material. *Id.* Taken together, they create an "organized and symmetrical repeating visual pattern along the top width of the shower curtain." *Id.* The effect of this combination and arrangement of design elements, Focus alleges, is to give the "visual appearance of an essentially 'neat' and 'orderly'" shower curtain. *Id.*

Focus circumscribes its claimed Trade Dress as outlined below:

> (1) a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;
>
> (2) and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;
>
> (3) wherein each ring includes a slit or gap in the ring;
>
> (4) and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

*Focus II*, 647 F. Supp. 3d at 207–08; Dkt. 148 ¶ 104.

### B. Procedural History

#### 1. Initial Litigation

On December 30, 2015, Focus filed suit against Kartri. Dkt. 1. On March 1, 2016, Focus amended to add Marquis as a defendant. Dkt. 20. On September 29, 2017, Focus filed its fourth amended complaint, the operative complaint in this action. Dkt. 148.

As relevant here, Focus alleged that defendants violated the Lanham Act, 15 U.S.C. § 1125(a), and New York unfair competition law in three ways. *Id.* ¶¶ 166–175. First, Focus alleged that Kartri infringed Focus's HOOKLESS® mark by "[using] the mark HOOKLESS when referring to Defendants' accused shower curtain products" to "represent to buyers that it sells a HOOKLESS® product." *Id.* ¶ 91. Second, Focus alleged that both defendants infringed its EZ ON mark by "using a trademark which is confusingly similar to" EZ ON: EZY HANG. *Id.* ¶ 169. Third, Focus alleged that both defendants' accused products infringed Focus's "trade dress rights," which it defines as "rights to the characteristics of the visual appearance of [Focus's] HOOKLESS® brand shower curtain products." *Id.* ¶¶ 102, 132.

Based on the same factual allegations, Focus also asserted an unfair competition claim under New York common law. *Id.* ¶¶ 176–188. And it sought enhanced damages in view of the alleged "willful nature" of the offense. *Id.* ¶ 192.

Discovery then ensued, after which both parties moved for summary judgment. Dkt. 230.

#### 2. Focus I *and Motion for Reconsideration*

On April 16, 2020, the Court resolved the parties' cross-motions for summary judgment brought as to some claims. Dkt. 297.

Focus's HOOKLESS® mark claim, on which Focus did not seek summary judgment, proceeded to trial. *Focus I*, 454 F. Supp. 3d at 238 n.3, 253. Marquis counterclaimed that the HOOKLESS® mark was "invalid" because it had "become generic." *Id.* at 246. But the Court

dismissed Marquis's counterclaim for lack of standing, because Focus did "not accuse[] Marquis of infringing the HOOKLESS® mark." *Id.* And Kartri, "the sole defendant that Focus has accused of infringement" of the HOOKLESS® mark, "waived the affirmative defense of genericness": It "neither asserted the alleged invalidity of the HOOKLESS® mark—on any basis—as an affirmative defense nor included it as a counterclaim." *Id.*

The EZ ON claim also proceeded to trial. *Id.* at 248. The Court rejected Marquis's argument that "defendants cannot be found to have infringed the EZ ON mark as a matter of law because Focus does not own the mark and therefore lacks standing to bring this claim." *Id.* at 248.

As to the trade dress claim, the Court found that Focus had recited in detail the "geometric and aesthetic characteristics" of the Trade Dress in a "sufficiently precise" manner. *Id.* at 249. But the Court found that the Trade Dress was ineligible for protection because it was generic—*i.e.*, it "refer[red] to the genus of which the particular product is a species." *Id.* at 250 (citations omitted).

On May 14, 2020, Focus sought reconsideration of the Court's decision on the trade dress claim. Dkt. 303. Focus argued that defendants had not raised the defense of genericism, and that reconsideration would permit it to be heard as to that point. Dkt. 303 at 10–11. On January 4, 2021, the Court granted reconsideration. Dkt. 312 at 17. It found that Focus had "adduced sufficient evidence on which a finder of fact could find" that its claimed trade dress was not generic. *Id.* at 11. The Court also found that the trade dress was "[n]onfunctional"—thus eligible for protection—in part because Focus has "demonstrated the availability of alternative designs" to its shower curtains. *Id.* at 7. The Court accordingly reserved resolution of the trade dress claim for trial. *Id.* at 17.

The parties did not seek summary judgment on the common law unfair competition claim. That claim also proceeded to trial. *Focus I*, 454 F. Supp. 3d at 238 n.3.

### 3. *Focus II*

On December 22, 2022, after a six-day bench trial, the Court found that Kartri had infringed the HOOKLESS® mark, that both defendants had infringed the trade dress, and that the infringements in violation of both the Lanham Act and New York common law had been willful. *Focus II*, 647 F. Supp. 3d at 271.

As to the HOOKLESS® and EZ ON marks, the Court found them valid and owned by Focus. *Id*. at 203. It then found that Focus had shown the requisite likelihood of confusion as to each. *Id*. at 208–28. Accordingly, the Court found that Kartri infringed the HOOKLESS® mark and that both defendants infringed the EZ ON mark. *Id*. at 271.

As to the trade dress, the Court found that it was not generic. *Id*. at 208. The Court also found that trial "reinforced" its earlier holding that the trade dress is nonfunctional, "as the evidence revealed various alternative designs" to Focus's. *Id*. at 209. And the Court found that the trade dress was "drawn in clear and specific detail":

> It specifies that the affixture of the shower curtain to the rod is to be by rings, not hooks (or buckles, clasps, or any other means of affixing). Those rings are to be integrated into the shower curtain so as to be co-planar with it (not perpendicular or at any other angle relative to the fabric). The rings are not to protrude above the curtain's upper edge. The rings are to contain slits that are fixed in place that allow the user to snap the curtain onto the rod—either ring by ring where the slit connects to the curtain's upper edge, or in pairs of rings where the slit horizontally connects two rings and travels through the curtain's fabric. The resulting appearance of the curtain's surface billowing back and forth across the curtain rod makes the appearance "neat and orderly."
>
> This level of specificity goes well beyond proposed trade dress descriptions that have been held unprotectible and generic—for example, "the 'theme' of skeletons engaging in sexual activities . . . used in [a] t-shirt design," *Jeffrey Milstein*, 58 F.3d at 32 (citation omitted), a "'generalized concept' of grotesque figures in toys," *id.*, or a combination of the words "sports" and "traveler" in a certain spatial arrangement, in a certain font, and enhanced by a model, *Sports Traveler, Inc. v.*

> *Advance Mag. Pub's, Inc.*, 25 F. Supp. 2d 154, 162–63 (S.D.N.Y. 1998); *see also Laurel Rd. Bank v. CommonBond, Inc.*, No. 18 Civ. 7797 (ER), 2019 WL 1034188, at *5 (S.D.N.Y. Mar. 5, 2019) (trade dress for advertisements generic where trade dress was described as "[1] a color palette with a dark background; [2] a statement in large, light-colored, sans serif font at the top of the advertisement; [3] a 'hierarchal' typography with smaller, sans serif font under the large typeface sentences; [4] center or left-side alignment; and [5] a colored line under a subset of words in the large typeface sentences" (brackets in original) (footnotes omitted)); *ID7D Co. v. Sears Holding Corp.*, No. 11 Civ. 1054 (VLB), 2012 WL 1247329, at *10 (D. Conn. Apr. 13, 2012) (trade dress for portable grill generic where plaintiff described it as "shiny exterior comprised of a rounded trapezoidal shaped lid on top, with a plastic handle and a rounded trapezoidal base pan at the bottom[, with t]he entire grilling unit [being] secured on top of four wire chrome legs with curved feet"). Plaintiffs' Trade Dress also does not capture a mere idea, but a concrete expression of it. *Cf., e.g.*, *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir. 1989) (trade dress protectable where it consisted of "beige, single-face (no fold) cards containing sentimental verses and frequently using ellipses written in Roulo's handwriting with brown ink"; "[f]lanking the messages on the left and right borders [were] a series of four stripes, two silver-foil stripes, enveloping one brown and one colored stripe in the middle"), *cert. denied*, 493 U.S. 1075 (1990).

*Id*. at 208. Accordingly, the Court found that both defendants had infringed Focus's trade dress. *Id*. at 271. And, citing evidence of defendants' past conduct, the Court found that they had "acted willfully, deliberately, and in bad faith" when infringing Focus's trade dress. *Id*. at 264.

Finally, the Court observed that "[t]he elements of an unfair competition claim under New York common law 'mirror' those of Lanham Act claims for trademark or trade dress infringement," except the "proponent of such a claim 'must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [defendant]'s bad faith.'" *Id*. at 228 (citations omitted). Accordingly, the Court held that "[t]he [Lanham-Act] findings . . . resolve[d]" the common law claim in Focus's favor. *Id*. at 229.

Defendants appealed. Dkt. 508.

### 4. Federal Circuit Decision

On September 30, 2025, the Federal Circuit affirmed in part, reversed in part, vacated in part, and remanded the case for further proceedings. *Focus Fed. Cir. Dec.*, 156 F.4th at 1284–85. Relevant here:

As to the HOOKLESS® mark claim, the Circuit vacated the infringement finding on the ground that the Court had erroneously compared the similarity of the parties' products rather than the similarity of their uses of the marks. *Id*. at 1281.

As to the EZ ON mark claim, the Circuit found that Focus did not meet its burden to establish standing to sue defendants, and, accordingly, reversed the Court's determination as to it. *Id*. at 1283–84.

As to the trade dress claim, the Circuit held that the Court's functionality analysis had failed to apply *TrafFix Devices, Inc. v. Marketing Displays, Inc*., 532 U.S. 23 (2001), which requires comparison of the trade dress's claimed features with those claimed in an expired utility patent—here, Focus's '232 patent. The Circuit observed that "the expired '232 patent, for example, could be read to claim the features of the trade dress in question," *id*. at 1285 n.16, and remanded for the Court to conduct that comparison in the first instance. It found:

> The district court's functionality determination, however, ignored *TrafFix*'s instruction to compare whether "the expired patent claim[s] the features [of the trade dress] in question." 532 U.S. at 30. Indeed, the district court readily accepted the plaintiffs' contention that the trade dress created a "neat and orderly" shower curtain, without comparing the elements of the claimed trade dress to the utility patent claims. *See* J.A. 124–126; *Bench Trial Order*, 647 F. Supp. 3d at 203–04, 206–09. This renders the district court's analysis incomplete regarding whether Focus met its burden of showing that its unregistered trade dress is not functional. *See* 15 U.S.C. § 1125(a)(3).

*Id*.

Finally, the Circuit vacated all findings of willfulness as to both the trade dress and the HOOKLESS® mark claims in light of its concomitant infringement vacaturs. *Id*. at 1287–88.

The Circuit separately noted that willfulness as to the Trade Dress could not rest on Focus's pre-suit cease-and-desist letter that asserted only patent rights, since defendants were not placed on notice of any trade dress claim until, at the earliest, March 2016—the date of the second amended complaint. *Id*. at 1287.

### 5. Proceedings on Remand

On January 23, 2026, the Court set a briefing schedule and directed the parties to confer to set out a "numbered list of the claims brought in the case." Dkt. 566 at 2. The parties did so. Dkts. 567–69.

On April 3, 2026, the Court set a briefing schedule for the open issues on remand relating to the trade dress and trademark claims, identified as Issue 19 (functionality of the trade dress), Issue 23 (infringement of the HOOKLESS® mark under federal law, as to Kartri only), Issue 26 (unfair competition as to the HOOKLESS® mark under New York law, as to Kartri only), Issue 32 (willfulness of any trade dress infringement, if found), and Issue 33 (willfulness of any HOOKLESS® infringement, if found, as to Kartri only). Dkt. 571.

On May 7, 2026, Focus filed its opening brief. Dkt. 577 ("Ps' Opening Br."). On May 21, 2026, defendants opposed, arguing that the Trade Dress is functional under *TrafFix*, that Kartri's use of "hookless" was merely descriptive, and that any infringement could not have been willful. Dkt. 582 ("Opp'n"). On May 29, 2026, Focus replied. Dkt. 584 ("Reply"). Focus argued that the trade dress is nonfunctional under *TrafFix*, that Kartri's use of "hookless" supports infringement and is not protected by fair use, and that the record establishes willfulness notwithstanding defendants' challenges to the trade dress's validity and scope.

## II. Applicable Legal Standard

For trademark and trade dress infringement claims, the "plaintiff bears the burden of proving each of the[] [claim's] elements by a preponderance of the evidence." *Hamilton Int'l*

*Ltd. v. Vortic LLC*, 486 F. Supp. 3d 657, 661 (S.D.N.Y. 2020), *aff'd*, 13 F.4th 264 (2d Cir. 2021). "The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) (collecting cases).

In a bench trial, as here, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). And "as trier of fact," the district court is "entitled, just as a jury would be," to "believe some parts and disbelieve other parts of the testimony of any given witness." *Id.* (collecting cases).

## III. Discussion

After years of litigation, the Court is left with discrete issues that remain unresolved following the Federal Circuit's September 30, 2025 decision. *See* Dkts. 567–69. This decision takes up the unresolved issues involving trade dress and trademark infringement. Dkt. 571 at 1.

The parties identified, and the Court commissioned briefing as to, three sets of such open issues. First, as to the functionality of the Trade Dress, the Circuit directed the Court to revisit its nonfunctionality analysis in light of the expired '232 patent. Second, as to the HOOKLESS® mark, the Circuit directed the Court to conduct a more thorough mark-to-mark comparison between the HOOKLESS® mark and Kartri's EZY HANG mark as branded on the parties' respective products. It directed the Court to consider whether Kartri's occasional use of the term "hookless" was itself a confusingly similar mark—an inquiry the Court had not conducted—and the scope of any resulting unfair competition liability under New York law. Third, to the extent infringement was found as to the Trade Dress and the HOOKLESS® mark, the Circuit directed the Court to determine whether such infringement was willful.

### A. Trade Dress Functionality

#### 1. Governing Principles

Sections 2 and 43(a) of the Lanham Act have been construed to protect not just source-identifying word marks, but also "trade dress"—that is, the "design or configuration of the product itself." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001). Because trade dress protection for an "ordinary" product design risks conferring an "unwarranted monopoly," a plaintiff asserting unregistered trade dress rights in a product design must clear several threshold hurdles. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997). It must prove that the trade dress (1) "is distinctive as to the source of the good"; (2) "is 'not functional'"; and (3) "there is a likelihood of confusion between its good and the defendant's." *Yurman*, 262 F.3d at 115–16 (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000); Trademark Amendments Act of 1999, Pub. L. 106-43, § 5 (1999) (codified at 15 U.S.C. § 1125(a)(3))).

"[I]n general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32 (cleaned up); *accord Yurman*, 262 F.3d at 116. The party claiming trade dress protection bears the burden of demonstrating that a trade dress is nonfunctional. 15 U.S.C. § 1125(a)(3).

"When considering the functionality of a trade dress," courts must assess a range of factors, including "the degree of usefulness of the similar features on the competing dress, the degree of similarity between the non-useful, ornamental features of the packaging, and the feasibility of alternatives to the useful features." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997). "A functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix*,

532 U.S. at 32 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). That said, in cases involving traditional "utilitarian" functionality, rather than "esthetic" functionality, "there is no need" to consider whether there is a "competitive necessity" for the asserted feature. *Id*. at 33.

Salient here, an expired *utility* patent has "vital significance" in resolving a trade dress claim: Such a patent is "strong evidence that the features therein claimed are functional." *Id*. at 29. "Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id*. at 30. In contrast to a utility patent, whose existence "is strong evidence that the features therein claimed [as trade dress] are functional, a *design* patent can be presumptive evidence of non-functionality." *E-Z Bowz, LLC v. Pro. Prod. Rsch. Co*., No. 00 Civ. 8670, 2003 WL 22068573, at *20 (S.D.N.Y. Sep. 5, 2003) (emphasis added) (citation omitted).

**2. Application**

In vacating this Court's holding of trade dress infringement, the Federal Circuit directed the Court on remand to apply the framework set forth in *TrafFix*—*i.e.*, to compare the features of Focus's claimed trade dress against the claims of its expired utility patent to assess whether the trade dress is nonfunctional and, therefore, eligible for protection. *Focus Fed. Cir. Dec.*, 156 F.4th at 1284–85.

Here, the principal "expired utility patent" is U.S. Patent No. 5,186,232 (the "'232 patent"), which Focus obtained in 1993 and which expired in 2013. *Id*. at 1284 & n.14. That patent covered grommet curtains that did not require threading to attach to a rod, attaching instead using horizontal slits between pairs of rings on the curtain. Ps' Opening Br., Ex. 2 ("'232 Patent"). Its claim was directed to accessories "adapted for being detachably mounted onto a

rod-like member" with a mounting means "comprising two openings defined in said material and communicating with each other." *Id.* at 4. The "background" section previewing the patent identified that the invention responded to a market need for curtains with a mounting mechanism that has "some aesthetic appeal." *Id.* at 3.

Focus does not argue that the '232 patent is a design patent that could support a finding of nonfunctionality. It concedes that the expired patent was directed to "*functional* aspects." Ps' Opening Br. at 13 (emphasis added). But, pointing to Patent No. D746,078—a PTO–issued design patent that "list[ed]" the '232 patent among its cited references—Focus contends that the '232 patent could still support a finding of nonfunctionality because it is *related to* a "design patent." Ps' Opening Br. at 13–14 & Ex. 8 at 1. Focus, however, does not cite any case law holding that a utility patent supports a finding of nonfunctionality merely because it is cited as a reference in a design patent. *See id.*

Next, Focus principally contends that the '232 patent cannot be used to defeat a finding of the Trade Dress's nonfunctionality because the Trade Dress covers "ornamentation" distinct from the patent. Ps' Opening Br. at 6–7. To this end, Focus argues that a party can plausibly infringe the Trade Dress without infringing the '232 patent. *Id.* at 9–10. Defendants respond that the '232 patent and its predecessor patents include features of the four elements of Focus's asserted trade dress. Opp'n at 9–11. They assert that Focus's "ornamentation" arguments are unsupported by the record of the '232 patent itself. *Id.* at 11.

The Court begins by comparing the features of the Trade Dress—the "neat and orderly" appearance, coplanar integrated rings, rings containing fixed slits or gaps, and symmetric pattern—with the claims of the expired '232 patent. *See Focus Fed. Cir. Dec.*, 156 F.4th at 1285 n.16. Of the '232 patent's 20 claims, three independent claims (claims 1, 10, and 14) and one

dependent claim (claim 20, which depends (via claim 19) from claim 14) are germane to this analysis.[2]

---

[2] Claim 1 covers:

> An accessory adapted for being detachably mounted onto a rod-like member, said accessory comprising a flexible sheet of material having an end portion and mounting means integral with said material near the end portion both for mounting onto and detaching from said rod-like member without the necessity of threading said accessory onto and off said rod-like member, said mounting means comprising two openings defined in said material and communicating with each other.

'232 Patent at 4. Claim 10 covers:

> An accessory adapted for being detachably mounted onto first and second rod-like members, said accessory comprising a flexible sheet of material having first and second opposing end portions, first mounting means integral with said material near the first end portion for mounting onto and for detaching from said first rod-like member without the necessity of threading said accessory onto and off said first rod-like member, said first mounting means comprising first and second openings defined in said material and communicating with each other, second mounting means integral with said material near said second end portion for mounting onto and for detaching from second rod-like member, said second mounting means comprising third and fourth openings defined in said material and communicating with each other.

*Id*. at 5. Claim 14 covers:

> An accessory adapted for being detachably mounted onto a rod-like member, said accessory comprising a flexible sheet of material selected from the group consisting [of] plastic, woven fabric, unwoven fabric, water resistant paper and metal, said material having an end portion and mounting means integral with said material near the end portion both for mounting onto and detaching from said rod-like member without the necessity of threading said accessory onto and off said rod-like member, said mounting means comprising two openings defined in said material and communicating with each other.

*Id*. Claim 20, which depends from Claim 19, which in turn depends from Claim 14, covers:

> The accessory as claimed in claim 19, wherein said reinforcing means comprises a resilient material which can be deformed to enable said accessory to be mounted onto and detached from said rod-like member *while maintaining the shape of the defined openings* sufficiently to *retain said accessory on said rod-like member*

Focus's asserted trade dress and the expired '232 patent substantially overlap as to at least Claims 14 and 20. These claims parallel the Trade Dress element wherein "each ring includes a slit or gap." *Focus II*, 647 F. Supp. 3d at 207–08. Claim 14, for example, describes that the mounting means does not necessitate "threading said accessory" onto and off a rod by means of "two openings defined in said material." '232 Patent at 5. This reflects a partial match to the "slit or gap" requirement because the necessary elements to generate this effect entail a slit connecting two rings, although the claim language itself does not use the term "ring." Claim 20, moreover, depends on Claim 19's "reinforcing means," a "resilient material which can be deformed . . . while maintaining the shape of the defined openings"—precisely describing a ring with a small flexible gap as identified in the Trade Dress. *Id.* Claim 20 also describes a manner in which the accessory on a rod-like member is moved so as to "draw" openings together and "move" them further apart, which could produce a coplanar visual result. *Id.* This substantially reflects Trade Dress element 2, which identifies rings that are essentially co-planar but that serve to provide a "neat" and "orderly" appearance.[3]

To be sure, the Court must ultimately assess whether "the particular combination and arrangement of design elements," rather than the individual elements, is functional. *Laurel Rd. Bank v. CommonBond, Inc.*, No. 18 Civ. 7797, 2019 WL 1034188, at *7 (S.D.N.Y. Mar. 5, 2019) (internal quotation marks omitted). But when confronted with the "assemblance of functional

---

> *when said accessory is moved on said rod-like member to draw said openings closer together and move them further apart from each other.*

*Id.* (emphasis added).

[3] This finding accords with the Federal Circuit's observation, citing Claim 20, that the claim "could be read to claim the features of the trade dress in question." *Focus Fed. Cir. Dec.*, 156 F.4th at 1285 n.16.

parts," it can be "semantic trickery" to say there is some sort of separate "overall appearance" which is non-functional. *Car-Freshner Corp. v. D & J Distrib. & Mfg., Inc.*, No. 14 Civ. 391, 2015 WL 3385683, at *5 (S.D.N.Y. May 26, 2015). Here, although the '232 patent discloses only some (two of the four) elements of the asserted Trade Dress, the patent as a whole squarely encompasses the hook-free curtain configuration, supporting its functionality. And the '232 patent's specifications and the Trade Dress's prosecution history support finding the Trade Dress functional. The '232 patent described these features in overtly functional terms:

> Accordingly, it can be seen that a need exists for a simple and effective accessory for attaching a curtain or the like to a rod while maintaining an aesthetic appearance. The present invention overcome the difficulty in the prior art of easily attaching a curtain or the like to a rod without the necessity of threading the rod or the use of support clips while *maintaining an attractive appearance* to the mounted curtain.

'232 Patent at 3 (emphasis added).

That description, presented in the patent's Background of Invention section, identified both "aesthetic and practical reasons" as animating the patent. *Id.* It described how the patent's aesthetics were fundamentally intertwined with the functional purpose. As the Background section noted, "curtains . . . are also used to beautify homes," and the visibility of "clips" after a shower curtain has been mounted had generated "a market" for "clips which have some aesthetic appeal to compensate for the necessity have having exposed clips." *Id.* Accordingly, it is unpersuasive to construe the Trade Dress as directed solely to ornamentation, given the account in the '232 patent itself as the functional purposes of the features shared with the trade dress. *Id.*

The PTO's examination of Focus's trade dress application reinforces this conclusion. When Focus attempted to register its trade dress, the examining attorney rejected its application as functional, finding that the '232 patent "claims the design features at issue." U.S. Trademark Application Serial No. 98/114,472, Apr. 8, 2024 Non-Final Action (filed Aug. 2, 2023). Focus responded to this rejection by citing to the district court's findings at issue here and requested a

suspension of its application. *See id.* at Oct. 8, 2024 Response to Office Action. The examiner noted Focus's response, maintained its functionality rejection, and suspended the application pending the outcome of this litigation. *Id.* at Oct. 22, 2024 Suspension Notice.

Because the '232 patent claims features of the Trade Dress, Focus faces a "heavy burden" to show that these overlapping elements are merely "ornamental, incidental, or arbitrary" so as to render the Trade Dress protectible. *TrafFix*, 532 U.S. at 30; *see also Metrokane, Inc. v. Wine Enthusiast*, 160 F. Supp. 2d 633, 638–39 (S.D.N.Y. 2001) (similar). Focus makes several arguments on this point, but it has not carried that burden here.

First, Focus argues that the Trade Dress's elements are directed to "ornamental" aspects—for example, that the upper edge be "neat" and "orderly" and that the curtain provide an "organized and symmetrical repeating visual pattern." Ps' Opening Br. at 12–13. But those aspects are directly implicated in the '232 patent, which was aimed at "draw[ing]" openings closer together while "maintaining the shape" of certain defined openings. '232 Patent at 2. In a similar vein, Focus notes the Trade Dress's "non-protrusion feature," which Focus says is not explicitly "required by any claims of the '232 patent." Ps' Opening Br. at 13–14. But Focus elides that such feature is part and parcel of the curtain's overall aesthetic appearance—an animating force expressly reflected in the '232 patent, which described curtains as serving to "beautify homes as well as offices" and specifically addressed how they are mounted "onto" a rod. '232 Patent at 3.

Second, Focus argues that defendants waived their '232 patent functionality position by failing to present arguments regarding the expired patents in their motion for summary judgment. Ps' Opening Br. at 21. Not so. Defendants made arguments based on the '232 patent in opposing Focus's motion for summary judgment. *See, e.g.*, Dkt. 288 at 12 ("Plaintiffs would

have their alleged trade dress continue the monopoly they once enjoyed based on their now-expired ’232 patent. Trade dress is not meant to be a vehicle to extend the patent owner's exclusive right after the patent has expired.”). And courts routinely “consider[] arguments not raised in [a party’s] motion for summary judgment but raised in [its] opposition to [a] cross-motion for summary judgment.” *Krasniqi v. Dibbins*, 558 F. Supp. 3d 168, 188 n.12 (D.N.J. 2021) (collecting cases). Moreover, the absence of thorough briefing as to its Trade Dress was among the grounds Focus cited in moving for reconsideration, in response to which the Court permitted supplemental briefing. Dkt. 303 at 17–19; Dkt. 304. And defendants’ opposition to Focus’s motion for reconsideration affirmatively invoked the ’232 Patent and noted that it had been cited in defendants’ submissions on the cross-motions for summary judgment. *See, e.g.*, Dkt. 305 (“evidence of record . . . including [p]laintiffs’ expired utility patent 5,186,232 that concerned [p]laintiffs’ major shower curtain product”).

Finally, Focus argues that defendants are bound by this Court’s prior finding that the functional purpose of a shower curtain is “protecting privacy and preventing water from spraying outside the shower area.” Ps’ Opening Br. at 13 (citing Dkt. 312 at 7).[4] Plaintiffs contend that this “holding” was not disturbed on appeal. *Id.* That is wrong. The Circuit expressly cited the Court’s conclusion as to functionality—that “the functional purposes of a shower curtain: protecting privacy and preventing water from spraying outside the shower area”—before casting doubt on the Court’s mode of reasoning, observing that the Court had “ignored” *TrafFix*’s

---

[4] The Court held that plaintiffs had demonstrated the availability of alternative designs to theirs, thus showing that protection of their hookless trade dress would not bar competitors from using hooked curtains, or all possible alternative hook-free designs. *See, e.g.*, Dkt. 243 (“Pl. MSJ”), Ex. 22 ¶ 69 (“[A]lternative designs, such as one involving hooks, could certainly perform the same functions”). Defendants, the Court held, had not shown “there is no alternative design that could perform the same function.” *Id.*

instruction "to compare whether the expired patent claims the features of the trade dress in question." *Focus Fed. Cir. Dec.*, 156 F.4th at 1284–85 (cleaned up). The Circuit thus vacated the Court's functionality determination on the ground that its analysis had been "incomplete." The Court's prior assessment was thus clearly overtaken by the Circuit's decision. *Id.* at 1285; *see also, e.g.*, *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 475 (S.D.N.Y. 2001) ("[W]hen a court vacates an order previously entered, the legal status is the same as if the order never existed. The order having become a nullity, no rights, constitutional or otherwise, can be considered as accruing from it.").

Accordingly, the Court concludes that the Trade Dress is functional.[5]

**B. Hookless® Mark**

Focus's trademark infringement claim is applicable solely to Kartri, because Focus did not bring such a claim against Marquis. The Circuit held that the Court "erred in its 'likelihood of confusion' analysis"—in particular, in analyzing the "similarity of the marks" factor of the eight-factor *Polaroid* balancing test—by "improperly determin[ing] whether Kartri's *product* would be confused for *products* sold under the registered HOOKLESS® mark." *Focus Fed. Cir. Dec.*, 156 F.4th at 1280 (emphasis in original). Instead, it held, the Court should have evaluated the "similarity of the products *in light of the way in which the marks are actually displayed* in their purchasing context." *Id.* (emphasis in original) (quoting *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005)). The Circuit thus directed the Court to (1) "conduct[] a detailed comparison between the HOOKLESS® mark and Kartri's EZY Hang mark as branded on the parties' respective products," and (2) consider

[5] In light of this ruling, the Court need not consider expired patents other than the '232 patent on which defendants also rely—namely, the Sharp and Lishman patents, which preceded the '232 patent. Opp'n at 10–11.

"whether Kartri's occasional use of the term 'hookless' [wa]s itself a confusingly similar mark." *Id*. at 1281. The Court takes up each in turn.

**1. Governing Principles**

Under the "modern test of infringement," courts must assess whether a defendant's use of the asserted mark is likely to cause confusion as to both the source and any sponsorship, affiliation or connection. *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 144 (S.D.N.Y. 2022) (Engelmayer, J.) (quoting *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016)). Courts in this Circuit conduct that analysis using the eight-factor balancing test famously articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). Those factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith, or lack thereof, in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the plaintiff's customers. *Time, Inc. v. Petersen Pub. Co.*, 173 F.3d 113, 117 (2d Cir. 1999).

Factor two, the similarity of the marks, requires courts to "look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993). Courts compare the marks "in their entirety, because 'juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar.'" *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 315 (S.D.N.Y. 2000), *aff'd*, 234 F.3d 1262 (2d Cir. 2000) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984)). In making that comparison, courts

determine whether "such similarity is more likely than not to cause consumer confusion." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 133 (2d Cir. 2004).

**2. Application**

*a. HOOKLESS® vs. EZY HANG*

Kartri contends that because "HOOKLESS" and "EZY HANG" "effectively" have no similarity in "appearance, spelling, or sound," there is no basis for finding confusion here. Opp'n at 26. Kartri accordingly devotes much of its briefing to the second inquiry the Circuit directed this Court to undertake—into the implications of Kartri's "occasional use of the term 'hookless.'" *Id.* Focus also does not meaningfully address the likelihood of confusion from Kartri's use of EZY HANG. *See* Ps' Opening Br. at 20–21. It instead notes that "[the] question, as the [Federal Circuit] put it, boils down to 'whether the court considered Kartri's occasional use of the term 'hookless' as itself a confusingly similar mark.'" *Id.* at 20.

Notwithstanding the parties' apparent agreement that the HOOKLESS® and EZY HANG marks are dissimilar, the Court, consistent with the Circuit's directive, independently compares the marks as branded on the parties' respective products. On such comparison, the Court finds the marks do not bear a meaningful similarity, whether in visual appearance, sound, or meaning, and, when viewed separately, do not convey the "same general overall impression" to the purchasing public. *See Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893 (2d Cir. 1982); *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 447 (S.D.N.Y. 2016).

As to visual appearance, Focus offers several examples of the HOOKLESS® mark as it appears on Focus's packaging. *See* Ps' Opening Br., Ex. 3 at 3. In these, "HOOKLESS®" appears in a serif italicized font and is prefaced and followed by the words "*Using Patented . . . Technology*":




*Id.* (emphasis in original). Although the parties did not offer analogous examples of "EZY HANG" on Kartri's packaging in the latest round of briefing, Focus's expert testified at trial that the "Ezy Hang mark[]" is "on the product packaging." Dkt. 488 at 406 (testimony of John Edward Elmore).[6]

On this record, the Court cannot find that the appearance of the two marks on their respective packaging likely at all to provoke confusion: Neither appears to bear a distinctive typeface or a prominently featured, shared letter of the alphabet. *See, e.g.*, *Ivoclar N. Am., Inc. v. Dentsply Int'l, Inc.*, 41 F. Supp. 2d 274, 280 (S.D.N.Y. 1998) (rejecting likelihood of confusion on grounds of visual similarity where presented in "non-distinctive[] typeface"); *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005) (finding likelihood of confusion possible where liquor bottles both bore similar orange ovals on labels); *Fashion Exch. LLC v. Hybrid*

[6] The Court directed the parties on January 23, 2026 to identify whether the factual record is complete with respect to the claim or whether additional fact-finding is necessary. Dkt. 566. On February 10, 2026, plaintiffs represented that "[t]he factual record on all these issues is already complete from . . . prior submissions to the Court, and extensive testimony at trial." Dkt. 567 at 14. On February 24, 2026, Kartri similarly represented that "[t]he factual record is complete" as to the HOOKLESS® mark issue. Dkt. 568 at 7.

*Promotions, LLC*, 697 F. Supp. 3d 86, 107 (S.D.N.Y. 2023) (finding likelihood of confusion on grounds that both producers "set forth the same primary word—'Hybrid'—in the same format (larger with a much smaller accompanying word below it), and at least one of the HYBRID & COMPANY marks is in all capital letters, as is defendants' 'HYBRID APPAREL' mark, in a similar font"). That Focus's representative packaging prominently displays the term "EZ ON" atop the HOOKLESS® mark makes it even less likely that consumers confuse the HOOKLESS® mark on Focus's packaging with the EZY HANG branding on Kartri's. *See* Ps' Opening Br., Ex. 3 at 3; *cf. Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 394 (2d Cir. 1995) (company's "prominent[] display" of its corporate name "near" the allegedly infringed mark can reduce the likelihood of consumer confusion).

As to sound, it is exceedingly unlikely a customer would find "HOOKLESS" and "EZY HANG" phonetically similar. The marks are not composed of the same words. *See W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993). They do not sound the same when uttered. *Cf. LaTouraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115, 117 (2d Cir. 1946) (similarity between product names was "most striking in oral speech" because "a call for one [product] . . . is likely to produce the other"). And "EZY HANG" is neither an abbreviated version of "HOOKLESS" nor an expanded or phonetically resonant term. *Cf. Classic Liquor Importers, Ltd.*, 201 F. Supp. 3d at 447 ("[T]here is no genuine dispute that ELITE and ELIT are intended to be pronounced identically.").

Finally, as to meaning, the record does not convincingly support that consumers encountering the HOOKLESS® and EZY HANG marks on shower curtain packaging would understand them to convey the same message. The word "HOOKLESS" describes the absence of hooks, whether as a feature of the product's design or as a characteristic of its operation. By

contrast, "EZY HANG" conveys that the product is easy to hang, without suggesting a particular mechanism by which hanging is made easier. A shower curtain could, for example, be easier to hang because its rings or other fasteners are designed to slide more readily along the curtain rod, rather than because it dispenses with hooks altogether.

*b. HOOKLESS® vs. Kartri's descriptive use of hookless*

Next, the Court compares Kartri's occasional use of the term "hookless" with Focus's HOOKLESS® mark. *See Focus Fed. Cir. Dec.*, 156 F.4th at 1280. The Court again finds no likelihood of consumer confusion.

Focus argues, citing references to "hookless" in four emails from Kartri representatives, that "Kartri marketed its products as 'Hookless' products when Kartri communicated with customers." Ps' Opening Br. at 20 n.13. In opposition, Kartri notes that it never used the term "HOOKLESS" in packaging or advertising its products, and that its private communications "with customers via email" do not bespeak a likelihood of confusion in the marketplace. Opp'n at 25. Kartri also argues that the descriptive use of the word "hookless," as it arises in "normal English," does not constitute trademark infringement. *Id.* at 26–27.

Kartri is correct. To begin, the record shows that Kartri's use of the term "hookless" was principally descriptive, as a means to describe a category of products: hook-free shower curtains. Indeed, since at least 2009, the term "hookless" has been generally "used in the marketplace to describe shower curtains that work with standard shower rods without the use of hooks." Plaintiffs' Trial Exhibit ("PTX") 521 (statement of trademark examiner).[7] In 2014, for example,

[7] Focus argues that Kartri waived its descriptive fair use defense. Reply at 12–13. But to the extent the Court considers whether Kartri's use of the term "hookless" was descriptive, it does so solely in assessing the second *Polaroid* factor—the similarity of the marks—as the Circuit directed. *Focus Fed. Cir. Dec.*, 156 F.4th at 1280–81. That inquiry is distinct from the fair use defense under 15 U.S.C. § 1115(b)(4).

Kartri provided a retail customer who inquired about pricing with a quote for "Hookless Double H Chevron pattern Fabric Shower Curtain w/300D Plainweave Snap Liner Beige Color 71 Inch W × 77 Inch L." *See Focus II*, 647 F. Supp. 3d at 191 (quoting PTX 232). That title contains a list of the product's attributes: its pattern (chevron), its liner (plainweave snap), its color (beige), its dimensions (71 inch by 77 inch), and, lastly, its attachment style (hookless). It is far from clear, therefore, that the use of "hookless" was to convey anything other than a descriptive attribute of the curtain.[8]

Nor do customers' requests to Kartri for "hookless" curtains reliably indicate that those customers were seeking products bearing the HOOKLESS® mark. *See, e.g.*, *Focus II*, 647 F. Supp. 3d at 191 (quoting PTX 230–32). The emails on which Focus relies principally involve wholesale buyers seeking to source products for commercial clients or obtain pricing and other product information. *See id.* at 189–91 (citing PTX 231: involving Kartri and buyer for textile business; PTX 246: involving Kartri and another buyer for same textile business). The record does not support extrapolating from these communications that a retail shopper would have been confused by how Kartri affirmatively *marketed* its product. And a careful review of Kartri's customer emails illustrates their limited probative force in showing a likelihood of confusion. For example, in a June 8, 2016 email from Karen Teska of Standard Textile to Kartri's sales

[8] As Focus notes, on December 18, 2013, in an email to a product manager at Best Western International, Kartri's Dolph used the word "hookless" in a manner that appeared to refer to HOOKLESS®. Dolph wrote that Kartri had "a version of hookless called EZY Hang, [and] we would like to know how we can go about getting this product considered as an offering on Best [W]estern supply." PTX 230. But the description of EZY HANG as a "version of hookless" appeared if anything to distinguish Kartri's product from HOOKLESS® products, as opposed to suggesting that the two shared a common source. In any event, Dolph's statement was in private email to a single prospective wholesale purchaser. The record does not support that the email "created a likelihood of confusion with [Focus's] HOOKLESS® *mark*" in the relevant market. *Focus Fed. Cir. Dec.*, 156 F.4th at 1280 (emphasis in original).

operations manager Samantha Dolph with the subject headline "Direct Supply – Hookless shower curtains using our Matrix fabric," Teska stated: "Good afternoon! Can you please advise our costs for Hookless shower curtains 72 × 72 out of our Matrix fabric." PTX 246. This statement uses the term "Hookless" descriptively: Teska, a textile buyer, sought to understand the "costs" for a curtain with particular specifications—hookless, 72 × 72, Matrix fabric. The letter's wording suggests that Teska's use of the term "hookless" referenced a feature of the product, rather than a rival brand. To the same effect is the April 24, 2014 email from Pam Cales of GMK Associates to Kartri's sales director Sarah Woody requesting a price quote for "Hookless shower curtain[s]." PTX 231. There is no indication that Cales used the word "Hookless" to refer to the HOOKLESS® brand.

As for Kartri representatives' use of the term "hookless" in internal communications, these, by definition, could not cause consumers to confuse Kartri's products with Focus's. On July 1, 2015, for example, Sarah Woody, a Kartri sales director, in an email to Kartri's co-owner Patricia Kubus, referred to an EZY HANG product as "our equivalent of the Hookless Double H pattern." *See Focus II*, 647 F. Supp. 3d at 191. Although such internal communication may be "probative of [defendants'] intent to mislead consumers—which, in turn, is probative of whether such efforts would succeed," *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 332 (2d Cir. 2020), the ultimate inquiry is whether Focus's and Kartri's products are similar "*in light of the way in which the marks are actually displayed* in their purchasing context," *Focus Fed. Cir. Dec.*, 156 F.4th at 1280 (emphasis in original). Kartri's internal use of the word "hookless" could not have had any effect on perceptions in the marketplace. *Star Indus.*, 412 F.3d at 384.

And significantly, Kartri did not use the word "hookless" on its packaging or in its public advertising. And it did not accompany its references to "hookless" with the registered trademark

symbol, which might have suggested it was using the term as a mark. These facts weigh against finding that "Kartri's use of the *term* 'hookless' itself created a likelihood of confusion with [Focus's] HOOKLESS® *mark*." *Focus Fed. Cir. Dec.*, 156 F.4th at 1280; *see, e.g.*, *McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1274–75 (S.D.N.Y. 1986) (similar representation of parties' products in "defendants' advertising" dispositive as to likelihood of consumer confusion); *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F. Supp. 619, 621 (S.D.N.Y. 1981) (display of "corporate name" on boxes and packaging contributed to likelihood of confusion); *Welch Allyn Inc. v. Tyco Int'l Servs. AG*, 200 F. Supp. 2d 130, 137 (N.D.N.Y. 2002) (use of "corporate tag line" on defendants' products and packaging supported finding total effect of the marks somewhat similar).

Taken as a whole, the record does not support a finding that Kartri's scattered use of the term "hookless" resulted in its products being "actually display[ed]" in a "purchasing context" in a manner confusingly similar to HOOKLESS®. *Louis Vuitton*, 426 F.3d at 538. The Court cannot conclude that "Kartri's occasional usage of the term 'hookless' itself" created a likelihood of confusion. *Focus Fed. Cir. Dec.*, 156 F.4th at 1281.

c. *Revised* Polaroid *Analysis*

"The *Polaroid* factors are to be weighed holistically in determining whether the party seeking to establish an infringement claim has demonstrated the probability of confusion of a substantial number of consumers of the relevant class." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 366 (S.D.N.Y. 2003). "[T]he Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 399 (S.D.N.Y. 2014) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).

Here, in light of its revised mark-to-mark analysis, the Court reweighs the *Polaroid* factors. The Court does so even though the Circuit, in vacating the Court's findings as to the HOOKLESS® mark infringement determination, did not address (whether to disturb or ratify) the Court's findings as to the other *Polaroid* factors. *See Focus Fed. Cir. Dec.*, 156 F.4th at 1281. That is because the Circuit's other findings (*e.g.*, its reversal of the finding of EZ ON infringement) bear on certain factors (*e.g.*, factor six, bad faith). In its revised analysis, the Court has considered the extent to which the Circuit's holdings bear on *Polaroid* factors.

***Factor One (Strength of the HOOKLESS® Mark)***: The first *Polaroid* factor "focuses on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 667 (S.D.N.Y. 2016) (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991)). "Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace," that is, its secondary meaning. *Id*. at 667–68 (quoting *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).

As to the strength of the HOOKLESS® mark, the Court previously found such "strong" and "inherently distinctive." *Focus II*, 647 F. Supp. 3d at 217. The Court accordingly found the substantial distinctiveness "obviate[d] the need to analyze [its] strength under *Polaroid*." *Id*. at 210. The Circuit, in reviewing Kartri's challenges, did not address the Court's findings as to the strength or distinctiveness of the HOOKLESS® mark. *See Focus Fed. Cir. Dec.*, 156 F.4th at 1280. To the contrary, the existence of a distinct mark is presupposed by the Circuit's direction that this Court undertake a revised mark-to-mark analysis. Accordingly, for the same reasons set out in *Focus II*, the Court finds this first factor favors Focus. 647 F. Supp. 3d at 209–11.

***Factor Two (similarity)***: As reviewed above, neither a comparison of the HOOKLESS® and EZY HANG marks nor a comparison of the HOOKLESS® mark and Kartri's use of the term "hookless" is likely at all to sow confusion among consumers who are "ordinarily prudent." *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 480–81 (S.D.N.Y. 2020). As to HOOKLESS® and EZY HANG, there is no similarity in appearance, sound, or meaning. As to HOOKLESS® and Kartri's "hookless" usage, Kartri's limited use of the term "hookless" was principally as a descriptor, using a familiar industry term to refer to a product category. The Court now finds this factor heavily to favor Kartri.

***Factor Three (competitive proximity of the products)***: "The 'competitive proximity' factor concerns whether and to what extent products bearing the two parties' marks compete with each other." *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045, 2020 WL 5758917 (PAE), at *12 (S.D.N.Y. Sep. 28, 2020); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). Courts consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal"—taking into account, for example, "appearance, style, function, fashion appeal, advertising orientation and price." *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129, 2000 WL 1253240, at *7 (S.D.N.Y. Sep. 1, 2000) (internal quotation marks omitted); *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993).

The Court previously held that this factor "weighs overwhelmingly in plaintiffs' favor as to the HOOKLESS® Mark," because EZY HANG and HOOKLESS® compete for the same consumers and extol the same product virtues in the hospitality market. *Focus II*, 647 F. Supp. 3d at 220–21. The products' names emphasize the efficiencies they promote in installation and replacement and suggest the likelihood of lower maintenance and labor costs. *See id.* As such,

the Court found the products likely to "serve the same purpose" and to "fall within the same general class." *Lang*, 949 F.2d at 582. Because this analysis was separate from its comparison of EZY HANG and EZ ON, the Circuit's reversal of the ruling as to the EZ ON infringement does not disturb the Court's findings as to EZY HANG. *Focus II*, 647 F. Supp. 3d at 221.

***Factor Four (bridging the gap)***: This factor turns on the likelihood that the senior user (here, Focus) will enter the market of the junior user (here, Kartri) in the future, or that consumers will perceive Focus as likely to do so. *Star Indus.*, 412 F.3d at 387. The factor exists to "protect[] the [senior user's] interest in being able to enter a related field at some future time." *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 619 (2d Cir. 2008) (summary order) (citing *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459–60 (2d Cir. 2004)). Where the parties' products are already in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis." *Star Indus.*, 412 F.3d at 387 (treating factor as neutral where both parties used marks on liquor bottle labels). As to the HOOKLESS® mark, the bridging-the-gap factor is neutral. Because Focus and defendants both sell their respective HOOKLESS® and EZY HANG curtains in the hospitality market, Focus has no gap to bridge. *See id.*

***Factor Five (actual confusion)***: Although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986), "[t]here can be no more positive or substantial proof of the likelihood of confusion," *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 385 (S.D.N.Y. 2008) (quoting *Savin Corp.*, 391 F.3d at 459). But "actual confusion" is just one "factor probative of likelihood of confusion"; it is not "probative of whether certain of the other *Polaroid* factors are implicated in this case." *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 927

(S.D.N.Y. 1981); *see also Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 214 (2d Cir. 1985) ("No single *Polaroid* factor is pre-eminent."). "In some cases, a jury may properly find actual confusion evidence *de minimis* and thus unpersuasive as to the ultimate issue" of the likelihood of confusion. *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (analyzing factors analogous to the *Polaroid* factors).

The Court previously found that Focus had adduced some evidence of "actual" consumer confusion. At trial, Focus offered evidence that its warehouses had received Kartri products from customers who were attempting to return them to the seller and that Focus's customer service department had fielded calls from "confused" customers—typically a hotel's head of housekeeping or general manager, who sought to lodge a quality complaint. *Focus II*, 647 F. Supp. 3d at 223. The Circuit itself recognized the "evidence in the record to support actual confusion between the HOOKLESS® mark and Kartri's use of the term 'hookless.'" *Focus Fed. Cir. Dec.*, 156 F.4th at 1280. Accordingly, the Court finds that this factor favors Focus.

***Factor Six (bad faith)***: "The inquiry into willfulness or bad faith 'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp.*, 391 F.3d at 460).

The Court's prior "bad faith" analysis was principally driven by the close similarity, in look and sound, between Kartri's EZY HANG mark and Focus's EZ ON mark. *Focus II*, 647 F. Supp. 3d at 224. The Court now revises this analysis in light of the Circuit's reversal of the EZ ON infringement determination. As to HOOKLESS®, Kartri avoided "hook" or "hookless" in its own branding so as to give Focus the "respect of the name." *See, e.g.*, Dkt. 490 at 25 (Kartri's

president Karen Goskowski, testifying "I wanted to stay away from the word 'hook' or anything 'hookless' or anything in that respect to give them the respect of the name. And I didn't see it necessary to touch on anything like that"). And Kartri's principals did not appear to know that Focus's products were patented at the time of their development of EZY HANG. *See id*. at 26 (Court: "You knew that Focus made a hookless shower curtain for hotels, but you didn't know more than that." Goskowski: "Correct."). Moreover, there is record evidence that Kartri distinguished its EZY HANG mark as the actual product source when responding to customer inquiries about the Focus product. *See* Dkt. 490 at 752 (testimony of Kartri co-owner Kubus that Kartri would state to customers it had a "compatible version" to HOOKLESS® but "we would tell the customers we're not hookless"). Taken together, the evidence now weighs substantially against a finding of bad faith.

***Factor Seven (quality of Kartri's product)***: The seventh factor "directs courts to weigh cross-cutting considerations." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013). "On the one hand, the court must determine 'whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two.'" *Id*. "On the other, if the products are roughly equal in quality, the court must also consider whether 'that very similarity of quality' may tend to create confusion as to source by bringing the products into even closer proximity." *Id*. (quoting *Morningside Grp. Ltd. v. Morningside Cap. Grp., LLC*, 182 F.3d 133, 142 (2d Cir. 1999)).

The Court's findings as to this factor—which recapped trial testimony that the overall fabric of the EZY HANG was of lower quality, the fabric window was lower weight, and the snap-in liner was flimsier—were undisturbed by the Circuit's findings as to EZ ON. Because the assembled evidence established that the EZY HANG curtain had quality issues, but no evidence

was adduced as to the deficiencies in Focus's HOOKLESS® curtain, the Court finds that Kartri's product created a risk that Focus's "reputation could be jeopardized." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (internal quotation marks omitted).

***Factor Eight (consumer sophistication)***: The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (cleaned up). "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011). Confusion is therefore more likely "where the goods are cheap and bought casually." *Dooney & Bourke*, 561 F. Supp. 2d at 389 (internal quotation marks omitted).

The Court's prior analysis of this point centered on the "nearly identical" EZY HANG and EZ ON products. *See Focus II*, 647 F. Supp. 3d at 226. Given that, the Court noted that there is a presumption that the likely customers of Focus's and Kartri's products would be confused among them, "unless they [we]re exceedingly sophisticated." *Id.* And, it found, the evidence did not establish that level of sophistication, in that the distributors through whom Kartri sold were not apt to be experts in hookless shower curtain products, and the ultimate retail purchasers of Kartri's products, were, on the whole, of low sophistication. *Id.*[9] With Focus's EZ ON product removed from the equation, however, the presumption that guided the Court's analysis does not apply with nearly the same force. This factor continues to favor a likelihood of confusion, but only very lightly.

---

[9] The hospitality-market purchasers of Focus's products, the Court found, were of medium sophistication. *Id.*

* * *

The *Polaroid* factors thus point in different directions. Several factors—two (similarity of the marks) and six (bad faith)—weigh strongly against finding confusion. Several others—one (strength of Focus's mark), three (competitive proximity), five (actual confusion), seven (quality of Kartri's products), eight (customer sophistication)—favor such a finding. *Polaroid* itself does not provide guidance as to how to balance the eight factors when some favor each party. And courts have disdained as mechanistic an "attempt to aggregate the degrees by which the factors favor one side and see if that aggregate exceeds the total for the other side." *Car-Freshner Corp.*, 980 F.3d at 334 ("No formula is available."). Although the Second Circuit has recognized that the "first three *Polaroid* factors" are "perhaps the most significant in determining the likelihood of confusion," *Mobil Oil Corp.*, 818 F.2d at 258, here, even those three factors point in different directions.

Accordingly, the Court's charter is to consider these factors holistically to assess the likelihood of confusion. The question is close, but the Court's considered judgment is that Focus has failed to establish such a likelihood. Although more factors favor Focus, the one that carries by far the most weight in the Court's analysis here, the dissimilarity between the parties' marks, heavily disfavors Focus, with the comparison now limited to two very different marks: Focus's HOOKLESS® mark and Kartri's EZY HANG mark. Consumers encounter Kartri's products under that entirely distinct mark, and Kartri's descriptive use of "hookless" was only occasional, in narrow contexts, and did not identify Focus as the source of those products. The Court here did not find the similarity-of-the-marks factor dispositive—the absence of bad faith contributed to its bottom-line assessment—but the similarity factor was sufficiently weighty that it alone likely would have carried the day. *See Nat'l Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d

576, 579 (2d Cir. 2005) ("[I]n an appropriate case, the 'similarity of the marks' factor can be dispositive."); *see also 1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 255 (2d Cir. 2024) ("[T]he dissimilarity of the marks factor is dispositive in this case."); *cf. Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007) (in analyzing Eleventh Circuit's multi-factor test, "[o]verwhelming visual dissimilarity can defeat an infringement claim, even where the other six factors all weigh in favor of the plaintiff"); *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1375 (Fed. Cir. 1998) (in analyzing Federal Circuit's multi-factor test, "one . . . factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks").

**C. Unfair Competition Under Common Law**

An unfair competition claim under New York common law requires all the elements of a Lanham Act unfair competition claim plus a showing of bad faith. *Trove Brands LLC v. Jia Wei Lifestyle Inc.*, No. 24 Civ. 3050, 2025 WL 580305 (PAE), at *9 (S.D.N.Y. Feb. 21, 2025); *see also Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 606 (S.D.N.Y. 2012). Where, as here, a court finds that a plaintiff has not established all elements of the Lanham Act claim, it need not reach the question of whether plaintiffs have made a showing of bad faith. *See, e.g.*, *AM Gen. LLC*, 450 F. Supp. 3d at 486–87 (where balancing *Polaroid* factors in dispute over use of Humvees in Call of Duty games found such use "not explicitly misleading," there was no further occasion to consider plaintiffs' pendent state law unfair competition claims); *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 325–30 (S.D.N.Y. 2012) (where plaintiffs' trademark infringement claim failed as a matter of law so too did its unfair competition claim).

**D. Willfulness**

The Federal Circuit remanded for consideration of willfulness, in the event the Court found infringement. The Court, however, has not found infringement, and thus there is no occasion to consider willfulness. *See Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*, No. 16 Civ. 3086, 2019 WL 4857468, at *14 n.12 (S.D.N.Y. Oct. 2, 2019), *aff'd*, 829 F. App'x 529 (Fed. Cir. 2020) (summary order) (finding of non-infringement "obviate[d]" need to address willfulness); *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227, 301 (W.D.N.Y. 2008) ("There can be no willful infringement where there is no infringement"), *aff'd*, 351 F. App'x 441 (Fed. Cir. 2009) (summary order); *Ethicon, Inc. v. U.S. Surgical Corp.*, 762 F. Supp. 480, 505 (D. Conn. 1991) (where record did not support finding infringement, there was "certainly no question of a *willful* infringement" (emphasis in original)), *aff'd*, 965 F.2d 1065 (Fed. Cir. 1992); *Sheldon Friedlich Mktg. Corp. v. Carol Wright Sales, Inc.*, No. 82 Civ. 4318, 1983 WL 64848, at *7 (S.D.N.Y. Mar. 4, 1983) (same).

**CONCLUSION**

For the foregoing reasons, the Court, on remand, finds that Focus has not established its claims of trade dress or trademark infringement.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: November 5, 2026
New York, New York